# DOUBLE HELIX CORPORATION

## Debtor-In-Possession (DIP) Financing Term Sheet[1]

TERM SHEET

The term sheet (this "***Term Sheet***") is entered into on March 10, 2025 between **DOUBLE HELIX CORPORATION**, a Missouri non-profit corporation ("**Borrower**") and **K-LOVE, INC.**, a Tennessee non-profit corporation ("***DIP Lender***") and sets forth the terms for the proposed DIP Loan (as defined below). This Term Sheet establishes the material terms for the DIP Loan but except for the obligation to return the Deposit to DIP Lender upon denial of the Interim DIP Order shall not be binding on the DIP Lender and the Borrower unless and until approved by the Bankruptcy Court via the Interim DIP Order. This Term Sheet is not meant to be, nor shall it be construed as, an attempt to describe all of, or the specific phrasing for, the provisions of the definitive documentation governing the DIP Loan (the "***DIP Loan Documentation***"). Rather, this Term Sheet is intended only to outline certain key terms to be included in or otherwise consistent with, and subject to the terms of, DIP Loan Documentation acceptable to DIP Lender, and it is in no way intended to be a substitute for DIP Loan Documentation to be duly executed by the DIP Lender and the Borrower.

| DIP Loan | $500,000.00 Senior Secured super-priority debtor-in-possession single draw term loan (the "***DIP Loan***") to be funded in accordance with the DIP Loan Documentation. Amounts repaid in respect of principal under the DIP Loan may not be re-borrowed. |
|---|---|
| Targeted Petition Date | No later than March 13, 2025 (the "***Petition Date***"). |
| Bankruptcy Case | A Chapter 11 case filed by the Borrower (the "***Chapter 11 Case***") to be filed and maintained in the United States Bankruptcy Court for the Eastern District of Missouri, (the "***Bankruptcy Court***"). |
| Deposit of DIP Loan Proceeds | Concurrently herewith, DIP Lender has delivered an amount equal to $500,000.00 ("***Note Proceeds***") to Carmody MacDonald P.C., bankruptcy counsel for the Borrower ("***Borrower's Agent***"). The Note Proceeds shall be held in trust in accordance with the terms below. In the event the Bankruptcy Court issues the Interim DIP Order (as defined below) authorizing the DIP Loan, then Borrower's Agent shall have the immediate right to deliver $150,000.00 of the Note Proceeds from the lawyer's trust account directly to Borrower. In the event the Bankruptcy Court issues the Final DIP Order (as defined below) approving the DIP Loan Documentation, then Borrower's Agent shall have the immediate right to deliver the balance of the Note Proceeds from the lawyer's trust account directly to Borrower; provided, however, a portion of these funds shall be directed to pay any legal fees owed to DIP Lender's bankruptcy counsel and to Borrower's Agent (not to exceed $50,000 each). In the event (i) the Bankruptcy Court denies its approval of |

---

[1] Final DIP Loan documentation will contain additional terms and provisions not inconsistent with the terms and provisions of this Term Sheet.

Doc ID: 1868fa9cad52c5472c722ac407e37e815f2c756e

| | |
|---|---|
| | the DIP Loan, (ii) the Bankruptcy Case is dismissed for any reason or (iii) the Borrower has not requested Bankruptcy Court approval of the DIP Loan by March 25, 2025, then Borrower's Agent shall promptly return the full amount of the Note Proceeds to DIP Lender. |
| Effective Date of DIP Loan | Upon the earlier of (i) execution of the DIP Loan Documentation by Borrower and DIP Lender or (ii) release of any of the the Note Proceeds to Borrower after entry of an acceptable Interim DIP Order (the "***Effective Date***"). For the avoidance of doubt, the DIP Loan shall not be deemed effective until the Effective Date and no party shall have any rights to the Carve-Out Expenses prior to the Effective Date. |
| Priority | Super-priority senior lien for repayment of all principal, interest, fees and expenses, (the "***DIP Obligations***") against all assets of the Borrower, whether real or personal, including postpetition assets, subject only to the Carve-Out Expenses (as defined below). |
| Maturity Date | The earliest of ("***Maturity Date***"): (i) the closing of the Sale (defined below) of a substantial part of the assets of the Borrower; (ii) the occurrence and declaration of an event of default under, and as defined in, the DIP Loan Documentation or (iii) if closing of the Sale (defined below) has not occurred within 9 months of the Petition Date; provided, however, DIP Lender will cooperate with Borrower to enable Borrower to obtain replacement DIP financing. |
| Repayment | The Borrower may repay the DIP Obligations, in whole or in part, at any time without premium or penalty. On the Maturity Date, all DIP Obligations shall be repaid in full, together with accrued interest and fees. |
| Existing Debt; Adequate Protection | Debt by on Borrower's building located at 3524 Washington Avenue, Saint Louis, MO 63103 in the amount of aggregate principal amount of $600,000 and $700,000 respectively ("***Existing Debt***"). |
| Use of Proceeds | Proceeds of the DIP Loan may be used by Borrower for general corporate expenditures and funding operations during the Chapter 11 Case and towards consummation of a Private Sale or 363 Sale Process (each as defined below). No proceeds from the DIP Loan and no cash collateral (including the Carve-Out Expenses), may be used in connection with (a) the modification, stay, or amendment of the DIP Orders without the consent of the DIP Lender or (b) any litigation, proceeding or adverse action against, or challenge to the claims, rights or liens of, the DIP Lender. |
| Interest Rate | 12% per annum, payable in arrears on the Maturity Date with said interest to be waived if DIP Lender is the successful purchaser of the Station Assets in the Sale. |
| Default Rate | The Interest Rate plus two percent (2%) per annum. |

2

| | |
|---|---|
| Facility Fee | 3.00 % of principal amount of DIP Loan to be fully earned on the Effective Date and payable on the Maturity Date which shall be waived if DIP Lender is the successful purchaser of the Station Assets in the Sale. |
| Collateral | Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all DIP Obligations will be secured by a security interest in all of the Borrower's present and future assets to the fullest extent permitted by law whether real or personal, and including proceeds, causes of action and rights in respect of avoidance actions under Section 549 of the Bankruptcy Code, including for the avoidance of doubt any proceeds derivived from the sale of License (defined below) (the "**DIP Collateral**"), but excluding proceeds, causes of action and rights in respect of avoidance actions under sections 544, 547, and 548 of the Bankruptcy Code.  The liens on the DIP Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or postpetition liens, security interests and other interests and shall be subject and only to (i) the Carve-Out Expenses and (ii) the valid and perfected mortgage in existence as of the Petition Date with respect to the Existing Debt ("**Existing Mortgage**").  The DIP Lender shall also have superpriority administrative expense claims under section 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code against the Borrower for the amount of all DIP Obligations, subject only to the Carve-Out Expenses.  No person other than the DIP Lender shall have a lien on the DIP Collateral, except for (i) the liens under the Existing Mortgage. |
| Conditions Precedent for effectiveness of DIP Loan and funding | The DIP Loan Documentation shall contain conditions to the effectiveness of the DIP Loan that are customary and appropriate for financings of this type and for this transaction in particular, including, without limitation, the following:<br><br>(a) the Bankruptcy Court shall have approved the DIP Loan on an interim basis no later than 14 days after the Petition Date (the "**Interim DIP Order**") and, on a final basis no later than 45 days after the Petition Date (the "**Final DIP Order**" and, collectively with the Interim DIP Order, the "**DIP Orders**"), which orders will be in form and substance acceptable to the DIP Lender in its sole and absolute discretion.<br>(b) the DIP Orders shall be acceptable to the DIP Lender and shall include provisions relating to the DIP Loan that are customary for such facilities and other provisions acceptable to the DIP Lender with respect to adequate protection and other appropriate provisions;<br>(c) the DIP Loan Documentation, in form and substance satisfactory to the DIP Lender, shall have been executed and delivered by all parties thereto; and |

3

| | |
|---|---|
| | (d) all first day motions filed by the Borrower (including critical vendor motion if any) and all first day orders entered on the docket of the Bankruptcy Court shall be satisfactory to the DIP Lender. |
| Covenants | The DIP Loan Documentation shall contain affirmative and negative covenants and reporting requirements that are customary and appropriate for financings of this type and for this transaction in particular, including, without limitation, the following:<br><br>(a) the Borrower shall continually consult with and provide the DIP Lender with reasonable access to financial, operational and other information relevant to the 363 Sale Process (as defined below) and material motions and proceedings in the Bankruptcy Court case.<br>(b) the Borrower shall enter into a stalking horse agreement ("**_Stalking Horse Agreement_**") or private sale agreement with DIP Lender for the sale of radio frequency licensed by the Federal Communications Commission to Borrower (88.1 FM)(aka FM radio broadcast station KDHX, St. Louis, Missouri, FCC Facility Id. 17380) (the "**_License_**") as soon as practicable and no later than April 11, 2025 substantially on the terms set forth in the Offer to Purchase between Borrower and DIP Lender dated February 25, 2025 ("**_LOI Terms_**").<br>(c) If the Bankruptcy Court requires a public 363 Sale Process, bidding procedures related to 363 Sale Process shall be reasonably acceptable to the DIP Lender. The bid procedures shall be approved by the Bankruptcy Court before a motion for Sale is agreed to by the parties. |
| Sale Process | The LOI Terms reflect the highest and best price available for the License (and related assets) (collectively, "**_Station Assets_**") after an extensive search undertaken by Borrower (and its media broker) to locate potential purchasers for the Station Assets. Borrower and DIP Lender intend to request Borrower and DIP Lender be authorized to complete the sale of the Station Assets as a private sale ("**_Private Sale_**") in accordance with the LOI Terms. However, in the event the Bankruptcy Court requires that the Station Assets are sold via a process public bid (the "**_363 Sale Process_**") on or immediately following the Petition Date to solicit bids and conduct a sale of the Station Assets pursuant to Section 363 of the Bankruptcy Code ("**_Section 363 Sale_**"), DIP Lender will serve as the stalking horse purchaser under the Stalking Horse Agreement for a purchase price and other term consistent with the LOI Terms. The Stalking Horse Agreement will contain bidding procedures acceptable to the DIP Lender, including, without limitation, (i) payment of a break-up fee in the amount of (x)$350,000 plus (y) expenses incurred by the DIP Lender in the amount not to exceed $300,000 (together, the "**_Break-_** |

Doc ID: 1868fa9cad52c5472c722ac407e37e815f2c756e

| | |
|---|---|
| | *Up Protection"*), payable upon and earned in the event of a termination by the DIP Lender because the Borrower selects an alternative transaction, (ii) a minimum overbid of $650,000 for alternative bids, (iii) a requirement that alternative bids to be qualified will not have any due diligence, financing or other conditions and be no less favorable to the estate than the terms of the Stalking Horse Agreement, (iv) bids to be submitted no later than March 25, 2025 with an auction to be held (if there are alternative qualified bids) no later than April 8, 2025, and (v) an open auction process with full opportunity for DIP Lender to raise its bid and include as a credit the Break-Up Protection in any subsequent bids, and (vi) the Borrower consulting with the DIP Lender concerning alternative bids and the selection of the highest and best transaction.  The DIP Loan is being provided by the DIP Lender in reliance upon the promulgation and consummation of a sale of the Station Assets via Private Sale or a Section 363 Sale (each a "*Sale*"). |
| Events of Default | The DIP Loan Documentation shall contain events of default that are customary and appropriate (including with respect to notice and grace periods where appropriate and customary) for financings of this type. |
| Carve-Out Expenses | The DIP Lender's liens and administrative claims shall be subject to the prior payment of the Carve-Out Expenses.<br><br>"*Carve-Out Expenses*" shall mean: Attorney's fees for counsel for the Borrower in an amount not to exceed $50,000 and US Trustee fees. Notwithstanding the foregoing, DIP Lender reserves its full rights to refuse release of the Note Proceeds for payment of any Carve-Expenses if the Bankruptcy Case is dismissed prior to completion of a Sale on account of Borrower's lack of standing or for any other reason. |
| DIP Loan Documentation | The DIP Loan Documentation and all other documents, agreements, certificates and opinions to be executed or delivered in connection with the DIP Loan, or relating to the transactions contemplated by this Term Sheet, shall be in form and substance customary for financings of this type and shall be acceptable to DIP Lender in its sole and absolute discretion.  DIP Lender shall not be subject to the doctrine of marshalling. |
| Governing Law | Missouri |

**[SIGNATURE PAGE FOLLOWS]**

5

**IN WITNESS WHEREOF**, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers as of the day and year first above written.

**BORROWER:**

**DOUBLE HELIX CORPORATION**

BY: *Kelly K Wells*

Name: Kelly Wells
Title: Executive Director

**DIP LENDER**

**K-LOVE, INC.**

By: _____

Name: Thomas Stultz
Title: Chief Executive Officer

By: _____

Name: Matthew Reynolds
Title: Chief Financial Officer

6