**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | In Proceedings Under Chapter 11 |
| | ) | Case No. 25-40745-659 |
| **DOUBLE HELIX CORPORATION,** | ) | Honorable Kathy A. Surratt-States |
| d/b/a KDHX COMMUNITY MEDIA, | ) | |
| | ) | Hearing Date:  May 13, 2025 |
| Debtor. | ) | Hearing Time: 10:00 a.m. |
| | ) | Hearing Location: Courtroom 7 North |
| | ) | Response Deadline: May 13, 2025 at 9:00 a.m. |
| | ) | |
| | ) | Robert E. Eggmann, Esq. |
| | ) | Carmody MacDonald P.C. |
| | ) | 120 S. Central Ave., Suite 1800 |
| | ) | St. Louis, MO  63005 |
| | ) | (314) 854-8600 |
| | ) | ree@carmodymacdonald.com |

**MOTION FOR ENTRY OF ORDERS: (I) APPROVING (A) BIDDING PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION AND SALE HEARING, (D) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING; AND (E) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM NOTICE THEREOF; AND (II) GRANTING RELATED RELIEF**

---

COMES NOW Double Helix Corporation, d/b/a KDHX Community Media (the "**Debtor**"), the above-captioned debtor and debtor in possession, by and through the undersigned counsel, pursuant to Rule 6004(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and submits this *Motion for Entry of Orders: (I) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (II) Granting Related Relief* (the "**Motion**"). In support of this Motion, Debtor respectfully states as follows:

I.      **BACKGROUND INFORMATION**[1]

**Procedural Background, Jurisdiction, and Venue**

1.      On March 10, 2025 (the "**Petition Date**"), Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), commencing a bankruptcy case in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**" or this "**Court**") under Case No. 25-40745-659 (the "**Chapter 11 Case**"). Debtor continues to operate its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Debtor consents to the entry of a final order of this Court for relief in connection with the Motion.

**Debtor's Pre-Petition Business Operations**

6.      Debtor is a nonprofit Missouri corporation currently doing business as KDHX Community Media. Since 1987, Debtor has operated KDHX-FM radio station ("**KDHX**" or the "**Station**") as an independent, non-commercial, educational, listener-supported community radio broadcast station in St. Louis, Missouri.  KDHX's business operations involve the use of substantial broadcasting and transmitting equipment, a transmitting tower, other assets located at

---

[1] The factual background information provided in this Motion is further supported by the *Declaration of Kelly K. Wells* [Doc. 49, pp. 13-16] (the "**Wells Declaration**") in support of Debtor's *Motion for an Order: (A) Authorizing the Sale of All or Substantially All of the Non-Real Estate Assets of Debtor Free and Clear of All Liens, Claims, Encumbrances, and Interests to K-LOVE, Inc., Pursuant to 11 U.S.C. § 363(f); (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (C) Granting Other Relief Related to the Proposed Sale* [Doc. 49] (the "**Sale Motion**") filed on March 25, 2025.

KDHX's tower site location and at the studio building located at 3524 Washington Ave., St. Louis, MO 63103 (the "**Real Estate**"). Debtor also holds an unexpired ground lease (the "**Lease**") for Debtor's broadcast transmitting tower site. (Wells Declr. ¶¶ 5-6.)

7.     Since the Station's inception, Debtor has operated KDHX as a radio broadcast station pursuant to certain licenses (the "**FCC Licenses**") issued to it by the Federal Communications Commission ("**FCC**") and is subject to the FCC's regulatory jurisdiction under the United States Communications Act of 1934, United States Code title 47, section 151, *et seq.*, as amended, and in connection with the rules, regulations, decisions and published policies of the FCC (collectively, the "**Communications Laws**"). (Wells Declr. ¶ 7.)

8.     In order to maintain and be eligible for renewal of its current FCC Licenses, KDHX must provide continuous on-air non-commercial educational radio programming. Due to recent personnel cuts, KDHX has been forced to utilize previously recorded radio programming. (Wells Declr. ¶ 8.)

9.     Given the nature of its non-commercial content production, Debtor has historically and consistently relied upon significant community financial contributions to help fund the Station's operations. (Wells Declr. ¶ 5.)

10.    In response to dire and long-standing economic pressures, including the commencement of litigation against the Debtor organization and its officers and directors in state court venues, as well as industry-wide challenges to fundraising efforts that are unique to publicly supported media, Debtor has been forced to make significant cuts over the past year to its content production and operations. (Wells Declr. ¶ 8.)

<u>**Debtor's Pre-Petition and Post-Petition Marketing and Sale Efforts**</u>

11.    Prior to the Petition Date, due to prevailing economic conditions including the

3

absence of sufficient financial resources to fund Debtor's customary business operations and its payroll obligations, Debtor searched for a potential buyer for all or substantially all of its non-real estate assets as a going concern. (Wells Declr. ¶ 9.)

12.     Debtor began actively marketing its assets for a potential private sale pursuant to Section 363 of the Bankruptcy Code and determined that such a sale would be the most expedient and beneficial option for all parties and creditors. (Wells Declr. ¶ 9.)

13.     Debtor received an offer from K-LOVE, Inc. ("**K-LOVE**"), a Tennessee non-profit 501(c)(3) organization and the sole member of Educational Media Foundation, to purchase all or substantially all of Debtor's business assets and operations, including an assignment of Debtor's interest in the FCC Licenses and the Lease but excluding any interest in the Real Estate (collectively, the "**Assets**"), as a going concern, pursuant to the terms of an Asset Purchase Agreement dated March 24, 2025 (the "**APA**") , a true copy of which APA is attached hereto as **Exhibit 1** and incorporated herein by this reference. (Wells Declr. ¶¶ 10, 12, 13.)

14.     K-LOVE has submitted an assignment application (the "**FCC Application**") to the FCC in order to obtain the FCC's approval (the "**FCC Consent**") of the assignment of Debtor's FCC Licenses in accordance with the terms of the APA. That FCC Application remains pending. (Wells Declr. ¶ 15.)

15.     Debtor has sought the authorization of the Bankruptcy Court for the sale of the Assets to K-LOVE. On March 25, 2025, Debtor filed a *Motion for an Order: (A) Authorizing the Sale of All or Substantially All of the Non-Real Estate Assets of Debtor Free and Clear of All Liens, Claims, Encumbrances, and Interests to K-LOVE, Inc., Pursuant to 11 U.S.C. § 363(f); (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in*

4

*Connection Therewith; and (C) Granting Other Relief Related to the Proposed Sale* [Doc. 49] (the "**Sale Motion**").

16.    A hearing on the Sale Motion has been continued for hearing to May 13, 2025 at 10:00 a.m. for status conference.

17.    Debtor has received a competing written offer to purchase its Assets from Gateway Creative Broadcasting, Inc. ("**Gateway**"), pursuant to the terms of a proposed Asset Purchase Agreement submitted to Debtor by Gateway (the "**Gateway Offer**").

18.    While Debtor has received no other offers for the purchase of the Assets, Debtor remains mindful of its obligation under the Bankruptcy Code to explore potentially higher offers for the Assets. The time to do so is short, however, as Debtor's necessary financial resources to fund continued operational costs are limited.

19.    The applicable Communications Laws mandate certain approval procedures to be followed by the FCC when evaluating the prospective assignment of broadcast licenses, including Debtor's FCC Licenses. Given these stringent requirements related to broadcast license assignment authorization, Debtor believes the population of potential qualified purchasers of the Assets to be quite limited.

20.    In order to facilitate an efficient and speedy sale, on April 18, 2025 Debtor filed an *Application to Employ Tideline Partners, LLC as Broker for the Debtor* [Doc. 103] (the "**Application to Employ Broker**"), seeking to employ Tideline Partners, LLC (the "**Broker**") as broker for the Debtor to assist with the marketing and sale of those assets used directly in connection with Station's operations. The Application to Employ Broker is currently set for hearing before this Court on May 19, 2025 at 11:00 a.m.

21.     To ensure a satisfactory marketing and sale process for Debtor's Assets (the "**Sale Process**") and to demonstrate no indication of favoritism, Debtor shall make available to potential purchasers (each, a "**Potential Bidder**" as defined and meeting the requirements set forth herein below) wishing to be apprised of marketing efforts information concerning non-confidential inquiries and offers.

22.     Debtor now proposes a sale of the Assets to the highest and best bidder in accordance with certain bidding and auction procedures approved by this Court.

23.     Debtor proposes that K-LOVE be approved to serve as the stalking horse purchaser for the Assets (K-LOVE is also referenced herein as the "**Stalking Horse Bidder**").

24.     Debtor and the Stalking Horse Bidder have spent significant time and effort, both pre-petition and post-petition, negotiating the APA terms with the Stalking Horse Bidder, culminating in the execution of the APA (the APA is also referenced herein as the "**Stalking Horse Agreement**") and the loan documents for the DIP Facility. The negotiated terms reflected in the Stalking Horse Agreement include bid protections in favor of the Stalking Horse Bidder that will help drive the Sale Process.

25.     Although Debtor seeks to establish a Stalking Horse Bidder, Debtor continues in its efforts to generate interest in the Sale Process and, in conjunction with Broker, to attract additional prospective buyers.

## Post-Petition Financing

26.     Debtor has experienced an absence of sufficient operating capital over recent months, as community-sourced financial support for the Station has dwindled. To further sustain operations through the Sale Process, as is required in order to maintain its FCC Licenses, Debtor

was able to secure short-term debtor-in-possession ("**DIP**") financing from K-LOVE (the "**DIP Facility**").

27.     The short-term financing offered to Debtor by K-LOVE was approved by this Court on an interim basis pursuant to the *Interim Order Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(c) and (d)* [Doc. 38] (the "**Interim DIP Order**") entered on March 21, 2025. On April 30, 2025, the Court entered the *Second Interim Order Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(c) and (d)* [Doc. 185] (the "**Second Interim DIP Order**" and collectively with the Interim DIP Order, the "**Interim DIP Orders**").

28.     The DIP Facility and the Interim DIP Orders have provided and will provide necessary financing which will allow Debtor to continue to fund payroll, rent, and utility expenses and to service third-party debt pending the completion of the Sale Process. Termination of Debtor's operations would jeopardize the Sale Process, injure Debtor's creditors, both unsecured and secured, and could cost numerous employees their jobs.

29.     The DIP Facility and the Stalking Horse Agreement not only contemplate the Sale Process but also identify specific "**Milestones**" to be met thereunder (with prior approval of the Bankruptcy Court), including, but not limited to:

     a.  In the event that the Debtor is required to conduct a public auction for the sale of the Assets, to hold said auction no later than April 16, 2025;

     b.  File a Sale Motion within three days following the execution of the APA, or on or before March 27, 2025;

     c.  File an assignment application seeking the FCC Consent within 10 days following execution of the APA, or on or before April 3, 2025;

     d.  Provide incremental increase in the purchase price for the Assets if Closing is accomplished within certain target dates following execution of the APA, specifically within 6 months and 12 months after March 24, 2025; and

     e.  To complete the closing on the sale of Assets no later than 14 days following the later of (i) the date on which the FCC Consent shall have been granted and (ii)

7

Bankruptcy Court approval authorizing the sale has been obtained, unless delayed by consent.

30.     Gateway has also offered a proposed extension of debtor-in-possession financing on equal or better terms than currently offered by K-LOVE (the "**Gateway DIP Loan**"), as set forth in greater detail in the Gateway Offer.

### The Stalking Horse Agreement and Proposed Sale Process

31.     Debtor proposes to effectuate a sale of the Assets to the highest and best bidder, or bidders, if any materialize, by a form asset purchase agreement (as amended from time to time, the "**Form APA**") in substantial conformity to the Stalking Horse Agreement but without the proposed Stalking Horse Bid Protections for any party but K-LOVE. The Form APA provides for, among other things, the sale of the Assets free and clear of all liens, claims, encumbrances, and other interests (the "**Transaction**"). A copy of the Form APA may be obtained from Debtor's Counsel at ree@carmodymacdonald.com upon reasonable written request.

32.     Debtor proposes to effectuate the Transaction via the procedures outlined in the bid procedures (the "**Bid Procedures**") attached as **Exhibit 2** to the proposed Order approving this Motion (the "**Bid Procedures Order**"), a true copy of which Bid Procedures Order is hereto attached as **Exhibit 2** and incorporated herein by this reference, to determine the highest and best bid (each, a "**Bid**") by a bidder or bidders (each, a "**Bidder**") and to authorize and approve the Transaction pursuant to the terms of a sale order (the "**Sale Order**") to be entered following a Sale Hearing (as defined below).

33.     Debtor seeks approval of the form and manner of notice of the Bid Procedures, the Sale Hearing (as defined below), the Objection Deadline, the respective dates, times, and places for an auction, if required under the Bid Procedures, by notice substantially in the form attached hereto as **Exhibit 3** (the "**Transaction Notice**").

8

34.    In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts (as defined herein), including the Lease, that are designated by a Successful Bidder (or its designated assignee), pursuant to the Assumption and Assignment Procedures (defined herein) set forth in the Bid Procedures Order and pursuant to the proposed manner set forth in the Assumption Notice attached as **Exhibit C** to the Bid Procedures Order.

35.    The Bid Procedures provide Debtor with flexibility to solicit proposals, negotiate transactions, hold an auction, and proceed to consummate a potential Transaction, all while protecting the due process rights of all interested parties and ensuring a full and fair opportunity to review and consider proposed transactions. Debtor proposes to establish the following key dates and deadlines for the Sale Process:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order. | **May 13, 2025 at 10:00 a.m.  CT** |
| Deadline to submit written Bids. | **May 27, 2025 at 5:00 p.m. CT** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received. | **May 28, 2025** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid. | **May 28, 2025** |
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, virtually, via Zoom, pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction. | **May 30, 2025 at 2:00 p.m.    CT** |
| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and  assignment. | **June 2, 2025** |

| Deadline to file objections to Transaction(s). | **June 2, 2025** |
|---|---|
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place). | **June 3, 3025** |
| Sale Hearing. | **June 9, 2025 at 10:00 a.m.   CT** |

## II.    <u>**RELIEF REQUESTED**</u>

36.    Pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the United States Bankruptcy Court for the Eastern District of Missouri *Chapter 11 Guidelines for Sales and Sale Procedures Motions* (the "**Local Guidelines**"), Debtor seeks entry of the Bid Procedures Order as follows:

    a.   authorizing and approving the Bid Procedures substantially in the form attached as <u>**Exhibit A**</u> to the Bid Procedures Order;

    b.   designating and approving the Stalking Horse Bidder and approving the Stalking Horse Bid Protections (as defined herein) for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Stalking Horse Agreement, the Bid Procedures, and the Bid Procedures Order;

    c.   authorizing and scheduling the deadline for potential bidders to submit a proposal to purchase the Assets ("**Bid Deadline**"), an auction ("**Auction**") if necessary, and a hearing with respect to the approval of a proposed Transaction ("**Sale Hearing**");

    d.   authorizing and approving notice of the sale of the Assets, the Auction, and the Sale Hearing, substantially in the form of the Transaction Notice;

    e.   authorizing and approving the procedures (the "**Assumption and Assignment Procedures**") set forth in the Bid Procedures Order for the assumption and assignment of the Contracts (defined herein) and the determination of the Cure Costs (defined herein); and

    f.   authorizing and approving the form and manner of notice to each non-Debtor

counterparty (each, a "**Counterparty**") to a relevant executory contract or unexpired non-residential real property lease of the Debtor (collectively, the "**Contracts**") regarding (a) the Debtor's potential assumption and assignment of Contracts and the Debtor's calculation of the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), and (b) the information supporting the Successful Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "**Adequate Assurance Information**") substantially in the form of the Assumption Notice attached as <u>**Exhibit C**</u> to the Bid Procedures Order.

Moreover, as stated in greater detail in the Sale Motion, Debtor further seeks the entry of the Sale Order authorizing and approving the following:

a. the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtor and any purchaser of the Assets, with liens, if any, to attach to the proceeds of the applicable Transaction(s);

b. the assumption and assignment of proposed assumed Contracts in connection with the Transaction(s); and

c. granting related relief.

## <u>The Bid Procedures</u>

37.     Debtor and Debtor's advisors believe they have a keen understanding of the marketplace for the sale of the Assets. As such, Debtor intends to implement a streamlined sale and marketing process that contemplates an auction in the event that the Debtor receives a higher or otherwise better bid than the Stalking Horse Bid.

38.     The Bid Procedures are designed to maximize value for the Assets without jeopardizing ongoing operations and will enable the Debtor to review, analyze, and compare all bids received to determine which bid is the highest or best offer for the Assets.

39.     The Bid Procedures describe, among other things, procedures for parties to access diligence information, the way bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately

successful bidder (a "**Successful Bidder**") and bid (a "**Successful Bid**"), and the deadlines with
respect to the Bid Procedures. Debtor submits that the Bid Procedures afford it the opportunity to
pursue a streamlined sale process that will maximize the value of the Assets.

40.    In accordance with Section 3(a) of the Local Guidelines, the material terms of the
Bid Procedures are summarized below:[2]

| MATERIAL TERMS OF THE BID PROCEDURES | |
|---|---|
| Provisions Governing Qualification of Bidders and Qualified Bids.<br><br>Local Guidelines 3(a)(i)-(ii) | 1. **Bid Deadline** – Deadline to submit a binding and irrevocable offer to acquire the Assets is **May 27, 2025 at 5:00 p.m.** (prevailing Central Time) (the "**Bid Deadline**").<br>2. **Potential Bidder Requirements** – To access the Debtor's material documents, a potential bidder ("**Potential Bidder**") must submit:<br>   a. <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern).<br>   b. <u>Financial Wherewithal</u>. Sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine that the interested party (a) has the financial wherewithal to consummate the applicable Transaction and (b) intends to access the data room for a purpose consistent with the Bid Procedures.<br>3. **Qualified Bid Requirements**. The Debtor, in its reasonable judgment, will determine whether any bid qualifies as a Qualified Bid. The Stalking Horse Bid shall be a Qualified Bid. For any other bid to constitute a Qualified Bid, it must contain the following:<br>   a. <u>Identity of Bidder</u>. A Qualified Bid must fully disclose, by its legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction, and the complete terms of any such participation).<br>   b. <u>Assets Purchased</u>. A Qualified Bid must in the Proposed Purchase Agreement, clearly identify in writing the particular Assets the Potential Bidder seeks to acquire from the Debtor, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement.<br>   c. <u>Purchase Price</u>: The price ("**Purchase Price**") proposed to be paid for the specified Assets in U.S. Dollars. In addition, a bid must propose a Purchase Price equal to or greater than the sum of: (1) the "**Stalking Horse Bid**" (defined as an amount equal to |

---

[2] To the extent that there is any inconsistency between the terms of the Bid Procedures and the summary set forth herein, the terms of the Bid Procedures shall control.

$4,350,000 (the "**Base Purchase Price**"), provided that should the Closing shall occur within six months after March 24, 2025 then the Base Purchase Price shall be increased to $4,850,000 (the "**First Early Closing Purchase Price**"), provided further that should the Closing occur between six and 12 months after March 24, 2025 then the Base Purchase Price shall be increased to $4,600,000 (the "**Second Early Closing Purchase Price**")); plus (2) a break-up fee of $350,000 (or as otherwise agreed by K-LOVE) plus expenses incurred by the Stalking Horse Bidder in connection with the DIP Facility not to exceed $300,000 (collectively, the "**Break Up Fee**"); plus (3) the repayment of any amounts outstanding as of Closing on the DIP Facility (collectively, the "**DIP Repayment**"); plus (4) an initial overbid requirement of $650,000 over the Purchase Price proposed by Stalking Horse Bidder herein (the "**Initial Overbid**") (which can be either variable consistent with the Stalking Horse Bid or based solely on the First Early Closing Purchase Price). The Break-Up Protections shall also: (a) entitle the Stalking Horse Bidder to super-priority administrative claim treatment in the Chapter 11 Case, senior to all other super-priority claims; and (b) ensure that the payment of the outstanding DIP Repayment to shall be paid in full in cash to the Stalking Horse Bidder in full upon Closing no later than two (2) business days after entry of the Sale Order approving the Successful Bid, and such payment shall not be contingent upon the occurrence of Closing.

d. Acquired Assets. The Assets that the Potential Bidder seeks to acquire.

e. Excluded Assets. The Assets that the Potential Bidder does not seek to acquire.

f. Assumed Liabilities. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all of Debtor's liabilities.

g. Excluded Liabilities. The liabilities of the Debtor that the Potential Bidder does not seek to assume.

h. Form of Consideration. Each bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the items set forth at paragraph (c) above.

i. <u>Credit Bid</u>. Persons or entities holding a perfected security interest in any Assets of the Debtor may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a "credit bid" for such Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtor's prepetition or post-petition secured credit facilities. A credit bid must include a commitment to provide cash consideration sufficient to pay the items set forth at paragraph (c) above, including at Closing the Break-Up Fee and DIP Repayment payable to the Stalking Horse Bidder.

j. <u>Unconditional Offer/No Financial Contingencies</u>. A commitment that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such Bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).

k. <u>Proof of Financial Ability to Perform</u>. Each bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.

To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand (or other immediately available cash), each Bid must include committed financing documents that demonstrate to the Debtor's satisfaction that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its bid.

l. <u>Designation of Contracts and Leases</u>. Each Bid must identify with particularity each and every executory contract and unexpired lease (collectively, the "**Contracts**"), the assumption and assignment of which is contemplated by the applicable

Transaction (collectively, "**Proposed Assumed Contracts**"); provided, that the Proposed Purchase Agreement may allow the Potential Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to[five (5) business days prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Sale Transaction on substantially the terms included in the Stalking Horse Agreement. The Debtor shall provide notice to the applicable non-Debtor Contract and Lease contract Counterparties of such removal and/or addition of such Counterparty's Contract and Lease as soon as reasonably practicable.

m. <u>FCC Application and Consent to Assignment</u>. Each Bid must acknowledge the Successful Bidder's obligation to execute, file, and diligently prosecute the appropriate application to the FCC (the "**FCC Assignment Application**") requesting the FCC's consent (the "**FCC Consent**") to the assignment from Debtor to Successful Bidder of the FCC Licenses held by the Station. The FCC Assignment Application shall be filed by the Successful Bidder on or before the later of: (i) ten (10) days after execution of an Asset Purchase Agreement, or (ii) five (5) days the date of entry of the final Sale Order.

n. <u>Required Approvals</u>. A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor. A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

o. <u>Disclosure of Identity and Corporate Authorization</u>. Each Bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the bid and the Bidding Procedures.

p.  Employee Obligations. Each Bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "**Employee Obligations**").

q.  No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts. Except for the Stalking Horse Bid, each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

r.  Disclosure of Connections. Each Bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.

s.  Joint Bids. The Debtor will be authorized to approve joint bids, including joint credit bids, in their reasonable discretion on a case-by-case basis.

t.  Representations and Warranties. Each Bid must include the following representations and warranties:

   i.  a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;

   ii.  a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the Assets to be purchased and the liabilities to be assumed (as applicable), in making its bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such Assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;

   iii.  a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable Assets;

   iv.  a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

16

| | |
|---|---|
| | v.     a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and<br>vi.     a statement that the Potential Bidder agrees to be bound by the terms of these Bidding Procedures.<br>u.   <u>Additional Requirements</u>. A Potential Bidder must also accompany its bid with:<br>    i.     no less than the cash portion of the Purchase Price (a "**Deposit**"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline;<br>    ii.     the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Potential Bidder;<br>    iii.     a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and<br>    iv.     a detailed analysis of the value of any non-cash component of the bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Guidelines 3(a)(iii)(A)-(D) | 1.   <u>Purchaser Reimbursable Expenses</u>. If the Stalking Horse Bidder terminates the Stalking Horse Agreement due to the Debtor entering into a definitive agreement with respect to a Bidder who is not the Stalking Horse Bidder, and the Debtor subsequently consummates a sale with that same Bidder, the Stalking Horse Bidder shall be entitled to the Break-Up Fee, which shall be $350,000 (or as otherwise agreed by K-LOVE) plus expenses incurred by the Stalking Horse Bidder in connection with the DIP Facility not to exceed $300,000 which may include only the reasonable, documented actual costs and expenses incurred and paid by the Stalking Horse Bidder for solicitor and attorney fees.<br>2.   <u>Initial Overbid Amount</u>. To be considered a Qualified Bid, the Initial Overbid must equal at least $650,000 over the Purchase Price proposed by Stalking Horse Bidder herein (which can be either variable consistent with the Stalking Horse Bid or based solely on the First Early Closing Purchase Price as set forth in paragraph 3(c) above).<br>3.   <u>Treatment of Purchaser Reimbursable Expenses</u>. The items described in paragraph (c)(2)-(3), above, shall be paid at Closing.<br>4.   <u>Credit for Payments to Stalking Horse Bidder.</u>   At Closing on any Transaction with the Stalking Horse Bidder, the Stalking Horse Bidder shall credit as against any cash to be paid at Closing a sum equal all payments made by the Debtor under the DIP Facility ("**Stalking Horse DIP Credit**"). |
| **Modification of Bidding and Auction Procedures**<br><br>**Local Guidelines** | 1.   Debtor may extend the Bid Deadline for all or certain Potential Bidders, without further order of the Bankruptcy Court.<br>2.   The Auction may be held virtually pursuant to procedures filed by Debtor on the Bankruptcy Court's docket or may be held at another time and date as may be determined by the Debtor. |

| 3(a)(iii)(E) | 3. Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such Bid that it may be designated a Qualified Bid. |
| | 4. Debtor reserves the right to and may increase or decrease the Minimum Overbid Amount at any time during the Auction. |
| | 5. Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with the Bid Procedures and the Bid Procedures Order that the Debtor reasonably determines to be appropriate to promote a competitive Auction. |
| | 6. At the Auction, the Debtor, in its reasonable business judgment, will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder). |
| | 7. Provided the same shall not cause a default relating either to the DIP Facility or the Stalking Horse Agreement, the Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party. |
| | 8. The Debtor may extend the applicable Sale Objection deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. |
| **Closing with Alternative Backup Bidders**<br><br>**Local Guidelines 3(a)(iii)(F)** | 1. Debtor may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and deem each such bid(s) a "**Back-Up Bid**." |
| | 2. Back-Up Bids shall remain open and irrevocable until the earliest to occur of (such date, the "**Back-Up Bid Expiration Date**"): |
| |    a. applicable outside date for consummation of the Transaction set forth in the Back-Up Bid; |
| |    b. consummation of a Transaction with a Successful Bidder; and |
| |    c. release of such Back-Up Bid by the Debtor in writing. |
| | 3. If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid. |
| **Provisions Governing the Auction**<br><br>**Local Guidelines 3(b)** | **Schedule for Auction:** |
| | 1. If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid,) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall file a notice with the Bankruptcy Court by **May 28, 2025 at 5:00 pm (prevailing Central Time)** indicating that the no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder. |
| | 2. If the Debtor receives more than one Qualified Bid for any Asset (including the Stalking Horse Bid), the Debtor will conduct the Auction on **May 30, 2025 at 2:00 p.m. (prevailing Central Time)** (i) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction, or (iii) at such other date or location as may be determined by the Debtor. |
| | **Participants and Attendees at Auction**: |
| | 1. Only Qualified Bidders are eligible to participate in the Auction. |

|  | 2. Professionals and/or other representatives of the Debtor and Qualified Bidders shall be permitted to attend and observe the Auction.<br><br>3. Any creditor of the Debtor may attend and observe the Auction; provided, that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to the proposed attorneys for the Debtor via electronic mail; and further provided that Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction.<br><br>**Auction Procedures**:<br>1. <u>Open Auction</u>. The Auction, if any, will be conducted openly and shall be transcribed or recorded.<br><br>2. <u>Baseline Bids</u>. Bidding for the Assets will start with the highest or otherwise best offer received, as determined by the Debtor in its sole discretion.<br><br>3. <u>Minimum Overbid</u>. Bidding shall begin in the amount of the Initial Overbid Amount. The Debtor has the right to increase or decrease the Minimum Overbid Amount thereafter at any time during the Auction.<br><br>4. <u>No Collusion</u>: Each Potential Bidder must confirm in writing and on the record that it has not engaged in any collusion and that its Bid represents a binding, good faith, bona fide offer.<br><br>5. <u>Disclosure of Bids</u>. All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders.<br><br>6. <u>Confidentiality</u>. All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients or parties necessary to place their bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements. |
|---|---|

41.     Debtor believes that the time periods set forth in the Bid Procedures are reasonable and appropriate under the circumstances presented in this case. Debtor's business has been marketed, if informally, in recent months to other radio stations and potential interested buyers in the industry.

42.     Moreover, news of a potential sale of the Station has been the subject of significant local media attention and scrutiny which has brought attention to the Sale Process, and thus parties that may have an interest in bidding at the Auction likely have already evaluated the Debtor's business.

43. Information regarding the Debtor's business remains available to Potential Bidders. Potential Bidders that have not previously conducted diligence on the Debtor's business will have immediate access (subject to the execution of an appropriate confidentiality agreement and compliance with certain financial thresholds) to a substantial body of information regarding the Debtor's Assets.

44. In addition, the timeline proposed considers that an efficient timeline will minimize administrative expenses and maximize recoveries ultimately available for unsecured creditors without threatening a cessation of the Debtor's ongoing operations.

### The Stalking Horse Agreement

45. Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder is purchasing substantially all of the Assets and assuming the liabilities of the Debtor, which includes the unexpired Lease related to the transmitter site for the Station (the "**Proposed Assumed Contract**").

46. The Stalking Horse Agreement Break-Up Fee is a reasonable estimate of the costs to be incurred by the Stalking Horse Bidder in bringing a Transaction to fruition, including assistance in the preparation of various motions and orders submitted to the Court for purposes of creating an opportunity for other potential bidders to participate in an Auction. The Stalking Horse Agreement provides for the payment of the estimated actual, documented, and reasonable out-of-pocket costs and expenses that are incurred by the Stalking Horse Bidder in connection with the negotiation, documentation, execution, and performance of the Stalking Horse Agreement, the Transaction, and all proceedings incident thereto ("**Purchaser Reimbursable Expenses**").

47. The Purchaser Reimbursable Expenses are payable to K-LOVE at the closing of an Alternative Transaction. If, for some reason, the Purchaser Reimbursable Expenses are not paid

at the closing of an Alternative Transaction, the Purchaser Reimbursable Expenses will be deemed

a super-priority administrative expense, with priority over all other administrative expenses, other

than the DIP Facility, in the event that the Stalking Horse Agreement is terminated by the Stalking

Horse Bidder as a result of a material breach by the Debtor or the Debtor enters into a definitive

agreement with respect to a Bidder that is not the Stalking Horse Bidder, and in each case, the

Debtor subsequently consummates a sale with another Bidder.

48.     The Bid Procedures also provide for initial overbid minimum and subsequent

bidding increment requirements for bids submitted for the Assets (the Purchaser Reimbursable

Expenses and the other bid protections described in this paragraph collectively are referred to as

the **"Stalking Horse Bid Protections"**). In the event the Auction is held and the Stalking Horse

Bidder is not the winning bidder, the Stalking Horse Bidder has agreed to act as a "**Back-Up**

**Bidder**" and, as such, may hold open its binding offer to purchase the Assets for a period of time

after the Auction in the event the winning bid at the Auction is not consummated.

49.     In accordance with the Local Guideline 2(c), the chart below summarizes

the significant terms of the Stalking Horse Agreement:

| Material Terms of the Stalking Horse Agreement | |
| --- | --- |
| **Stalking Horse Agreement Provision** | **Summary Description** |
| **Purchase Price** | Equal to Four Million Three Hundred Fifty Thousand Dollars and 00/100 Cents ($4,350,000.00) (the "**Base Purchase Price**"). Notwithstanding the foregoing, in the event Closing occurs (i) within six (6) months from the Effective Date of the APA (March 25, 2025), the Base Purchase Price shall be increased to Four Million Eight Hundred Fifty Thousand Dollars and 00/100 Cents ($4,850,000.00) ("**First Early Closing Purchase Price**") and (ii) between six (6) and twelve (12) months from the Effective Date, the Base Purchase Price shall be increased to Four Million Six Hundred Thousand Dollars and 00/100 Cents ($4,600,000.00) ("**Second Early Closing Purchase Price**"). The Base Purchase Price, First Early Closing Purchase Price or Second Early Closing Purchase Price as applicable on the Closing Date are referred to as the "**Purchase Price**" and each shall be subject to the adjustments described in the Stalking Horse Agreement. The Purchase Price shall be subject to potential reductions resulting from (i) amounts required to be withheld under |

| | applicable law, and (ii) payments of "**Cure Amounts**" under the Lease as required by the Sale Order, subject to payments under the DIP Facility. *See* Stalking Horse Agreement § 1.4. |
|---|---|
| **Purchased Assets** | Substantially all the non-real estate assets and operations of the Debtor related to the business of the Debtor, including an assignment of the FCC Licenses and the Lease and excluding such Excluded Assets disclosed in the Stalking Horse Agreement. *See* Stalking Horse Agreement §1.1 and 1.2. |
| **Assumed Liabilities** | Liabilities arising under the terms of the Lease. *See* Stalking Horse Agreement § 1.3. |
| **Sale to Insider** Local Guidelines 2(c)(i) | The Transaction is not to an insider. |
| **Agreements with Management** Local Guidelines 2(c)(ii) | There are not expected to be agreements with management personnel. The experience and assistance of current employees and management may be required to sustain operations, but there is no obligation to offer post-Closing employment to any current Station employees. *See* Stalking Horse Agreement § 7.1. |
| **Releases** Local Guidelines 2(c)(iv) | Customary release documentation evidencing the release and termination of all claims and liens, if any, associated with all indebtedness owed by Seller to a secured lender with respect to the Assets, Lease, and FCC Licenses. *See* Stalking Horse Agreement §§ 1.1, 9.7 and 10.1 |
| **Private Sale/No Competitive Bidding** Local Guidelines 2(c)(iv) | The Stalking Horse Agreement is subject to better or otherwise higher bids at an auction. *See* Stalking Horse Agreement §§ 2.2 and 2.3. |
| **Closing and Other Deadlines** Local Guidelines 2(c)(v) | The outside date for closing is a date fixed by Debtor and the Stalking Horse Bidder which shall be no later than fourteen (14) days following the later of: (i) the date on which the FCC Consent shall have been granted for the assignment of the FCC Licenses, and (ii) the date upon which Bankruptcy Court approval authorizing the sale is obtained, provided that the other conditions to closing set forth in Articles 8 and 9 of the Stalking Horse Agreement have either been waived or satisfied. However, should any objection be filed with the FCC against the Assignment Application, then Buyer may elect to delay the Closing until no later than ten (10) days following the date on which the FCC Consent shall have become a Final Order and the other conditions to closing set forth in Articles 8 and 9 have either been waived or satisfied. *See* Stalking Horse Agreement §2.5. |
| **Good Faith Deposit** Local Guidelines 2(c)(vi) | The Stalking Horse Bidder paid a deposit of $500,000.00 to the Debtor's counsel. Subject to Bankruptcy Court approval, the deposit is used as DIP financing. *See* Stalking Horse Agreement §1.4(b). |
| **Interim Arrangements** | As DIP lender, there are customary interim financing arrangements with the Stalking Horse Bidder, subject to Bankruptcy Court approval. |

| | |
|---|---|
| **with Stalking Horse Bidder** Local Guidelines 2(c)(vii) | *See* Stalking Horse Agreement §1.4(a). |
| **Use of Proceeds** Local Guidelines 2(c)(vii) | Promptly following the Closing, the cash proceeds of the sale shall be paid: (a) the Successful Bidder shall pay to the Stalking Horse Bidder the Break-Up Fee and fully pay and satisfy the DIP Facility provided to the Debtor by the Stalking Horse during the course of the within bankruptcy proceedings; (b) pay any Cure Amounts, (c) pay any amounts required to be paid under applicable law, and (d) retain the resulting net sale proceeds of the sale of the Assets pending further order of the Court.

*See* Stalking Horse Agreement §1.4. |
| **Tax Exemption** Local Guidelines 2(c)(ix) | Presently under the circumstances, exemption pursuant to 11 U.S.C. Section 1146(a) is not sought due to Debtor's status as a non-profit corporation. |
| **Record Retention** Local Guidelines 2(c)(x) | The books and records and related documentation shall remain with the Debtor, which includes those required by Debtor in connection with administering the bankruptcy case. |
| **Sale of Avoidance Actions** Local Guidelines 2(c)(xi) | Debtor is not selling avoidance claims. |
| **Requested Findings as to Successor Liability** Local Guidelines 2(c)(xii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.

The proposed Sale Order provides that all Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.

*See* Stalking Horse Agreement §1.3. |
| **Sale Free and Clear of Unexpired Leases** Local Guidelines 2(c)(xiii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.

The proposed Sale Order provides that all Purchased Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.

*See* Stalking Horse Agreement §1.3. |
| **Credit Bid** Local Guidelines 2(c)(xiv) | Not applicable. |
| **Relief from Bankruptcy Rule 6004(h)** | Relief from Bankruptcy Rule 6004(h) is sought. |

| Local Guidelines 2(c)(xv) | Sale Motion ¶ 38. |
|---|---|

### The Noticing Procedures

50.     The Bid Procedures and Bid Procedures Order provide for procedures regarding noticing (the "**Noticing Procedures**"), including:

a.     **Transaction Notice**. As soon as practicable, but no later than three (3) business days after entry of the Bid Procedures Order, the Debtor will file with the Bankruptcy Court and serve the Transaction Notice which will set forth: (i) a description of the Assets for sale; (ii) the date, time, and place of the (A) Auction and (B) Sale Hearing; and (iii) the deadlines and procedures for objecting to the proposed Transaction(s).

b.     **Deadline to Cancel the Auction**: If no Qualified Bid is received, the Debtor shall file a notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid by no later than **May 28, 2025 at 5:00 p.m. (prevailing Central Time).**

c.     **Selection of Qualified Bids**. The Debtor will notify Bidders of (i) status as a Qualified Bidder and (ii) selection of Baseline Bid by no later than **May 28, 2025 at 5:00 p.m. (prevailing Central Time)**; provided, that the Debtor shall have the right to extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders (as defined in the Bidding Procedures), without further order of the Court.

d.     **Notice of Auction Results**. The Debtor shall file with the Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and, to the extent the Successful Bidder is not the Stalking Horse Bidder (a) provide Counterparties with Adequate Assurance Information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment by no later than **June 2, 2025 at 5:00 p.m. (prevailing Central Time)**.

51.     The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the deadline to object to the proposed Transaction(s), the Bid Deadline, and the date, time and location of the Auction, and Sale

Hearing. Accordingly, the Debtor requests that the Bankruptcy Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rules 2002 and 6004 and Local Rule 2002-1.

### Need for a Timely Sale Process

52.     Debtor believes that the time periods set forth in the Bid Procedures are reasonable and will provide parties with sufficient time and information to submit a bid for the Assets. In formulating the Bid Procedures and time periods set forth therein, the Debtor balanced (i) on the one hand, the need to provide adequate and appropriate notice to parties in interest and potential bidders to ensure due process and a competitive bidding process that will maximize sale proceeds and (ii) on the other hand, the need to run a quick and efficient sale process to avoid administrative expenses that will decrease the realizable value available to creditors and prevent an interruption of the Debtor's business operations. To that end, the Bid Procedures are designed to encourage prospective bidders to submit bids to provide the highest or otherwise best available recoveries to the Debtor's stakeholders.

53.     The Debtor's formulation of the Bid Procedures was also informed by (i) the efforts pre-petition to identify a buyer for the Assets; and (ii) the fact that likely interested Bidders have already been solicited. Furthermore, potential Bidders have had and, in accordance with the Bid Procedures, will continue to have access to comprehensive information including information gathered based upon specific due diligence requests of the Stalking Horse Bid and other prepetition potential Bidders.

54.     A timely sale process is also necessary because of the Milestones.

55.     Failure to adhere to the time periods set forth in the Bid Procedures and the Milestones could jeopardize the closing of the Transaction, which the Debtor believes is the best

means of maximizing the value of the Assets, maintaining the business as a going concern, and minimizing claims against the Debtor's estate. In light of the foregoing, the Debtor has determined that pursuing the Transaction in the manner and with the procedures proposed is in the best interests of the Debtor's estate and provides interested parties with sufficient opportunity to participate.

### Assumption and Assignment Procedures

56.     In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts that are designated by a Successful Bidder. The Assumption and Assignment Procedures set forth in the Bid Procedures Order are designed, among other things, to provide notice of the assumption/assignment and Cure Costs to relevant Counterparties and govern the Debtor's provision of Adequate Assurance Information (as defined herein).

57.     The Debtor submits that the Assumption and Assignment Procedures as set forth in the Bid Procedures Order are reasonable and appropriate and they comply in all respects with the Bankruptcy Code. The Debtor requests that the Assumption and Assignment Procedures be approved.

58.     As illustrated in the Bid Procedures, the Debtor will serve the Assumption and Assignment Notice on all Counterparties regarding the proposed assumption and assignment Proposed Assumed Contracts. The Assumption and Assignment Notice will identify the Debtor's calculation of any Cure Costs payable if the Debtor ultimately assumes and assigns such Contracts. Each Counterparty will then have ample time to object to the Debtor's calculation of such Cure Costs.

59.     Further, as set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid" a Potential Bidder must include with its bid proof of its financial ability to perform in

26

satisfaction of the requirements under section 365(f)(2)(B) with respect to any Contracts to be assumed and assigned ("**Adequate Assurance Information**"). Upon request, the Debtor will make available the Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and such Counterparties will have an opportunity to file an objection in advance of the Sale Hearing as set forth in the Assumption and Assignment Procedures.

### III.  RELIEF REQUESTED IS WARRANTED AND IN BEST INTEREST OF THE DEBTOR AND STAKEHOLDERS

#### The Bid Procedures are Fair and Reasonable

60.     The Bid Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's assets— maximizing the value of sale proceeds received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value); *Wintz v. American Freightways, Inc. (In re Wintz Companies)*, 219 F.3d 807, 812-813 (8th Cir. 2000) (sale procedure providing for competitive bidding calculated to maximize value to the estate was deemed valid); *Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

61.     The Bid Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Assets. Debtor has structured the Bid Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Assets. Additionally, the Bid Procedures will allow the Debtor to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Transaction. Moreover, entry into the Stalking Horse Agreement ensures that the Debtor will obtain fair market value for the Assets more than double estimated liquidation values that could result if operations were impaired by setting a minimum price for the Assets. As such, the Debtor and its creditors can be assured that the consideration obtained will be fair and reasonable.

62.     Courts in this and other districts have approved procedures substantially similar to the proposed Bid Procedures. *See, e.g. In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505]; *In re Peabody Energy Corporation*, 1642529 (BSS) (Bankr. E.D. Mo. Jan. 12, 2017) [Docket No. 1964]; *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KSS) (Bankr. E.D. Mo. June 12, 2016) [Docket No. 378]; *see also In re Bumble Bee Parent, Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) [Docket No. 171]; *In re Fusion Connect, Inc.*, Case No. 19-11811 (SMB) (Bankr. S.D.N.Y. July 3, 2019) [Docket No. 164]; *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (MFW) (Bankr. D. Del. Jun. 13, 2019) [Docket No. 324]; *In re Ditech Holding Corp.,* Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) [Docket No. 456]; *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2018) [Docket No. 159]; *In re Sears Holdings Corp.,* Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 19, 2018) [Docket No. 816]; *In re Color*

*Spot Holdings, Inc.*, Case No. 18-11272 (LSS) (Bankr. D. Del. Jun. 25, 2018) [Docket No. 134].

Accordingly, the Bid Procedures should be approved.

### Stalking Horse Bid Protections are Reasonable and Appropriate

63.    The Bid Procedures contain certain Stalking Horse Bid Protections for the Stalking Horse Bidder, such as the Initial Overbid and the Break-Up Fee which approximates actual out of pocket costs of the Stalking Horse, and the DIP Repayment. Bid incentives such as these are necessary to incentivize a bidder to provide a floor price for the Debtor's assets based on the bidder's due diligence and investigation pre-auction, which forms the basis for other potential bidders to come in and potentially overbid. Bidding incentives such as these Stalking Horse Bid Protections are commonplace in connection with sales under section 363 of the Bankruptcy Code.

64.    Approval of these protections in connection with a sale of assets has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *See, e.g.*, *In re Armstrong Energy, Inc.*, No. 17-47541 (KAS) (Bankr. E.D. Mo. Dec. 1, 2017) [Docket No. 208] (no break-up fees were requested and court approved expense reimbursement in an amount not exceeding $1 million); *In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505] (approving break-up fee and reimbursement fee of $19,250,000); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 30, 2017) [Docket No. 2262] (approving a break-up fee of $200,000 and expense reimbursement in an amount not exceeding $150,000); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. Oct. 19, 2016) [Docket No. 1306] (approving a break-up fee of $645,000 and expense reimbursement in the amount of $1 million); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS)

29

(Bankr. E.D. Mo. June 23, 2016) [Docket No. 898] (approving a break-up fee of $4.32 million, which is 1.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $1.5 million); *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. July 11, 2016) [Docket No. 78] (approving a breakup fee of $250,000); *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KAS) (Bankr. E.D. Mo. June 15, 2016) [Docket No. 399] (approving a break-up fee equating to 2.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $500,000).

65.     Approval of the Stalking Horse Bid Protections is appropriate under the circumstances. Courts in this circuit have stated that "bid procedures should provide a vehicle to enhance the bid." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (citing *In re Food Barn Stores, Inc.*, 107 F.3d 558, (8th Cir. 1997) (discussing bid protections). Here, the Stalking Horse Bidder relied upon the agreement with the Debtor to seek the Stalking Horse Protections, thereby enabling Debtor to obtain a DIP Facility on favorable terms when no other lending was available to sustain the Debtor's operations.

66.     The Stalking Horse Bid Protections are a normal and, indeed, necessary component of a sale outside the ordinary course. Such protections are material inducements to encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and participate in arms-length sale negotiations, despite the inherent risks of a chapter 11 process. *See, e.g., In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that

"agreements to provide reimbursement of fees and expenses are meant to compensate the potential

acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

67.     As illustrated above, the Stalking Horse protections are reasonable and typical in

cases such as this one. Furthermore, the Stalking Horse Protections are fair, and reasonably

compensate the Stalking Horse Bidder for taking actions that will benefit the Debtor's estate and

should be approved for the following reasons.

a. First, the Stalking Horse Bid Protections are the product of good faith, arms-length

negotiations between the Stalking Horse Bidder and the Debtor, which was acting

in the interest of its estate consistent with its fiduciary duty.

b. Second, the Stalking Horse Bid Protections promote competitive bidding by

inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid

for the Assets on which other bidders— and the Debtor— can rely. The Stalking

Horse Bid Protections were a material inducement for, and a condition of, the

Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement and

to provide the DIP Facility. Indeed, the Stalking Horse Agreement increases the

likelihood that the price at which the Assets are sold will reflect their market value,

and Stalking Horse Bidder is entitled to be compensated as a result.

c. Third, the Stalking Horse Bid Protections are reasonable relative to the proposed

Purchase Price in view of the substantial benefits that the Debtor will receive from

having the Stalking Horse Agreement serve as a floor for Bidders that submit a Bid

for the Assets, which will confirm that the Debtor receives the highest or best offer

for the Assets. Debtor believe that the Break-Up Fee is within the range of what

courts in this District have held as reasonable. Moreover, the Stalking Horse

31

Agreement provides the Debtor with a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter or chill bidding, are reasonable, and will enable the Debtor to maximize the value of the Assets.

## Proposed Transaction Should Be Approved

68.     Ample authority exists for approval of the sale proposed by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. September 15, 2022) [Docket No. 898]; *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993) (citing *In re George Walsh Chevrolet*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990)); *see also Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010).

69.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale

32

will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re George Walsh Chevrolet*, 118 B.R. at 102; *In re The Landing*, 156 B.R. at 249*; In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

**1. Debtor Has Demonstrated a Sound Business Justification for the Proposed Transaction.**

70.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value); *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc.,* 107 F.3d at 566 n.16 (emphasis original, internal alterations and quotations omitted)).

71.    As set forth above, a strong business justification exists for the sale of the Assets as described herein. An orderly but expeditious sale of the Assets is critical to preserving and realizing their going concern value and, in turn, to maximizing recoveries for the Debtor's economic stakeholders and creditors. The marketing process undertaken pre-petition supports the conclusion that a 363 sale is necessary for (i) the Debtor to raise capital so as to operate during the

pendency of this case, and (ii) the Debtor to sell its assets on terms most favorable to the Debtor. There has simply been no other option proposed to the Debtor that will enable them to reorganize, maintain their business as a going concern, and maximize recoveries to creditors. Those processes inform that without a 363 sale, the Debtor has a genuine risk of liquidating at distressed prices to the detriment of the Debtor, its creditors, and other key stakeholders. Pursuing the sale of the Assets represents a reasonable exercise of the Debtor's business judgment and is in the best interests of all parties.

**2. Noticing Procedures are Reasonable and Appropriate.**

72.     The notice to third parties that the Debtor proposes to provide, as set forth in the Bid Procedures Order and the Bid Procedures, is more than adequate and reasonable. Such notice will ensure that actual notice of the Auction, the Sale Hearing, and any Transaction will be provided to all known creditors of the Debtor. Such notice will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Assets, whether it be the Stalking Horse Bidder or the Successful Bidder, shall not be liable under theories of successor liability in connection with such Assets.

**3. Proposed Transaction Will Produce a Fair and Reasonable Purchase Price for the Assets.**

73.     The Stalking Horse Bid is an offer to purchase the Assets for a price that the Debtor already has determined to be fair and reasonable. Given that the Stalking Horse Bid will serve as a floor for Qualified Bids for the Assets, the Debtor is confident that the sale process will culminate in the Debtor's obtaining the highest or best value for the Assets.

74.     The Bid Procedures were carefully designed to facilitate a robust and competitive bidding process to maximize the value of the Assets. The Bid Procedures provide an appropriate framework for the Debtor to review, analyze, and compare all bids received to determine which

bids are in the best interests of the Debtor's estate and its stakeholders. Transactions governed by the Bid Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets, which will inure to the benefit of all parties in interest in this Chapter 11 Case. Debtor's compliance with the Bid Procedures Order and the Bid Procedures will provide the basis for a finding that the purchase price represents reasonably equivalent value and is fair and reasonable.

### 4.    Good Faith Purchaser Protections Are Appropriate.

75.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor even if approval of a sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states the following:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

76.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one that purchases assets for value, in good faith, and without notice of adverse claims. *See In re Trism, Inc.*, 328 F.3d 1003, 1008 (8th Cir. 2003) ("Section 363(m) protects a good faith purchaser and lists no other exceptions or any other qualifications to receive the protection of section 363(m)."). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also U.S. v. Whitney Design, Inc. (In re Whitney*

*Design, Inc.)*, No. 4:10-CV-441, 2011 WL 13254299, at *2 (E.D. Mo. Jan. 11, 2011) (the purpose of Section 363 is to protect third party purchasers in good faith and "by providing reliability and finality, §363 enhances the value of the debtor's assets sold in bankruptcy").

77.     Debtor and the Stalking Horse Bidder have agreed to the Stalking Horse Agreement without collusion, in good faith, and through extensive arms-length negotiations. To that end, the Stalking Horse Bidder and the Debtor engaged separate counsel and other professional advisors, including FCC counsel, to represent their respective interests in the negotiation of the Stalking Horse Bid and the Stalking Horse Agreement, and in the sale process generally. To the best of the Debtor's knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Bid to be set aside under 363(m) of the Bankruptcy Code.

78.     Further, and as set forth above, the Bid Procedures are designed to produce a fair and transparent competitive bidding process. The Stalking Horse Agreement was negotiated at arms-length and in good faith and any other stock/asset purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arms-length and in good faith. Accordingly, based upon the record to be made at the Sale Hearing, the Debtor will seek a finding that any Successful Bidder (including the Stalking Horse Bidder if named a Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**Assumption and Assignment of Proposed Assumed Contracts Should Be Approved**

79.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the

assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Market Square Inn., Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also In re Noranda Aluminum, Inc.*, 549 B.R. 725, 727–28 (Bankr. E.D. Mo. 2016) (in the Eighth Circuit, the business judgment test "entails a determination that the transaction is in the best interest of the estate" (quoting *Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997)).

80.    The assumption and assignment of the Proposed Assumed Contract in connection with a Transaction is an exercise of the Debtor's sound business judgment because a Bidder may determine that such contracts are necessary to operate the Debtor's business, and as such, are essential to obtaining the highest or otherwise best offer for the Assets. Moreover, the Proposed Assumed Contract will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bid Procedures Order, which will be reviewed by the Debtor's key stakeholders. Accordingly, the Debtor's assumption of Proposed Assumed Contract is an exercise of sound business judgment and should be approved.

81.    The consummation of a Transaction, which will involve the assignment of the Proposed Assumed Contract, will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code

requires that any outstanding defaults under the Proposed Assumed Contract be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtor proposes to file with the Court and serve on each contract and lease Counterparty, the Assumption and Assignment Notice indicating the Debtor's calculation of the Cure Cost for each such contracts and leases. The Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Proposed Assumed Contract to the Successful Bidder, including the proposed Cure Cost.

82.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 60506 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

83.     As set forth in the Bid Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid Adequate Assurance Information. Debtor will provide Adequate Assurance Information to all Counterparties to the Proposed Assumed Contract and Counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtor's assumption and assignment of the Proposed Assumed Contracts, satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

84.     In addition, to facilitate the assumption and assignment of the Proposed Assumed Contract, the Debtor further requests that the Court find that all anti-assignment provisions in the Proposed Assumed Contract, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code. See 11 U.S.C § Section 365(f)(1).

### Reservation of Rights

85.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver or limitation of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim

subsequently.

## Notice and Notice Parties

86.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Eastern District of Missouri, Attention: Paul Randolph, 111 South 10th Street, Suite 6.353, St. Louis, MO  63102; (ii) the holders of the 20 largest unsecured claims against the Debtor; (iii) Paige K. Fronabarger, Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC  20036; and (iv) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1.

## No Previous Request

87.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, Debtor respectfully requests that the Court enter an Order granting the requested relief and granting such other and further relief as is necessary and appropriate in the circumstances.

Respectfully submitted,

CARMODY MACDONALD P.C.

By: /s/ *Robert E. Eggmann*
Robert E. Eggmann #37374MO)
Nathan R. Wallace (#74890MO)
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600
(314) 854-8660 – FAX
ree@carmodymacdonald.com
nrw@carmodymacdonald.com

ATTORNEYS FOR DEBTOR

**EXHIBIT 1**

**(Asset Purchase Agreement with K-LOVE)**

**FINAL EXECUTION**

## <u>ASSET PURCHASE AGREEMENT</u>

This **ASSET PURCHASE AGREEMENT** (the "<u>Agreement</u>") is entered into as of this 24th day of March, 2025 (the "<u>Effective Date</u>"), by and between **DOUBLE HELIX CORPORATION**, a debtor-in-possession and Missouri non-profit corporation ("<u>Seller</u>") and **K-LOVE, INC.**, a Tennessee non-profit corporation ("<u>Buyer</u>") (Seller and Buyer are each a "<u>Party</u>" and, collectively, the "<u>Parties</u>").

## RECITALS

**WHEREAS**, Seller is the licensee of FM radio broadcast station KDHX, St. Louis, Missouri (FCC Facility Id. 17380) (the "<u>Station</u>") pursuant to certain authorizations issued by the Federal Communications Commission ("<u>FCC</u>") and owns and leases other assets used in connection with the transmission facilities used in the operation of the Station;

**WHEREAS**, on March 10, 2025, ("<u>Petition Date</u>"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), administered by the United States Bankruptcy Court for the Eastern District of Missouri  (the "<u>Bankruptcy Court</u>") under case number 25-40745 (the "<u>Bankruptcy Case</u>"), and Seller is managing its property and operating its business as debtor-in-possession in the Bankruptcy Case;

**WHEREAS**, on March 14, 2025, the Seller filed an "*Emergency Motion for Interim and Final Orders Authorizing Debtor to Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 364(c) and (d)"* with the Bankruptcy Court ("<u>DIP Motion</u>") seeking interim and final authorization to obtain post-petition financing from Buyer on the terms provided in the DIP Motion;

**WHEREAS**, Seller desires to sell to Buyer all of the Assets (defined below) including the FCC Licenses, subject to the assumption by Buyer of the Assumed Liabilities, and Buyer desires to purchase from Seller the Assets and assume the Assumed Liabilities, in each case, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties contemplate that such Assets will be sold, transferred, conveyed and assigned to Buyer and the Assumed Liabilities shall be assumed by Buyer (the "<u>Asset Purchase</u>"), as a private sale pursuant to Sections 105, 363, 365, 503, 507, 541 and 1146 of the Bankruptcy Code and in accordance with this Agreement and subject to an Order to be entered by the Bankruptcy Court; and subject nevertheless to the prior consent of the FCC to assignment of the Licenses (as defined below) to Buyer and compliance with applicable regulations of the FCC and the Communications Act of 1934, as amended ("<u>Communications Act</u>");

**WHEREAS**, the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, and the provisions, requirements and limitations of a sale order to be issued by the Bankruptcy Court ("<u>Sale Order</u>") and taking into account Buyer's provision of DIP Financing and the terms of the DIP Motion. Notwithstanding any provision of this Agreement, all obligations of the Buyer hereunder are subject to a final, non-appealable Sale Order that is satisfactory to Buyer in its commercially reasonable discretion.

**WHEREAS**, Buyer and Seller may enter into a Network Affiliation Agreement (the "Affiliation Agreement") which will permit Buyer to provide programming on the Station prior to Closing;

**WHEREAS,** programming under the Affiliation Agreement will commence at a mutually agreeable time in the future (which may not occur) and is subject to execution of a mutually acceptable form of Affiliation Agreement and approval of such Affiliation Agreement by the Bankruptcy Court, if required.

**WHEREAS**, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual promises herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE 1:  SALE AND PURCHASE

**1.1** **Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement, and subject to the exclusive jurisdiction and approval of the Bankruptcy Court, at Closing (defined below), except for the Excluded Assets (defined below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept assignment from Seller, all right, title and interest of Seller in and to the following real, personal, tangible, intangible assets and properties of Seller that are used or held for use in the operation of the Station (the "Assets"):

(a) **Licenses and Authorizations**.  All licenses, authorizations, permits, applications and approvals issued to or pending with respect to the Station by (i) the FCC (the "FCC Licenses"), including Seller's rights in the call letters of the Station; (ii) the Federal Aviation Administration ("FAA"); and (iii) any other permits, registrations, licenses, variances, exemptions, orders and approvals of all Governmental Authorities held by Seller in connection with the operation of the transmitter site for the Station (the "Transmitter Site") (collectively, the "Licenses"), including those described on Schedule 1.1(a) and any renewals or modifications thereof between the date hereof and Closing.

(b) **Tangible Personal Property**.  The following tangible personal property (collectively, the "Tangible Personal Property"):  all equipment, transmitters, antennas, cables, furniture, fixtures, spare parts and other tangible personal property of every kind and description that are located at or relating to the Transmitter Site that are used or held for use in the operation of the Station, which are described on Schedule 1.1(b), and any additions and improvements thereto prior to the Closing Date, except for any retirements or dispositions thereof made between the date hereof and the Closing Date in the ordinary course of business and consistent with the terms of this Agreement.

(c) **Lease**. All of Seller's interest in the ground lease and any other leases, licenses, subleases or other agreements which permit Seller to utilize or occupy all or a portion of the real property required for operation of the Transmitter Site for the Station, as identified on Schedule 1.1(c) and any modification permitted in Schedule 1.1(c) (the "Real Property Lease").

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

(d) **Files and Records**. The Station's public inspection file, filings with the FCC relating to the Station, and such other environmental reports, title insurance policies, surveys, deeds, zoning reports, technical information, engineering data (including construction drawings and structural engineering reports), and books and records that primarily relate to the other Assets being conveyed hereunder.

(e) **Claims**. Any and all claims and rights against third parties if and to the extent that they relate to the Assets, including, without limitation, all rights under manufacturer and vendor warranties and any proceeds from insurance claims made by Seller relating to property or equipment included in Assets that have not been repaired, replaced or restored by Seller prior to Closing Date, but excluding all causes of action arising under Chapter 5 of the Bankruptcy Code.

(f) **Prepaid Items**. All deposits, reserves, prepaid expenses, and other prepaid taxes relating to the Assets pro-rated as of Closing for which Seller receives a credit under Section 1.4(c).

1.2 **Excluded Assets**. The following shall be excluded from the Assets and retained by Seller (collectively, the "Excluded Assets"):

(a) **Cash**. All cash, cash equivalents or similar investments such as certificates of deposit, treasury bills and other marketable securities on hand and/or in banks and deposits of Seller.

(b) **Donations and other Consideration**. All donations, accounts receivable or other consideration of Seller arising from the operation of the Station prior to Closing.

(c) **Insurance**. Except to the extent specified in Section 1.1(e), any insurance policies, intercompany accounts, promissory notes, amounts due from employees, bonds, letters of credit, or other similar items; any cash surrender value in regard thereto of Seller; and any proceeds from insurance claims made by Seller relating to property or equipment included in Assets that have been repaired, replaced or restored by Seller prior to Closing Date.

(d) **Benefit Plans**. Any pension, profit-sharing or cash or deferred (Section 401(k)) plans and trusts and assets thereof, or any other employee benefit plan or arrangement, and the assets thereof.

(e) **Tax Refunds**. Any interest in and to any refunds of federal, state or local franchise, income or other taxes of Seller for taxes incurred and actually paid by Seller prior to Closing.

(f) **Books and Records**. All the financial records, account books and general ledgers, and all corporate records (including organizational documents) of Seller, including tax returns and transfer books.

(g) **Corporate and Studio Assets.** All corporate assets of Seller as well as all equipment and other assets used or held for use to operate Seller's broadcast studio for the Station.

3

(h)    **Contracts.**  Any contracts or agreements not listed on Schedule 1.1(c), including all ASCAP, BMI, SESAC and GMR licenses and the current studio lease for the Station.

(i)    **Intellectual Property.**  Except for any interim programming on the Station pursuant to the Affiliation Agreement (if executed) any and all intellectual property of Seller and its affiliates which is used or held for use in the operation of the Station.

(j)    **Rights and Claims.**  All rights and claims related to the Excluded Liabilities.

(k)    **Office Building.**  Seller's building located at 3524 Washington Avenue, Saint Louis, MO 63103 ("Seller's Office Building").

(l)    **Other Assets**.  Any other tangible or intangible asset not specifically described in Section 1.1.

For the avoidance of doubt, in the event there is any conflict between items described as Assets and those treated as Excluded Assets, the term Assets shall be deemed to control.

**1.3    Liabilities**.  The Assets shall be transferred by Seller to Buyer free and clear of all Liens ("Liens"), other than Permitted Encumbrances.  In addition to payment of the Purchase Price, at Closing, Buyer shall assume and undertake to pay, discharge and perform all Liabilities under the Real Property Lease which arise or relate to the period of time occurring from and after Closing ("Assumed Liabilities").  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated or deemed to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller or any Affiliate of Seller or relating to the Business and Seller and its Affiliates shall be solely and exclusively liable with respect to all such Liabilities, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").  For the avoidance of doubt, the Excluded Liabilities with respect to Seller include, but are not limited to, the following: (i) any obligations or liabilities under the Real Property Lease, or other Assets relating to the period prior to Closing; (ii) any obligations or liabilities of Seller which are unrelated to the Assets; (iii) any obligations or liabilities relating to employees of Seller; (iv) any obligations or liabilities relating to the Excluded Assets; (v) any federal, state or local franchise, income or other taxes of Seller; (vi) any other obligations or liabilities of Seller, including obligations or liabilities arising from Seller's failure to obtain any required license, permit, or other authorization to conduct the operation of the Station prior to Closing; (vii) any Liability of Seller or its Affiliates, or for which any of Seller or its Affiliates is liable, arising out of, or relating to, or in connection with the administration of the Bankruptcy Case or the negotiation, execution, and consummation of the transactions contemplated by this Agreement or any other Transaction Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Seller; (viii) any Liability incurred by Seller or its directors, officers, managers, stockholders, members, partners, agents or employees (acting in such capacities), including all indemnification claims; (ix) any Liability of Seller or related to the Business that arises under or relates to a violation of Environmental Laws or to the release, treatment, storage, disposal or other management of a Hazardous Material prior

4

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

to the Closing Date; and (x) any and all Liabilities whether arising prior to, on or after the Closing Date in respect of any employee, officer, director or independent contractor of Seller or any of its Affiliates or arising under any employee benefit plans; (xi) all Liabilities related to the WARN Act, to the extent applicable, with respect to employees of Seller, and for claim, charge, prosecution, action, suit, litigation, inquiry, investigation or proceeding resulting from such employees' separation of employment prior to or on the Closing Date, as with respect to all periods prior to the Closing Date, Seller shall remain liable and responsible for compliance with, as well as any liability which may arise or exist under the WARN Act with respect to the termination of any employee of Seller prior to or on the Closing Date; and (xii) all Liabilities in respect of taxes, including Liabilities in respect of taxes arising out of the conduct of the Business or ownership of the Assets.  Seller shall transfer and assign the Real Property Lease to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code to Buyer, and Buyer shall assume the Real Property Lease from Seller, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.  In connection with and as a prerequisite to such assignment and assumption, Seller shall file any motion required with the Bankruptcy Court for Seller to assume the Real Property Lease and assign it to Buyer at Closing.  Buyer shall pay in full, subject to a dollar for dollar reduction in the Purchase Price as provided in Section 1.4(a), all "Cure Amounts" required to be paid to the Lessor of the Real Property Lease as otherwise determined by the Bankruptcy Court to cure all defaults under the Real Property Lease to the extent required by Section 365(b) of the Bankruptcy Code and Seller shall have no Liability therefore.

1.4    **Consideration; Payments.**

(a)    **Purchase Price**.  The base purchase price to be paid for the Assets will be an amount equal to Four Million Three Hundred Fifty Thousand Dollars and 00/100 Cents ($4,350,000.00) (the "Base Purchase Price").  Notwithstanding the foregoing, in the event Closing occurs (i) within six (6) months from the Effective Date, the Base Purchase Price shall be increased to Four Million Eight Hundred Fifty Thousand Dollars and 00/100 Cents ($4,850,000.00) ("First Early Closing Purchase Price") and (ii) between six (6) and twelve (12) months from the Effective Date, the Base Purchase Price shall be increased to Four Million Six Hundred Thousand Dollars and 00/100 Cents ($4,600,000.00) ("Second Early Closing Purchase Price").  The Base Purchase Price, First Early Closing Purchase Price or Second Early Closing Purchase Price as applicable on the Closing Date are referred to as the "Purchase Price" and each shall be subject to the adjustments described in Section 1.4(d) below.  The Purchase Price shall be subject to potential reductions resulting from (i) amounts required to be withheld under applicable law (including Section 897 or 1445 of the Bankruptcy Code), and (ii) payments of "Cure Amounts" under the Real Property Lease as required by the Sale Order.

(b)    **Promissory Note and Security Agreement**.  No later than fourteen (14) days following the entry of an interim order ("Interim DIP Order") of the Bankruptcy Court authorizing Seller to obtain post-petition financing in accordance with the DIP Motion, Buyer and Seller shall (i) execute the DIP Loan Documents (as defined below) contemplated by this Agreement and by the DIP Motion, and (ii) work to obtain entry of a final order of the DIP Motion ("Final DIP Order" and both such orders, the "DIP Orders").

(c)    **Payments at Closing**.  At Closing, Buyer shall pay or caused to be paid to (i) Seller the Purchase Price (a portion of which shall be satisfied by offsetting the DIP Obligations

5

that Seller owes Buyer as of the Closing Date under the DIP Loan Documents) and the balance of which shall be made by payment of immediately available funds to an account designated by Seller.

(d) **Proration Adjustment**. Subject to any reimbursement obligations which may be required for operations pursuant to the Affiliation Agreement (if executed), all rent, charges and other payments owed or due under the Real Property Lease assumed by Buyer, real property and tangible personal property taxes assessed on the ownership of the Assets (which shall be based on the most recent tax bill available), utility bills and other ongoing costs of usual operation of the Transmitter Site shall be prorated in accordance with generally accepted accounting principles (GAAP) as of 11:59 p.m. CT on the date prior to the Closing Date ("Effective Time"), and an adjustment to the Purchase Price shall be made as set forth in this subsection to reflect the principle that all expenses attributable to the ownership of the Assets and the operation of the Transmitter Site before the Effective Time (including the rent owed by Seller under the Real Property Lease) shall be for the account of Seller, and all expenses attributable to the ownership of the Assets or the operation of the Transmitter Site (but excluding the Excluded Assets) on or after the Closing Date (including the rent owed by Seller under the Real Property Lease) shall be for the account of Buyer. For purposes of making the adjustments pursuant to this Section, at least five (5) days prior to Closing, Seller shall prepare and deliver a list to Buyer with the anticipated prorations required for Closing ("Adjustment List"). The Adjustment List shall set forth each prorated expense item and include the net adjustment ("Adjustment") to be made to the Purchase Price as a result thereof. Within sixty (60) days following the Closing Date, Buyer shall prepare and deliver a revised Adjustment List ("Revised Adjustment List") revising any items on the original Adjustment List to determine if additional Adjustments are required. If a further Adjustment is required and such amount is for the benefit of Seller, then Buyer shall promptly pay the further Adjustment amount to Seller. If the further Adjustment is required and such amount is for the benefit of Buyer, then Seller shall promptly pay the further Adjustment amount to Buyer. In the event that the Parties disagree with the Adjustment List or Revised Adjustment List or with any other matter arising out of this subsection ("Contested Matter"), and Buyer and Seller cannot resolve the dispute themselves within sixty (60) days, Buyer and Seller will refer the matters under dispute to an independent certified public accounting firm mutually agreeable to Buyer and Seller, whose decision shall be final and whose fees and expenses with respect to each such matter shall be allocated to each Party based upon the percentage which the portion of the Contested Matter not awarded to each Party bears to the amount actually contested by such Party. If, on the Closing Date, the current real property and/or personal property tax bills with respect to the Assets are not available, the amount of real property and personal property taxes will be apportioned based on the current year's millage and the current year's assessment. If the current year's millage is not fixed and the current year's assessment is available, taxes will be apportioned based on such assessment and the prior year's millage.

(e) **Allocation**. Buyer and Seller shall allocate the Purchase Price among the Assets in accordance with an allocation schedule prepared in compliance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (and any similar provisions of state, local, or foreign law, as appropriate), as reasonably established by Buyer. Buyer and Seller shall each use this allocation in preparing and filing their own IRS Form 8594 to submit with their income tax returns.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

## ARTICLE 2: BANKRUPTCY COURT CONSENT; FCC APPLICATIONS; CLOSING

2.1     **Bankruptcy Court Approval of Asset Purchase**. Not later than three (3) Business Days following execution of this Agreement, Seller will submit to the Bankruptcy Court a motion for an Order: (A) authorizing the sale of all or substantially all of the Assets (other than the Seller's Office Building) free and clear of all Liens to Buyer pursuant to 11 U.S.C. § 363(f); (B) authorizing the assumption and assignment of Real Property Lease and (C) granting other relief related to the proposed sale (the "Sale Motion").

2.2     **Alternative Transaction**.  This Agreement is subject to approval by the Bankruptcy Court.  The Parties acknowledge that the Bankruptcy Court may require consideration of competing bids for the disposition of all or some of the Assets to a purchaser or purchasers other than Buyer ("Alternative Buyer") or affecting any other transaction the consummation of which would be substantially inconsistent with this Agreement ( "Alternative Transaction").  If consideration of an Alternative Transaction is required by the Bankruptcy Court, then Seller agrees to seek the Bankruptcy Court's approval for certain Break-Up Protections (as defined below) in favor of Buyer, namely such protections as would (1) entitle Buyer to super-priority administrative claim treatment in the Bankruptcy Case, senior to all other super-priority claims, and (2) ensure the payment of the outstanding DIP Obligations to Buyer in full upon consummation of an Alternative Transaction, and (3) authorize the Buyer to credit bid the Break-Up Protections and DIP Obligations at any auction for Seller's assets.  Any proposed order approving the Bid Procedures offered by Seller to the Bankruptcy Court shall be in form and substance acceptable to Buyer and its counsel, and Seller hereby agrees not to change or modify any of the dates or procedure set forth in such proposed Bid Procedures order, including without limitation the dates of the sale hearings and Closing Date, without the prior written consent of Buyer unless is otherwise so ordered by the Bankruptcy Court.  Seller further agrees that the requirements for the Bid Procedures order, including payment of the Break-Up Protections, are reasonable consideration for Buyer having expended considerable time and expense in connection with this Agreement, the DIP Financing, the DIP Loan Documents, the negotiation thereof, the identification and quantification of the assets of Seller, and to compensate Buyer as a stalking-horse bidder, in the event that an Alternative Transaction is required and consummated with a Person other than Buyer.

2.3     **Buyer Protections in the Event of Alternative Transaction**.  If consideration of an Alternative Transaction is required by the Bankruptcy Court, then Seller agrees to seek the Bankruptcy Court's approval to (i) adopt bid procedures and bid protections ("Bid Procedures") consistent with the terms set forth in the DIP Financing Term Sheet, which shall be satisfactory in form and substance to Buyer in its sole discretion and (ii) to treat this Agreement as a stalking horse bid by Buyer subject to the credit bid and overbid protections in favor of Buyer as set forth in the Bid Procedures.  The Bid Procedures shall apply to consideration of any Alternative Transaction (whether there is a public auction or direct bids from competitors without public auction).  The Bid Procedures (or any sale terms requested to be adopted by the Bankruptcy Court for a private sale without a public auction) shall afford Buyer the benefits Buyer negotiated to be a stalking horse bidder in exchange for providing the DIP financing consistent with the terms in the DIP Financing Term Sheet. These terms ("Break-Up Protections") include, without limitation, (i) payment of a break-up fee to Buyer in the amount of $350,000 plus expenses incurred by the Buyer in connection with the DIP Financing and proposed Asset Purchase in an amount not to

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

exceed $300,000 and which fees shall be at the closing of the Alternative Transaction to an Alternative Buyer (collectively, the "Break-Up Fee"), (ii) a minimum overbid requirement of $650,000 over the Purchase Price proposed by Buyer herein (which can be either variable consistent with Section 1.4(a) or based solely on the First Early Closing Purchase Price), (iii) a requirement that any alternative bid shall not be conditioned upon any due diligence, financing or other conditions and be no less favorable to the estate than the terms proposed by Buyer herein, (iv) bids to be submitted no later than 21 days after the filing of the Sale Motion or such other date as is otherwise ordered by the Bankruptcy Court, with an auction to be held (if there are alternative qualified bids) no later than April 16, 2025 or such other date as is otherwise ordered by the Bankruptcy Court, and (v) the full opportunity for Buyer to raise its bid and include as a credit bid the Break-Up Fee and DIP Obligations in connection with consideration of any Alternative Transaction ordered by the Bankruptcy Court for Seller's assets and in any subsequent bids, and (vi) the Seller consulting with Buyer concerning alternative bids and the selection of the highest and best transaction.  The Break-Up Protections shall also (i) entitle Buyer to super-priority administrative claim treatment in the Bankruptcy Case, senior to all other super-priority claims, and (ii) ensure the payment of the outstanding DIP Obligations to Buyer in full upon consummation of an Alternative Transaction.

### 2.4    FCC Consent; Assignment Application.

(a)    **FCC Application**.  Seller and Buyer shall execute, file, and diligently prosecute the appropriate application to the FCC (the "Assignment Application") requesting the FCC's consent ("FCC Consent") to the assignment from Seller to Buyer of the FCC Licenses pertaining to the Station.  The Assignment Application shall be filed not later than ten (10) Business Days after the date of the execution of this Agreement.  Buyer and Seller shall be responsible for all of its other costs with respect to the preparation, filing and prosecution of the Assignment Application; *provided, however*, that neither Buyer nor Seller shall be required to pay consideration to any third party to obtain FCC Consent.  Buyer and Seller shall cooperate in good faith to diligently prosecute the Assignment Application and otherwise use their commercially reasonable best efforts to obtain the FCC Consent as soon as possible; *provided, however*, that neither Party shall be required to appear at any trial-type hearing or to participate in a judicial appeal.  Buyer and Seller shall oppose any petitions to deny or other objection filed with respect to an Assignment Application to the extent such petition or objection relates to such Party.  Neither Buyer nor Seller shall take any intentional action that would, or intentionally fail to take such action the failure of which to take would, reasonably be expected to have the effect of preventing or materially delaying the receipt of FCC Consent.  Buyer and Seller shall (i) keep each other informed in all material respects and on a reasonably timely basis of any material communication received by such Party from, or given by such Party to, the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby; (ii) notify each other of all documents filed with or received from the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby, and provide each other with copies of all such documents; (iii) furnish each other with such information and assistance as the other may reasonably request in connection with their preparation of the Assignment Application; and (iv) cooperate in all respects with each other in connection with this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby and in connection with any investigation or other inquiry by or before the FCC related to the foregoing.  Buyer and Seller shall have the right to review in advance, and to the extent practicable each will

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

consult with the other on, all information relating to the other Party that appears in any filing made with, or written materials submitted to, the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby. Seller and Buyer agree to cooperate to the extent necessary to obtain the FCC's extension of the effectiveness of the FCC Consent as may be required.

2.5    **Closing.**    Subject to Bankruptcy Court approval, the consummation of the transaction contemplated in this Agreement (referred to herein as the "Closing") shall occur on a date fixed by the Parties (the "Closing Date"), which such date shall be no later than fourteen (14) days following the later of (i) the date on which the FCC Consent shall have been granted and (ii) Bankruptcy Court approval authorizing the sale obtained, and the other conditions to closing set forth in Articles 8 and 9 have either been waived or satisfied, provided, however, that if any petition to deny or other objection is filed with the FCC against the Assignment Application, then Buyer may elect to delay the Closing until no later than ten (10) days following the date on which the FCC Consent shall have become a Final Order and the other conditions to closing set forth in Articles 8 and 9 have either been waived or satisfied. For purposes of this Agreement, "Final Order" means an order or approval by the FCC (i) that has not been reversed, stayed, enjoined, set aside, annulled, or suspended, (ii) that has received no timely requests for stay, petition for rehearing, petition for reconsideration, application for review, or notice of appeal is pending by the FCC or any court, and (iii) as to which the times for filing any such request, petition, application, notice, or appeal, or for reconsideration or review (by the FCC on its own motion or any other party), shall have expired. The Closing shall be held at the offices of Buyer's counsel or by exchange of documents via email, or as Seller and Buyer may agree.

2.6    **Closing Before FCC Final Order.**    In the event Closing occurs before the FCC Consent shall have become a Final Order and the FCC or a court subsequently rescinds the FCC Consent, and such rescission becomes a Final Order, Seller and Buyer shall cooperate fully and in good faith to make such arrangements as shall be reasonable under then-prevailing circumstances to fully comply with all FCC requirements and restore each Party, to the greatest extent practicable, to the status quo ante prior to the Closing, including having Buyer return the Assets to Seller and having Seller return the Purchase Price to Buyer in readily available federal funds.

## ARTICLE 3:  REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement for Buyer to enter into this Agreement, Seller represents and warrants as of the Effective Date as follows:

3.1    **Organization and Authorization.**    Seller is a non-profit corporation duly incorporated, validly existing, and in good standing under the laws of Missouri. Subject to Bankruptcy Court approval, Seller has the power and authority to execute and deliver this Agreement and to consummate the transaction contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). Seller has the power to carry on its Business as it is now conducted and as proposed to be conducted. The execution, performance and delivery of this Agreement (and the Affiliation Agreement if executed) and the consummation of the transaction contemplated hereby on Seller's part have been duly and validly authorized by the shareholders/members and/or board of directors/managers of Seller (to the extent required), and no other proceedings on the part of Seller are necessary to authorize the execution

9

and delivery of, or the performance of Seller's obligations under this Agreement, or to consummate the transactions contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). This Agreement has been duly and validly executed and delivered by Seller. This Agreement constitutes the legal, valid, and binding obligation of Seller enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforcement of creditors' rights or the application of principles of equity.

3.2    **No Defaults; Consents**.    The execution, delivery, and performance of this Agreement by Seller will not (a) constitute a violation of, or conflict with, Seller's organizational documents; (b) result in a default (or give rise to any right of termination, cancellation, or acceleration) under, or conflict with, any of the terms, conditions, or provisions of any Real Property Lease subject to obtaining any required consent of the Lessor of the Real Property Lease; (c) violate any statute, regulation, order, injunction, or decree of any Governmental Authority which is applicable to Seller or any of the Assets; (d) result in the creation or imposition of any Lien, charge, or encumbrance of any nature whatsoever upon any of the Assets, other than Permitted Encumbrances or the Liens arising in favor of Buyer from this Agreement; or (e) require the consent or approval of any governmental authority, lending institution, or other third party except Closing is subject to Bankruptcy Court approval after notice and a hearing and the provisions, requirements and limitations of the Sale Order and prior consent of the FCC is required for the assignment of the FCC Licenses to Buyer. Seller has not entered into any agreement with any third party related to the Station's FCC Licenses, including agreements for the sale, transfer, or assignment of the FCC Licenses or any interest therein.

3.3    **Tangible Personal Property**.    Schedule 1.1(b) contains a description of all material items of tangible personal property owned or leased by Seller and located at the Transmitter Site that are used or held for use in the operation of the Station. Seller owns and has, and will have on the Closing Date, good and marketable title or a valid leasehold interest to the Tangible Personal Property. Except as set forth in Schedule 1.1(b), each material item of Tangible Personal Property is in good operating condition, reasonable wear and tear excepted and consistent in all material respects with the condition of such Tangible Personal Property when inspected by Buyer's representatives. The Tangible Personal Property in service is operating in compliance, in all material respects, with the FCC Licenses and rules and regulations of the FCC and FAA.

3.4    **Real Property**.    Schedule 1.1(c) contains a description of all real property which is leased, licensed, subleased or sublicensed by Seller and used or held for use in the operation of the Transmitter Site. The Transmitter Site (i) provide sufficient vehicular access to the Transmitter Site without need to obtain any additional access rights and (ii) is served by all utilities which are required for adequate operation of the Station's transmitter facilities located at the Transmitter Site. To the Knowledge of Seller there is no pending or threatened suit for condemnation or other taking by any public authority of any real property which is the subject of the Real Property Lease. All buildings and other improvements subject to the Real Property Lease are in good operating condition and are not in need of material repair (ordinary wear and tear excepted). The Transmitter Site is not subject to any zoning, restrictive covenant or other agreement or order that prohibits use of the real property for such Transmitter Site from being used as a tower site. Subject to obtaining applicable lessor consent (along with the consent of any ground lessor if also required), Seller has the full legal power and authority to assign its rights under the Real Property Lease to Buyer. All

10

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

permanent certificates of occupancy and other consents and approvals required to be obtained from any Governmental Authority, association or board with jurisdiction for Seller to utilize the real property subject to the Real Property Lease have been issued and are in full force and effect. Seller is operating the Station in all material respects in compliance with permissible levels of RF radiation specified in either the Communications Laws (defined below) or any other applicable law.

3.5     **FCC Licenses and Other Licenses**.  Schedule 1.1(a) hereto contains a true and complete list of the FCC Licenses and the Licenses.  The FCC Licenses and the Licenses are in full force and effect and have not been revoked, suspended, cancelled, rescinded or materially and adversity modified.  Seller lawfully holds, and is the sole holder of, the FCC Licenses none of which is subject to any restrictions or conditions that would limit in any material respect the operations of the Station, other than (a) as may be set forth on the faces of such FCC Licenses and other licenses or (b) as may be applicable to substantial segments of the radio broadcasting industry.  Seller is qualified to be an FCC licensee, and is operating the Station in compliance in all material respects with the FCC Licenses, the Communications Act of 1934, as amended, and all regulations and published policies of the FCC (the "Communications Laws"), including that the Station is transmitting at no less than ninety percent (90%) of its authorized power.  There is not now pending, or, to the Knowledge of Seller, threatened, any action by or before the FCC to revoke, cancel, rescind, modify, or refuse to renew any of the FCC Licenses, and Seller has not received any notice of, and has no Knowledge of, any pending, issued, or outstanding order by or before the FCC, order to show cause, notice of violation, notice of apparent liability, notice of forfeiture, or material complaint against either the Station or Seller, except as set forth in Schedule 1.1(a).  Seller has not received any written notice or complaint that a Station is causing interference to any other licensed facility within the past two years.  All material reports and filings required to be filed with the FCC by Seller with respect to the operation of the Station have been filed, and all such reports and filings are substantially accurate and complete in all material respects.  Seller maintains a public inspection file for the Station and, as of the date of filing of the Assignment Application, such filed substantially comply with the Communications Laws in all material respects.

3.6     **Title; Title Documents**.  Seller owns and holds, and the conveyance instruments to be executed by Seller and delivered to Buyer at Closing upon entry of the Sale Order will transfer, good and marketable title to the Assets, free and clear of all Liens other than Permitted Encumbrances to the fullest extent permissible under Sections 363 and 365 of the Bankruptcy Code.

3.7     **Employees.**  Seller is not a party to any collective bargaining, union or similar agreement with respect to the employees of Seller at the Station, and no union represents or claims to represent or is attempting to organize such employees.

3.8     **Brokers**.  Except for Greg Guy of Tideline Partners, who represents Seller and whose broker fees with respect to the Station will be paid by Seller, there is no broker or finder or other person who, as a result of any agreement, understanding, or action, would have any valid claim for a commission or a brokerage fee in connection with the sale of the Station pursuant to this Agreement.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**3.9**    **Insurance**.  All of the material Assets that are insurable are insured against loss, injury, or damage.

**3.10**    **Litigation; Compliance with Law**.  Except for the Bankruptcy Case and matters described in Schedule 3.10 ("Pending Litigation") Seller is not subject to any order, writ, injunction, judgment, arbitration, decision, or decree having a binding effect and affecting the Assets or which restrains or enjoins, or purports to restrain or enjoin, or could reasonably be expected to restrain or enjoin, the transaction contemplated hereby, and to the Knowledge of Seller no such proceeding is pending.  Except for the Pending Litigation, to the Knowledge of Seller, there is no material litigation pending by or against, or threatened against, Seller which could materially and adversely affect any of the Assets.

**3.11**    **Environmental Matters**.  To the Knowledge of Seller: (a) Seller has not in generated, used, transported, treated, stored, released or disposed of, or suffered or knowingly permitted anyone else to generate, use transport, treat, store, release or dispose of any Hazardous Material in violation of any applicable environmental law at the Transmitter Site; (b) there has not been any generation, use, transportation, treatment, storage, release or disposal of any Hazardous Material at the Transmitter Site which has created or might reasonably be expected to create any material liability under any applicable environmental law or which would require reporting to or notification of any governmental entity; and (c) no asbestos or polychlorinated biphenyl or underground storage tank is contained in or located at any Transmitter Site.  Seller is in compliance in all material respects with all environmental, health and safety laws applicable to the real property at the Transmitter Site and Assets.  There is no action, suit or proceeding pending or threatened against Seller in respect of the Station that asserts that Seller has violated any environmental, health or safety laws applicable to the real property at the Transmitter Site or Assets.  Seller has delivered to Buyer true and complete copies of all environmental reports and assessments in Seller's possession that are applicable to the real property at the Transmitter Site or the Station.

**3.12**    **Taxes**.  With respect to the Station, Seller has filed all required tax returns and paid all taxes which have become due pursuant to such returns or pursuant to any real property and/or personal property assessments which have become payable.

**3.13**    **Performance of Real Property Lease**.  The Real Property Lease is in effect and is binding upon Seller and, to the Knowledge of Seller, the other party thereto (subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally).  Seller has performed in all material respects all of its obligations pursuant to the Real Property Lease and is not in material default or breach of any such agreement.  Seller has not received written notice from the counterparty to the Real Property Lease that such party contends that Seller is in material default or breach under the Real Property Lease.  To the Knowledge of Seller, there has not been, and is not, any material default or breach under the Real Property Lease by the other party to such agreement.  Seller has delivered to Buyer true and complete copies of the Real Property Lease, together with all amendments thereto.  Except as set forth or otherwise contemplated in Schedule 1.1(c) attached hereto, there have been no modifications, extensions, or amendments of the Real Property Lease, whether oral or written, except as may be contemplated by this Agreement.  Seller has not been notified by any other party to the Real Property Lease that such party has a present intent to terminate or not to renew the Real Property Lease.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**3.14** **Pending Bankruptcy Proceeding.** Seller acknowledges that it is a debtor in possession under Chapter 11 of the Bankruptcy Code, and that this Agreement is subject to the approval of the Bankruptcy Court pursuant to Section 363 and 365 of the Bankruptcy Code. Except for the pending Bankruptcy Case, to the Knowledge of Seller, there are no other insolvency proceedings of any character, including, without limitation, receivership, composition, or other arrangements with creditors, affecting Seller or any of the Assets.

## ARTICLE 4:  REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties to Seller, but solely with respect to the transaction contemplated by this Agreement:

**4.1** **Organization and Standing**. Buyer is a non-profit, corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee and is qualified to do business in the state of Missouri, and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

**4.2** **Authorization**. Buyer has the power and authority to execute and deliver this Agreement, and to consummate the transaction contemplated hereby. Buyer's performance under this Agreement does not contravene its organizational documents or breach any contractual obligation. Buyer has the power to carry on its business as is now conducted and as proposed to be conducted. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly and validly authorized by Buyer, and no other proceedings on the part of Buyer are necessary to authorize the execution and delivery of, or the performance of Buyer's obligations under this Agreement, or to consummate the transaction contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). This Agreement has been duly and validly executed and delivered by Buyer. This Agreement constitutes the legal, valid, and binding agreement of Buyer enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforcement of creditors' rights or the application of principles of equity.

**4.3** **No Defaults**. The execution, delivery, and performance of this Agreement by Buyer will not (a) conflict with or result in any breach of any provision of the articles of organization, operating agreement, or other similar organizational documents of Buyer; (b) result in a default (or give rise to any right of termination, cancellation, or acceleration) under, or conflict with, any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, agreement, lease, or other instrument or obligation relating to Buyer or its business, except for such defaults (or rights of termination, cancellation, or acceleration) or conflicts as to which requisite waivers or consents have been obtained and delivered to Seller; (c) violate any statute, regulation, order, injunction, or decree of any Governmental Authority which is applicable to Buyer; or (d) require the consent or approval of any governmental authority, lending institution, or other third party other than the FCC Consent or consents required for the assignment of the Real Property Lease.

**4.4** **Buyer's Qualification**. Buyer is legally, financially, and technically qualified to acquire and to become the noncommercial educational FCC licensee of the Station and to perform its obligations under this Agreement. There are no facts known to Buyer which, under

13

Communications Laws, would reasonably be expected to (a) disqualify Buyer from becoming the holder of the FCC Licenses, or (b) disqualify Buyer from consummating the transactions contemplated hereby. Buyer has sufficient funds available to pay the Purchase Price.

**4.5** **Litigation**. Buyer is not subject to any order, writ, injunction, judgment, arbitration, decision, or decree having a binding effect and affecting the business of Buyer or which restrains or enjoins, or purports to restrain or enjoin, or could reasonably be expected to restrain or enjoin, the transaction contemplated hereby, and no such proceeding is pending. There is no material litigation pending by or against, or, to the knowledge of Buyer, threatened against Buyer that would prevent or materially impede the consummation by Buyer of the transaction contemplated by this Agreement.

**4.6** **Brokers**. No broker, finder or other person is entitled to a commission, brokerage fee or other similar payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement or action of Buyer or any party acting on Buyer's behalf. Payment of any broker engaged by Buyer shall be Buyer's sole cost and expense.

## ARTICLE 5:  COVENANTS OF SELLER

Except as otherwise provided in the Affiliation Agreement (if executed) following Buyer's commencement of programming thereunder or as required by the Bankruptcy Code or by Order of the Bankruptcy Court, Seller covenants and agrees with Buyer that, between the Effective Date and the Closing Date, Seller shall act in accordance with the following:

**5.1** **Station Documents**. The records, files and other documents kept in connection with the Station shall be maintained by Seller in the usual and ordinary manner consistent with past practices.

**5.2** **Maintenance of Property**. Seller shall maintain the Tangible Personal Property included in the Assets in good operating condition and consistent with past practices and will replace any material item of Tangible Personal Property that becomes worn out, lost, stolen, or destroyed with like property of substantially equivalent kind and value.

**5.3** **FCC Compliance; License Renewals**. Seller shall continue to operate and maintain the Station in accordance with all material respects with the terms of the FCC Licenses and in material compliance with all applicable laws, including Communications Laws. Seller shall maintain the FCC Licenses in full force and effect and shall timely file and prosecute any renewal applications or other submissions to the FCC. Seller promptly will deliver to Buyer (a) after filing, copies of any material reports, applications, or responses to the FCC in connection with the Station filed after the Effective Date and (b) copies of any material communications from the FCC, or directed to the FCC by a third party, in connection with the Station that are received by Seller or of which Seller becomes aware after the Effective Date. Seller will not file any application with the FCC requesting authority to modify any Station's facilities without Buyer's prior written consent, and Seller shall take all actions necessary to keep the FCC Licenses, including all material permits and applications pending before the FCC, valid and in full force and effect.

**5.4** **Insurance**. Seller shall maintain in full force and effect through the Closing Date property damage, liability, and other insurance with respect to the Assets.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**5.5**     **Disposition of Assets**.  Seller shall not, without the prior written consent of Buyer, sell, lease, or transfer, agree to sell, lease, or transfer, or terminate or let expire, any of the material Assets without replacement thereof with an asset of equivalent kind, condition, and value that satisfies industry standards for such assets, nor create any new Lien on the Assets other than Permitted Encumbrances and Liens arising pursuant to, and in accordance with, the terms of this Agreement.

**5.6**     **Consummation of Agreement**.  Seller shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transaction contemplated by this Agreement to be fully carried out.

**5.7**     **Access to Transmitter Site**.  At the request of Buyer, Seller shall from time to time give to, or cause to be given to, Buyer reasonable access during normal business hours to the Transmitter Site; *provided, however*, that all such access shall be scheduled in a manner reasonably acceptable to that Seller and not interfere with the operation of the Transmitter Site and where required, comply with any access requirements or restrictions in the Real Property Lease and any other leases to which Seller is a party with respect to the Transmitter Site.

**5.8**     **Bankruptcy Court Actions**.  Seller shall employ commercially reasonable efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm, or obtain the Bankruptcy Court approval or recognition of the Asset Purchase and DIP Financing and any other agreement contemplated hereby and to consummate the transactions contemplated hereby.  Seller shall promptly provide Buyer with proposed drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court which relate to the approval of this Agreement, the Asset Purchase, DIP Financing, or the consummation of the transactions contemplated by this Agreement, or any provision therein or herein, and shall provide Buyer and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

## ARTICLE 6:  COVENANTS OF BUYER

Buyer covenants and agrees with Seller that:

**6.1**     **Consummation of Agreement**.  Buyer shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transaction contemplated by this Agreement to be fully carried out.

## ARTICLE 7:  JOINT COVENANTS

Seller and Buyer covenant and agree with one another that:

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**7.1**   **Employees.**   Buyer is not obligated to and does not intend to offer post-Closing employment with any current Station employees.

**7.2**   **Receivables or other payments.**   Seller has no knowledge of having any receivables.  Buyer shall have no obligation to collect Seller's receivables or any other payments owed to Seller to the exist that they exist.

## ARTICLE 8:  CONDITIONS TO THE OBLIGATIONS OF SELLER

With respect to the transaction contemplated under this Agreement, the obligations of Seller to consummate hereunder are subject to the fulfillment of the following conditions prior to or on the Closing Date, unless waived in writing by Seller.

**8.1**   **Representations, Warranties and Covenants**.

(a)   Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

(b)   Buyer shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**8.2**   **Proceedings**.   Neither Seller nor Buyer is subject to any restraining order or injunction (or similar action) that restrains or prohibits the consummation of the transaction contemplated hereby.

**8.3**   **Bankruptcy Court Approval**.  This Agreement and the transactions contemplated hereby are approved by the Bankruptcy Court pursuant to a final, non-appealable Sale Order.

**8.4**   **FCC Licenses**.  The FCC Consent with respect to the Assignment Application has been issued by the FCC and become effective.

**8.5**   **Deliveries.**  Buyer has complied with each and every one of its obligations set forth in Section 10.2.

## ARTICLE 9: CONDITIONS TO THE OBLIGATIONS OF BUYER

With respect to the transaction contemplated under this Agreement, the obligations of Buyer to consummate hereunder are subject to the fulfillment of the following conditions prior to or on the Closing Date, unless waived in writing by Buyer.

**9.1**   **Representations, Warranties and Covenants**.

(a)   Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

(b)     Seller shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**9.2     Proceedings**.  Neither Seller nor Buyer is subject to any restraining order or injunction (or similar action) that restrains or prohibits the consummation of the transaction contemplated hereby.

**9.3     Bankruptcy Court Approval**.  This Agreement and the transactions contemplated hereby are approved by the Bankruptcy Court pursuant to a final, non-appealable Sale Order acceptable to Buyer in its commercial reasonable discretion.

**9.4     FCC Licenses**.  The FCC Consent with respect to the Assignment Application has been issued by the FCC and shall have become effective and if Buyer requests to delay Closing as permitted in Section 2.4, the FCC Consent shall have become a Final Order.

**9.5     Absence of Any Material Adverse Change**.  There shall have been no material adverse change in the Assets or FCC Licenses.

**9.6     Deliveries**.  Seller has complied with each and every one of the obligations set forth in Section 10.1.

**9.7     Liens**.  No Liens (other than Permitted Encumbrances) shall exist or have been filed or recorded against the Assets in the public records of the Secretary of State of Seller's state of formation or in any other jurisdiction in which the Assets are located.  Duly executed UCC releases, mortgage terminations or other similar documents or instruments required to transfer the Assets free and clear of Liens (other than Permitted Encumbrances) shall have been delivered by Seller.

## ARTICLE 10:  ITEMS TO BE DELIVERED AT CLOSING

**10.1     Deliveries by Seller**.  At Closing, Seller shall deliver to Buyer, duly executed by Seller or such other signatory as may be required by the nature of the document, the following:

(a)     a certificate for Seller, dated as of the Closing Date, executed by an officer of Seller, certifying on behalf of Seller that the closing conditions specified in Section 9.1 have been satisfied;

(b)     a good standing certificate issued by Seller's jurisdiction of formation;

(c)     a bill of sale sufficient to sell, convey, transfer and assign the Assets (other than the FCC Licenses and Real Property Lease) to Buyer free and clear of any Liens (other than Permitted Encumbrances), in a form reasonably acceptable to Buyer (the "Bill of Sale");

(d)     an Assignment and Assumption of Real Property Lease sufficient to sell, convey, transfer and assign the Real Property Lease to Buyer free and clear of any Liens (other than Permitted Encumbrances), in a form reasonably acceptable to Buyer (the "Assignment and Assumption of Real Property Lease");

17

(e)     an Assignment and Assumption of Licenses sufficient to assign the Licenses, including the FCC Licenses and Station's call letters, which are included in the Assets to Buyer, in a form reasonably acceptable to Buyer (the "<u>Assignment and Assumption of Licenses</u> ");

(f)     executed releases, in suitable form for filing and otherwise in form and substance reasonably satisfactory to Buyer, of any security interests granted in the Assets as security for payment of loans and other obligations and of any other Liens (other than Permitted Encumbrances); and

(g)     any other documents reasonably requested by Buyer that are reasonably necessary to convey the Assets to Buyer at Closing.

**10.2**   **Deliveries by Buyer**.  At Closing, Buyer shall deliver to Seller the following, duly executed by Buyer or such other signatory as may be required by the nature of the document:

(a)     a certificate for Buyer, dated as of the Closing Date, executed by an officer or other authorized representative of Buyer, certifying on behalf of Buyer that the closing conditions specified in <u>Section 8.1</u> have been satisfied;

(b)     payment of the Purchase Price in accordance with the Sale Order and taking into account credit offsets for satisfaction of the DIP Obligations;

(c)     a good standing certificate issued by Buyer's jurisdiction of formation;

(d)     the Bill of Sale;

(e)     the Assignment and Assumption of Real Property Lease;

(f)     the Assignment and Assumption of Licenses;

(g)     any other documents reasonably requested by Seller and reasonably necessary to consummate the transactions set forth in this Agreement.

## ARTICLE 11:  SURVIVAL AND INDEMNITY

The rights and obligations of Buyer and Seller under this Agreement shall be subject to the following terms and conditions:

**11.1**   **Survival of Covenants, Representations, and Warranties**.  Except as stated below, the representations and warranties of Buyer and Seller contained in this Agreement shall survive Closing for twelve (12) months from the Closing Date, <u>except for</u> the provisions of <u>Section 3.1</u> (Organization and Authorization), <u>Section 3.6</u> ( Title; Title Documents); <u>Section 3.8</u> (Brokers) and <u>Section 3.12</u> (<u>Taxes</u>) (the "<u>Fundamental Representations</u>") which shall survive until the last to occur of (a) expiration of any applicable statute of limitations or (b) eighteen months (18) months from the Closing Date.  The covenants and agreements in this Agreement to be performed after Closing shall survive Closing until performed.  All other covenants shall expire at Closing.

18

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**11.2** **General Agreement to Indemnify**.

(a)      After Closing, Seller on the one hand, and Buyer on the other hand, shall indemnify, defend and hold harmless each other and any employee, representative, agent, director, officer, affiliate or permitted assign of each other (each, an "Indemnified Party") from and against any and all claims, claims, actions, suits, proceedings, liabilities, obligations, losses and damages, amounts paid in settlement, interest, costs and expenses (including reasonable attorneys' fees, court costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing) (collectively, "Losses") asserted against, incurred or suffered by any Indemnified Party as a result of, arising out of, or relating to: (i) the failure of any representation or warranty of the Indemnifying Party made in the Agreement to have been true and correct as of the Closing Date as though such representation or warranty were made at and as of the Closing Date, or (ii) the breach by the Indemnifying Party of any covenant of such Party contained in this Agreement to be performed after Closing.  The term "Losses" is expressly limited to such Party's actual out-of-pocket costs and expenses and does not and shall not include special, indirect, incidental, consequential or punitive or exemplary damages unless paid in satisfaction of a Third Party Claim (defined below).  Adjustments to the Purchase Price made pursuant to Section 1.4(d) of this Agreement shall not be included in any calculation of Party's total "Losses" for purposes of meeting the Loss threshold provided in Section 11.4.

(b)      After Closing, Seller further agrees to indemnify and hold harmless Buyer and any other Indemnified Party of Buyer from and against any Losses asserted against, incurred or suffered by Buyer or any other Indemnified Party of Buyer arising out of, resulting from, or relating to the Excluded Liabilities or the operations of the Station and ownership of the Assets prior to Closing only as ordered by the Bankruptcy Court.

(c)      After Closing, Buyer further agrees to indemnify and hold harmless Seller and any other Indemnified Party of Seller from and against any Losses asserted against, incurred or suffered by Seller or any other Indemnified Party of Seller arising out of, resulting from, or relating to the Assumed Liabilities or the operations of the Station and the Assets from and after Closing only as ordered by the Bankruptcy Court.

**11.3** **General Procedures for Indemnification**.

(a)      The Indemnified Party seeking indemnification under this Agreement shall promptly notify in writing the Party or Parties from whom indemnification is sought (the "Indemnifying Party") of the assertion and basis of any claim, or the commencement and basis of any action, suit or proceeding by any third party in respect of which indemnity may be sought hereunder (a "Third Party Claim") and will give the Indemnifying Party such information with respect thereto as the Indemnifying Party may reasonably request, but failure to give such notice shall not relieve the Indemnifying Party of any liability hereunder (except to the extent the Indemnifying Party has suffered prejudice by such failure).  The Indemnifying Party shall have the right, but not the obligation, exercisable by written notice to the Indemnified Party within thirty (30) days of receipt of notice from the Indemnified Party of the commencement of a Third Party Claim, to assume the defense and control the settlement of such Third Party Claim that involves (and continues to involve) solely money damages; *provided, however*, that prior to assuming any claim defense, the Indemnifying Party must show the Indemnified Party that they have the

19

financial ability to pay out any potential monetary claim before they are allowed to assume its defense. Failure by the Indemnifying Party to so notify the Indemnified Party shall be deemed a waiver by the Indemnifying Party of its right to assume the defense of such claim.

(b)     Whether or not the Indemnifying Party chooses to defend or prosecute any Third Party Claim, the Parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

(c)     The Indemnifying Party or the Indemnified Party, as the case may be, shall have the right to participate in (but not control), at its own expense, the defense of any Third Party Claim that the other is defending, as provided in this Agreement.

(d)     The Indemnifying Party, if it has assumed the defense of any Third Party Claim as provided in this Agreement, shall not consent to, or enter into, any compromise or settlement of, or consent to the entry of any judgment arising from, any such Third Party Claim (which compromise, settlement, or judgment (i) commits the Indemnified Party to take, or to forbear to take, any action or (ii) does not provide for a complete release by such third party of the Indemnified Party) without the Indemnified Party's prior written consent. If the conditions set forth herein are met but the Indemnified Party refuses to settle any Third Party Claim, the Indemnifying Party may tender the settlement amount and be relieved of further liability.

(e)     The Indemnifying Party shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the Indemnified Party, but shall be subrogated to any right of action to the extent that it has paid or successfully defended against any Third Party Claim.

**11.4    Limitations on Indemnification**.     Neither Party shall be required to indemnify the other Party for any Losses under this Article 11 unless written notice of a claim under this Article 11 was received by an Indemnifying Party before the end of the survival period for such claim as set forth in Section 11.1. In addition, Seller shall not be required to indemnify Buyer for any Losses under Section 11.2(a)(i) (except with respect to the Fundamental Representations) and Buyer shall not be required to indemnify Seller for any Losses under Section 11.2(a)(i) until the aggregate claim for Losses exceeds $50,000, after which the Indemnified Party shall be entitled to recover for all Losses in excess of such threshold. Notwithstanding the foregoing, the maximum liability of Seller for Losses under Section 11.2(a)(i) shall not exceed Two Million Dollars ($2,000,000.00) except with respect to a breach of the Fundamental Representations which shall not exceed the Purchase Price. In calculating the amount of Losses to Buyer, such Losses shall be reduced by any recovery from any third party (including insurance proceeds) as a result of the facts or circumstances giving rise to the Losses. The limitations set forth in this Section shall not apply to Losses arising under Sections 11.2(b) or 11.2(c) of this Agreement. These indemnification provisions as set forth in Article 11 shall apply only if the transactions contemplated by this Agreement are closed.

**11.5    Exclusive Remedy**. Following Closing, the right to indemnification, defense, hold harmless, payment or reimbursement provided in this Article 11 will be the exclusive remedy

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

of any Party with respect to Losses in connection with the transactions contemplated by this Agreement.

## ARTICLE 12:  TERMINATION

**12.1    <u>Termination</u>**.  This Agreement, in whole or in part, in accordance with the terms of this Agreement, and consistent with <u>Section 13.11</u> below, may be terminated at any time by Buyer or by Seller prior to Closing, or the applicable Closing, as set forth below:

(a)    by the mutual written consent of Buyer and Seller;

(b)    by written notice of Seller to Buyer, provided that Seller is not in breach or default of this Agreement, if Buyer (i) breaches in any material respect any of Buyer's representations or warranties provided herein; or (ii) defaults in any material respect in the performance of any of Buyer's covenants or agreements under this Agreement; and in any of which events (i)-(ii) such breach or default is not cured by Buyer within the Cure Period (as defined below), if applicable;

(c)    by written notice of Buyer to Seller, provided Buyer is not in breach or default of this Agreement, if Seller (i) breaches in any material respect any of Seller's representations or warranties provided herein or in the DIP Loan Documents; or (ii) defaults in any material respect in the performance of any of Seller's covenants or agreements under this Agreement or any of Seller or its affiliates covenants under the DIP Loan Documents; and in any of which events (i)-(ii) such breach or default is not cured by Seller within the Cure Period, if applicable;

(d)    This Agreement will terminate automatically if the Bankruptcy Court does not approve the Asset Purchase or if a consideration of an Alternative Transaction is required, and ultimately approved by the Bankruptcy Court to a Person other than Buyer, upon consummation of such Alternative Transaction; and

(e)    by written notice of Seller to Buyer, or Buyer to Seller (i) if Closing has not been consummated with eighteen (18) months after the date the FCC releases public notice that the Assignment Application has been accepted for filing ("<u>Drop Dead Date</u>"); (ii) if, for any reason, the FCC denies or dismisses the Assignment Application and the time for reconsideration or court review under the Communications Laws with respect to such denial or dismissal has expired and there is not then pending with respect thereto a timely filed petition for reconsideration or request for review; or (iii) if, for any reason, the Assignment Application is designated for an evidentiary hearing, *provided, however*, that the right to terminate this Agreement under this subsection shall not be available to any Party whose breach of this Agreement has been the cause of, or resulted in, the failure of Closing to occur on or before such date.

**12.2    <u>Cure Period</u>**.  The term "<u>Cure Period</u>" as used herein means a period commencing with the date that Buyer or Seller receives from the other Party written notice of breach or default hereunder and continuing until thirty (30) days thereafter; *provided, however*, that if the breach or default cannot reasonably be cured within such period but can be cured before the Drop Dead Date, and if diligent efforts to cure promptly commence, then the Cure Period shall continue as long as such diligent efforts to cure continue, but not beyond the Drop Dead Date.  Except as set forth

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

below, the termination of this Agreement with respect to the transaction contemplated hereunder shall not relieve the Buyer or Seller of any liability for breach or default under this Agreement prior to the date of such termination.

**12.3**    **Liability; Right to Terminate**.  A termination of this Agreement shall not relieve any Party hereto of any liability for which it otherwise would be subject.  Unless otherwise permitted by Order of the Bankruptcy Court, no Party that is in material breach of this Agreement shall be entitled to terminate this Agreement except with the written consent of the other Party.

**12.4**    **Damages and Remedies upon Default**.

(a)    **Buyer's Default**.  Upon a termination of the Agreement by Seller pursuant to Section 12.1(b), Seller's sole remedy shall be the payment by Buyer to Seller of the amount of $250,000,00 which amount will be paid as liquidated damages and not as a penalty ("Seller Liquidated Damages").  The Parties agrees that payment of the Seller Liquidated Damages shall first be made by cancelling on a dollar-for-dollar basis, any outstanding indebtedness associated with the DIP Obligations.  Seller shall also arrange for alternative financing as soon as practicable to enable repayment in full to Buyer of the remaining outstanding balance of the DIP Obligations, including all interest earned thereon and fees and expenses required to be paid thereunder.  Seller and Buyer acknowledge that these Seller Liquidated Damages are reasonable in light of the anticipated harm that would be caused by Buyer's breach of any of its material obligations under this Agreement and the difficulty of ascertaining damages and proof of loss and that these damages do not constitute a penalty.

(b)    **Other Termination**.  In the event there is an Alternative Transaction for which Buyer is not the successful bidder, then within fourteen (14) days after the entry of an order of the Bankruptcy Court approving a sale to the successful bidder of the Alternative Transaction, Seller shall arrange for alternative financing as soon as practicable to enable repayment in full to Buyer of the remaining outstanding DIP Obligations, including all interest earned thereon and fees and expenses required to be paid thereunder including payment of the Break-Up Fees, subject to Bankruptcy Court approval.

## ARTICLE 13:  MISCELLANEOUS

**13.1**    **Governing Law**.  The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of Missouri, (exclusive of those relating to conflicts of laws) and the Bankruptcy Code, as applicable.  Any action at law, suit in equity or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, related to or from this Agreement, or any provision hereof, shall be litigated only in the Bankruptcy Court or if the Bankruptcy Court is not the proper forum, the federal or state courts of the State of Missouri, County of St. Louis.  The Parties hereby consent to the personal and subject matter jurisdiction of such courts and waive any right to transfer or change the venue of any litigation between them.

**13.2**    **Expenses; Taxes**.  Each Party hereto shall bear all of its expenses incurred in connection with the transaction contemplated by this Agreement, including without limitation, accounting, engineering and legal fees incurred in connection herewith; *provided, however*,

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

that Seller and Buyer shall share equally (a) all filing fees required to be paid in connection with the Assignment Application as set forth in <u>Section 2.1</u>; and (b) the costs of any state or local sales, use, stamp or transfer taxes and other similar taxes applicable to the transfer of the Assets under this Agreement, if any.

  **13.3** <u>**Entire Agreement; Amendment; No Waiver**</u>.  This Agreement, including the schedules and exhibits hereto, contain the entire agreement and understanding by and between the Parties, and no other representations, promises, agreements, or understanding, written or oral, not contained herein shall be of any force or effect.  This Agreement may only be amended in a writing signed by all of the Parties.  No oral agreement shall have any effect.  No failure or delay in exercising any right hereunder shall be deemed or construed to be a waiver of such right, either prospectively or in the particular instance.  This Agreement has been prepared by all of the Parties hereto, and no inference of ambiguity against the drafter of a document therefore applies against any Party hereto.

  **13.4** <u>**Confidentiality**</u>.  Except for information about the Station and the Assets acquired by Buyer at or after Closing and except where such information is known through other lawful sources or where its disclosure is required in accordance with applicable law, including requirements of the FCC pursuant to the Assignment Application and as is required in order to pursue an order approving the DIP Motion and the Sale Motion.  before the Bankruptcy Court, Buyer and Seller shall keep confidential all non-public information obtained by it with respect to the other Party or the Station in connection with this Agreement.  If the transaction contemplated herein is not consummated for any reason, Buyer and Seller shall return to each other or destroy, without retaining a copy thereof in any medium whatsoever, any schedules, documents or other written information, including all financial information, obtained from the other in connection with this Agreement and the transaction contemplated hereby.

  **13.5** <u>**Public Announcements**</u>.

   (a) Except as is required by the Bankruptcy Court in connection with the DIP Motion and the Sale Motion, prior to the filing of the Assignment Application, no Party shall, without the prior approval of the other Party hereto (which approval may not be unreasonably withheld), make any press release or public statement concerning the transaction contemplated by this Agreement, except (i) to announce that the transaction has been entered into and (ii) as and to the extent that such Party shall be so obligated by law or the requirements of any national securities exchange; provided, however, that both Parties will be permitted to publicly comment on, issue public statements regarding and otherwise discuss the transaction contemplated by this Agreement (without the other Party's prior approval), including, without limitation, in response to analyst questions, on earnings calls and as otherwise determined by a Party in its sole discretion.

   (b) Notwithstanding the foregoing, the Parties acknowledge that the rules and regulations of the FCC require that local public notice of the transaction contemplated by this Agreement be made by Seller after the Assignment Application has been filed with the FCC and that a copy of this Agreement and other related documents as may be required by the FCC rules and policies shall be included as a material part of the Assignment Application, which will be made available for public inspection at the Station and in the FCC's records.  The form and

23

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

substance of the required public notices, to the extent not dictated by the Communications Laws, shall be mutually agreed upon by Seller and Buyer.

(c)    Notwithstanding the foregoing, the Parties acknowledge that the certain information must be disclosed to the Bankruptcy Court, including this Agreement and the DIP Loan Documents, in an effort to obtain the DIP Orders and the Sale Order contemplated by this Agreement, and such information will remain unsealed and will be available for public review.

**13.6    Risk of Loss**.  The risk of loss to any of the Assets on or prior to the Closing Date shall be upon Seller.  Seller shall repair or replace any damaged or lost Assets; *provided, however*, that in the event any lost or damaged Assets is reasonably expected to exceed Fifty Thousand Dollars ($50,000.00) to repair or replace, then either Party may, at its option, upon prior written notice to the other Party, postpone Closing for a period of up to ninety (90) days while Seller shall repair or replace such Assets, and the Closing Dates hall be extended to accommodate such 90-day period.  Notwithstanding the foregoing, if the expected insurance proceeds are sufficient to repair or replace the damaged or lost Assets, the Parties shall close the transaction contemplated herein with the Assets in their damaged or lost condition, and Seller shall assign to Buyer all proceeds of insurance on such damaged or lost Assets, and Buyer shall have the responsibility to repair or replace the damaged or lost Assets.  Further, however, if the damage or loss exceeds Four Hundred Thousand Dollars ($400,000.00), and Seller elects not to repair or replace the lost or damaged Assets, then, either Party shall have the right to terminate the Agreement by written notice to the other Party before Closing, and in such event the Parties hereby agree to use good faith efforts to reform the terms of this Agreement consistent with Section 13.11 hereof.

**13.7    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective representatives, successors and assigns.  Neither Seller nor Buyer may assign this Agreement or any part hereof prior to Closing without the prior written consent of the other Party and any attempted assignment without such consent shall be void.  In the event of any assignment of this Agreement, the assignee shall enter into a written agreement accepting joint and several liability for all obligations under this Agreement.

**13.8    Specific Performance**.  Seller acknowledges that the Assets are a unique asset not readily obtainable on the open market and that, in the event that Seller fails to perform its obligation to consummate the transaction contemplated hereby, money damages alone will not be adequate to compensate Buyer for its injury.  Therefore, Seller agrees and acknowledges that in the event of Seller's failure to perform its obligation to consummate the transaction contemplated hereby, in lieu of seeking damages or any other remedy, Buyer may seek specific performance of the terms of this Agreement and of Seller's obligation to consummate the transaction contemplated hereby.  The Bankruptcy Court's failure to approve the Asset Purchase shall not constitute a failure to perform by Seller under this provision.

**13.9    Notices**.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly made and received on date delivered by hand, receipt confirmed, or the next Business Day when sent for next Business Day delivery by a nationally recognized overnight courier service, expenses prepaid, addressed as set forth below:

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

If to Seller, then to:

>Double Helix Corporation
>3524 Washington Ave.
>St. Louis, MO 63103
>Attention: Kelly Wells
>Email: kelly@kdhx.org

with a copy (which shall not constitute notice) to:

>Foster Garvey P.C.
>3000 K Street NW
>Washington, DC 20007
>Attention: Brad Deutsch
>Email: brad.deutsch@foster.com

and with a copy (which shall not constitute notice) to:

>Robert E. Eggmann, Esq.
>Carmody MacDonald P.C.
>120 S. Central Ave., Suite 1800
>St. Louis, MO 63105
>Email: ree@carmodymacdonald.com

If to Buyer, then to:

>K-LOVE, Inc.
>2000 Reams Fleming Blvd.
>Franklin, TN 37064
>Attn. Legal Department

with a copy (which shall not constitute notice) to:

>Paige K. Fronabarger, Esq.
>Wilkinson Barker Knauer LLP
>1800 M Street, NW, Suite 800N
>Washington, DC 20036
>Email: Pfronabarger@wbklaw.com

Any Party may change the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section providing for the giving of notice.

**13.10  Further Assurances**.  From time to time prior to, on and after the Closing Date, each Party hereto will execute all such instruments and take all such actions as any other Party shall reasonably request, without payment of further consideration other than any reasonable

25

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

expenses that may be incurred by the other Party, in connection with carrying out and effectuating the intent and purpose of the transaction contemplated by this Agreement, including without limitation the execution and delivery of any and all confirmatory and other instruments in addition to those to be delivered on a Closing Date, and any and all actions which may reasonably be necessary to complete the transaction contemplated hereby. The Parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement.

13.11   **Partial Invalidity**. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision contained herein, or its application to any particular circumstance shall, for any reason, be held to be invalid or unenforceable by a court of competent jurisdiction, such provision or such application shall be ineffective to the extent of such invalidity or unenforceability in such jurisdiction, without invalidating the remainder of such provision or any other provisions hereof, or its application in any other circumstance, unless such a construction would be unreasonable, and without invalidating such provision or its application in any other jurisdiction.

13.12   **No Third Party Beneficiaries**. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the Parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

13.13   **Execution in Counterparts**. This Agreement (and any other document delivered in connection with this Agreement) may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. This Agreement (and any other document delivered in connection with this Agreement) may be executed via electronic or digital signature and signature pages may be exchanged by facsimile or other electronic transmission, (including via DocuSign or a similar program) with the same legal effect as if the signatures had appeared in original handwriting on the same physical document. At the request of either Party hereto or to any such agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to the other Party. No Party hereto or to any such agreement or instrument shall raise the fact execution of such document by digital or electronic signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation of a contract and each such Party forever waives any such defense.

13.14   **Headings**. The headings set forth in this Agreement are for convenience only and will not control or affect the meaning or construction of the provisions of this Agreement.

13.15   **Definitions**. In addition to the terms defined elsewhere in this Agreement, the following terms shall have the respective meanings specified below:

(a)      "Affiliate" means, with respect to any Person, (i) a spouse or member of the immediate family of such Person, (ii) any member, manager, director, officer or partner of such Person, (iii) any corporation, partnership, business, association, limited liability company, firm, trust or other entity of which such Person is a member, manager, director, officer, trustee, or partner or owns or controls or is the beneficiary of, directly or indirectly, more than twenty percent (20%)

26

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

of the voting stock or other equity interests and (iv) any other Person who either directly or indirectly through one or more intermediaries is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, partnership interests or by contract, assignment, credit arrangement, as trustee or executor, or otherwise, and the terms "controls," "controlling" and "controlled by" shall have correlative meanings.

(c)      "<u>Business</u>" means the business of Seller conducted as of the date hereof.

(d)      "<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day on which commercial banks in St. Louis, Missouri, are authorized or required by Law to be closed.

(e)      "<u>Cure Amounts</u>" means all cash amounts that, pursuant to section 365 of the Bankruptcy Code, will be required to be paid as of the Closing Date to cure any monetary defaults on the part of Seller under the Real Property Lease as a prerequisite to the assumption of such Real Property Lease under section 365 of the Bankruptcy Code.

(f)      "<u>DIP Financing</u>" means the debtor-in-possession financing Buyer has agreed to provide Seller as set forth in the DIP Motion and reflected in the DIP Loan Documents (when executed).

(g)      "<u>DIP Financing Term Sheet</u>" means that certain Debtor-In-Possession (DIP) Financing Term Sheet entered into between Seller and Buyer on March 10, 2025.

(h)      "<u>DIP Loan Documents</u>" shall mean that certain Senior Secured Super-Priority Debtor-in-Possession Promissory Note and Security Agreement to be entered into by Seller, as borrower, and Buyer, as lender.

(i)      "<u>DIP Obligations</u>" shall mean all obligations and indebtedness of Seller to Buyer whether now or hereafter owing or existing, including, without limitation, all obligations arising in connection with the DIP Financing as set forth in the DIP Financing Term Sheet and the DIP Loan Documents, together with all interest and other sums payable in connection with any of the foregoing, as allowed by Sale Order or other orders of the Bankruptcy Court.

(j)      "<u>Environmental Law</u>" means any Law (i) relating to pollution or the protection, preservation or restoration of human health (in regards to exposure to Hazardous Materials) or the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or any exposure to or release of, or the management of (including the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production or disposal of) any Hazardous Materials or (ii) that regulates, imposes liability (including for enforcement, investigatory costs, cleanup, removal or response costs, natural resource damages, contribution, injunctive relief, personal injury or property damage) or establishes standards of care with respect to any of the foregoing. The term "Environmental Law" includes, without limitation, any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence,

27

nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Hazardous Materials.

(k)    "Governmental Authority" means any shall mean any (a) nation, state, province, tribal, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, provincial, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any government agency, ministry, branch, department, official, or entity and any court or other tribunal); (d) multinational organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(l)    "Hazardous Materials" means all substances defined or regulated as hazardous, a pollutant or a contaminant under any Environmental Law, including any regulated pollutant or contaminant (including any constituent, raw material, product or by-product thereof), petroleum or natural gas hydrocarbons or any liquid or fraction thereof, asbestos or asbestos-containing material, polychlorinated biphenyls, any hazardous or solid waste, and any toxic, radioactive, infectious or hazardous substance, material or agent.

(m)    "Knowledge of Seller" means that any officer or senior executive of Seller has, or at any time had, actual knowledge of the item or matter, or received written notice of the fact or matter.

(n)    "Law" means any federal, state, provincial, local, foreign, international or supranational law (including common law), statute, treaty, ordinance, rule, regulation, Order, code, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Authority.

(o)    "Liability" or "Liabilities" means any and all claims, demands, fines, liabilities, losses, obligations, penalties, judgments, damages, charges, costs, debts and indebtedness (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses related thereto (including fees, discounts, expenses of legal counsel, experts, engineers and consultants, and costs of investigations).

(p)    "Lien" means any "Interest" as that term is used in Section 363(f) of the Bankruptcy Code, lien (including any mechanics lien), encumbrance, license, pledge, mortgage, indenture, deed of trust, security interest, pledge, hypothecation, claim, lease, charge, escrow, option, right of first offer, right of first refusal, preemptive right, easement, servitude, reservation, covenant, encroachment, right of use, right of way, security agreement or other similar agreement, arrangement, contract, commitment, understanding or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind with respect to any Person, or any proxy, voting trust or agreement, transfer restriction under any director or

28

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

member or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

(q)     "Order" means, other than in connection with the Final Order, any judgment, order, administrative order, writ, stipulation, injunction (whether permanent or temporary), award, decree or similar legal restraint of, or binding settlement having the same effect with, any governmental action.

(r)     "Permitted Encumbrance" means (i) statutory Liens for current taxes not yet due, (ii) vendor's, mechanic's, materialman's, carriers', workers', landlords', repairman's, warehouseman's and other similar Liens (A) with respect to Liabilities that are not yet due and payable, or if due, are not delinquent, (B) that are being contested in good faith by appropriate proceedings and for which adequate reserves (based on good faith estimates of management) have been set aside for the payment thereof or (C) arising or incurred in the ordinary course of business relating to obligations to which there is no default on the part of Seller and which are not, individually or in the aggregate, material to the operation of the Business and do not materially affect the market value or continued use of the asset encumbered thereby, (iii) Liens imposed or promulgated by applicable Law or any Governmental Authority with respect to the Transmitter Site real property, including zoning, building or similar restrictions which are not violated by (A) the current use or occupancy of such real property, (B) the proposed use, occupancy or development thereof or (C) the operation of the Business, or any violation of which could not materially adversely affect the market value or continued use of the Transmitter Site real property y, (iv) utility easements, minor encroachments, rights of way, imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects and similar Liens or Liabilities (other than Assumed Liabilities), but not including any monetary Liens, that are imposed by any Governmental Authority having jurisdiction thereon or otherwise are typical for the applicable property type and locality as do not individually or in the aggregate materially interfere with the present occupancy under, or use or market value of the respective Transmitter Site real property subject to the Real Property Lease or otherwise materially impair the operation of the Business, and (v) any Liens to be released at or prior to Closing; provided that, in each case enumerated in this definition, such Lien shall only be a Permitted Encumbrance if it cannot otherwise be removed, discharged, released or transferred, as the case may be, pursuant to Section 363(f) of the Bankruptcy Code or otherwise.

(s)     "Person" means any individual, corporation, partnership, proprietorship, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority, or other entity, organization or institution of any type whatsoever.

(t)     "Transaction Documents" means, collectively, this Agreement, the DIP Loan Documents, the Bill(s) of Sale, the Assumption Agreement(s) and each other agreement, document or instrument executed and delivered by the Parties in connection with the consummation of the transactions contemplated hereby.

*[SIGNATURE PAGES FOLLOW]*

29

<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

**SELLER:**                    **DOUBLE HELIX CORPORATION**

By: _____
     Name:  Kelly K. Wells
     Title:  Executive Director

**BUYER:**                     **K-LOVE, INC.**

By: _____
     Name: Thomas Stultz
     Title: Chief Executive Officer

By: _____
     Name: Matt Reynolds
     Title: Chief Financial Officer

**FINAL EXECUTION**

## SCHEDULES

1.1(a)      FCC & Other Governmental Authorizations

1.1(b)      Tangible Personal Property

1.1(c)      Real Property Lease

3.10        Pending Litigation

## EXHIBITS

**Schedule 1.1(a)**

**FCC & Other Governmental Authorizations**
**Main Station Noncommercial Educational KDHX (FM), 88.1 MHz, St. Louis, Missouri**
**FCC Facility ID Number 17380**
*Double Helix Corporation*

| Type of Authorization | Call Sign | FCC File Number | Grant Date | Expiration Date |
|---|---|---|---|---|
| Renewal of License | KDHX | 0000124190 | 1/21/2021 | 2/1/2029 |
| Broadcast License | KDHX | BLED-19880401KA | 4/24/1989 | N/A |
| Auxiliary License | KDHX | BXLED-20071226AAO | 2/12/2008 | N/A |

**Pending Applications**

None.

**Broadcast Auxiliary Licenses**

| Type of Authorization | Call Sign | Grant Date | Expiration Date |
|---|---|---|---|
| Aural Studio Transmitter Link | WLP431 | 11/21/1990 | 2/1/2029 |
| Remote Pickup | WPKN366 | 5/8/1997 | 2/1/2029 |

2

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

## Schedule 1.1(b)

## Tangible Personal Property

| __Equipment__ |
| --- |
| Radio Tower |
| BE FM 20T FM Transmitter (Analog) |
| Harris 210 Transmitter (Backup Transmitter) |
| FM Dummy Load Tester 25,000 Watt |
| 5 Bay ERI FM Antenna |
| 4 Bay ERI FM Antenna |
| Harris FlexStar Exciter |
| Burk ARC-16 |
| Kohler Generator |
| Transmission Line for both Antenna |
| Orban FM Processor 8500 |
| Mosley StarLink |
| 5 ton A/C Unit |

<u>Note</u>:  Buyer will also acquire Seller's shelter located at the Transmitter Site.

## Schedule 1.1(c)

### Real Property Lease

Lease Agreement dated July 27, 1983 between the Raymond A. McNeely ("Lessor") and Double Helix Corporation, as amended by the Amendment and Extension of Lease Agreement dated February 7, 2003 for real property located in Jefferson County, Missouri, and more fully described in Book 388, Page 448 of the Recorder of Deeds of Jefferson County, Missouri.

# Schedule 3.10

## Pending Litigation

| | | | |
|---|---|---|---|
| DAEHLER BROWN ET AL V DOUBLE HELIX CORPORATION | 11/08/2024 | Not Disposed | See Link 1 |
| STACY BERNARD ET AL V DOUBLE HELIX CORP ET AL | 01/29/2025 | Not Disposed | See Link 2 |



Audit trail

| | |
|---|---|
| Title | KDHX Asset Purchase Agreement |
| File name | KDHX_Asset_Purcha...l_APA_3.24.25.pdf |
| Document ID | e0db38535e86732a2a7de0afcb886351196ae729 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **03 / 24 / 2025**<br>20:57:39 UTC | Sent for signature to Thomas Stultz (tstultz@kloveair1.com) and Matthew Reynolds (mreynolds@kloveair1.com) from pfronabarger@wbklaw.com<br>IP: 64.98.245.119 |
| **VIEWED** | **03 / 24 / 2025**<br>20:59:05 UTC | Viewed by Matthew Reynolds (mreynolds@kloveair1.com)<br>IP: 152.39.176.200 |
| **SIGNED** | **03 / 24 / 2025**<br>21:00:48 UTC | Signed by Matthew Reynolds (mreynolds@kloveair1.com)<br>IP: 192.100.255.11 |
| **VIEWED** | **03 / 24 / 2025**<br>21:40:32 UTC | Viewed by Thomas Stultz (tstultz@kloveair1.com)<br>IP: 93.115.5.83 |
| **SIGNED** | **03 / 24 / 2025**<br>21:40:57 UTC | Signed by Thomas Stultz (tstultz@kloveair1.com)<br>IP: 192.100.255.11 |
| **COMPLETED** | **03 / 24 / 2025**<br>21:40:57 UTC | The document has been completed. |

**EXHIBIT 2**

**(Proposed Bid Procedures Order)**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **In Proceedings Under Chapter 11** |
| | ) | **Case No. 25-40745-659** |
| **DOUBLE HELIX CORPORATION,** | ) | **Honorable Kathy A. Surratt-States** |
| **d/b/a KDHX COMMUNITY MEDIA,** | ) | |
| | ) | **Ref. Mtn. _____** |
| **Debtor.** | ) | |
| | ) | **Hearing Date:  May 13, 2025** |
| | ) | **Hearing Time: 10:00 a.m.** |
| | ) | **Hearing Location: Courtroom 7 North** |

**ORDER (I) APPROVING: (A) BIDDING PROCEDURES, (B) DESIGNATION OF
STALKING HORSE BIDDER AND STALKING HORSE BID PROTECTIONS,
(C) SCHEDULING AUCTION AND SALE HEARING, (D) FORM AND MANNER OF
NOTICE OF SALE, AUCTION, AND SALE HEARING; AND (E) ASSUMPTION AND
ASSIGNMENT PROCEDURES AND FORM NOTICE THEREOF; AND
(II) GRANTING RELATED RELIEF[3]**

Upon the motion (the "**Motion**") of Double Helix Corporation, the above-captioned debtor

and debtor in possession (the "**Debtor**"), for entry of an order pursuant to sections 105(a), 363, 365,

503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004,

6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the

United States Bankruptcy Court of Eastern District of Missouri *Chapter 11 Guidelines for Sales and

Sale Procedures Motions* ("**Local Guidelines**"): (i) authorizing and approving the bidding

procedures substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures**") and

incorporated herein by this reference, in connection with the sale of any or substantially all of

Debtor's Assets; (ii) designating and approving K-LOVE, Inc. as the stalking horse bidder

---

3 Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Motion.

("**Stalking Horse Bidder**"); (iii) approving the Stalking Horse Bid Protections for the Stalking Horse Bidder in accordance with the terms and conditions set forth in that certain Asset Purchase Agreement, effective as of March 24, 2025 (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse Agreement**") attached hereto as **Exhibit B** and incorporated herein by this reference, and pursuant to the Bid Procedures; (iv) authorizing and scheduling an auction for the Assets (the "**Auction**"), and scheduling a hearing (the "**Sale Hearing**") with respect to the approval of a proposed sale transaction for the Assets (the "**Transaction**"); (v) authorizing and approving the form and manner of notice to each non-Debtor counterparty (each a "**Counterparty**") to an executory contract or unexpired non-residential real property lease of the Debtor (each a "**Contract**") regarding the Debtor's potential assumption and assignment of Contracts and the Debtor's calculation of the amount necessary to cure any monetary defaults under such Contracts ("**Cure Costs**"), substantially in the form attached here to as **Exhibit C** ("**Assumption and Assignment Notice**") and incorporated herein by this reference; (vi) authorizing and approving the procedures set forth herein ("**Assumption and Assignment Procedures**") for the assumption and assignment of Contracts to the Successful Bidder ("**Proposed Assumed Contracts**"); and (vii) granting related relief, all as more fully set forth in the Motion; and subject to the approval by the Federal Communications Commission (the "**FCC**") of the assignment of KDHX's broadcast licensing agreement (the "**FCC License**") in favor of the successful bidder at the Auction (the "**Successful Bidder**"); and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b) as to which the Bankruptcy Court has the power to enter a final judgment; and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper

43

notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein on an interim basis; and it appearing that the relief requested in the Motion is in the best interests of the Debtor and its estate and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED[4] THAT:

A.  <u>Jurisdiction</u>. This Court has jurisdiction to hear and determine the Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.  <u>Statutory and Legal Predicates</u>. The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.  <u>Pre-Petition and Post-Petition Marketing Process</u>. Debtor asserts that its advisors engaged in marketing and sale efforts before and after the commencement of the Chapter 11 Case to solicit and develop the highest or best offer for the Assets.

D.  <u>Bid Procedures</u>. Debtor has articulated good and sufficient business reasons for the Court to approve the Bid Procedures. The Bid Procedures are fair, reasonable, and

---

4 The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtor's sound business judgment. The Bid Procedures were negotiated in good faith and at arms-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtor's business resulting in the highest or otherwise best offer.

E. <u>Designation of Stalking Horse Bid</u>. Selection of the Stalking Horse Bidder as a "stalking horse" is in the best interest of Debtor and its estate and reflects a sound exercise of the Debtor's business judgment. The Stalking Horse Agreement provides the Debtor with the opportunity to sell the Assets to preserve and realize their going concern value. Without the Stalking Horse Bid, the Debtor would likely realize a lower price for the Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a benefit to the Debtor, its estate, and creditors in this Chapter 11 Case. The Stalking Horse Bid will provide the Debtor with the opportunity to secure a fair and adequate baseline price for the Assets at the Auction, if any, and, accordingly, will provide a clear benefit to the Debtor's estates, creditors, and all other parties in interest.

F. <u>Designation of Stalking Horse Bidder</u>. The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement, and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bid Procedures. The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders exists between the Stalking Horse Bidder and the Debtor.

45

Pursuit of the Stalking Horse Bid as a "stalking-horse" purchase agreement is in the best interests of the Debtor, its estate, and creditors, and it reflects a sound exercise of the Debtor's business judgment.

G. <u>Stalking Horse Bid Protections</u>. The Stalking Horse Bid Protections (i) have been negotiated by the Stalking Horse Bidder and the Debtor and their respective advisors at arms-length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse Agreement and the Transaction contemplated thereby. The Break-Up Fee (as defined in the Stalking Horse Agreement), shall not exceed $350,000.00 plus reasonable expenses and to the extent payable under the Stalking Horse Agreement: (a) (i) approximates the actual and necessary costs and expenses of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code and (ii) shall be treated as allowed administrative expense claims against the Debtor's estate pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code (if not otherwise paid at the closing of an Alternative Transaction); (b) is commensurate to the real and material benefits conferred upon the Debtor's estate by the Stalking Horse Bidder; and (c) is fair, reasonable, and appropriate, including in light of the size and nature of the Transaction and the efforts that have been and will be expended by the Stalking Horse Bidder. The Stalking Horse Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse Agreement. Unless it is assured that each of the Stalking Horse Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Stalking Horse Agreement or otherwise be bound under the Stalking Horse Agreement (including the obligations to maintain its committed offer while such

46

offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures), or to provide debtor-in-possession financing if necessary to sustain the Debtor's ongoing operations.

H. <u>Assumption and Assignment Provisions</u>. Debtor has articulated good and sufficient business reasons for the Court to approve the Assumption and Assignment Procedures. The Assumption and Assignment Procedures provide an adequate opportunity for all Counterparties to Contracts to raise any objections to the Proposed Assumed Contracts or the proposed Cure Costs. The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

I. <u>Assumption and Assignment Notice</u>. The Assumption and Assignment Notice, the form of which is attached hereto as **<u>Exhibit C</u>**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein, except as expressly required herein.

J. <u>Notice</u>. Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required, except as set forth in the Bid Procedures and the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest, including those persons and entities entitled to notice pursuant to Bankruptcy Rule 2002.

K. Debtor has articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the

Stalking Horse Bid Protections, and (iv) the form and manner of notice of the Auction and the Sale Hearing for the Sale Transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      The Bid Procedures are hereby approved, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the Assets and the Auction.  Debtor is authorized to take all actions necessary or appropriate to implement the Bid Procedures.

**Stalking Horse Bid Protections**

3.      Debtor is authorized to enter into the Stalking Horse Agreement, and the Stalking Horse Bid shall be subject to higher or otherwise better Qualified Bids (as defined herein), in accordance with the terms and procedures of the Bid Procedures.

4.      The Stalking Horse Bid Protections are approved as set forth herein, including the Break-Up Fee (as defined in the Stalking Horse Agreement) of up to Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) plus reasonable expenses, payable in accordance with, and subject to the terms of, the Stalking Horse Agreement and the Bid Procedures.  The Break-Up Fee, if not otherwise paid at the closing of an Alternative Transaction, shall constitute an allowed super-priority administrative expense claim against the Debtor's estate pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code, with priority over all other administrative expenses of the kind, including any claim granted pursuant to any order approving the Debtor's entry into a post-petition financing facility or to continue to access cash collateral following the commencement of the chapter 11 case.

48

**The Bid Procedures**

1.      The Bid Procedures, attached hereto as **Exhibit A**, are fully incorporated herein and approved, and shall apply with respect to any bids for, and the Auction and sale of, any or substantially all of the Debtor's Assets, including the Assets set forth in the Stalking Horse Agreement. The procedures and requirements set forth in the Bid Procedures, including those associated with submitting a "Qualified Bid" (as defined herein), are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtor's estate, creditors, and other parties in interest. Debtor is authorized to take all actions necessary or appropriate to implement the Bid Procedures in accordance with the terms of this Order and the Bid Procedures.

2.      The deadline for submitting Qualified Bids ("**Bid Deadline**") is **May 27, 2025 at 5:00 p.m. (prevailing Central Time)**; provided, that Debtor shall have the right to extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders (as defined in the Bid Procedures), without further order of the Court; provided that any such extension or modification shall not cause a breach of the Stalking Horse Agreement, or by itself extend any milestone or deadline in the Stalking Horse Agreement.  Any party that does not submit a Qualified Bid by the applicable Bid Deadline in accordance with the Bid Procedures will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction unless permitted by Order of the Court.

3.      The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid (including as may be increased at the Auction) is a Qualified Bid, as set forth in the Bid Procedures.

49

4.      All Potential Bidders (as defined in Bid Procedures) submitting bids determined by Debtor to be "**Qualified Bids**" in accordance with the Bid Procedures are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Assets.

5.      To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code ("**Adequate Assurance Information**"), including the Potential Bidder's financial wherewithal and willingness to perform under any Contracts that will be assumed and assigned to such bidder. In addition to the other requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be accompanied by a written statement confirming that (a) the bidder has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a binding, good faith, and bona fide offer that it intends to consummate if selected as the Successful Bidder.

6.      Debtor shall have the right, as it may reasonably determine to be in the best interests of its estate, to carry out the Bid Procedures including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best purchase price and/or terms received prior to the Auction; (d) determine which Qualified Bid(s) is the Successful Bid(s) (e) designate the second highest or otherwise best bid(s) as Back-Up Bid(s); (f) reject any bid that is (i) inadequate or insufficient, (ii) not a Qualified Bid or otherwise not in conformity with the requirements of this Order, the Bid Procedures, or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (g) adjourn or cancel the Auction and/or the Sale Hearing in

open court without further notice or as provided in the Bid Procedures; and (h) modify the Bid Procedures in a manner consistent with its fiduciary duties and applicable law.

7.      Debtor shall have the right, in its reasonable business judgment, in good faith and in a manner consistent with its fiduciary duties, and applicable law, to modify the Bid Procedures to further the goal of attaining the highest or otherwise best offer for the Assets, including by: (a) waiving terms and conditions with respect to any Potential Bidder; (b) extending the deadlines set forth in the Bid Procedures; and (c) announcing at the Auction modified or additional procedures for conducting the Auction; provided, that any such waiver, extension, modification, or addition shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Facility. Nothing in this Order or the Bid Procedures shall obligate the Debtor to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

8.      Debtor shall identify those bids that qualify as Qualified Bids (each bidder that submits such a Qualified Bid being a "**Qualified Bidder**") and shall notify each Qualified Bidder of its status as a Qualified Bidder by **May 28, 2025, at 5:00 p.m. (prevailing Central Time)**. If more than one Qualified Bid is timely received (including the Stalking Horse Bid), the Auction shall be conducted virtually, via Zoom, pursuant to procedures to be timely filed by the Debtor on the Bankruptcy Court's docket, or at such other time and location as determined by the Debtor, after providing notice to the Qualified Bidders, may determine in their reasonable business judgment.

9.      Only Qualified Bidders will be eligible to participate in the Auction, subject to such limitations as the Debtor may impose in good faith. In addition, professionals and/or other representatives of the Debtor, the Stalking Horse Bidder, Qualified Bidders, and the United States Trustee shall be permitted to attend and observe the Auction. Any creditor of the Debtor may attend and observe the Auction; provided, that such creditor provides the Debtor with written notice of its

intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to the proposed attorneys for the Debtor via electronic mail; and further provided, that, the Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction. The proceedings of the Auction shall be transcribed or videotaped at Debtor's option.

10.     Absent further order of the Court, no Qualified Bidder (other than the Stalking Horse Bidder solely as provided herein) shall be entitled to any expense reimbursement, break-up fee, termination fee, or other similar fee or payment in connection with any Transaction, and by submitting a bid, such Qualified Bidder is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

11.     If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid) for the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor shall not conduct an Auction and by **May 28, 2025 at 5:00 p.m. (prevailing Central Time)** shall file a notice with the Bankruptcy Court indicating that no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.

12.     The Debtor may, in the exercise of its business judgment, identify the highest or otherwise best Qualified Bid(s) as the successful bid(s) (a "**Successful Bid**" and, the bidder(s) submitting such bid(s), a "**Successful Bidder**"). The Debtor may also identify which Qualified Bid(s) constitute(s) the second highest or otherwise best bid and deem such second highest or otherwise

52

best bid(s) each a back-up bid (such bid shall be a "**Back-Up Bid**" and, the bidder submitting such bid, a "**Back-Up Bidder**").

13.     By **June 2, 2025 at 9:00 a.m. (prevailing Central Time)**, the Debtor shall file with the Court, serve on the Objection Notice Parties and each Counterparty to a Proposed Assumed Contract included in the Successful Bid(s) and Back-Up Bid(s), a notice containing the results of the Auction ("**Notice of Auction Results**"), which shall (a) identify the Successful Bidder(s) and the Back-Up Bidder(s); (b) provide Adequate Assurance Information for the Successful Bidder (if not the Stalking Horse Bidder); (c) a schedule of all Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known; (d) identify any known proposed assignees of Proposed Assumed Contracts (if known and if different from the applicable Successful Bidder(s) or Back-Up Bidder(s)); and (e) set forth the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

### Sale Hearing and Sale Objection Deadline

14.     The Sale Hearing for the sale of the Assets shall be held before this Court on **June 9, 2025, at 10:00 a.m. (prevailing Central Time)**. At the Sale Hearing, the Debtor will seek entry of a Sale Order approving and authorizing the Transaction to the Successful Bidder(s). Notwithstanding the foregoing, the Debtor may (after consultation with the Successful Bidder(s)) seek an adjournment of the Sale Hearing, as the Debtor deems appropriate in the exercise of its reasonable business judgment.

15.     Unless otherwise ordered by the Court, objections to the proposed Transaction, including any objection to the sale of any Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, and entry of an order authorizing the sale of the applicable Assets (the "**Sale Order**" and each such objection, a "**Sale Objection**") must: (a)

be in writing and specify the nature of such objection; (b) comply with the Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri

(the "**Local Rules**"); and (c) be filed with this Court and served on:

  i.  Robert E. Eggmann, Counsel for Debtor, 120 S. Central Ave., Suite 1800, St. Louis, MO 63105;

  ii.  the Office of the United States Trustee for the Eastern District of Missouri, Attention: Paul Randolph, 111 South 10th Street, Suite 6.353, St. Louis, MO 63102;

  iii. Paige K. Fronabarger, Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC 20036;

(collectively, the "**Objection Notice Parties**") by **June 2, 2025, at 5:00 p.m. (prevailing Central**

**Time)** ("**Sale Objection Deadline**").

16. Unless otherwise allowed by Order of the Court, the failure of any objecting person or

entity to timely file and serve a Sale Objection on the Objection Notice Parties by the applicable

Sale Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any

objection to the Motion, or to the consummation and performance of the Sale Transaction

contemplated by the Stalking Horse Bid or, if the Auction is held, any purchase agreement with

the Successful Bidder, including the transfer of the St. Louis Assets to the Stalking Horse Bidder

or the Successful Bidder, free and clear of all liens, claims, encumbrances, and interests pursuant

to sections 363(f) of the Bankruptcy Code. Failure to object shall constitute consent for the

purposes of sections 363(f) of the Bankruptcy Code.

## Notice of Sale Transaction

17. The Transaction Notice attached as **Exhibit 3** to the Motion is approved, and no

other or further notice of the sale of the Assets, the Auction, the Sale Hearing, the Sale Objection

Deadline, and the Sale Transaction shall be required if the Debtor serves and publishes such notice

in the manner provided in the Bidding Procedures and this Order. The Sale Notice contains the

type of information required under Bankruptcy Rule 2002 and complies in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

18.    All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion; (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder; (c) the Auction; (d) the Sale Objection Deadline; (e) the Sale Transaction, including the sale of the Assets (as set forth under the Stalking Horse Bid); and (f) the Sale Hearing, and no further notice of the foregoing shall be required.

### Assumption and Assignment Procedures

19.    The Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit C**, is reasonable, fair, and appropriate, contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice to any Counterparty to any known Contracts of the Debtor's proposed Cure Costs relating to the proposed assumption and assignment of such Contracts to the Successful Bidder, shall be required if the Debtor files and serves such notice (and the Notice of Auction Results) in accordance with the Assumption and Assignment Procedures and this Order.

20.    The following Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor Counterparties, comply in all respects with the Bankruptcy Code, and are approved:

a.    Not later than five (5) business days after entry of this Order, the Debtor shall file with the Court and serve on all Counterparties to Contracts and the Objection Notice Parties the Assumption and Assignment Notice which shall: (1) include a schedule of the Debtor's good faith calculation of the Cure Costs with respect to each Contract; (2) expressly state that assumption or assignment of any Contract is not guaranteed and is subject to Court approval; (3) direct the Counterparty to relevant publicly available financial information regarding the Stalking Horse

Bidder for purposes of demonstrating Adequate Assurance Information; (4) prominently display the deadline to file a Cure Objection and an Adequate Assurance Objection (each defined herein); and (5) prominently display the dates, times, and location of the Sale Hearing;

b.      All objections to any proposed Cure Costs (a "**Cure Objection**"), the Adequate Assurance Information (an "**Adequate Assurance Objection**") for the Stalking Horse Bidder, and the potential assumption and assignment of any Contract (an "**Assumption/Assignment Objection**") shall: (1) be in writing; (2) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (3) state, with specificity, the legal and factual bases thereof, including the cure amount the objecting Counterparty believes is required to cure defaults under the relevant Contract; (4) include any appropriate documentation in support thereof; and (5) be filed with the Court and served on the Objection Notice Parties by the applicable deadline set forth in the applicable notice, which shall be at least fourteen (14) calendar days after service of such notice;

c.      If a timely Cure Objection, Adequate Assurance Objection, or Assumption/Assignment Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided, that a Cure Objection, Adequate Assurance Objection, or Assumption/Assignment Objection may, at the Debtor's discretion (in consultation with the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder), be adjourned to a subsequent hearing and the Debtor may assign Proposed Assumed Contracts while such objection remains outstanding;

d.      If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty shall be forever barred from asserting any objection regarding the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract against the Debtor, the Successful Bidder, or the property of any of them;

e.      If the Successful Bidder is not the Stalking Horse Bidder, then on the date of service of the Notice of Auction Results (or such other notice identifying a Successful Bidder) or as soon as reasonably practicable thereafter, the Debtor shall serve all Counterparties to any Proposed Assumed Contracts a notice that: (1) sets forth a schedule of Proposed Assumed Contracts to be assumed by the Debtor and assigned to the applicable Successful Bidder, and (2) Adequate Assurance Information for the applicable Successful Bidder;

f.      If the Successful Bidder is not the Stalking Horse Bidder, then any Adequate Assurance Objection to the Successful Bidder's and/or its known proposed assignee's (if different from the Successful Bidder) proposed form of Adequate Assurance Information with respect to such Proposed Assumed Contract shall be filed with the Court and served on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee of such Proposed Assumed Contract (if different from the Successful Bidder) by the applicable deadline set forth in the applicable Assumption and Assignment Notice, which shall be at least five (5)

calendar days after the filing of such notice (other than with respect to Adequate Assurance Objections to a Back-Up Bid);

g.      If a Counterparty fails to file with the Court and serve on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee (if different from the Successful Bidder) of the relevant Proposed Assumed Contract, a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such Adequate Assurance Objection regarding the applicable Proposed Assumed Contract. The Successful Bidder and/or its known proposed assignee of the Proposed Assumed Contract shall be deemed to have provided adequate assurance of future performance with respect to the Proposed Assumed Contract in accordance with Bankruptcy Code section 365(f)(2)(B) notwithstanding anything to the contrary in the Contract or any other document, and the Debtor shall be authorized to assume and assign the applicable Proposed Assumed Contract to the applicable Successful Bidder (or its known proposed assignee) without further notice to any Counterparty or any other party in interest, and without need for further order of the Court, with such assumption and assignment being subject to the terms of the Sale Order;

h.      The Debtor shall have the right to serve a supplemental Assumption and Assignment Notice that modifies the schedule of Proposed Assumed Contracts, including to modify any Cure Amount or add or remove any Contract, until one (1) business day prior to entry of the Sale Order and may allow for certain Contracts to be assumed and assigned following the closing of the Sale Transaction(s) on substantially the terms included in the Stalking Horse Agreement; provided, further, that after the closing of the Sale Transaction, the Debtor shall have the right to serve a supplemental Assumption and Assignment Notice to add Contracts not otherwise rejected or Excluded Assets (as defined in the Asset Purchase Agreement) to the schedule of Proposed Assumed Contracts; provided, that the Debtor promptly serves a revised Assumption and Assignment Notice on each Counterparty affected. To the extent the Debtor lowers the Cure Cost or adds any Contract to the supplemental Assumption and Assignment Notice, such Counterparties shall file any Cure Objection or Adequate Assurance Objection with respect to the revised Assumption and Assignment Notice not later than seven (7) calendar days after the date of filing and service of the revised notice;

i.      The Debtor's assumption and assignment of a Proposed Assumed Contract to a Successful Bidder (or to a designee of the Successful Bidder) is subject to Court approval and consummation of a Sale Transaction with the applicable Successful Bidder. Accordingly, absent the closing of a Sale Transaction, the Proposed Assumed Contract shall not be deemed either assumed or assumed and assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code; and

j.      The inclusion of a Contract or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtor, the Successful Bidders, or any other party in interest that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code. The Debtor reserves all rights, claims, and causes of action with respect to each Contract scheduled on any Assumption and Assignment Notice and Notice of Auction Results. The Debtor's inclusion of any Contract on an Assumption and Assignment Notice or Notice of Auction Results shall not be a guarantee that such Contract ultimately will be assumed or assumed

57

and assigned. The initial Assumption and Assignment Notice and any subsequent notice shall be without prejudice to a Successful Bidder's rights under the applicable purchase agreement to subsequently (1) exclude a Contract from the schedule of Proposed Assumed Contracts previously included on such notice or (2) include additional Proposed Assumed Contracts for assumption and assignment in accordance with the applicable Successful Bidder's purchase agreement.

### **General Provisions**

21.    All persons or entities (whether or not Qualified Bidders) that participate in the bidding process, including submitting a bid for any of the Assets during the sale process, including at the Auction, shall be deemed to have knowingly and voluntarily (a) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auction, and any Transaction, (b) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes related to the Bid Procedures, the Auction, and/or any Transaction) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, and (c) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

22.    Notwithstanding the applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules or otherwise stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

23.    Debtor is authorized to make non-substantive changes to the Bid Procedures, the Assumption and Assignment Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors prior to mailing.

24.     To the extent there is any inconsistency between this Order and the Bid Procedures attached hereto, the Bid Procedures shall govern with respect to the conduct of the Auction, and otherwise this Order shall govern.

25.     The Debtor and the Stalking Horse Bidder are authorized to take all steps necessary or appropriate to carry out this Order.

26.     No later than two (2) business days after the date of this Order, the Debtor shall serve a copy of the Order and shall file a certificate of service no later than twenty-four (24) hours after service.


Dated: _____, 2025        _____

                                        HONORABLE KATHY S. SURRATT-STATES,
                                        UNITED STATES BANKRUPTCY JUDGE

<u>**EXHIBIT A TO BID PROCEDURES ORDER**</u>

**(Bid Procedures)**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **In Proceedings Under Chapter 11** |
| | ) | **Case No. 25-40745-659** |
| **DOUBLE HELIX CORPORATION,** | ) | **Honorable Kathy A. Surratt-States** |
| **d/b/a KDHX COMMUNITY MEDIA,** | ) | |
| | ) | |
| Debtor. | ) | |

**BID PROCEDURES**

     **On March 10, 2025, Double Helix Corporation ("Debtor")** filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**"). Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

     The Debtor is seeking to sell substantially all of its non-real estate assets and operations and transfer and assign certain interests related to the operation of its business (collectively, the "**Assets**"). On May [*], 2025, the Bankruptcy Court entered an Order [Doc. [*]] (the "**Bid Procedures Order**"),[5] which, among other things, preliminarily approved these procedures (these "**Bid Procedures**") for the consideration of the highest or otherwise best offer or combination of offers to acquire the Assets on the terms and conditions set forth herein.

     K-LOVE, Inc. (the "**Stalking Horse Bidder**") has submitted a bid for the purchase of the Assets and has executed a certain Asset Purchase Agreement (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse Agreement**") dated March 24, 2025.[6] The Stalking Horse Agreement contemplates, pursuant to the terms and subject to the conditions contained therein, among other things, the sale of the Assets to the Stalking Horse Bidder for the purchase price equal to the sum of: (1) $4,350,000 (the "**Base Purchase Price**"), provided that should the Closing shall occur within six months after March 24, 2025 then the Base Purchase Price shall be increased to $4,850,000 (the "**First Early Closing Purchase Price**"), provided further that

---

[5] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion for Entry of Orders: (I) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (II) Granting Related Relief* [Doc. [*]] (the "**Bid Procedures Motion**") or the Bid Procedures Order, as applicable.

[6] A copy of the Stalking Horse Agreement is attached to the Bid Procedures Order as <u>**Exhibit B**</u>.

should the Closing occur between six and 12 months after March 24, 2025 then the Base Purchase Price shall be increased to $4,600,000 (the "**Second Early Closing Purchase Price**")); plus (2) a break-up fee of $350,000 plus expenses incurred by the Stalking Horse Bidder in connection with the DIP Facility not to exceed $300,000 (collectively, the "**Break Up Fee**"); plus (3) the repayment of any amounts outstanding as of Closing on the DIP Facility provided by the Stalking Horse Bidder to the Debtor (the "**DIP Repayment**"); plus (4) an initial overbid requirement of $650,000 over the Purchase Price proposed by Stalking Horse Bidder herein (the "**Initial Overbid**") (which can be either variable consistent with the Stalking Horse Bid or based solely on the First Early Closing Purchase Price (the "**Stalking Horse Bid**"). The Stalking Horse Bid sets the floor for the sale and is subject to higher or otherwise better offers submitted in accordance with the terms and conditions of these Bid Procedures.

These Bid Procedures describe, among other things: (i) the procedures for bidders to submit bids for the acquisition of the Assets, in whole or in part; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids; (iii) the process for negotiating the bids received; (iv) the conduct of the Auction if Qualified Bids are received; (v) the procedure for the selection of any Successful Bidder; and (vi) the process for Bankruptcy Court approval of a Transaction at the Sale Hearing (each as defined herein).

### Summary of Important Dates

These Bid Procedures provide Qualified Bidders the opportunity to submit competing bids for all or any portion of the Asset, and to participate in an auction to be conducted by the Debtor (the "*Auction*").

The key dates for the sale process are set forth below. Such dates may be extended or otherwise modified by the Debtor by filing a notice of such extension or modification on the Court's docket; provided that any such extension or modification shall not by itself extend any milestone or deadline in the Stalking Horse Agreement:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order. | **May 13, 2025 at 10:00 a.m.  CT** |
| Deadline to submit written Bids. | **May 27, 2025 at 5:00 p.m. CT** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received. | **May 28, 2025** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid. | **May 28, 2025** |

61

| | |
|---|---|
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, virtually, via Zoom, pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction. | **May 30, 2025 at 2:00 p.m.    CT** |
| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and  assignment. | **June 2, 2025** |
| Deadline to file objections to Transaction(s). | **June 2, 2025** |
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place). | **June 3, 3025** |
| Sale Hearing. | **June 9, 2025 at 10:00 a.m.    CT** |

## **Property to Be Sold**

The Debtor seeks to sell all or substantially all of the Assets to a purchaser (each sale in furtherance of the same, a "**Transaction**").

## **Due Diligence**

The Debtor shall supply Potential Bidders with all material documents, including all documents provided to Stalking Horse Bidder, related to the Assets. To access the data, an interested party must submit to the Debtor or its advisors the following:

(A) an executed confidentiality agreement in form and substance that is customary and satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern); and

(B) sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has

62

the financial wherewithal to consummate the applicable Transaction and (ii) intends to access the data for a purpose consistent with these Bid Procedures.

Each interested party that meets the above requirements to the satisfaction of the Debtor shall be a "**Potential Bidder**." As soon as practicable, the Debtor will provide each Potential Bidder access to the data; provided, that such access and the availability of additional due diligence will be terminated by the Debtor in its reasonable discretion at any time for any reason whatsoever, including if (i) a Potential Bidder does not become a Qualified Bidder, (ii) these Bid Procedures are terminated, or (iii) the Potential Bidder breaches any obligations under its confidentiality agreement or the Debtor becomes aware that information submitted by the Potential Bidder is inaccurate or misleading. The Debtor may restrict or limit the access of a Potential Bidder to the data if the Debtor determines, based on its reasonable business judgment, that certain information in the data is sensitive, proprietary, or otherwise not appropriate for disclosure to such Potential Bidder.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate the applicable Transaction.

Until the Bid Deadline, and except as otherwise provided herein, the Debtor will provide all Potential Bidders with reasonable access to the data and any additional information requested by Potential Bidders (subject to any restrictions pursuant to applicable law or these Bid Procedures) that the Debtor believes to be reasonable and appropriate under the circumstances.

Neither the Debtor nor any of its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (i) to any person or entity who (a) is not a Potential Bidder; (b) does not comply with the participation requirements set forth above; or (c) in the case of competitively sensitive information, is a competitor of the Debtor (except pursuant to "clean team" or other information sharing procedures satisfactory to the Debtor) and (ii) to the extent not permitted by law or contract.

## **Bid Deadline**

A Potential Bidder that desires to make a bid (a "**Bid**") for some or all of the Assets shall deliver written and electronic copies of its Bid, so as to be received no later than **May 27, 2025 at 5:00 p.m. (prevailing Central Time)** ("**Bid Deadline**"); provided, that the Debtor may extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders, without further order of the Bankruptcy Court.

The extension of the Bid Deadline hereunder shall not, by itself, result in an extension of any milestone or deadline under the Stalking Horse Agreement, as applicable. **The submission of a Bid by the Bid Deadline (as it may be extended in accordance with the foregoing) shall constitute a binding and irrevocable offer to acquire the Assets specified in such Bid.** Any party that does not submit a Bid by the Bid Deadline, unless permitted by Order of the Court will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in any Auction for the applicable Assets.

There may not be any communications between and amongst Potential Bidders regarding the Debtor unless the Debtor has previously authorized such communication in writing. The Debtor reserves the right, in its reasonable business judgment to disqualify any Potential Bidders that have communications between and amongst one another.

Bids must be submitted by email to the following Debtor's representatives ("**Bid Notice Parties**"):

**Robert E. Eggmann, Esq.**
**Carmody MacDonald P.C.**
ree@carmodymacdonald.com

### Form and Content of Qualified Bids

A Bid must be received by the Bid Notice Parties by the Bid Deadline and contain a signed purchase agreement from a Potential Bidder that identifies the purchaser by its legal name and any other party that will be participating in the Transaction contemplated by the Bid. To constitute a "**Qualified Bid**" a Bid must include, at a minimum, the following:[7]

A.  Proposed Purchase Agreement. Each Bid must include, in both PDF and MS-WORD format, an executed purchase agreement ("**Form APA**") for the acquisition of all, some, or any one of the Assets, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement.  A copy of the Form APA may be obtained upon reasonable written request from Debtor's counsel, Robert E. Eggmann at ree@carmodymacdonald.com.

B.  Bid Requirements. Each Bid must clearly set forth the following in writing in the Proposed Purchase Agreement, as applicable:

(i)  Purchase Price; Initial Overbid. The price ("**Purchase Price**") proposed to be paid for the specified Assets in U.S. Dollars. In addition, (a) a Bid must propose a Purchase Price equal to or greater than the sum of (1) the value of Stalking Horse Bid; (2) an initial overbid ("**Initial Overbid**"), consisting of the sum of the Break-Up Fee and an additional cash amount of not less than $300,000; and (3) the DIP Repayment.

(ii)  Acquired Assets. The Assets that the Potential Bidder seeks to acquire. For the avoidance of doubt, a Qualified Bid may seek to purchase less than all the Assets.

---

[7] Debtor may waive any of the following requirements for a Bid to constitute a Qualified Bid to the extent reasonably necessary to promote bids and a robust Auction so long as any such waiver is not materially inconsistent with these Bid Procedures. For the avoidance of any doubt, the Stalking Horse Bid is a Qualified Bid.

(iii) <u>Excluded Assets</u>. The Assets that the Potential Bidder does not seek to acquire.

(iv) <u>Assumed Liabilities</u>. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all the Debtor's liabilities.

(v) <u>Excluded Liabilities</u>. The liabilities of the Debtor that the Potential Bidder does not seek to assume.

(vi) <u>Form of Consideration</u>. Each Bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the Break-Up Fee and DIP Repayment.

C.      <u>Unconditional Offer/No Financial Contingencies</u>. A commitment that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such Bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).

D.      <u>Proof of Financial Ability to Perform</u>. Each Bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any executory contracts and unexpired leases (each a "**Contract**") that are assumed and assigned to such party, including an adequate assurance letter which the Debtor is authorized to share with applicable non-Debtor Contract counterparties (each a "**Counterparty**") if such Bid is determined to be the Successful Bid or Back-Up Bid. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Transaction in a timely manner.

E.    <u>Designation of Contracts and Leases</u>. Each Bid must identify with particularity each and every Contract, the assumption and assignment of which is contemplated by the applicable Transaction (collectively, "**Proposed Assumed Contracts**"); <u>provided</u>, that the Proposed Purchase Agreement may allow the Potential Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to five (5) business days prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Transaction on substantially the terms included in the Stalking Horse Agreement; <u>provided</u>, <u>further</u>, that the Proposed Purchase Agreement may allow the Potential Bidder to add Contracts to the schedule of Proposed Assumed Contracts after the closing of the Transaction, if the Contract has not been previously rejected by the Debtor and is not an Excluded Asset (as defined in the Proposed Purchase Agreement), upon written notice to and consent of the Debtor. The Debtor shall provide notice to the applicable Counterparties of such removal and/or addition of such Counterparty's Contract and Lease as soon as reasonably practicable.

F.    <u>Required Approvals</u>. A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor (in consultation with the Consultation Parties). A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

G.    <u>FCC Application and Consent to Assignment</u>. Each Bid must acknowledge the Successful Bidder's obligation to execute, file, and diligently prosecute the appropriate application to the FCC (the "**FCC Assignment Application**") requesting the FCC's consent (the "**FCC Consent**") to the assignment from Debtor to Successful Bidder of the FCC Licenses held by the Station. The FCC Assignment Application shall be filed by the Successful Bidder on or before the later of: (i) ten (10) days after execution of an Asset Purchase Agreement, or (ii) five (5) days the date of entry of the final Sale Order.

H.    <u>Disclosure of Identity and Corporate Authorization</u>. Each Bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its Bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval

66

from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the Bid and these Bid Procedures.

I.      Employee Obligations. Each Bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "**Employee Obligations**").

J.      No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts. With the exception of the Stalking Horse Bid, each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

K.      Disclosure of Connections. Each Bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.

L.      Joint Bids. The Debtor will be authorized to approve joint Bids, including joint credit bids, in its reasonable discretion and upon consultation with the Committee and the SBA, on a case-by-case basis.

M.      Representations and Warranties. Each Bid must include the following representations and warranties:

    i.      a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;

    ii.     a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the Assets to be purchased and the liabilities to be assumed (as applicable), in making its Bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such Assets or

liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;

iii.    a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable Assets;

iv.    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

v.    a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

vi.    a statement that the Potential Bidder agrees to be bound by the terms of these Bid Procedures.

N.    <u>Additional Requirements</u>. A Potential Bidder must also accompany its Bid with:

i.    a good faith cash deposit in the amount of no less than ten percent (10%) of the cash portion of the Purchase Price (a "**Deposit**"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtor (the "**Escrow Agent**") pursuant to an escrow agreement to be entered into between a Debtor and the Escrow Agent; <u>provided</u>, that to the extent a Qualified Bidder increases the cash portion of the Purchase Price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased cash portion of the Purchase Price;

ii.    the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wish to discuss the Bid submitted by the Potential Bidder;

iii.    a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

      iv.    a detailed analysis of the value of any non-cash component of the Bid, if any, and back-up documentation to support such value.

### <u>Review of Bids; Designation and Notice of Qualified Bids</u>

Debtor, in consultation with its advisors, will evaluate all Bids that are timely submitted and may engage in negotiations with Potential Bidders that submit Bids as the Debtor deems appropriate, in the exercise of its business judgment, based upon the Debtor's evaluation of each Bid. A Bid will not be a Qualified Bid if it is materially less favorable than the terms of the Stalking Horse Agreement.

The Debtor shall determine, in its reasonable judgment which of the Bids received by the Bid Deadline qualify as a "**Qualified Bid**" (each Potential Bidder that submits such a Qualified Bid, a "**Qualified Bidder**") and shall notify each Qualified Bidder of its status as a Qualified Bidder by **<u>May 28, 2025 at 5:00 p.m.</u> (prevailing Central Time)** (the "**Qualified Bid Deadline**"). The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid (including as may be modified in favor of the Debtor at the Auction (if any)) represents a Qualified Bid.

Without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price or otherwise improve the terms of its Qualified Bid during the period that such Qualified Bid remains binding as specified herein; <u>provided</u>, that any Qualified Bid may be improved at the Auction as set forth in these Bid Procedures. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such Bid such that it may be designated a Qualified Bid.

In evaluating the Bids, the Debtor may take into consideration the following non-exhaustive factors:

1. the amount and the form of consideration of the Purchase Price;

2. the Assets and liabilities included in or excluded from the Bid, including any Contracts or other liabilities proposed to be assumed;

3. the value to be provided to the Debtor under the Bid, including the net economic effect upon the Debtor's estate, taking into account any Stalking Horse Bidder's right to any Break-Up Fee;

4. any benefit to the Debtor's bankruptcy estate from any assumption or waiver of liabilities;

5. the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial

wherewithal to meet all commitments, and required governmental or other approvals, including FCC Consent;

6. the impact on trade creditors;

7. the impact on the Debtor's ability to confirm a chapter 11 plan; and

8. any other factors the Debtor may reasonably deem relevant consistent with its fiduciary duties.

On or before the Qualified Bid Deadline, the Debtor shall notify Qualified Bidders of (i) the Bids that the Debtor has determined to be Qualified Bids and (ii) the Bid(s) that the Debtor has determined to be the highest or otherwise best Qualified Bid(s) to serve as the baseline bid(s) at the Auction ("**Baseline Bid**"). For the avoidance of doubt, the Baseline Bid shall equal (or exceed) an amount equal to the value of the Stalking Horse Bid plus the Initial Overbid.

### Failure to Receive Qualified Bids Other Than Stalking Horse Bid

If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid) for the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall file a notice with the Bankruptcy Court by **May 28, 2025, at 5:00 p.m. (prevailing Central Time)** indicating that no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.

### Auction Procedures

If the Debtor receives one or more Qualified Bids (other than the Stalking Horse Bid) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will conduct the Auction on **May 30, 2025 beginning at 2:00 p.m. (prevailing Central Time) virtually, via Zoom, pursuant to procedures to be timely filed by the Debtor on the Bankruptcy Court's docket**, or such other date or at such other location as may be determined by the Debtor. Only Qualified Bidders, including the Stalking Horse Bidder, will be eligible to participate in the Auction, subject to such limitations as the Debtor may impose in good faith. In addition, only professionals and/or other representatives of the Debtor, Counsel for the Debtor, Qualified Bidders, and the United States Trustee shall be permitted to attend and observe the Auction. Further, any creditor of the Debtor may attend and observe the Auction; provided that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to proposed counsel for the Debtor via electronic mail at ree@carmodymacdonald.com; and further provided that Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction

Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with these Bid Procedures and the Bid Procedures Order that the Debtor reasonably

70

determines to be appropriate to promote a competitive Auction. Any rules developed by the Debtor will provide that all Bids in the Auction will be made and received on an open basis, and all Qualified Bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder placing a Qualified Bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of a Qualified Bid submitted in response to any successive Bids made at the Auction will be disclosed to all other Qualified Bidders. Each Qualified Bidder will be permitted an amount of time that the Debtor reasonably determines to be an appropriate amount of time to respond to the previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded.

At the Auction, Qualified Bidders (including the Stalking Horse Bidder) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the Purchase Price and terms proposed in the applicable Bid and will proceed thereafter in minimum bid increments in an amount to be determined by Counsel for the Debtor (a "**Minimum Overbid Amount**"). The Debtor reserves the right to increase or decrease the Minimum Overbid Amount at any time during the Auction; provided however, that any initial overbid must be sufficient to satisfy the Break-Up Fee. If the Stalking Horse Bidder bids at the Auction for the applicable Assets that are the subject of its Stalking Horse Bid, such Stalking Horse Bidder will also be entitled to include the amount of the Break-Up Fee and any outstanding Stalking Horse DIP Credit in its bid, such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Break-Up Fee must exceed the most recent bid by at least the Minimum Overbid Amount.

At the Auction, the Debtor, in its reasonable business judgment, will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder). Debtor may adopt additional rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote the goals of maximizing the value of the Assets and provided that such rules are not inconsistent with these Bid Procedures.

Absent consent of the Debtor, pursuant to Sections 156 and 157 of the Bankruptcy Code, Potential Bidders and their representatives may not communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction. Each Potential Bidder participating in an Auction will be required to confirm in writing and on the record at an Auction that (i) it has not engaged in any collusion with respect to the submission of any Bid or the Auction and (ii) its Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified in such Bid if selected as the Successful Bidder.

All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients or parties necessary to place their Bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements.

The Debtor may, in the exercise of its reasonable business judgment, identify the highest or otherwise best Qualified Bid(s) for particular Assets as the successful bid(s) (each, a "**Successful Bid**" and, the bidder submitting such bid, a "**Successful Bidder**"). Debtor may also identify which Qualified Bid(s) constitute the next highest or otherwise best bid(s) and deem such next highest or otherwise best bid(s) each a back-up bid (such bid(s) shall each be a "**Back-Up**

Bid" and, the bidder submitting such bid, a "**Back-Up Bidder**"). Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (i) the applicable outside date for consummation of the Transaction set forth in the Back-Up Bid, (ii) consummation of the Transaction with a Successful Bidder, and (iii) the release of such Back-Up Bid by the Debtor in writing (such date, the "**Back-Up Bid Expiration Date**"). If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid.

Within one (1) business day after the Auction, or at such later time agreed to by the Debtor in its reasonable business judgment, (i) the Successful Bidder(s) shall submit to the Debtor fully executed documentation memorializing the terms of the Successful Bid(s) and (ii) the Back-Up Bidder(s) shall submit to the Debtor execution versions of the documentation memorializing the terms of the Back-Up Bid(s). Neither a Successful Bid nor a Back-Up Bid may be assigned to any party without the consent of the Debtor.

At any time before entry of an order approving any Transaction, the Debtor reserves the right to and may reject the applicable Qualified Bid (other than the Stalking Horse Bid) if such Qualified Bid, in the Debtor's reasonable business judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bid Procedures, or the terms and conditions of the applicable Transaction; or (iii) contrary to the best interests of the Debtor and its estate.

## Post-Auction Process

No later than June 2, 2025, the Debtor shall file with the Bankruptcy Court a notice containing the results of the Auction (the "**Notice of Auction Results**") that includes (i) the identity of the Successful Bidder(s) and the Back-Up Bidder(s); (ii) adequate assurance of future performance information for the Successful Bidder (if different from Stalking Horse Bidder), (iii) schedule of Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known, (iv) identify any known proposed assignees of Proposed Assumed Contracts (if known and if different from the applicable Successful Bidder(s) or Back-Up Bidders(s)), and (v) set forth the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

Within seven (7) calendar days after the Auction, if one is held, the Debtor shall direct the Escrow Agent to return the Deposits of all bidders other than the Deposits of the Successful Bidder(s) and Back-Up Bidder(s); provided, for the avoidance of doubt, the return of the Escrow Amount (as defined in the Stalking Horse Agreement) shall be governed by the Stalking Horse Agreement and any applicable escrow agreement. Within five (5) calendar days after the Back-Up Bid Expiration Date, the Debtor shall direct the Escrow Agent to return the Deposit(s) of the Back-Up Bidder(s). Upon the authorized return of any such Deposits, the Bid associated therewith shall be deemed revoked and no longer enforceable.

Each Successful Bidder's Deposit shall be applied against the cash portion of the Purchase Price of such bidder's Successful Bid upon the consummation of a Transaction. In addition to the foregoing, the Deposit of any Qualified Bidder will be forfeited to the Debtor if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or

with the Debtor's written consent, during the time the Qualified Bid remains binding and irrevocable or (ii) except as provided herein, the Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate a Transaction in accordance with these Bid Procedures, which forfeiture will not limit any other rights and remedies of the Debtor.

## Notices Regarding Assumption and Assignment

Debtor shall provide all notices regarding the proposed assumption and assignment of Contracts in accordance with the Assumption and Assignment Procedures included in the Bid Procedures Order.

## Sale Objections and Hearing

At the hearing before the Bankruptcy Court, the Debtor will seek entry of an order approving and authorizing, among other things, the Transaction to the Successful Bidder(s) (the hearing, the "**Sale Hearing**"). The Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing; provided, that any such adjournment shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Credit Agreement. No further notice of any such adjournment or continuance will be required to be provided to any party.

The Debtor will seek entry of an order authorizing and approving, among other things, the applicable Transaction at the Sale Hearing to be held on **June 9, 2025, at 10:00 a.m.** **(prevailing Central Time)**.

Objections to the Transaction, including any objection to the sale of any Assets free and clear of liens, claims, encumbrances, and other interests (each, a "**Sale Objection**"), shall (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, with the exception of the parties claims a lien in the Assets, provide proposed language that, if accepted and incorporated by the Debtor, would obviate such objection; (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri; (v) be filed with the Bankruptcy Court; and (vi) be served upon the Objection Notice Parties (as defined below) by **June 3, 2025, at 5:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**"); provided, that the Debtor may extend the applicable Sale Objection Deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Bankruptcy Court at the Sale Hearing.

To the extent a Sale Hearing is necessary and Sale Objections have been filed, each Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of its Successful Bid and the Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under the Proposed Assumed Contracts to be assumed and assigned as part of the applicable Sale Transaction.

Unless permitted by Order of the Court, any party who fails to file a Sale Objection with the Bankruptcy Court and serve it on the Objection Notice Parties (as defined herein) by the

73

applicable Sale Objection Deadline will be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of a Transaction, including the transfer of Assets to such Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.

### Consent to Jurisdiction and
### Authority as Condition to Bidding

All Potential Bidders (including any Stalking Horse Bidder and any credit bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court with respect to these Bid Procedures, the bid process, the Auction, any Transaction, the Sale Hearing, and the construction and enforcement of any agreement or any other document relating to a Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing; and (iii) consented to the entry of a final order or judgment in any way related to any of the foregoing if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### Noticing

Information that must be provided to the "**Objection Notice Parties**" under these Bid Procedures must be provided to each of the following parties:

(i) Robert E. Eggmann, Counsel for Debtor, Carmody MacDonald, P.C., 120 S. Central Ave., Suite 1800, St. Louis, MO  63105;

(ii) Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO  63102; and

(iii) Paige K. Fronabarger**,** Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC  20036.

### Reservation of Rights

The Debtor, in its reasonable business judgment, in a manner consistent with its fiduciary duties and applicable law reserves the right to: (i) modify these Bid Procedures; (ii) waive the terms and conditions set forth herein with respect to all Potential Bidders; (iii) extend the deadlines set forth herein; and (iv) announce at the Auction any modified or additional procedures for conducting the Auction. Nothing in these Bid Procedures shall obligate the Debtor to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

### Fiduciary Duties

Nothing in these Bid Procedures shall require the Debtor to take any action, or refrain from taking any action to the extent the Debtor determines that refraining from taking such action or taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**EXHIBIT B TO BID PROCEDURES ORDER**

**(The Stalking Horse Agreement)**

FINAL EXECUTION

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (the "Agreement") is entered into as of this 24th day of March, 2025 (the "Effective Date"), by and between **DOUBLE HELIX CORPORATION**, a debtor-in-possession and Missouri non-profit corporation ("Seller") and **K-LOVE, INC.**, a Tennessee non-profit corporation ("Buyer") (Seller and Buyer are each a "Party" and, collectively, the "Parties").

## RECITALS

**WHEREAS**, Seller is the licensee of FM radio broadcast station KDHX, St. Louis, Missouri (FCC Facility Id. 17380) (the "Station") pursuant to certain authorizations issued by the Federal Communications Commission ("FCC") and owns and leases other assets used in connection with the transmission facilities used in the operation of the Station;

**WHEREAS**, on March 10, 2025, ("Petition Date") Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), administered by the United States Bankruptcy Court for the Eastern District of Missouri  (the "Bankruptcy Court") under case number 25-40745 (the "Bankruptcy Case"), and Seller is managing its property and operating its business as debtor-in-possession in the Bankruptcy Case;

**WHEREAS**, on March 14, 2025, the Seller filed an "*Emergency Motion for Interim and Final Orders Authorizing Debtor to Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 364(c) and (d)*" with the Bankruptcy Court ("DIP Motion") seeking interim and final authorization to obtain post-petition financing from Buyer on the terms provided in the DIP Motion;

**WHEREAS**, Seller desires to sell to Buyer all of the Assets (defined below) including the FCC Licenses, subject to the assumption by Buyer of the Assumed Liabilities, and Buyer desires to purchase from Seller the Assets and assume the Assumed Liabilities, in each case, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties contemplate that such Assets will be sold, transferred, conveyed and assigned to Buyer and the Assumed Liabilities shall be assumed by Buyer (the "Asset Purchase"), as a private sale pursuant to Sections 105, 363, 365, 503, 507, 541 and 1146 of the Bankruptcy Code and in accordance with this Agreement and subject to an Order to be entered by the Bankruptcy Court; and subject nevertheless to the prior consent of the FCC to assignment of the Licenses (as defined below) to Buyer and compliance with applicable regulations of the FCC and the Communications Act of 1934, as amended ("Communications Act");

**WHEREAS**, the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, and the provisions, requirements and limitations of a sale order to be issued by the Bankruptcy Court ("Sale Order") and taking into account Buyer's provision of DIP Financing and the terms of the DIP Motion. Notwithstanding any provision of this Agreement, all obligations of the Buyer hereunder are subject to a final, non-appealable Sale Order that is satisfactory to Buyer in its commercially reasonable discretion.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**WHEREAS**, Buyer and Seller may enter into a Network Affiliation Agreement (the "Affiliation Agreement") which will permit Buyer to provide programming on the Station prior to Closing;

**WHEREAS**, programming under the Affiliation Agreement will commence at a mutually agreeable time in the future (which may not occur) and is subject to execution of a mutually acceptable form of Affiliation Agreement and approval of such Affiliation Agreement by the Bankruptcy Court, if required.

**WHEREAS**, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual promises herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE 1:  SALE AND PURCHASE

**1.1** **Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement, and subject to the exclusive jurisdiction and approval of the Bankruptcy Court, at Closing (defined below), except for the Excluded Assets (defined below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept assignment from Seller, all right, title and interest of Seller in and to the following real, personal, tangible, intangible assets and properties of Seller that are used or held for use in the operation of the Station (the "Assets"):

(a) **Licenses and Authorizations**. All licenses, authorizations, permits, applications and approvals issued to or pending with respect to the Station by (i) the FCC (the "FCC Licenses"), including Seller's rights in the call letters of the Station; (ii) the Federal Aviation Administration ("FAA"); and (iii) any other permits, registrations, licenses, variances, exemptions, orders and approvals of all Governmental Authorities held by Seller in connection with the operation of the transmitter site for the Station (the "Transmitter Site") (collectively, the "Licenses"), including those described on Schedule 1.1(a) and any renewals or modifications thereof between the date hereof and Closing.

(b) **Tangible Personal Property**. The following tangible personal property (collectively, the "Tangible Personal Property"):  all equipment, transmitters, antennas, cables, furniture, fixtures, spare parts and other tangible personal property of every kind and description that are located at or relating to the Transmitter Site that are used or held for use in the operation of the Station, which are described on Schedule 1.1(b), and any additions and improvements thereto prior to the Closing Date, except for any retirements or dispositions thereof made between the date hereof and the Closing Date in the ordinary course of business and consistent with the terms of this Agreement.

(c) **Lease**. All of Seller's interest in the ground lease and any other leases, licenses, subleases or other agreements which permit Seller to utilize or occupy all or a portion of the real property required for operation of the Transmitter Site for the Station, as identified on Schedule 1.1(c) and any modification permitted in Schedule 1.1(c) (the "Real Property Lease").

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

(d)    **Files and Records**.  The Station's public inspection file, filings with the FCC relating to the Station, and such other environmental reports, title insurance policies, surveys, deeds, zoning reports, technical information, engineering data (including construction drawings and structural engineering reports), and books and records that primarily relate to the other Assets being conveyed hereunder.

(e)    **Claims**.  Any and all claims and rights against third parties if and to the extent that they relate to the Assets, including, without limitation, all rights under manufacturer and vendor warranties and any proceeds from insurance claims made by Seller relating to property or equipment included in Assets that have not been repaired, replaced or restored by Seller prior to Closing Date, but excluding all causes of action arising under Chapter 5 of the Bankruptcy Code.

(f)    **Prepaid Items**.  All deposits, reserves, prepaid expenses, and other prepaid taxes relating to the Assets pro-rated as of Closing for which Seller receives a credit under Section 1.4(c).

1.2    **Excluded Assets**.  The following shall be excluded from the Assets and retained by Seller (collectively, the "Excluded Assets"):

(a)    **Cash**.  All cash, cash equivalents or similar investments such as certificates of deposit, treasury bills and other marketable securities on hand and/or in banks and deposits of Seller.

(b)    **Donations and other Consideration**.  All donations, accounts receivable or other consideration of Seller arising from the operation of the Station prior to Closing.

(c)    **Insurance**.  Except to the extent specified in Section 1.1(e), any insurance policies, intercompany accounts, promissory notes, amounts due from employees, bonds, letters of credit, or other similar items; any cash surrender value in regard thereto of Seller; and any proceeds from insurance claims made by Seller relating to property or equipment included in Assets that have been repaired, replaced or restored by Seller prior to Closing Date.

(d)    **Benefit Plans**.  Any pension, profit-sharing or cash or deferred (Section 401(k)) plans and trusts and assets thereof, or any other employee benefit plan or arrangement, and the assets thereof.

(e)    **Tax Refunds**.  Any interest in and to any refunds of federal, state or local franchise, income or other taxes of Seller for taxes incurred and actually paid by Seller prior to Closing.

(f)    **Books and Records**.  All the financial records, account books and general ledgers, and all corporate records (including organizational documents) of Seller, including tax returns and transfer books.

(g)    **Corporate and Studio Assets.**  All corporate assets of Seller as well as all equipment and other assets used or held for use to operate Seller's broadcast studio for the Station.

3

(h)    **Contracts.**  Any contracts or agreements not listed on <u>Schedule 1.1(c)</u>, including all ASCAP, BMI, SESAC and GMR licenses and the current studio lease for the Station.

(i)    **Intellectual Property.**  Except for any interim programming on the Station pursuant to the Affiliation Agreement (if executed) any and all intellectual property of Seller and its affiliates which is used or held for use in the operation of the Station.

(j)    **Rights and Claims.**  All rights and claims related to the Excluded Liabilities.

(k)    **Office Building.**  Seller's building located at 3524 Washington Avenue, Saint Louis, MO 63103 ("<u>Seller's Office Building</u>").

(l)    **Other Assets**.  Any other tangible or intangible asset not specifically described in <u>Section 1.1</u>.

For the avoidance of doubt, in the event there is any conflict between items described as Assets and those treated as Excluded Assets, the term Assets shall be deemed to control.

**1.3    Liabilities**.  The Assets shall be transferred by Seller to Buyer free and clear of all Liens ("<u>Liens</u>"), other than Permitted Encumbrances.  In addition to payment of the Purchase Price, at Closing, Buyer shall assume and undertake to pay, discharge and perform all Liabilities under the Real Property Lease which arise or relate to the period of time occurring from and after Closing ("<u>Assumed Liabilities</u>").  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated or deemed to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller or any Affiliate of Seller or relating to the Business and Seller and its Affiliates shall be solely and exclusively liable with respect to all such Liabilities, other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>").  For the avoidance of doubt, the Excluded Liabilities with respect to Seller include, but are not limited to, the following: (i) any obligations or liabilities under the Real Property Lease, or other Assets relating to the period prior to Closing; (ii) any obligations or liabilities of Seller which are unrelated to the Assets; (iii) any obligations or liabilities relating to employees of Seller; (iv) any obligations or liabilities relating to the Excluded Assets; (v) any federal, state or local franchise, income or other taxes of Seller; (vi) any other obligations or liabilities of Seller, including obligations or liabilities arising from Seller's failure to obtain any required license, permit, or other authorization to conduct the operation of the Station prior to Closing; (vii) any Liability of Seller or its Affiliates, or for which any of Seller or its Affiliates is liable, arising out of, or relating to, or in connection with the administration of the Bankruptcy Case or the negotiation, execution, and consummation of the transactions contemplated by this Agreement or any other Transaction Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Seller; (viii) any Liability incurred by Seller or its directors, officers, managers, stockholders, members, partners, agents or employees (acting in such capacities), including all indemnification claims; (ix) any Liability of Seller or related to the Business that arises under or relates to a violation of Environmental Laws or to the release, treatment, storage, disposal or other management of a Hazardous Material prior

4

to the Closing Date; and (x) any and all Liabilities whether arising prior to, on or after the Closing Date in respect of any employee, officer, director or independent contractor of Seller or any of its Affiliates or arising under any employee benefit plans; (xi) all Liabilities related to the WARN Act, to the extent applicable, with respect to employees of Seller, and for claim, charge, prosecution, action, suit, litigation, inquiry, investigation or proceeding resulting from such employees' separation of employment prior to or on the Closing Date, as with respect to all periods prior to the Closing Date, Seller shall remain liable and responsible for compliance with, as well as any liability which may arise or exist under the WARN Act with respect to the termination of any employee of Seller prior to or on the Closing Date; and (xii) all Liabilities in respect of taxes, including Liabilities in respect of taxes arising out of the conduct of the Business or ownership of the Assets.  Seller shall transfer and assign the Real Property Lease to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code to Buyer, and Buyer shall assume the Real Property Lease from Seller, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.  In connection with and as a prerequisite to such assignment and assumption, Seller shall file any motion required with the Bankruptcy Court for Seller to assume the Real Property Lease and assign it to Buyer at Closing.  Buyer shall pay in full, subject to a dollar for dollar reduction in the Purchase Price as provided in Section 1.4(a), all "Cure Amounts" required to be paid to the Lessor of the Real Property Lease as otherwise determined by the Bankruptcy Court to cure all defaults under the Real Property Lease to the extent required by Section 365(b) of the Bankruptcy Code and Seller shall have no Liability therefore.

  **1.4**  <u>**Consideration; Payments.**</u>

    (a)  <u>**Purchase Price**</u>.  The base purchase price to be paid for the Assets will be an amount equal to Four Million Three Hundred Fifty Thousand Dollars and 00/100 Cents ($4,350,000.00) (the "<u>Base Purchase Price</u>").  Notwithstanding the foregoing, in the event Closing occurs (i) within six (6) months from the Effective Date, the Base Purchase Price shall be increased to Four Million Eight Hundred Fifty Thousand Dollars and 00/100 Cents ($4,850,000.00) ("<u>First Early Closing Purchase Price</u>") and (ii) between six (6) and twelve (12) months from the Effective Date, the Base Purchase Price shall be increased to Four Million Six Hundred Thousand Dollars and 00/100 Cents ($4,600,000.00) ("<u>Second Early Closing Purchase Price</u>").  The Base Purchase Price, First Early Closing Purchase Price or Second Early Closing Purchase Price as applicable on the Closing Date are referred to as the "<u>Purchase Price</u>" and each shall be subject to the adjustments described in <u>Section 1.4(d)</u> below.  The Purchase Price shall be subject to potential reductions resulting from (i) amounts required to be withheld under applicable law (including Section 897 or 1445 of the Bankruptcy Code), and (ii) payments of "<u>Cure Amounts</u>" under the Real Property Lease as required by the Sale Order.

    (b)  <u>**Promissory Note and Security Agreement**</u>.  No later than fourteen (14) days following the entry of an interim order ("<u>Interim DIP Order</u>") of the Bankruptcy Court authorizing Seller to obtain post-petition financing in accordance with the DIP Motion, Buyer and Seller shall (i) execute the DIP Loan Documents (as defined below) contemplated by this Agreement and by the DIP Motion, and (ii) work to obtain entry of a final order of the DIP Motion ("<u>Final DIP Order</u>" and both such orders, the "<u>DIP Orders</u>").

    (c)  <u>**Payments at Closing**</u>.  At Closing, Buyer shall pay or caused to be paid to (i) Seller the Purchase Price (a portion of which shall be satisfied by offsetting the DIP Obligations

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

that Seller owes Buyer as of the Closing Date under the DIP Loan Documents) and the balance of which shall be made by payment of immediately available funds to an account designated by Seller.

(d)    **Proration Adjustment**.  Subject to any reimbursement obligations which may be required for operations pursuant to the Affiliation Agreement (if executed), all rent, charges and other payments owed or due under the Real Property Lease assumed by Buyer, real property and tangible personal property taxes assessed on the ownership of the Assets (which shall be based on the most recent tax bill available), utility bills and other ongoing costs of usual operation of the Transmitter Site shall be prorated in accordance with generally accepted accounting principles (GAAP) as of 11:59 p.m. CT on the date prior to the Closing Date ("Effective Time"), and an adjustment to the Purchase Price shall be made as set forth in this subsection to reflect the principle that all expenses attributable to the ownership of the Assets and the operation of the Transmitter Site before the Effective Time (including the rent owed by Seller under the Real Property Lease) shall be for the account of Seller, and all expenses attributable to the ownership of the Assets or the operation of the Transmitter Site (but excluding the Excluded Assets) on or after the Closing Date (including the rent owed by Seller under the Real Property Lease) shall be for the account of Buyer.  For purposes of making the adjustments pursuant to this Section, at least five (5) days prior to Closing, Seller shall prepare and deliver a list to Buyer with the anticipated prorations required for Closing ("Adjustment List").  The Adjustment List shall set forth each prorated expense item and include the net adjustment ("Adjustment") to be made to the Purchase Price as a result thereof.  Within sixty (60) days following the Closing Date, Buyer shall prepare and deliver a revised Adjustment List ("Revised Adjustment List") revising any items on the original Adjustment List to determine if additional Adjustments are required.  If a further Adjustment is required and such amount is for the benefit of Seller, then Buyer shall promptly pay the further Adjustment amount to Seller.  If the further Adjustment is required and such amount is for the benefit of Buyer, then Seller shall promptly pay the further Adjustment amount to Buyer.  In the event that the Parties disagree with the Adjustment List or Revised Adjustment List or with any other matter arising out of this subsection ("Contested Matter"), and Buyer and Seller cannot resolve the dispute themselves within sixty (60) days, Buyer and Seller will refer the matters under dispute to an independent certified public accounting firm mutually agreeable to Buyer and Seller, whose decision shall be final and whose fees and expenses with respect to each such matter shall be allocated to each Party based upon the percentage which the portion of the Contested Matter not awarded to each Party bears to the amount actually contested by such Party.  If, on the Closing Date, the current real property and/or personal property tax bills with respect to the Assets are not available, the amount of real property and personal property taxes will be apportioned based on the current year's millage and the current year's assessment.  If the current year's millage is not fixed and the current year's assessment is available, taxes will be apportioned based on such assessment and the prior year's millage.

(e)    **Allocation**.  Buyer and Seller shall allocate the Purchase Price among the Assets in accordance with an allocation schedule prepared in compliance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (and any similar provisions of state, local, or foreign law, as appropriate), as reasonably established by Buyer.  Buyer and Seller shall each use this allocation in preparing and filing their own IRS Form 8594 to submit with their income tax returns.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

## ARTICLE 2: BANKRUPCTY COURT CONSENT; FCC APPLICATIONS; CLOSING

**2.1**     **Bankruptcy Court Approval of Asset Purchase**.  Not later than three (3) Business Days following execution of this Agreement, Seller will submit to the Bankruptcy Court a motion for an Order: (A) authorizing the sale of all or substantially all of the Assets (other than the Seller's Office Building) free and clear of all Liens to Buyer pursuant to 11 U.S.C. § 363(f); (B) authorizing the assumption and assignment of Real Property Lease and (C) granting other relief related to the proposed sale (the "Sale Motion").

**2.2**     **Alternative Transaction**.     This Agreement is subject to approval by the Bankruptcy Court.  The Parties acknowledge that the Bankruptcy Court may require consideration of competing bids for the disposition of all or some of the Assets to a purchaser or purchasers other than Buyer ("Alternative Buyer") or affecting any other transaction the consummation of which would be substantially inconsistent with this Agreement ( "Alternative Transaction").    If consideration of an Alternative Transaction is required by the Bankruptcy Court, then Seller agrees to seek the Bankruptcy Court's approval for certain Break-Up Protections (as defined below) in favor of Buyer, namely such protections as would (1) entitle Buyer to super-priority administrative claim treatment in the Bankruptcy Case, senior to all other super-priority claims, and (2) ensure the payment of the outstanding DIP Obligations to Buyer in full upon consummation of an Alternative Transaction, and (3) authorize the Buyer to credit bid the Break-Up Protections and DIP Obligations at any auction for Seller's assets.   Any proposed order approving the Bid Procedures offered by Seller to the Bankruptcy Court shall be in form and substance acceptable to Buyer and its counsel, and Seller hereby agrees not to change or modify any of the dates or procedure set forth in such proposed Bid Procedures order, including without limitation the dates of the sale hearings and Closing Date, without the prior written consent of Buyer unless is otherwise so ordered by the Bankruptcy Court.  Seller further agrees that the requirements for the Bid Procedures order, including payment of the Break-Up Protections, are reasonable consideration for Buyer having expended considerable time and expense in connection with this Agreement, the DIP Financing, the DIP Loan Documents, the negotiation thereof, the identification and quantification of the assets of Seller, and to compensate Buyer as a stalking-horse bidder, in the event that an Alternative Transaction is required and consummated with a Person other than Buyer.

**2.3**     **Buyer Protections in the Event of Alternative Transaction**.  If consideration of an Alternative Transaction is required by the Bankruptcy Court, then Seller agrees to seek the Bankruptcy Court's approval to (i) adopt bid procedures and bid protections ("Bid Procedures") consistent with the terms set forth in the DIP Financing Term Sheet, which shall be satisfactory in form and substance to Buyer in its sole discretion and (ii) to treat this Agreement as a stalking horse bid by Buyer subject to the credit bid and overbid protections in favor of Buyer as set forth in the Bid Procedures.   The Bid Procedures shall apply to consideration of any Alternative Transaction (whether there is a public auction or direct bids from competitors without public auction).  The Bid Procedures (or any sale terms requested to be adopted by the Bankruptcy Court for a private sale without a public auction) shall afford Buyer the benefits Buyer negotiated to be a stalking horse bidder in exchange for providing the DIP financing consistent with the terms in the DIP Financing Term Sheet.  These terms ("Break-Up Protections") include, without limitation, (i) payment of a break-up fee to Buyer in the amount of $350,000 plus expenses incurred by the Buyer in connection with the DIP Financing and proposed Asset Purchase in an amount not to

7

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

exceed $300,000 and which fees shall be at the closing of the Alternative Transaction to an Alternative Buyer (collectively, the "Break-Up Fee"), (ii) a minimum overbid requirement of $650,000 over the Purchase Price proposed by Buyer herein (which can be either variable consistent with Section 1.4(a) or based solely on the First Early Closing Purchase Price), (iii) a requirement that any alternative bid shall not be conditioned upon any due diligence, financing or other conditions and be no less favorable to the estate than the terms proposed by Buyer herein, (iv) bids to be submitted no later than 21 days after the filing of the Sale Motion or such other date as is otherwise ordered by the Bankruptcy Court, with an auction to be held (if there are alternative qualified bids) no later than April 16, 2025 or such other date as is otherwise ordered by the Bankruptcy Court, and (v) the full opportunity for Buyer to raise its bid and include as a credit bid the Break-Up Fee and DIP Obligations in connection with consideration of any Alternative Transaction ordered by the Bankruptcy Court for Seller's assets and in any subsequent bids, and (vi) the Seller consulting with Buyer concerning alternative bids and the selection of the highest and best transaction.  The Break-Up Protections shall also (i) entitle Buyer to super-priority administrative claim treatment in the Bankruptcy Case, senior to all other super-priority claims, and (ii) ensure the payment of the outstanding DIP Obligations to Buyer in full upon consummation of an Alternative Transaction.

### 2.4    FCC Consent; Assignment Application.

(a)    **FCC Application**.  Seller and Buyer shall execute, file, and diligently prosecute the appropriate application to the FCC (the "Assignment Application") requesting the FCC's consent ("FCC Consent") to the assignment from Seller to Buyer of the FCC Licenses pertaining to the Station.  The Assignment Application shall be filed not later than ten (10) Business Days after the date of the execution of this Agreement.  Buyer and Seller shall be responsible for all of its other costs with respect to the preparation, filing and prosecution of the Assignment Application; *provided, however*, that neither Buyer nor Seller shall be required to pay consideration to any third party to obtain FCC Consent.  Buyer and Seller shall cooperate in good faith to diligently prosecute the Assignment Application and otherwise use their commercially reasonable best efforts to obtain the FCC Consent as soon as possible; *provided, however*, that neither Party shall be required to appear at any trial-type hearing or to participate in a judicial appeal.  Buyer and Seller shall oppose any petitions to deny or other objection filed with respect to an Assignment Application to the extent such petition or objection relates to such Party.  Neither Buyer nor Seller shall take any intentional action that would, or intentionally fail to take such action the failure of which to take would, reasonably be expected to have the effect of preventing or materially delaying the receipt of FCC Consent.  Buyer and Seller shall (i) keep each other informed in all material respects and on a reasonably timely basis of any material communication received by such Party from, or given by such Party to, the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby; (ii) notify each other of all documents filed with or received from the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby, and provide each other with copies of all such documents; (iii) furnish each other with such information and assistance as the other may reasonably request in connection with their preparation of the Assignment Application; and (iv) cooperate in all respects with each other in connection with this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby and in connection with any investigation or other inquiry by or before the FCC related to the foregoing.  Buyer and Seller shall have the right to review in advance, and to the extent practicable each will

8

consult with the other on, all information relating to the other Party that appears in any filing made with, or written materials submitted to, the FCC with respect to this Agreement, the Station, the Assignment Application, or the transaction contemplated hereby. Seller and Buyer agree to cooperate to the extent necessary to obtain the FCC's extension of the effectiveness of the FCC Consent as may be required.

2.5     **Closing.**    Subject to Bankruptcy Court approval, the consummation of the transaction contemplated in this Agreement (referred to herein as the "Closing") shall occur on a date fixed by the Parties (the "Closing Date"), which such date shall be no later than fourteen (14) days following the later of (i) the date on which the FCC Consent shall have been granted and (ii) Bankruptcy Court approval authorizing the sale obtained, and the other conditions to closing set forth in Articles 8 and 9 have either been waived or satisfied, provided, however, that if any petition to deny or other objection is filed with the FCC against the Assignment Application, then Buyer may elect to delay the Closing until no later than ten (10) days following the date on which the FCC Consent shall have become a Final Order and the other conditions to closing set forth in Articles 8 and 9 have either been waived or satisfied. For purposes of this Agreement, "Final Order" means an order or approval by the FCC (i) that has not been reversed, stayed, enjoined, set aside, annulled, or suspended, (ii) that has received no timely requests for stay, petition for rehearing, petition for reconsideration, application for review, or notice of appeal is pending by the FCC or any court, and (iii) as to which the times for filing any such request, petition, application, notice, or appeal, or for reconsideration or review (by the FCC on its own motion or any other party), shall have expired. The Closing shall be held at the offices of Buyer's counsel or by exchange of documents via email, or as Seller and Buyer may agree.

2.6     **Closing Before FCC Final Order**.    In the event Closing occurs before the FCC Consent shall have become a Final Order and the FCC or a court subsequently rescinds the FCC Consent, and such rescission becomes a Final Order, Seller and Buyer shall cooperate fully and in good faith to make such arrangements as shall be reasonable under then-prevailing circumstances to fully comply with all FCC requirements and restore each Party, to the greatest extent practicable, to the status quo ante prior to the Closing, including having Buyer return the Assets to Seller and having Seller return the Purchase Price to Buyer in readily available federal funds.

## ARTICLE 3:  REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement for Buyer to enter into this Agreement, Seller represents and warrants as of the Effective Date as follows:

3.1     **Organization and Authorization**.    Seller is a non-profit corporation duly incorporated, validly existing, and in good standing under the laws of Missouri. Subject to Bankruptcy Court approval, Seller has the power and authority to execute and deliver this Agreement and to consummate the transaction contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). Seller has the power to carry on its Business as it is now conducted and as proposed to be conducted. The execution, performance and delivery of this Agreement (and the Affiliation Agreement if executed) and the consummation of the transaction contemplated hereby on Seller's part have been duly and validly authorized by the shareholders/members and/or board of directors/managers of Seller (to the extent required), and no other proceedings on the part of Seller are necessary to authorize the execution

9

and delivery of, or the performance of Seller's obligations under this Agreement, or to consummate the transactions contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). This Agreement has been duly and validly executed and delivered by Seller. This Agreement constitutes the legal, valid, and binding obligation of Seller enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforcement of creditors' rights or the application of principles of equity.

       **3.2**    **No Defaults; Consents**. The execution, delivery, and performance of this Agreement by Seller will not (a) constitute a violation of, or conflict with, Seller's organizational documents; (b) result in a default (or give rise to any right of termination, cancellation, or acceleration) under, or conflict with, any of the terms, conditions, or provisions of any Real Property Lease subject to obtaining any required consent of the Lessor of the Real Property Lease; (c) violate any statute, regulation, order, injunction, or decree of any Governmental Authority which is applicable to Seller or any of the Assets; (d) result in the creation or imposition of any Lien, charge, or encumbrance of any nature whatsoever upon any of the Assets, other than Permitted Encumbrances or the Liens arising in favor of Buyer from this Agreement; or (e) require the consent or approval of any governmental authority, lending institution, or other third party except Closing is subject to Bankruptcy Court approval after notice and a hearing and the provisions, requirements and limitations of the Sale Order and prior consent of the FCC is required for the assignment of the FCC Licenses to Buyer. Seller has not entered into any agreement with any third party related to the Station's FCC Licenses, including agreements for the sale, transfer, or assignment of the FCC Licenses or any interest therein.

       **3.3**    **Tangible Personal Property**. Schedule 1.1(b) contains a description of all material items of tangible personal property owned or leased by Seller and located at the Transmitter Site that are used or held for use in the operation of the Station. Seller owns and has, and will have on the Closing Date, good and marketable title or a valid leasehold interest to the Tangible Personal Property. Except as set forth in Schedule 1.1(b), each material item of Tangible Personal Property is in good operating condition, reasonable wear and tear excepted and consistent in all material respects with the condition of such Tangible Personal Property when inspected by Buyer's representatives. The Tangible Personal Property in service is operating in compliance, in all material respects, with the FCC Licenses and rules and regulations of the FCC and FAA.

       **3.4**    **Real Property**. Schedule 1.1(c) contains a description of all real property which is leased, licensed, subleased or sublicensed by Seller and used or held for use in the operation of the Transmitter Site. The Transmitter Site (i) provide sufficient vehicular access to the Transmitter Site without need to obtain any additional access rights and (ii) is served by all utilities which are required for adequate operation of the Station's transmitter facilities located at the Transmitter Site. To the Knowledge of Seller there is no pending or threatened suit for condemnation or other taking by any public authority of any real property which is the subject of the Real Property Lease. All buildings and other improvements subject to the Real Property Lease are in good operating condition and are not in need of material repair (ordinary wear and tear excepted). The Transmitter Site is not subject to any zoning, restrictive covenant or other agreement or order that prohibits use of the real property for such Transmitter Site from being used as a tower site. Subject to obtaining applicable lessor consent (along with the consent of any ground lessor if also required), Seller has the full legal power and authority to assign its rights under the Real Property Lease to Buyer. All

10

permanent certificates of occupancy and other consents and approvals required to be obtained from any Governmental Authority, association or board with jurisdiction for Seller to utilize the real property subject to the Real Property Lease have been issued and are in full force and effect. Seller is operating the Station in all material respects in compliance with permissible levels of RF radiation specified in either the Communications Laws (defined below) or any other applicable law.

3.5    **FCC Licenses and Other Licenses**. Schedule 1.1(a) hereto contains a true and complete list of the FCC Licenses and the Licenses. The FCC Licenses and the Licenses are in full force and effect and have not been revoked, suspended, cancelled, rescinded or materially and adversity modified. Seller lawfully holds, and is the sole holder of, the FCC Licenses none of which is subject to any restrictions or conditions that would limit in any material respect the operations of the Station, other than (a) as may be set forth on the faces of such FCC Licenses and other licenses or (b) as may be applicable to substantial segments of the radio broadcasting industry. Seller is qualified to be an FCC licensee, and is operating the Station in compliance in all material respects with the FCC Licenses, the Communications Act of 1934, as amended, and all regulations and published policies of the FCC (the "Communications Laws"), including that the Station is transmitting at no less than ninety percent (90%) of its authorized power. There is not now pending, or, to the Knowledge of Seller, threatened, any action by or before the FCC to revoke, cancel, rescind, modify, or refuse to renew any of the FCC Licenses, and Seller has not received any notice of, and has no Knowledge of, any pending, issued, or outstanding order by or before the FCC, order to show cause, notice of violation, notice of apparent liability, notice of forfeiture, or material complaint against either the Station or Seller, except as set forth in Schedule 1.1(a). Seller has not received any written notice or complaint that a Station is causing interference to any other licensed facility within the past two years. All material reports and filings required to be filed with the FCC by Seller with respect to the operation of the Station have been filed, and all such reports and filings are substantially accurate and complete in all material respects. Seller maintains a public inspection file for the Station and, as of the date of filing of the Assignment Application, such filed substantially comply with the Communications Laws in all material respects.

3.6    **Title; Title Documents**. Seller owns and holds, and the conveyance instruments to be executed by Seller and delivered to Buyer at Closing upon entry of the Sale Order will transfer, good and marketable title to the Assets, free and clear of all Liens other than Permitted Encumbrances to the fullest extent permissible under Sections 363 and 365 of the Bankruptcy Code.

3.7    **Employees.** Seller is not a party to any collective bargaining, union or similar agreement with respect to the employees of Seller at the Station, and no union represents or claims to represent or is attempting to organize such employees.

3.8    **Brokers**. Except for Greg Guy of Tideline Partners, who represents Seller and whose broker fees with respect to the Station will be paid by Seller, there is no broker or finder or other person who, as a result of any agreement, understanding, or action, would have any valid claim for a commission or a brokerage fee in connection with the sale of the Station pursuant to this Agreement.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**3.9**    **Insurance**.  All of the material Assets that are insurable are insured against loss, injury, or damage.

**3.10**    **Litigation; Compliance with Law**.  Except for the Bankruptcy Case and matters described in Schedule 3.10 ("Pending Litigation") Seller is not subject to any order, writ, injunction, judgment, arbitration, decision, or decree having a binding effect and affecting the Assets or which restrains or enjoins, or purports to restrain or enjoin, or could reasonably be expected to restrain or enjoin, the transaction contemplated hereby, and to the Knowledge of Seller no such proceeding is pending.  Except for the Pending Litigation, to the Knowledge of Seller, there is no material litigation pending by or against, or threatened against, Seller which could materially and adversely affect any of the Assets.

**3.11**    **Environmental Matters**.  To the Knowledge of Seller: (a) Seller has not in generated, used, transported, treated, stored, released or disposed of, or suffered or knowingly permitted anyone else to generate, use transport, treat, store, release or dispose of any Hazardous Material in violation of any applicable environmental law at the Transmitter Site; (b) there has not been any generation, use, transportation, treatment, storage, release or disposal of any Hazardous Material at the Transmitter Site which has created or might reasonably be expected to create any material liability under any applicable environmental law or which would require reporting to or notification of any governmental entity; and (c) no asbestos or polychlorinated biphenyl or underground storage tank is contained in or located at any Transmitter Site.  Seller is in compliance in all material respects with all environmental, health and safety laws applicable to the real property at the Transmitter Site and Assets.  There is no action, suit or proceeding pending or threatened against Seller in respect of the Station that asserts that Seller has violated any environmental, health or safety laws applicable to the real property at the Transmitter Site or Assets.  Seller has delivered to Buyer true and complete copies of all environmental reports and assessments in Seller's possession that are applicable to the real property at the Transmitter Site or the Station.

**3.12**    **Taxes**.  With respect to the Station, Seller has filed all required tax returns and paid all taxes which have become due pursuant to such returns or pursuant to any real property and/or personal property assessments which have become payable.

**3.13**    **Performance of Real Property Lease**.  The Real Property Lease is in effect and is binding upon Seller and, to the Knowledge of Seller, the other party thereto (subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally).  Seller has performed in all material respects all of its obligations pursuant to the Real Property Lease and is not in material default or breach of any such agreement.  Seller has not received written notice from the counterparty to the Real Property Lease that such party contends that Seller is in material default or breach under the Real Property Lease.  To the Knowledge of Seller, there has not been, and is not, any material default or breach under the Real Property Lease by the other party to such agreement.  Seller has delivered to Buyer true and complete copies of the Real Property Lease, together with all amendments thereto.  Except as set forth or otherwise contemplated in Schedule 1.1(c) attached hereto, there have been no modifications, extensions, or amendments of the Real Property Lease, whether oral or written, except as may be contemplated by this Agreement.  Seller has not been notified by any other party to the Real Property Lease that such party has a present intent to terminate or not to renew the Real Property Lease.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**3.14** **Pending Bankruptcy Proceeding.** Seller acknowledges that it is a debtor in possession under Chapter 11 of the Bankruptcy Code, and that this Agreement is subject to the approval of the Bankruptcy Court pursuant to Section 363 and 365 of the Bankruptcy Code. Except for the pending Bankruptcy Case, to the Knowledge of Seller, there are no other insolvency proceedings of any character, including, without limitation, receivership, composition, or other arrangements with creditors, affecting Seller or any of the Assets.

### ARTICLE 4:  REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties to Seller, but solely with respect to the transaction contemplated by this Agreement:

**4.1** **Organization and Standing**. Buyer is a non-profit, corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee and is qualified to do business in the state of Missouri, and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

**4.2** **Authorization**. Buyer has the power and authority to execute and deliver this Agreement, and to consummate the transaction contemplated hereby. Buyer's performance under this Agreement does not contravene its organizational documents or breach any contractual obligation. Buyer has the power to carry on its business as is now conducted and as proposed to be conducted. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly and validly authorized by Buyer, and no other proceedings on the part of Buyer are necessary to authorize the execution and delivery of, or the performance of Buyer's obligations under this Agreement, or to consummate the transaction contemplated hereby (with respect to such consummation, subject to the satisfaction of the conditions set forth herein). This Agreement has been duly and validly executed and delivered by Buyer. This Agreement constitutes the legal, valid, and binding agreement of Buyer enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforcement of creditors' rights or the application of principles of equity.

**4.3** **No Defaults**. The execution, delivery, and performance of this Agreement by Buyer will not (a) conflict with or result in any breach of any provision of the articles of organization, operating agreement, or other similar organizational documents of Buyer; (b) result in a default (or give rise to any right of termination, cancellation, or acceleration) under, or conflict with, any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, agreement, lease, or other instrument or obligation relating to Buyer or its business, except for such defaults (or rights of termination, cancellation, or acceleration) or conflicts as to which requisite waivers or consents have been obtained and delivered to Seller; (c) violate any statute, regulation, order, injunction, or decree of any Governmental Authority which is applicable to Buyer; or (d) require the consent or approval of any governmental authority, lending institution, or other third party other than the FCC Consent or consents required for the assignment of the Real Property Lease.

**4.4** **Buyer's Qualification**. Buyer is legally, financially, and technically qualified to acquire and to become the noncommercial educational FCC licensee of the Station and to perform its obligations under this Agreement. There are no facts known to Buyer which, under

13

Communications Laws, would reasonably be expected to (a) disqualify Buyer from becoming the holder of the FCC Licenses, or (b) disqualify Buyer from consummating the transactions contemplated hereby.  Buyer has sufficient funds available to pay the Purchase Price.

**4.5**      **Litigation**.      Buyer is not subject to any order, writ, injunction, judgment, arbitration, decision, or decree having a binding effect and affecting the business of Buyer or which restrains or enjoins, or purports to restrain or enjoin, or could reasonably be expected to restrain or enjoin, the transaction contemplated hereby, and no such proceeding is pending.  There is no material litigation pending by or against, or, to the knowledge of Buyer, threatened against Buyer that would prevent or materially impede the consummation by Buyer of the transaction contemplated by this Agreement.

**4.6**      **Brokers**.  No broker, finder or other person is entitled to a commission, brokerage fee or other similar payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement or action of Buyer or any party acting on Buyer's behalf. Payment of any broker engaged by Buyer shall be Buyer's sole cost and expense.

## ARTICLE 5:  COVENANTS OF SELLER

Except as otherwise provided in the Affiliation Agreement (if executed) following Buyer's commencement of programming thereunder or as required by the Bankruptcy Code or by Order of the Bankruptcy Court, Seller covenants and agrees with Buyer that, between the Effective Date and the Closing Date, Seller shall act in accordance with the following:

**5.1**      **Station Documents**.  The records, files and other documents kept in connection with the Station shall be maintained by Seller in the usual and ordinary manner consistent with past practices.

**5.2**      **Maintenance of Property**.  Seller shall maintain the Tangible Personal Property included in the Assets in good operating condition and consistent with past practices and will replace any material item of Tangible Personal Property that becomes worn out, lost, stolen, or destroyed with like property of substantially equivalent kind and value.

**5.3**      **FCC Compliance; License Renewals**.  Seller shall continue to operate and maintain the Station in accordance with all material respects with the terms of the FCC Licenses and in material compliance with all applicable laws, including Communications Laws.  Seller shall maintain the FCC Licenses in full force and effect and shall timely file and prosecute any renewal applications or other submissions to the FCC.  Seller promptly will deliver to Buyer (a) after filing, copies of any material reports, applications, or responses to the FCC in connection with the Station filed after the Effective Date and (b) copies of any material communications from the FCC, or directed to the FCC by a third party, in connection with the Station that are received by Seller or of which Seller becomes aware after the Effective Date.  Seller will not file any application with the FCC requesting authority to modify any Station's facilities without Buyer's prior written consent, and Seller shall take all actions necessary to keep the FCC Licenses, including all material permits and applications pending before the FCC, valid and in full force and effect.

**5.4**      **Insurance**.  Seller shall maintain in full force and effect through the Closing Date property damage, liability, and other insurance with respect to the Assets.

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**5.5** **Disposition of Assets**.  Seller shall not, without the prior written consent of Buyer, sell, lease, or transfer, agree to sell, lease, or transfer, or terminate or let expire, any of the material Assets without replacement thereof with an asset of equivalent kind, condition, and value that satisfies industry standards for such assets, nor create any new Lien on the Assets other than Permitted Encumbrances and Liens arising pursuant to, and in accordance with, the terms of this Agreement.

**5.6** **Consummation of Agreement**.  Seller shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transaction contemplated by this Agreement to be fully carried out.

**5.7** **Access to Transmitter Site**.  At the request of Buyer, Seller shall from time to time give to, or cause to be given to, Buyer reasonable access during normal business hours to the Transmitter Site; *provided, however*, that all such access shall be scheduled in a manner reasonably acceptable to that Seller and not interfere with the operation of the Transmitter Site and where required, comply with any access requirements or restrictions in the Real Property Lease and any other leases to which Seller is a party with respect to the Transmitter Site.

**5.8** **Bankruptcy Court Actions**.  Seller shall employ commercially reasonable efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm, or obtain the Bankruptcy Court approval or recognition of the Asset Purchase and DIP Financing and any other agreement contemplated hereby and to consummate the transactions contemplated hereby.  Seller shall promptly provide Buyer with proposed drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court which relate to the approval of this Agreement, the Asset Purchase, DIP Financing, or the consummation of the transactions contemplated by this Agreement, or any provision therein or herein, and shall provide Buyer and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

## ARTICLE 6:  COVENANTS OF BUYER

Buyer covenants and agrees with Seller that:

**6.1** **Consummation of Agreement**.  Buyer shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transaction contemplated by this Agreement to be fully carried out.

## ARTICLE 7:  JOINT COVENANTS

Seller and Buyer covenant and agree with one another that:

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**7.1    Employees.**  Buyer is not obligated to and does not intend to offer post-Closing employment with any current Station employees.

**7.2    Receivables or other payments.**    Seller has no knowledge of having any receivables.  Buyer shall have no obligation to collect Seller's receivables or any other payments owed to Seller to the exist that they exist.

### ARTICLE 8:  CONDITIONS TO THE OBLIGATIONS OF SELLER

With respect to the transaction contemplated under this Agreement, the obligations of Seller to consummate hereunder are subject to the fulfillment of the following conditions prior to or on the Closing Date, unless waived in writing by Seller.

**8.1    Representations, Warranties and Covenants**.

(a)    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

(b)    Buyer shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**8.2    Proceedings**.  Neither Seller nor Buyer is subject to any restraining order or injunction (or similar action) that restrains or prohibits the consummation of the transaction contemplated hereby.

**8.3    Bankruptcy Court Approval**.  This Agreement and the transactions contemplated hereby are approved by the Bankruptcy Court pursuant to a final, non-appealable Sale Order.

**8.4    FCC Licenses**.  The FCC Consent with respect to the Assignment Application has been issued by the FCC and become effective.

**8.5    Deliveries.**  Buyer has complied with each and every one of its obligations set forth in Section 10.2.

### ARTICLE 9: CONDITIONS TO THE OBLIGATIONS OF BUYER

With respect to the transaction contemplated under this Agreement, the obligations of Buyer to consummate hereunder are subject to the fulfillment of the following conditions prior to or on the Closing Date, unless waived in writing by Buyer.

**9.1    Representations, Warranties and Covenants**.

(a)    Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

16

(b)      Seller shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**9.2      Proceedings**.  Neither Seller nor Buyer is subject to any restraining order or injunction (or similar action) that restrains or prohibits the consummation of the transaction contemplated hereby.

**9.3      Bankruptcy Court Approval**.  This Agreement and the transactions contemplated hereby are approved by the Bankruptcy Court pursuant to a final, non-appealable Sale Order acceptable to Buyer in its commercial reasonable discretion.

**9.4      FCC Licenses**.  The FCC Consent with respect to the Assignment Application has been issued by the FCC and shall have become effective and if Buyer requests to delay Closing as permitted in Section 2.4, the FCC Consent shall have become a Final Order.

**9.5      Absence of Any Material Adverse Change**.  There shall have been no material adverse change in the Assets or FCC Licenses.

**9.6      Deliveries**.  Seller has complied with each and every one of the obligations set forth in Section 10.1.

**9.7      Liens**.  No Liens (other than Permitted Encumbrances) shall exist or have been filed or recorded against the Assets in the public records of the Secretary of State of Seller's state of formation or in any other jurisdiction in which the Assets are located.  Duly executed UCC releases, mortgage terminations or other similar documents or instruments required to transfer the Assets free and clear of Liens (other than Permitted Encumbrances) shall have been delivered by Seller.

## ARTICLE 10:  ITEMS TO BE DELIVERED AT CLOSING

**10.1      Deliveries by Seller**.  At Closing, Seller shall deliver to Buyer, duly executed by Seller or such other signatory as may be required by the nature of the document, the following:

(a)      a certificate for Seller, dated as of the Closing Date, executed by an officer of Seller, certifying on behalf of Seller that the closing conditions specified in Section 9.1 have been satisfied;

(b)      a good standing certificate issued by Seller's jurisdiction of formation;

(c)      a bill of sale sufficient to sell, convey, transfer and assign the Assets (other than the FCC Licenses and Real Property Lease) to Buyer free and clear of any Liens (other than Permitted Encumbrances), in a form reasonably acceptable to Buyer (the "Bill of Sale");

(d)      an Assignment and Assumption of Real Property Lease sufficient to sell, convey, transfer and assign the Real Property Lease to Buyer free and clear of any Liens (other than Permitted Encumbrances), in a form reasonably acceptable to Buyer (the "Assignment and Assumption of Real Property Lease");

17

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

(e)      an Assignment and Assumption of Licenses sufficient to assign the Licenses, including the FCC Licenses and Station's call letters, which are included in the Assets to Buyer, in a form reasonably acceptable to Buyer (the "<u>Assignment and Assumption of Licenses</u> ");

(f)      executed releases, in suitable form for filing and otherwise in form and substance reasonably satisfactory to Buyer, of any security interests granted in the Assets as security for payment of loans and other obligations and of any other Liens (other than Permitted Encumbrances); and

(g)      any other documents reasonably requested by Buyer that are reasonably necessary to convey the Assets to Buyer at Closing.

**10.2    <u>Deliveries by Buyer</u>**.  At Closing, Buyer shall deliver to Seller the following, duly executed by Buyer or such other signatory as may be required by the nature of the document:

(a)      a certificate for Buyer, dated as of the Closing Date, executed by an officer or other authorized representative of Buyer, certifying on behalf of Buyer that the closing conditions specified in <u>Section 8.1</u> have been satisfied;

(b)      payment of the Purchase Price in accordance with the Sale Order and taking into account credit offsets for satisfaction of the DIP Obligations;

(c)      a good standing certificate issued by Buyer's jurisdiction of formation;

(d)      the Bill of Sale;

(e)      the Assignment and Assumption of Real Property Lease;

(f)      the Assignment and Assumption of Licenses;

(g)      any other documents reasonably requested by Seller and reasonably necessary to consummate the transactions set forth in this Agreement.

## ARTICLE 11:  SURVIVAL AND INDEMNITY

The rights and obligations of Buyer and Seller under this Agreement shall be subject to the following terms and conditions:

**11.1    <u>Survival of Covenants, Representations, and Warranties</u>**.  Except as stated below, the representations and warranties of Buyer and Seller contained in this Agreement shall survive Closing for twelve (12) months from the Closing Date, <u>except for</u> the provisions of <u>Section 3.1</u> (Organization and Authorization), <u>Section 3.6</u> ( Title; Title Documents); <u>Section 3.8</u> (Brokers) and <u>Section 3.12</u> (<u>Taxes</u>) (the "<u>Fundamental Representations</u>") which shall survive until the last to occur of (a) expiration of any applicable statute of limitations or (b) eighteen months (18) months from the Closing Date.  The covenants and agreements in this Agreement to be performed after Closing shall survive Closing until performed.  All other covenants shall expire at Closing.

18

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**11.2    General Agreement to Indemnify**.

(a)    After Closing, Seller on the one hand, and Buyer on the other hand, shall indemnify, defend and hold harmless each other and any employee, representative, agent, director, officer, affiliate or permitted assign of each other (each, an "Indemnified Party") from and against any and all claims, claims, actions, suits, proceedings, liabilities, obligations, losses and damages, amounts paid in settlement, interest, costs and expenses (including reasonable attorneys' fees, court costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing) (collectively, "Losses") asserted against, incurred or suffered by any Indemnified Party as a result of, arising out of, or relating to: (i) the failure of any representation or warranty of the Indemnifying Party made in the Agreement to have been true and correct as of the Closing Date as though such representation or warranty were made at and as of the Closing Date, or (ii) the breach by the Indemnifying Party of any covenant of such Party contained in this Agreement to be performed after Closing.  The term "Losses" is expressly limited to such Party's actual out-of-pocket costs and expenses and does not and shall not include special, indirect, incidental, consequential or punitive or exemplary damages unless paid in satisfaction of a Third Party Claim (defined below).  Adjustments to the Purchase Price made pursuant to Section 1.4(d) of this Agreement shall not be included in any calculation of Party's total "Losses" for purposes of meeting the Loss threshold provided in Section 11.4.

(b)    After Closing, Seller further agrees to indemnify and hold harmless Buyer and any other Indemnified Party of Buyer from and against any Losses asserted against, incurred or suffered by Buyer or any other Indemnified Party of Buyer arising out of, resulting from, or relating to the Excluded Liabilities or the operations of the Station and ownership of the Assets prior to Closing only as ordered by the Bankruptcy Court.

(c)    After Closing, Buyer further agrees to indemnify and hold harmless Seller and any other Indemnified Party of Seller from and against any Losses asserted against, incurred or suffered by Seller or any other Indemnified Party of Seller arising out of, resulting from, or relating to the Assumed Liabilities or the operations of the Station and the Assets from and after Closing only as ordered by the Bankruptcy Court.

**11.3    General Procedures for Indemnification**.

(a)    The Indemnified Party seeking indemnification under this Agreement shall promptly notify in writing the Party or Parties from whom indemnification is sought (the "Indemnifying Party") of the assertion and basis of any claim, or the commencement and basis of any action, suit or proceeding by any third party in respect of which indemnity may be sought hereunder (a "Third Party Claim") and will give the Indemnifying Party such information with respect thereto as the Indemnifying Party may reasonably request, but failure to give such notice shall not relieve the Indemnifying Party of any liability hereunder (except to the extent the Indemnifying Party has suffered prejudice by such failure).  The Indemnifying Party shall have the right, but not the obligation, exercisable by written notice to the Indemnified Party within thirty (30) days of receipt of notice from the Indemnified Party of the commencement of a Third Party Claim, to assume the defense and control the settlement of such Third Party Claim that involves (and continues to involve) solely money damages; *provided, however*, that prior to assuming any claim defense, the Indemnifying Party must show the Indemnified Party that they have the

19

financial ability to pay out any potential monetary claim before they are allowed to assume its defense.  Failure by the Indemnifying Party to so notify the Indemnified Party shall be deemed a waiver by the Indemnifying Party of its right to assume the defense of such claim.

(b)      Whether or not the Indemnifying Party chooses to defend or prosecute any Third Party Claim, the Parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

(c)      The Indemnifying Party or the Indemnified Party, as the case may be, shall have the right to participate in (but not control), at its own expense, the defense of any Third Party Claim that the other is defending, as provided in this Agreement.

(d)      The Indemnifying Party, if it has assumed the defense of any Third Party Claim as provided in this Agreement, shall not consent to, or enter into, any compromise or settlement of, or consent to the entry of any judgment arising from, any such Third Party Claim (which compromise, settlement, or judgment (i) commits the Indemnified Party to take, or to forbear to take, any action or (ii) does not provide for a complete release by such third party of the Indemnified Party) without the Indemnified Party's prior written consent.  If the conditions set forth herein are met but the Indemnified Party refuses to settle any Third Party Claim, the Indemnifying Party may tender the settlement amount and be relieved of further liability.

(e)      The Indemnifying Party shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the Indemnified Party, but shall be subrogated to any right of action to the extent that it has paid or successfully defended against any Third Party Claim.

**11.4      Limitations on Indemnification**.      Neither Party shall be required to indemnify the other Party for any Losses under this Article 11 unless written notice of a claim under this Article 11 was received by an Indemnifying Party before the end of the survival period for such claim as set forth in Section 11.1. In addition, Seller shall not be required to indemnify Buyer for any Losses under Section 11.2(a)(i) (except with respect to the Fundamental Representations) and Buyer shall not be required to indemnify Seller for any Losses under Section 11.2(a)(i) until the aggregate claim for Losses exceeds $50,000, after which the Indemnified Party shall be entitled to recover for all Losses in excess of such threshold.  Notwithstanding the foregoing, the maximum liability of Seller for Losses under Section 11.2(a)(i) shall not exceed Two Million Dollars ($2,000,000.00) except with respect to a breach of the Fundamental Representations which shall not exceed the Purchase Price.  In calculating the amount of Losses to Buyer, such Losses shall be reduced by any recovery from any third party (including insurance proceeds) as a result of the facts or circumstances giving rise to the Losses.  The limitations set forth in this Section shall not apply to Losses arising under Sections 11.2(b) or 11.2(c) of this Agreement.  These indemnification provisions as set forth in Article 11 shall apply only if the transactions contemplated by this Agreement are closed.

**11.5      Exclusive Remedy**.  Following Closing, the right to indemnification, defense, hold harmless, payment or reimbursement provided in this Article 11 will be the exclusive remedy

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

of any Party with respect to Losses in connection with the transactions contemplated by this Agreement.

## ARTICLE 12:  TERMINATION

**12.1** <u>**Termination**</u>.  This Agreement, in whole or in part, in accordance with the terms of this Agreement, and consistent with <u>Section 13.11</u> below, may be terminated at any time by Buyer or by Seller prior to Closing, or the applicable Closing, as set forth below:

(a)    by the mutual written consent of Buyer and Seller;

(b)    by written notice of Seller to Buyer, provided that Seller is not in breach or default of this Agreement, if Buyer (i) breaches in any material respect any of Buyer's representations or warranties provided herein; or (ii) defaults in any material respect in the performance of any of Buyer's covenants or agreements under this Agreement; and in any of which events (i)-(ii) such breach or default is not cured by Buyer within the Cure Period (as defined below), if applicable;

(c)    by written notice of Buyer to Seller, provided Buyer is not in breach or default of this Agreement, if Seller (i) breaches in any material respect any of Seller's representations or warranties provided herein or in the DIP Loan Documents; or (ii) defaults in any material respect in the performance of any of Seller's covenants or agreements under this Agreement or any of Seller or its affiliates covenants under the DIP Loan Documents; and in any of which events (i)-(ii) such breach or default is not cured by Seller within the Cure Period, if applicable;

(d)    This Agreement will terminate automatically if the Bankruptcy Court does not approve the Asset Purchase or if a consideration of an Alternative Transaction is required, and ultimately approved by the Bankruptcy Court to a Person other than Buyer, upon consummation of such Alternative Transaction; and

(e)    by written notice of Seller to Buyer, or Buyer to Seller (i) if Closing has not been consummated with eighteen (18) months after the date the FCC releases public notice that the Assignment Application has been accepted for filing ("<u>Drop Dead Date</u>"); (ii) if, for any reason, the FCC denies or dismisses the Assignment Application and the time for reconsideration or court review under the Communications Laws with respect to such denial or dismissal has expired and there is not then pending with respect thereto a timely filed petition for reconsideration or request for review; or (iii) if, for any reason, the Assignment Application is designated for an evidentiary hearing, *provided, however*, that the right to terminate this Agreement under this subsection shall not be available to any Party whose breach of this Agreement has been the cause of, or resulted in, the failure of Closing to occur on or before such date.

**12.2** <u>**Cure Period**</u>.  The term "<u>Cure Period</u>" as used herein means a period commencing with the date that Buyer or Seller receives from the other Party written notice of breach or default hereunder and continuing until thirty (30) days thereafter; *provided, however*, that if the breach or default cannot reasonably be cured within such period but can be cured before the Drop Dead Date, and if diligent efforts to cure promptly commence, then the Cure Period shall continue as long as such diligent efforts to cure continue, but not beyond the Drop Dead Date.  Except as set forth

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

below, the termination of this Agreement with respect to the transaction contemplated hereunder shall not relieve the Buyer or Seller of any liability for breach or default under this Agreement prior to the date of such termination.

**12.3**   **Liability; Right to Terminate**.  A termination of this Agreement shall not relieve any Party hereto of any liability for which it otherwise would be subject.  Unless otherwise permitted by Order of the Bankruptcy Court, no Party that is in material breach of this Agreement shall be entitled to terminate this Agreement except with the written consent of the other Party.

**12.4**   **Damages and Remedies upon Default**.

(a)   **Buyer's Default**.  Upon a termination of the Agreement by Seller pursuant to Section 12.1(b), Seller's sole remedy shall be the payment by Buyer to Seller of the amount of $250,000,00 which amount will be paid as liquidated damages and not as a penalty ("Seller Liquidated Damages").  The Parties agrees that payment of the Seller Liquidated Damages shall first be made by cancelling on a dollar-for-dollar basis, any outstanding indebtedness associated with the DIP Obligations.  Seller shall also arrange for alternative financing as soon as practicable to enable repayment in full to Buyer of the remaining outstanding balance of the DIP Obligations, including all interest earned thereon and fees and expenses required to be paid thereunder.  Seller and Buyer acknowledge that these Seller Liquidated Damages are reasonable in light of the anticipated harm that would be caused by Buyer's breach of any of its material obligations under this Agreement and the difficulty of ascertaining damages and proof of loss and that these damages do not constitute a penalty.

(b)   **Other Termination**.  In the event there is an Alternative Transaction for which Buyer is not the successful bidder, then within fourteen (14) days after the entry of an order of the Bankruptcy Court approving a sale to the successful bidder of the Alternative Transaction, Seller shall arrange for alternative financing as soon as practicable to enable repayment in full to Buyer of the remaining outstanding DIP Obligations, including all interest earned thereon and fees and expenses required to be paid thereunder including payment of the Break-Up Fees, subject to Bankruptcy Court approval.

## ARTICLE 13:  MISCELLANEOUS

**13.1**   **Governing Law**.  The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of Missouri, (exclusive of those relating to conflicts of laws) and the Bankruptcy Code, as applicable.  Any action at law, suit in equity or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, related to or from this Agreement, or any provision hereof, shall be litigated only in the Bankruptcy Court or if the Bankruptcy Court is not the proper forum, the federal or state courts of the State of Missouri, County of St. Louis.  The Parties hereby consent to the personal and subject matter jurisdiction of such courts and waive any right to transfer or change the venue of any litigation between them.

**13.2**   **Expenses; Taxes**.  Each Party hereto shall bear all of its expenses incurred in connection with the transaction contemplated by this Agreement, including without limitation, accounting, engineering and legal fees incurred in connection herewith; *provided, however*,

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

that Seller and Buyer shall share equally (a) all filing fees required to be paid in connection with the Assignment Application as set forth in <u>Section 2.1</u>; and (b) the costs of any state or local sales, use, stamp or transfer taxes and other similar taxes applicable to the transfer of the Assets under this Agreement, if any.

**13.3    Entire Agreement; Amendment; No Waiver**.  This Agreement, including the schedules and exhibits hereto, contain the entire agreement and understanding by and between the Parties, and no other representations, promises, agreements, or understanding, written or oral, not contained herein shall be of any force or effect.  This Agreement may only be amended in a writing signed by all of the Parties.  No oral agreement shall have any effect.  No failure or delay in exercising any right hereunder shall be deemed or construed to be a waiver of such right, either prospectively or in the particular instance.  This Agreement has been prepared by all of the Parties hereto, and no inference of ambiguity against the drafter of a document therefore applies against any Party hereto.

**13.4    Confidentiality**.  Except for information about the Station and the Assets acquired by Buyer at or after Closing and except where such information is known through other lawful sources or where its disclosure is required in accordance with applicable law, including requirements of the FCC pursuant to the Assignment Application and as is required in order to pursue an order approving the DIP Motion and the Sale Motion.  before the Bankruptcy Court, Buyer and Seller shall keep confidential all non-public information obtained by it with respect to the other Party or the Station in connection with this Agreement.  If the transaction contemplated herein is not consummated for any reason, Buyer and Seller shall return to each other or destroy, without retaining a copy thereof in any medium whatsoever, any schedules, documents or other written information, including all financial information, obtained from the other in connection with this Agreement and the transaction contemplated hereby.

**13.5    Public Announcements**.

(a)    Except as is required by the Bankruptcy Court in connection with the DIP Motion and the Sale Motion, prior to the filing of the Assignment Application, no Party shall, without the prior approval of the other Party hereto (which approval may not be unreasonably withheld), make any press release or public statement concerning the transaction contemplated by this Agreement, except (i) to announce that the transaction has been entered into and (ii) as and to the extent that such Party shall be so obligated by law or the requirements of any national securities exchange; provided, however, that both Parties will be permitted to publicly comment on, issue public statements regarding and otherwise discuss the transaction contemplated by this Agreement (without the other Party's prior approval), including, without limitation, in response to analyst questions, on earnings calls and as otherwise determined by a Party in its sole discretion.

(b)    Notwithstanding the foregoing, the Parties acknowledge that the rules and regulations of the FCC require that local public notice of the transaction contemplated by this Agreement be made by Seller after the Assignment Application has been filed with the FCC and that a copy of this Agreement and other related documents as may be required by the FCC rules and policies shall be included as a material part of the Assignment Application, which will be made available for public inspection at the Station and in the FCC's records.  The form and

23

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

substance of the required public notices, to the extent not dictated by the Communications Laws, shall be mutually agreed upon by Seller and Buyer.

(c)     Notwithstanding the foregoing, the Parties acknowledge that the certain information must be disclosed to the Bankruptcy Court, including this Agreement and the DIP Loan Documents, in an effort to obtain the DIP Orders and the Sale Order contemplated by this Agreement, and such information will remain unsealed and will be available for public review.

**13.6     Risk of Loss**.  The risk of loss to any of the Assets on or prior to the Closing Date shall be upon Seller.  Seller shall repair or replace any damaged or lost Assets; *provided, however*, that in the event any lost or damaged Assets is reasonably expected to exceed Fifty Thousand Dollars ($50,000.00) to repair or replace, then either Party may, at its option, upon prior written notice to the other Party, postpone Closing for a period of up to ninety (90) days while Seller shall repair or replace such Assets, and the Closing Dates hall be extended to accommodate such 90-day period.  Notwithstanding the foregoing, if the expected insurance proceeds are sufficient to repair or replace the damaged or lost Assets, the Parties shall close the transaction contemplated herein with the Assets in their damaged or lost condition, and Seller shall assign to Buyer all proceeds of insurance on such damaged or lost Assets, and Buyer shall have the responsibility to repair or replace the damaged or lost Assets.  Further, however, if the damage or loss exceeds Four Hundred Thousand Dollars ($400,000.00), and Seller elects not to repair or replace the lost or damaged Assets, then, either Party shall have the right to terminate the Agreement by written notice to the other Party before Closing, and in such event the Parties hereby agree to use good faith efforts to reform the terms of this Agreement consistent with Section 13.11 hereof.

**13.7     Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective representatives, successors and assigns.  Neither Seller nor Buyer may assign this Agreement or any part hereof prior to Closing without the prior written consent of the other Party and any attempted assignment without such consent shall be void.  In the event of any assignment of this Agreement, the assignee shall enter into a written agreement accepting joint and several liability for all obligations under this Agreement.

**13.8     Specific Performance**.  Seller acknowledges that the Assets are a unique asset not readily obtainable on the open market and that, in the event that Seller fails to perform its obligation to consummate the transaction contemplated hereby, money damages alone will not be adequate to compensate Buyer for its injury.  Therefore, Seller agrees and acknowledges that in the event of Seller's failure to perform its obligation to consummate the transaction contemplated hereby, in lieu of seeking damages or any other remedy, Buyer may seek specific performance of the terms of this Agreement and of Seller's obligation to consummate the transaction contemplated hereby.  The Bankruptcy Court's failure to approve the Asset Purchase shall not constitute a failure to perform by Seller under this provision.

**13.9     Notices**.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly made and received on date delivered by hand, receipt confirmed, or the next Business Day when sent for next Business Day delivery by a nationally recognized overnight courier service, expenses prepaid, addressed as set forth below:

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

If to Seller, then to:

>Double Helix Corporation
>3524 Washington Ave.
>St. Louis, MO 63103
>Attention: Kelly Wells
>Email: kelly@kdhx.org

with a copy (which shall not constitute notice) to:

>Foster Garvey P.C.
>3000 K Street NW
>Washington, DC 20007
>Attention:  Brad Deutsch
>Email: brad.deutsch@foster.com

and with a copy (which shall not constitute notice) to:

>Robert E. Eggmann, Esq.
>Carmody MacDonald P.C.
>120 S. Central Ave., Suite 1800
>St. Louis, MO  63105
>Email: ree@carmodymacdonald.com

If to Buyer, then to:

>K-LOVE, Inc.
>2000 Reams Fleming Blvd.
>Franklin, TN 37064
>Attn. Legal Department

with a copy (which shall not constitute notice) to:

>Paige K. Fronabarger, Esq.
>Wilkinson Barker Knauer LLP
>1800 M Street, NW, Suite 800N
>Washington, DC 20036
>Email: Pfronabarger@wbklaw.com

Any Party may change the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section providing for the giving of notice.

**13.10  Further Assurances**.  From time to time prior to, on and after the Closing Date, each Party hereto will execute all such instruments and take all such actions as any other Party shall reasonably request, without payment of further consideration other than any reasonable

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

expenses that may be incurred by the other Party, in connection with carrying out and effectuating the intent and purpose of the transaction contemplated by this Agreement, including without limitation the execution and delivery of any and all confirmatory and other instruments in addition to those to be delivered on a Closing Date, and any and all actions which may reasonably be necessary to complete the transaction contemplated hereby.  The Parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement.

**13.11**    **Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision contained herein, or its application to any particular circumstance shall, for any reason, be held to be invalid or unenforceable by a court of competent jurisdiction, such provision or such application shall be ineffective to the extent of such invalidity or unenforceability in such jurisdiction, without invalidating the remainder of such provision or any other provisions hereof, or its application in any other circumstance, unless such a construction would be unreasonable, and without invalidating such provision or its application in any other jurisdiction.

**13.12**    **No Third Party Beneficiaries**.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the Parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

**13.13**    **Execution in Counterparts**.  This Agreement (and any other document delivered in connection with this Agreement) may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. This Agreement (and any other document delivered in connection with this Agreement) may be executed via electronic or digital signature and signature pages may be exchanged by facsimile or other electronic transmission, (including via DocuSign or a similar program) with the same legal effect as if the signatures had appeared in original handwriting on the same physical document. At the request of either Party hereto or to any such agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to the other Party.  No Party hereto or to any such agreement or instrument shall raise the fact execution of such document by digital or electronic signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation of a contract and each such Party forever waives any such defense.

**13.14**    **Headings**.  The headings set forth in this Agreement are for convenience only and will not control or affect the meaning or construction of the provisions of this Agreement.

**13.15**    **Definitions**.  In addition to the terms defined elsewhere in this Agreement, the following terms shall have the respective meanings specified below:

(a)      "Affiliate" means, with respect to any Person, (i) a spouse or member of the immediate family of such Person, (ii) any member, manager, director, officer or partner of such Person, (iii) any corporation, partnership, business, association, limited liability company, firm, trust or other entity of which such Person is a member, manager, director, officer, trustee, or partner or owns or controls or is the beneficiary of, directly or indirectly, more than twenty percent (20%)

26

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

of the voting stock or other equity interests and (iv) any other Person who either directly or indirectly through one or more intermediaries is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, partnership interests or by contract, assignment, credit arrangement, as trustee or executor, or otherwise, and the terms "controls," "controlling" and "controlled by" shall have correlative meanings.

(c)    "Business" means the business of Seller conducted as of the date hereof.

(d)    "Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks in St. Louis, Missouri, are authorized or required by Law to be closed.

(e)    "Cure Amounts" means all cash amounts that, pursuant to section 365 of the Bankruptcy Code, will be required to be paid as of the Closing Date to cure any monetary defaults on the part of Seller under the Real Property Lease as a prerequisite to the assumption of such Real Property Lease under section 365 of the Bankruptcy Code.

(f)    "DIP Financing" means the debtor-in-possession financing Buyer has agreed to provide Seller as set forth in the DIP Motion and reflected in the DIP Loan Documents (when executed).

(g)    "DIP Financing Term Sheet" means that certain Debtor-In-Possession (DIP) Financing Term Sheet entered into between Seller and Buyer on March 10, 2025.

(h)    "DIP Loan Documents" shall mean that certain Senior Secured Super-Priority Debtor-in-Possession Promissory Note and Security Agreement to be entered into by Seller, as borrower, and Buyer, as lender.

(i)    "DIP Obligations" shall mean all obligations and indebtedness of Seller to Buyer whether now or hereafter owing or existing, including, without limitation, all obligations arising in connection with the DIP Financing as set forth in the DIP Financing Term Sheet and the DIP Loan Documents, together with all interest and other sums payable in connection with any of the foregoing, as allowed by Sale Order or other orders of the Bankruptcy Court.

(j)    "Environmental Law" means any Law (i) relating to pollution or the protection, preservation or restoration of human health (in regards to exposure to Hazardous Materials) or the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or any exposure to or release of, or the management of (including the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production or disposal of) any Hazardous Materials or (ii) that regulates, imposes liability (including for enforcement, investigatory costs, cleanup, removal or response costs, natural resource damages, contribution, injunctive relief, personal injury or property damage) or establishes standards of care with respect to any of the foregoing. The term "Environmental Law" includes, without limitation, any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence,

27

nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Hazardous Materials.

(k)     "Governmental Authority" means any shall mean any (a) nation, state, province, tribal, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, provincial, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any government agency, ministry, branch, department, official, or entity and any court or other tribunal); (d) multinational organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(l)     "Hazardous Materials" means all substances defined or regulated as hazardous, a pollutant or a contaminant under any Environmental Law, including any regulated pollutant or contaminant (including any constituent, raw material, product or by-product thereof), petroleum or natural gas hydrocarbons or any liquid or fraction thereof, asbestos or asbestos-containing material, polychlorinated biphenyls, any hazardous or solid waste, and any toxic, radioactive, infectious or hazardous substance, material or agent.

(m)     "Knowledge of Seller" means that any officer or senior executive of Seller has, or at any time had, actual knowledge of the item or matter, or received written notice of the fact or matter.

(n)     "Law" means any federal, state, provincial, local, foreign, international or supranational law (including common law), statute, treaty, ordinance, rule, regulation, Order, code, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Authority.

(o)     "Liability" or "Liabilities" means any and all claims, demands, fines, liabilities, losses, obligations, penalties, judgments, damages, charges, costs, debts and indebtedness (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses related thereto (including fees, discounts, expenses of legal counsel, experts, engineers and consultants, and costs of investigations).

(p)     "Lien" means any "Interest" as that term is used in Section 363(f) of the Bankruptcy Code, lien (including any mechanics lien), encumbrance, license, pledge, mortgage, indenture, deed of trust, security interest, pledge, hypothecation, claim, lease, charge, escrow, option, right of first offer, right of first refusal, preemptive right, easement, servitude, reservation, covenant, encroachment, right of use, right of way, security agreement or other similar agreement, arrangement, contract, commitment, understanding or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind with respect to any Person, or any proxy, voting trust or agreement, transfer restriction under any director or

28

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

member or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

(q)      "Order" means, other than in connection with the Final Order, any judgment, order, administrative order, writ, stipulation, injunction (whether permanent or temporary), award, decree or similar legal restraint of, or binding settlement having the same effect with, any governmental action.

(r)      "Permitted Encumbrance" means (i) statutory Liens for current taxes not yet due, (ii) vendor's, mechanic's, materialman's, carriers', workers', landlords', repairman's, warehouseman's and other similar Liens (A) with respect to Liabilities that are not yet due and payable, or if due, are not delinquent, (B) that are being contested in good faith by appropriate proceedings and for which adequate reserves (based on good faith estimates of management) have been set aside for the payment thereof or (C) arising or incurred in the ordinary course of business relating to obligations to which there is no default on the part of Seller and which are not, individually or in the aggregate, material to the operation of the Business and do not materially affect the market value or continued use of the asset encumbered thereby, (iii) Liens imposed or promulgated by applicable Law or any Governmental Authority with respect to the Transmitter Site real property, including zoning, building or similar restrictions which are not violated by (A) the current use or occupancy of such real property, (B) the proposed use, occupancy or development thereof or (C) the operation of the Business, or any violation of which could not materially adversely affect the market value or continued use of the Transmitter Site real property y, (iv) utility easements, minor encroachments, rights of way, imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects and similar Liens or Liabilities (other than Assumed Liabilities), but not including any monetary Liens, that are imposed by any Governmental Authority having jurisdiction thereon or otherwise are typical for the applicable property type and locality as do not individually or in the aggregate materially interfere with the present occupancy under, or use or market value of the respective Transmitter Site real property subject to the Real Property Lease or otherwise materially impair the operation of the Business, and (v) any Liens to be released at or prior to Closing; provided that, in each case enumerated in this definition, such Lien shall only be a Permitted Encumbrance if it cannot otherwise be removed, discharged, released or transferred, as the case may be, pursuant to Section 363(f) of the Bankruptcy Code or otherwise.

(s)      "Person" means any individual, corporation, partnership, proprietorship, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority, or other entity, organization or institution of any type whatsoever.

(t)      "Transaction Documents" means, collectively, this Agreement, the DIP Loan Documents, the Bill(s) of Sale, the Assumption Agreement(s) and each other agreement, document or instrument executed and delivered by the Parties in connection with the consummation of the transactions contemplated hereby.

*[SIGNATURE PAGES FOLLOW]*

29

<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

**SELLER:**                          **DOUBLE HELIX CORPORATION**

By: _____
    Name:  Kelly K. Wells
    Title:  Executive Director

**BUYER:**                           **K-LOVE, INC.**

By: _____
    Name: Thomas Stultz
    Title: Chief Executive Officer

By: _____
    Name: Matt Reynolds
    Title: Chief Financial Officer

**FINAL EXECUTION**

## <u>SCHEDULES</u>

| | |
|---|---|
| 1.1(a) | FCC & Other Governmental Authorizations |
| 1.1(b) | Tangible Personal Property |
| 1.1(c) | Real Property Lease |
| 3.10 | Pending Litigation |

## <u>EXHIBITS</u>

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

**Schedule 1.1(a)**

**FCC & Other Governmental Authorizations**
**Main Station Noncommercial Educational KDHX (FM), 88.1 MHz, St. Louis, Missouri**
**FCC Facility ID Number 17380**
***Double Helix Corporation***

| Type of Authorization | Call Sign | FCC File Number | Grant Date | Expiration Date |
|---|---|---|---|---|
| Renewal of License | KDHX | 0000124190 | 1/21/2021 | 2/1/2029 |
| Broadcast License | KDHX | BLED-19880401KA | 4/24/1989 | N/A |
| Auxiliary License | KDHX | BXLED-20071226AAO | 2/12/2008 | N/A |

**Pending Applications**

None.

**Broadcast Auxiliary Licenses**

| Type of Authorization | Call Sign | Grant Date | Expiration Date |
|---|---|---|---|
| Aural Studio Transmitter Link | WLP431 | 11/21/1990 | 2/1/2029 |
| Remote Pickup | WPKN366 | 5/8/1997 | 2/1/2029 |

2

Doc ID: e0db38535e86732a2a7de0afcb886351196ae729

## Schedule 1.1(b)

**Tangible Personal Property**

| **Equipment** |
| --- |
| Radio Tower |
| BE FM 20T FM Transmitter (Analog) |
| Harris 210 Transmitter (Backup Transmitter) |
| FM Dummy Load Tester 25,000 Watt |
| 5 Bay ERI FM Antenna |
| 4 Bay ERI FM Antenna |
| Harris FlexStar Exciter |
| Burk ARC-16 |
| Kohler Generator |
| Transmission Line for both Antenna |
| Orban FM Processor 8500 |
| Mosley StarLink |
| 5 ton A/C Unit |

<u>Note</u>:  Buyer will also acquire Seller's shelter located at the Transmitter Site.

## <u>Schedule 1.1(c)</u>

### Real Property Lease

Lease Agreement dated July 27, 1983 between the Raymond A. McNeely ("<u>Lessor</u>") and Double Helix Corporation, as amended by the Amendment and Extension of Lease Agreement dated February 7, 2003 for real property located in Jefferson County, Missouri, and more fully described in Book 388, Page 448 of the Recorder of Deeds of Jefferson County, Missouri.

## Schedule 3.10

## Pending Litigation

| | | | |
|---|---|---|---|
| DAEHLER BROWN ET AL V DOUBLE HELIX CORPORATION | 11/08/2024 | Not Disposed | See Link 1 |
| STACY BERNARD ET AL V DOUBLE HELIX CORP ET AL | 01/29/2025 | Not Disposed | See Link 2 |



Audit trail

| | |
|---|---|
| Title | KDHX Asset Purchase Agreement |
| File name | KDHX_Asset_Purcha...I_APA_3.24.25.pdf |
| Document ID | e0db38535e86732a2a7de0afcb886351196ae729 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **03 / 24 / 2025**<br>20:57:39 UTC | Sent for signature to Thomas Stultz (tstultz@kloveair1.com) and Matthew Reynolds (mreynolds@kloveair1.com) from pfronabarger@wbklaw.com<br>IP: 64.98.245.119 |
| VIEWED | **03 / 24 / 2025**<br>20:59:05 UTC | Viewed by Matthew Reynolds (mreynolds@kloveair1.com)<br>IP: 152.39.176.200 |
| SIGNED | **03 / 24 / 2025**<br>21:00:48 UTC | Signed by Matthew Reynolds (mreynolds@kloveair1.com)<br>IP: 192.100.255.11 |
| VIEWED | **03 / 24 / 2025**<br>21:40:32 UTC | Viewed by Thomas Stultz (tstultz@kloveair1.com)<br>IP: 93.115.5.83 |
| SIGNED | **03 / 24 / 2025**<br>21:40:57 UTC | Signed by Thomas Stultz (tstultz@kloveair1.com)<br>IP: 192.100.255.11 |
| COMPLETED | **03 / 24 / 2025**<br>21:40:57 UTC | The document has been completed. |

Powered by Dropbox Sign

**<u>EXHIBIT C TO BID PROCEDURES ORDER</u>**

**(Assumption Notice)**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **In Proceedings Under Chapter 11** |
| | ) | **Case No. 25-40745-659** |
| **DOUBLE HELIX CORPORATION,** | ) | **Honorable Kathy A. Surratt-States** |
| **d/b/a KDHX COMMUNITY MEDIA,** | ) | |
| | ) | |
| **Debtor.** | ) | |

**NOTICE OF CURE COSTS AND PROPOSED ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES IN CONNECTION WITH SALE</u>**

**TO ALL PERSONS RECEIVING THIS NOTICE, PLEASE TAKE NOTICE OF THE FOLLOWING:**

On March 10, 2025, Double Helix Corporation (the "**Debtor**"), debtor and debtor in possession, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**" or this "**Court**"). Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Debtor is a nonprofit Missouri corporation currently doing business as KDHX Community Media. Since 1987, Debtor has operated KDHX-FM radio station ("**KDHX**" or the "**Station**") as an independent, non-commercial, educational, listener-supported community radio broadcast station in St. Louis, Missouri. Debtor is seeking to sell substantially all of its business assets and operations, including an assignment of Debtor's interest in certain operating licenses issued by the Federal Communications Commission ("**FCC**") for used in conjunction with its operation of the Station (the "**FCC Licenses**") and a ground lease for its broadcast transmitter site (the "**Lease**"), but excluding any interest in the certain real estate where its business operations are located (the "**Real Estate**") (collectively, the "**Assets**"), as a going concern.

On May [\*], 2025 the Bankruptcy Court entered an order [Doc. [\*]] ("**Bid Procedures Order**"),[8] which, among other things (a) approved Bid Procedures, (b) designated a Stalking Horse

---

[8] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion for Entry of Orders: (I) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (II) Granting Related Relief* [Doc. [\*]] ("**Motion**"), or in the Bidding Procedures Order, as applicable.

Bidder and approved Stalking Horse Bid Protections, (c) scheduled an auction and sale hearing, (d) approved form and manner of notice of sale, auction, and sale hearing (the "**Bid Procedures**") for the consideration of the highest or otherwise best offer or combination of offers to acquire the Assets on the terms and conditions set forth herein; and approved procedures for the assumption and assignment of Contracts (the "**Assumption and Assignment Procedures**").

K-LOVE, Inc. (the "**Stalking Horse Bidder**") has submitted a bid and has executed that certain Asset Purchase Agreement dated March 24, 2025 (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse Agreement**").[9] The Stalking Horse Agreement contemplates, pursuant to the terms and subject to the conditions contained therein, among other things, the sale of the Assets to the Stalking Horse Bidder for the purchase price equal to the sum of: (1) $4,350,000 (the "**Base Purchase Price**"), provided that should the Closing shall occur within six months after March 24, 2025 then the Base Purchase Price shall be increased to $4,850,000 (the "**First Early Closing Purchase Price**"), provided further that should the Closing occur between six and 12 months after March 24, 2025 then the Base Purchase Price shall be increased to $4,600,000 (the "**Second Early Closing Purchase Price**")); plus (2) a break-up fee of $350,000 plus expenses incurred by the Stalking Horse Bidder in connection with the DIP Facility not to exceed $300,000 (collectively, the "**Break Up Fee**"); plus (3) the repayment of any amounts outstanding as of Closing on the DIP Facility provided by the Stalking Horse Bidder to the Debtor (the "**DIP Repayment**"); plus (4) an initial overbid requirement of $650,000 over the Purchase Price proposed by Stalking Horse Bidder herein (the "**Initial Overbid**") (which can be either variable consistent with the Stalking Horse Bid or based solely on the First Early Closing Purchase Price (the "**Stalking Horse Bid**"). The Stalking Horse Bid sets the floor for the sale and is subject to higher or otherwise better offers submitted in accordance with the terms and conditions of these Bid Procedures.

You are receiving this Notice because you may be a Counterparty to a Contract of the Debtor that potentially could be assumed and assigned to the Stalking Horse Bidder or one or more other Qualified Bidder(s) in connection with a sale of the St. Louis Assets.

**A.  Cure Objection.**

In accordance with the Assumption and Assignment Procedures and the Bid Procedures Order, the Debtor may, in connection with a Transaction with a Successful Bidder, seek to assume and assign to the Successful Bidder(s) certain Contracts of the Debtor.

Each of the Contracts that may be assumed and assigned in connection with a Transaction with a Successful Bidder and the Debtor's calculation of the Cure Costs with respect thereto are set forth on **Exhibit A** hereto.

Any objection to the proposed assumption, assignment, or potential designation of a Contract identified on **Exhibit 1** hereto and incorporated herein by this reference, the subject of which objection is the Debtor's proposed Cure Costs ("**Cure Objection**"), must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served

---

9 A copy of the Stalking Horse Agreement is attached to the Bid Procedures Order as **Exhibit B.**

on the Objection Notice Parties (as defined below) by no later than **June 2, 2025 at 5:00 p.m. (prevailing Central Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE. THE CURE COSTS SET FORTH ON <u>EXHIBIT 2</u> ANNEXED HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE UNDER BANKRUPTCY CODE SECTION 365(b), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE AGAINST THE DEBTOR, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

### B. Adequate Assurance Objection

Upon request by a Counterparty, the Debtor shall direct the Counterparty to Counsel to the Stalking Horse Bidder or Successful Bidder, as the case may be, for the purposes of demonstrating adequate assurance information of future performance by the Stalking Horse Bidder or Successful Bidder. At the Sale Hearing, the Stalking Horse Bidder or Successful Bidder may provide additional financial and commercial information to the extent required by the Bankruptcy Court to demonstrate adequate assurance information of future performance by the Stalking Horse Bidder or Successful Bidder.

Any objection to the proposed assumption or assignment of a Contract identified on **<u>Exhibit 1</u>** annexed hereto, the subject of which is the Stalking Horse Bidder's proposed form of adequate assurance of future performance with respect to such Contract (an "**Adequate Assurance Objection**"), must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **June 2, 2025, at 5:00 p.m. (prevailing Central Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE. THE SUCCESSFUL BIDDER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR UNEXPIRED LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(f)(2)(B), NOTWITHSTANDING ANYTHING TO THE**

CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT.

### C. Assumption/Assignment Objection

Any objection to the proposed assumption or assumption and assignment of a Contract identified on **Exhibit 1** annexed hereto (an "**Assumption/Assignment Objection**"), other than Cure Objections or Adequate Assurance Objections, must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **June 2, 2025, at 5:00 p.m. (prevailing Central Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ASSUMPTION /ASSIGNMENT OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE MOTION, THE SALE ORDER, THE TRANSACTION, OR THE DEBTOR'S CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER PURCHASE AGREEMENT EXECUTED BY THE DEBTOR AND A SUCCESSFUL BIDDER, INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

### D. Objection Notice Parties

The "**Objection Notice Parties**" as used herein means:

(i)     Robert E. Eggmann, Counsel for Debtor, 120 S. Central Ave., Suite 1800, St. Louis, MO 63150;

(ii)    the Office of the United States Trustee for the Eastern District of Missouri,111 South 10th Street Suite 6.353, St. Louis, MO 63102; and

(iii)   Paige K. Fronabarger, Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC 20036.

Debtor requests that if you have a Cure Objection, Adequate Assurance Objection, and/or Assumption/Assignment Objection, you contact the Debtor prior to **May 31, 2025 at 5:00 p.m. (prevailing Central Time)** to attempt to resolve such dispute consensually. The Debtor's contact for such matters is **Robert Eggmann, counsel for Debtor, at ree@carmodymacdonald.com**. If such dispute cannot be resolved consensually prior to **June 2, 2025, at 5:00 p.m. (prevailing Central Time)**, you must file and serve an objection by the deadlines set forth above and in accordance with the procedures set forth in this Notice to preserve your right to object.

### E.  Sale Hearing

A hearing to approve and authorize the sale of the Assets to the Successful Bidder (which may be the Stalking Horse Bidder) will be held before the Court on or before **June 9, 2025 at 10:00 a.m. (prevailing Central Time)**; provided, that the Debtor may reschedule or adjourn the Sale Hearing, in compliance with the applicable noticing requirements in the Bid Procedures. If a timely Cure Objection, Adequate Assurance Objection, or Assumption/ Assignment Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtor determines.

### <u>Additional Information</u>

Electronic copies of the Motion, the Bid Procedures Order, and the Bid Procedures, as well as all related exhibits, including the Stalking Horse Agreement and all other agreements filed with the Court, may be obtained free of charge from Debtor's proposed counsel at ree@carmodymacdonald.com.

### <u>Other</u>

The inclusion of any Contract on **<u>Exhibit 1</u>** shall not constitute or be deemed a determination or admission by the Debtor that a particular Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract ultimately will be assumed or assigned. All rights of the Debtor with respect thereto are reserved.

Notwithstanding the inclusion of any Contract on **<u>Exhibit 1</u>**, a Successful Bidder is not bound to accept assignment of any Contract.

In accordance with the terms of the Bid Procedures Order, the Debtor may until five (5) business days prior to entry of the order approving the Transaction, add or remove Contracts to the Proposed Assumed Contracts, by filing and serving upon the Counterparties to such Contracts a supplemental Assumption and Assignment Notice, which will be deemed to update any previously filed Assumption and Assignment Notice, including this Assumption and Assignment Notice. In addition, after the Transaction closes, the Debtor may continue adding Contracts to the Proposed Assumed Contracts, by filing and serving upon the Counterparties to such Contracts a supplemental Assumption and Assignment Notice.

## EXHIBIT 1 TO ASSUMPTION NOTICE

**(Contracts)**

1.     Lease Agreement dated July 27, 1983, by and between Raymond A. McNeely, as Lessor, and Double Helix Corporation, as Lessee, as amended by that Amendment and Extension of Lease Agreement Between Raymond A. McNeely and Double Helix Corporation dated February 7, 2003 for the certain real estate in Jefferson County, Missouri that serves as the location for Debtor's broadcast tower (the "Tower Site"), to wit:

> The Northwest Quarter of the Southwest Quarter of Section 35 Township, Range 5, East of the Fifth Principal Meridian, containing 40 acres, less and excepting therefrom 6 acres off the West side of the Northwest Quarter of the Southwest Quarter of said Section 35, in Jefferson County, Missouri.

2.     Standard Tower Access Lease Agreement dated November 16, 2016, by and between Brown Dog Networks, LLC, a limited liability corporation, as Lessee, and Double Helix Corporation, as Lessor, for dedicated interest services provided to the Tower Site.

## EXHIBIT 2 TO ASSUMPTION NOTICE

**(Cure Costs)**

None.

**EXHIBIT 3 TO BID PROCEDURES MOTION**

**(Transaction Notice)**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | In Proceedings Under Chapter 11 |
| | ) | Case No. 25-40745-659 |
| DOUBLE HELIX CORPORATION, | ) | Honorable Kathy A. Surratt-States |
| d/b/a KDHX COMMUNITY MEDIA, | ) | |
| | ) | |
| Debtor. | ) | Hearing Date:  June 9, 2025 |
| | ) | Hearing Time: 10:00 a.m. |
| | ) | Hearing Location: Courtroom 7 North |

**NOTICE OF THE SALE, BID PROCEDURES, AUCTION, AND SALE HEARING**

TO ALL PERSONS RECEIVING THIS NOTICE, PLEASE TAKE NOTICE OF THE FOLLOWING:

On March 10, 2025, Double Helix Corporation (the "**Debtor**"), debtor and debtor in possession, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**" or this "**Court**"). Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Debtor is a nonprofit Missouri corporation currently doing business as KDHX Community Media. Since 1987, Debtor has operated KDHX-FM radio station ("**KDHX**" or the "**Station**") as an independent, non-commercial, educational, listener-supported community radio broadcast station in St. Louis, Missouri. Debtor is seeking to sell substantially all of its business assets and operations, including an assignment of Debtor's interest in certain operating licenses issued by the Federal Communications Commission ("**FCC**") for used in conjunction with its operation of the Station (the "**FCC Licenses**") and a ground lease for its broadcast transmitter site (the "**Lease**"), but excluding any interest in the certain real estate where its business operations are located (the "**Real Estate**") (collectively, the "**Assets**"), as a going concern.

On April [*], 2025, Debtor filed its *Motion for Entry of Orders: (I) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (II) Granting Related Relief* [Doc. [*]] (the "**Motion**").

83

In the Motion, among other things, Debtor seeks an order of the Bankruptcy Court authorizing it to sell, pursuant to Bid Procedures set forth in **Exhibit A** hereto and incorporated herein by this reference, outside the ordinary course of business and free and clear of all liens, claims, encumbrances, and interests, all of Debtor's right, title and interest to substantially all of the Assets to the Successful Bidder(s)[10] and otherwise granting all necessary and appropriate related relief. A copy of the Motion, the proposed Bid Procedures Order identified below and other pleadings in the bankruptcy case can be obtained from upon reasonable written request from Debtor's bankruptcy counsel, Robert Eggmann, Esq. at Carmody MacDonald P.C.    at ree@carmodymacdonald.com.

A binding stalking horse bid ("**Stalking Horse Bid**") has been submitted by K-LOVE, Inc. (the "**Stalking Horse Bidder**"). The Stalking Horse Bidder has executed an Asset Purchase Agreement dated March 24, 2025 (the "**Stalking Horse Agreement**") (a true copy of which is attached to the proposed Bid Procedures Order as **Exhibit B**), for the purchase of substantially all of the Assets (the "**Stalking Horse Bid**"). The Stalking Horse Bid is subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Bid Procedures.

### The Sale Process

The Bid Procedures Order sets forth the following dates in connection with the transactions contemplated in the Motion:

| Event | Date and Time (if applicable) |
|---|---|
| Bid Deadline | **May 27, 2025 at 5:00 (prevailing Central Time)** |
| Auction (virtual) | **May 30, 2025 at 2:00 p.m. (prevailing Central Time)** |
| Sale Hearing Objection Deadline | **June 2, 2025 at 5:00 p.m. (prevailing Central Time)** |
| Sale Hearing | **June 9, 2025 at 10:00 a.m.** |

An initial hearing on the Motion, focusing on approval of the bid procedures and selection of any Stalking Horse Bidder, including any related Bid Protection, occurred on May 13, 2025. Thereafter, the Bankruptcy Court entered that certain *Order Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalkin g Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing* [Doc. [*]] ("**Bid Procedures Order**").

Pursuant to the Bid Procedures Order, if more than one Qualified Bid has been submitted for the Assets on or before **May 27, 2025 at 5:00 p.m.**, the Debtor will conduct an auction ("**Auction**") on **May 30, 2025, at 2:00 p.m. (prevailing Central Time)**, with respect to such Qualified Bids in order to determine the Successful Bid(s) to submit for approval by the Bankruptcy Court at the Final Hearing. Qualified Bidders seeking to participate as a bidder at the

---

[10] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion and the Bid Procedures.

Auction must comply with the Bid Procedures.

The Final Hearing on the Sale Motion shall be held on **June 9, 2025 at 10:00 a.m. (prevailing Central Time)**, in the Courtroom 7 North before the Honorable Kathy A. Surratt-States, United States Bankruptcy Judge, at the United States Bankruptcy Court, Eastern District of Missouri, 111 S 10th St, St. Louis, MO 63102.

### Additional Information Regarding Any Objection

Objections, if any, to all or any part of the Motion shall be filed on the docket of the Bankruptcy Court and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above: (a) counsel for Debtor, Robert E. Eggmann, Carmody MacDonald P.C., 120 S. Central Ave., Suite 1800, St. Louis, MO  63015; (b) the Office of the United States Trustee for the Eastern District of Missouri, 111 South 10th Street Suite 6.353, St. Louis, MO  63102; (c) Paige K. Fronabarger, Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC  20036.

Any person failing to timely file an objection to the Motion shall be barred from objecting to the Motion, including the sale of the Assets free and clear of any and all liens, claims, encumbrances, and interests and will be deemed to consent to the Transaction(s), including the sale of the Assets free and clear of any and all liens, claims, encumbrances, and interests.

### Reservation of Rights

Except as otherwise set forth herein and in the Bid Procedures, Debtor reserves the right to, in its reasonable business judgment, in a manner consistent with its fiduciary duties and applicable law to modify the Bid Procedures; waive terms and conditions set forth therein with respect to all Potential Bidders; extend the dates and deadlines set forth therein; announce at the Auction any modified or additional procedures for conducting the Auction; provided, that the Debtor shall not be authorized to make material modifications to the Bid Procedures without further order of the Court. Debtor may provide reasonable accommodations to any Potential Bidder(s) with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on the Debtor's business, in each case, to the extent not materially inconsistent with the Bid Procedures and the Bid Procedures Order. All parties reserve their rights to seek Bankruptcy Court relief with regard to the Auction, the Bid Procedures, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

**FAILURE TO ABIDE BY THE BID PROCEDURES, THE BID PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THIS CHAPTER 11 CASE MAY RESULT IN THE REJECTION OF YOUR BID. THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BID PROCEDURES ORDER BY THE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, THE SALE ORDER, THE PROPOSED TRANSACTION, OR THE DEBTOR'S CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER PURCHASE AGREEMENT EXECUTED BY THE DEBTOR AND A SUCCESSFUL BIDDER AS A RESULT OF THE AUCTION.**

<u>**EXHIBIT A TO TRANSACTION NOTICE**</u>

**(Bid Procedures)**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **In Proceedings Under Chapter 11** |
| | ) | **Case No. 25-40745-659** |
| **DOUBLE HELIX CORPORATION,** | ) | **Honorable Kathy A. Surratt-States** |
| **d/b/a KDHX COMMUNITY MEDIA,** | ) | |
| | ) | |
| Debtor. | ) | |

**BID PROCEDURES**

      **On March 10, 2025, Double Helix Corporation ("Debtor**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**"). Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

      The Debtor is seeking to sell substantially all of its non-real estate assets and operations and transfer and assign certain interests related to the operation of its business (collectively, the "**Assets**"). On May [*], 2025, the Bankruptcy Court entered an Order [Doc. [*]] (the "**Bid Procedures Order**"),[11] which, among other things, preliminarily approved these procedures (these "**Bid Procedures**") for the consideration of the highest or otherwise best offer or combination of offers to acquire the Assets on the terms and conditions set forth herein.

      K-LOVE, Inc. (the "**Stalking Horse Bidder**") has submitted a bid for the purchase of the Assets and has executed a certain Asset Purchase Agreement (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse Agreement**") dated March 24, 2025.[12] The Stalking Horse Agreement contemplates, pursuant to the terms and subject to the conditions contained therein, among other things, the sale of the Assets to the Stalking Horse Bidder for the purchase price equal to the sum of: (1) $4,350,000 (the "**Base Purchase Price**"), provided that should the Closing shall occur within six months after March 24, 2025 then the Base Purchase Price shall be increased to $4,850,000 (the "**First Early Closing Purchase Price**"), provided further that

---

[11] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion for Entry of Orders: (I) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (II) Granting Related Relief* [Doc. [*]] (the "**Bid Procedures Motion**") or the Bid Procedures Order, as applicable.

[12] A copy of the Stalking Horse Agreement is attached to the Bid Procedures Order as <u>**Exhibit B**</u>.

should the Closing occur between six and 12 months after March 24, 2025 then the Base Purchase Price shall be increased to $4,600,000 (the "**Second Early Closing Purchase Price**")); plus (2) a break-up fee of $350,000 plus expenses incurred by the Stalking Horse Bidder in connection with the DIP Facility not to exceed $300,000 (collectively, the "**Break Up Fee**"); plus (3) the repayment of any amounts outstanding as of Closing on the DIP Facility provided by the Stalking Horse Bidder to the Debtor (the "**DIP Repayment**"); plus (4) an initial overbid requirement of $650,000 over the Purchase Price proposed by Stalking Horse Bidder herein (the "**Initial Overbid**") (which can be either variable consistent with the Stalking Horse Bid or based solely on the First Early Closing Purchase Price (the "**Stalking Horse Bid**"). The Stalking Horse Bid sets the floor for the sale and is subject to higher or otherwise better offers submitted in accordance with the terms and conditions of these Bid Procedures.

These Bid Procedures describe, among other things: (i) the procedures for bidders to submit bids for the acquisition of the Assets, in whole or in part; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids; (iii) the process for negotiating the bids received; (iv) the conduct of the Auction if Qualified Bids are received; (v) the procedure for the selection of any Successful Bidder; and (vi) the process for Bankruptcy Court approval of a Transaction at the Sale Hearing (each as defined herein).

<u>**Summary of Important Dates**</u>

These Bid Procedures provide Qualified Bidders the opportunity to submit competing bids for all or any portion of the Asset, and to participate in an auction to be conducted by the Debtor (the "***Auction***").

The key dates for the sale process are set forth below. Such dates may be extended or otherwise modified by the Debtor by filing a notice of such extension or modification on the Court's docket; <u>provided</u> that any such extension or modification shall not by itself extend any milestone or deadline in the Stalking Horse Agreement:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order. | **May 13, 2025 at 10:00 a.m.  CT** |
| Deadline to submit written Bids. | **May 27, 2025 at 5:00 p.m. CT** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received. | **May 28, 2025** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid. | **May 28, 2025** |

| | |
|---|---|
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, virtually, via Zoom, pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction. | **May 30, 2025 at 2:00 p.m.   CT** |
| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and  assignment. | **June 2, 2025** |
| Deadline to file objections to Transaction(s). | **June 2, 2025** |
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place). | **June 3, 3025** |
| Sale Hearing. | **June 9, 2025 at 10:00 a.m.   CT** |

### **Property to Be Sold**

The Debtor seeks to sell all or substantially all of the Assets to a purchaser (each sale in furtherance of the same, a "**Transaction**").

### **Due Diligence**

The Debtor shall supply Potential Bidders with all material documents, including all documents provided to Stalking Horse Bidder, related to the Assets. To access the data, an interested party must submit to the Debtor or its advisors the following:

(A) an executed confidentiality agreement in form and substance that is customary and satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern); and

(B) sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has the financial wherewithal to consummate the applicable Transaction and (ii) intends to access the data for a purpose consistent with these Bid Procedures.

Each interested party that meets the above requirements to the satisfaction of the Debtor shall be a "**Potential Bidder**." As soon as practicable, the Debtor will provide each Potential Bidder access to the data; provided, that such access and the availability of additional due diligence will be terminated by the Debtor in its reasonable discretion at any time for any reason whatsoever, including if (i) a Potential Bidder does not become a Qualified Bidder, (ii) these Bid Procedures are terminated, or (iii) the Potential Bidder breaches any obligations under its confidentiality agreement or the Debtor becomes aware that information submitted by the Potential Bidder is inaccurate or misleading. The Debtor may restrict or limit the access of a Potential Bidder to the data if the Debtor determines, based on its reasonable business judgment, that certain information in the data is sensitive, proprietary, or otherwise not appropriate for disclosure to such Potential Bidder.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate the applicable Transaction.

Until the Bid Deadline, and except as otherwise provided herein, the Debtor will provide all Potential Bidders with reasonable access to the data and any additional information requested by Potential Bidders (subject to any restrictions pursuant to applicable law or these Bid Procedures) that the Debtor believes to be reasonable and appropriate under the circumstances.

Neither the Debtor nor any of its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (i) to any person or entity who (a) is not a Potential Bidder; (b) does not comply with the participation requirements set forth above; or (c) in the case of competitively sensitive information, is a competitor of the Debtor (except pursuant to "clean team" or other information sharing procedures satisfactory to the Debtor) and (ii) to the extent not permitted by law or contract.

## Bid Deadline

A Potential Bidder that desires to make a bid (a "**Bid**") for some or all of the Assets shall deliver written and electronic copies of its Bid, so as to be received no later than **May 27, 2025 at 5:00 p.m. (prevailing Central Time)** ("**Bid Deadline**"); provided, that the Debtor may extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders, without further order of the Bankruptcy Court.

The extension of the Bid Deadline hereunder shall not, by itself, result in an extension of any milestone or deadline under the Stalking Horse Agreement, as applicable. **The submission of a Bid by the Bid Deadline (as it may be extended in accordance with the foregoing) shall constitute a binding and irrevocable offer to acquire the Assets specified in such Bid.** Any party that does not submit a Bid by the Bid Deadline, unless permitted by Order of the Court will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in any Auction for the applicable Assets.

There may not be any communications between and amongst Potential Bidders regarding the Debtor unless the Debtor has previously authorized such communication in writing. The

Debtor reserves the right, in its reasonable business judgment to disqualify any Potential Bidders that have communications between and amongst one another.

Bids must be submitted by email to the following Debtor's representatives ("**Bid Notice Parties**"):

**Robert E. Eggmann, Esq.**
**Carmody MacDonald P.C.**
ree@carmodymacdonald.com

### Form and Content of Qualified Bids

A Bid must be received by the Bid Notice Parties by the Bid Deadline and contain a signed purchase agreement from a Potential Bidder that identifies the purchaser by its legal name and any other party that will be participating in the Transaction contemplated by the Bid. To constitute a "**Qualified Bid**" a Bid must include, at a minimum, the following:[13]

A.    <u>Proposed Purchase Agreement</u>. Each Bid must include, in both PDF and MS-WORD format, an executed purchase agreement ("**Form APA**") for the acquisition of all, some, or any one of the Assets, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement. A copy of the Form APA may be obtained upon reasonable written request from Debtor's counsel, Robert E. Eggmann at ree@carmodymacdonald.com.

B.    <u>Bid Requirements</u>. Each Bid must clearly set forth the following in writing in the Proposed Purchase Agreement, as applicable:

(i)  <u>Purchase Price; Initial Overbid</u>. The price ("**Purchase Price**") proposed to be paid for the specified Assets in U.S. Dollars. In addition, (a) a Bid must propose a Purchase Price equal to or greater than the sum of (1) the value of Stalking Horse Bid; (2) an initial overbid ("**Initial Overbid**"), consisting of the sum of the Break-Up Fee and an additional cash amount of not less than $300,000; and (3) the DIP Repayment.

(ii)    <u>Acquired Assets</u>. The Assets that the Potential Bidder seeks to acquire. For the avoidance of doubt, a Qualified Bid may seek to purchase less than all the Assets.

(iii)    <u>Excluded Assets</u>. The Assets that the Potential Bidder does not seek to acquire.

---

[13] Debtor may waive any of the following requirements for a Bid to constitute a Qualified Bid to the extent reasonably necessary to promote bids and a robust Auction so long as any such waiver is not materially inconsistent with these Bid Procedures. For the avoidance of any doubt, the Stalking Horse Bid is a Qualified Bid.

(iv)        Assumed Liabilities. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all the Debtor's liabilities.

(v)         Excluded Liabilities. The liabilities of the Debtor that the Potential Bidder does not seek to assume.

(vi)        Form of Consideration. Each Bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the Break-Up Fee and DIP Repayment.

C.        Unconditional Offer/No Financial Contingencies. A commitment that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such Bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).

D.        Proof of Financial Ability to Perform. Each Bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any executory contracts and unexpired leases (each a "**Contract**") that are assumed and assigned to such party, including an adequate assurance letter which the Debtor is authorized to share with applicable non-Debtor Contract counterparties (each a "**Counterparty**") if such Bid is determined to be the Successful Bid or Back-Up Bid. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Transaction in a timely manner.

E.        Designation of Contracts and Leases. Each Bid must identify with particularity each and every Contract, the assumption and assignment of which is contemplated by the applicable Transaction (collectively, "**Proposed Assumed Contracts**"); provided, that the Proposed Purchase Agreement may allow the Potential

Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to five (5) business days prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Transaction on substantially the terms included in the Stalking Horse Agreement; provided, further, that the Proposed Purchase Agreement may allow the Potential Bidder to add Contracts to the schedule of Proposed Assumed Contracts after the closing of the Transaction, if the Contract has not been previously rejected by the Debtor and is not an Excluded Asset (as defined in the Proposed Purchase Agreement), upon written notice to and consent of the Debtor. The Debtor shall provide notice to the applicable Counterparties of such removal and/or addition of such Counterparty's Contract and Lease as soon as reasonably practicable.

F.      Required Approvals. A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor (in consultation with the Consultation Parties). A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

G.      FCC Application and Consent to Assignment. Each Bid must acknowledge the Successful Bidder's obligation to execute, file, and diligently prosecute the appropriate application to the FCC (the "**FCC Assignment Application**") requesting the FCC's consent (the "**FCC Consent**") to the assignment from Debtor to Successful Bidder of the FCC Licenses held by the Station. The FCC Assignment Application shall be filed by the Successful Bidder on or before the later of: (i) ten (10) days after execution of an Asset Purchase Agreement, or (ii) five (5) days the date of entry of the final Sale Order.

H.      Disclosure of Identity and Corporate Authorization. Each Bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its Bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the Bid and these Bid Procedures.

92

I.      <u>Employee Obligations</u>. Each Bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "**Employee Obligations**").

J.      <u>No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts</u>. With the exception of the Stalking Horse Bid, each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

K.      <u>Disclosure of Connections</u>. Each Bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.

L.      <u>Joint Bids</u>. The Debtor will be authorized to approve joint Bids, including joint credit bids, in its reasonable discretion and upon consultation with the Committee and the SBA, on a case-by-case basis.

M.      <u>Representations and Warranties</u>. Each Bid must include the following representations and warranties:

    i.      a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;

    ii.      a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the Assets to be purchased and the liabilities to be assumed (as applicable), in making its Bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such Assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;

93

     iii.    a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable Assets;

     iv.    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

     v.    a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

     vi.    a statement that the Potential Bidder agrees to be bound by the terms of these Bid Procedures.

     N.    <u>Additional Requirements</u>. A Potential Bidder must also accompany its Bid with:

     i.    a good faith cash deposit in the amount of no less than ten percent (10%) of the cash portion of the Purchase Price (a "**Deposit**"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtor (the "**Escrow Agent**") pursuant to an escrow agreement to be entered into between a Debtor and the Escrow Agent; <u>provided</u>, that to the extent a Qualified Bidder increases the cash portion of the Purchase Price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased cash portion of the Purchase Price;

     ii.    the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wish to discuss the Bid submitted by the Potential Bidder;

     iii.    a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

     iv.    a detailed analysis of the value of any non-cash component of the Bid, if any, and back-up documentation to support such value.

### <u>Review of Bids; Designation and Notice of Qualified Bids</u>

Debtor, in consultation with its advisors, will evaluate all Bids that are timely submitted

94

and may engage in negotiations with Potential Bidders that submit Bids as the Debtor deems appropriate, in the exercise of its business judgment, based upon the Debtor's evaluation of each Bid. A Bid will not be a Qualified Bid if it is materially less favorable than the terms of the Stalking Horse Agreement.

The Debtor shall determine, in its reasonable judgment which of the Bids received by the Bid Deadline qualify as a "**Qualified Bid**" (each Potential Bidder that submits such a Qualified Bid, a "**Qualified Bidder**") and shall notify each Qualified Bidder of its status as a Qualified Bidder by **May 28, 2025 at 5:00 p.m. (prevailing Central Time)** (the "**Qualified Bid Deadline**"). The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid (including as may be modified in favor of the Debtor at the Auction (if any)) represents a Qualified Bid.

Without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price or otherwise improve the terms of its Qualified Bid during the period that such Qualified Bid remains binding as specified herein; provided, that any Qualified Bid may be improved at the Auction as set forth in these Bid Procedures. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such Bid such that it may be designated a Qualified Bid.

In evaluating the Bids, the Debtor may take into consideration the following non-exhaustive factors:

1. the amount and the form of consideration of the Purchase Price;

2. the Assets and liabilities included in or excluded from the Bid, including any Contracts or other liabilities proposed to be assumed;

3. the value to be provided to the Debtor under the Bid, including the net economic effect upon the Debtor's estate, taking into account any Stalking Horse Bidder's right to any Break-Up Fee;

4. any benefit to the Debtor's bankruptcy estate from any assumption or waiver of liabilities;

5. the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals, including FCC Consent;

6. the impact on trade creditors;

7. the impact on the Debtor's ability to confirm a chapter 11 plan; and

8. any other factors the Debtor may reasonably deem relevant consistent with its fiduciary duties.

On or before the Qualified Bid Deadline, the Debtor shall notify Qualified Bidders of (i) the Bids that the Debtor has determined to be Qualified Bids and (ii) the Bid(s) that the Debtor has determined to be the highest or otherwise best Qualified Bid(s) to serve as the baseline bid(s) at the Auction ("**Baseline Bid**"). For the avoidance of doubt, the Baseline Bid shall equal (or exceed) an amount equal to the value of the Stalking Horse Bid plus the Initial Overbid.

### Failure to Receive Qualified Bids Other Than Stalking Horse Bid

If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid) for the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall file a notice with the Bankruptcy Court by **May 28, 2025, at 5:00 p.m. (prevailing Central Time)** indicating that no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.

### Auction Procedures

If the Debtor receives one or more Qualified Bids (other than the Stalking Horse Bid) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will conduct the Auction on **May 30, 2025 beginning at 2:00 p.m. (prevailing Central Time) virtually, via Zoom, pursuant to procedures to be timely filed by the Debtor on the Bankruptcy Court's docket**, or such other date or at such other location as may be determined by the Debtor. Only Qualified Bidders, including the Stalking Horse Bidder, will be eligible to participate in the Auction, subject to such limitations as the Debtor may impose in good faith. In addition, only professionals and/or other representatives of the Debtor, Counsel for the Debtor, Qualified Bidders, and the United States Trustee shall be permitted to attend and observe the Auction. Further, any creditor of the Debtor may attend and observe the Auction; provided that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to proposed counsel for the Debtor via electronic mail at ree@carmodymacdonald.com; and further provided that Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction

Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with these Bid Procedures and the Bid Procedures Order that the Debtor reasonably determines to be appropriate to promote a competitive Auction. Any rules developed by the Debtor will provide that all Bids in the Auction will be made and received on an open basis, and all Qualified Bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder placing a Qualified Bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of a Qualified Bid submitted in response to any successive Bids made at the Auction will be disclosed to all other Qualified Bidders. Each Qualified Bidder will be permitted an amount of time that the Debtor reasonably determines to be an appropriate amount of time to respond to the

previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded.

At the Auction, Qualified Bidders (including the Stalking Horse Bidder) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the Purchase Price and terms proposed in the applicable bid and will proceed thereafter in minimum bid increments in an amount to be determined by Counsel for the Debtor (a "**Minimum Overbid Amount**"). The Debtor reserves the right to increase or decrease the Minimum Overbid Amount at any time during the Auction; provided however, that any initial overbid must be sufficient to satisfy the Break-Up Fee. If the Stalking Horse Bidder bids at the Auction for the applicable Assets that are the subject of its Stalking Horse Bid, such Stalking Horse Bidder will also be entitled to include the amount of the Break-Up Fee and any outstanding Stalking Horse DIP Credit in its bid, such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Break-Up Fee must exceed the most recent bid by at least the Minimum Overbid Amount.

At the Auction, the Debtor, in its reasonable business judgment, will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder). Debtor may adopt additional rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote the goals of maximizing the value of the Assets and provided that such rules are not inconsistent with these Bid Procedures.

Absent consent of the Debtor, pursuant to Sections 156 and 157 of the Bankruptcy Code, Potential Bidders and their representatives may not communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction. Each Potential Bidder participating in an Auction will be required to confirm in writing and on the record at an Auction that (i) it has not engaged in any collusion with respect to the submission of any Bid or the Auction and (ii) its Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified in such Bid if selected as the Successful Bidder.

All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients or parties necessary to place their Bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements.

The Debtor may, in the exercise of its reasonable business judgment, identify the highest or otherwise best Qualified Bid(s) for particular Assets as the successful bid(s) (each, a "**Successful Bid**" and, the bidder submitting such bid, a "**Successful Bidder**"). Debtor may also identify which Qualified Bid(s) constitute the next highest or otherwise best bid(s) and deem such next highest or otherwise best bid(s) each a back-up bid (such bid(s) shall each be a "**Back-Up Bid**" and, the bidder submitting such bid, a "**Back-Up Bidder**"). Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (i) the applicable outside date for consummation of the Transaction set forth in the Back-Up Bid, (ii) consummation of the Transaction with a Successful Bidder, and (iii) the release of such Back-Up Bid by the Debtor in writing (such date, the "**Back-Up Bid Expiration Date**"). If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid.

Within one (1) business day after the Auction, or at such later time agreed to by the Debtor in its reasonable business judgment, (i) the Successful Bidder(s) shall submit to the Debtor fully executed documentation memorializing the terms of the Successful Bid(s) and (ii) the Back-Up Bidder(s) shall submit to the Debtor execution versions of the documentation memorializing the terms of the Back-Up Bid(s). Neither a Successful Bid nor a Back-Up Bid may be assigned to any party without the consent of the Debtor.

At any time before entry of an order approving any Transaction, the Debtor reserves the right to and may reject the applicable Qualified Bid (other than the Stalking Horse Bid) if such Qualified Bid, in the Debtor's reasonable business judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bid Procedures, or the terms and conditions of the applicable Transaction; or (iii) contrary to the best interests of the Debtor and its estate.

## **Post-Auction Process**

No later than June 2, 2025, the Debtor shall file with the Bankruptcy Court a notice containing the results of the Auction (the "**Notice of Auction Results**") that includes (i) the identity of the Successful Bidder(s) and the Back-Up Bidder(s); (ii) adequate assurance of future performance information for the Successful Bidder (if different from Stalking Horse Bidder), (iii) schedule of Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known, (iv) identify any known proposed assignees of Proposed Assumed Contracts (if known and if different from the applicable Successful Bidder(s) or Back-Up Bidders(s)), and (v) set forth the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

Within seven (7) calendar days after the Auction, if one is held, the Debtor shall direct the Escrow Agent to return the Deposits of all bidders other than the Deposits of the Successful Bidder(s) and Back-Up Bidder(s); provided, for the avoidance of doubt, the return of the Escrow Amount (as defined in the Stalking Horse Agreement) shall be governed by the Stalking Horse Agreement and any applicable escrow agreement. Within five (5) calendar days after the Back-Up Bid Expiration Date, the Debtor shall direct the Escrow Agent to return the Deposit(s) of the Back-Up Bidder(s). Upon the authorized return of any such Deposits, the Bid associated therewith shall be deemed revoked and no longer enforceable.

Each Successful Bidder's Deposit shall be applied against the cash portion of the Purchase Price of such bidder's Successful Bid upon the consummation of a Transaction. In addition to the foregoing, the Deposit of any Qualified Bidder will be forfeited to the Debtor if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtor's written consent, during the time the Qualified Bid remains binding and irrevocable or (ii) except as provided herein, the Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate a Transaction in accordance with these Bid Procedures, which forfeiture will not limit any other rights and remedies of the Debtor.

## Notices Regarding Assumption and Assignment

Debtor shall provide all notices regarding the proposed assumption and assignment of Contracts in accordance with the Assumption and Assignment Procedures included in the Bid Procedures Order.

## Sale Objections and Hearing

At the hearing before the Bankruptcy Court, the Debtor will seek entry of an order approving and authorizing, among other things, the Transaction to the Successful Bidder(s) (the hearing, the "**Sale Hearing**"). The Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing; provided, that any such adjournment shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Credit Agreement. No further notice of any such adjournment or continuance will be required to be provided to any party.

The Debtor will seek entry of an order authorizing and approving, among other things, the applicable Transaction at the Sale Hearing to be held on **June 9, 2025, at 10:00 a.m.  (prevailing Central Time)**.

Objections to the Transaction, including any objection to the sale of any Assets free and clear of liens, claims, encumbrances, and other interests (each, a "**Sale Objection**"), shall (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, with the exception of the parties claims a lien in the Assets, provide proposed language that, if accepted and incorporated by the Debtor, would obviate such objection; (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri; (v) be filed with the Bankruptcy Court; and (vi) be served upon the Objection Notice Parties (as defined below) by **June 3, 2025, at 5:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**"); provided, that the Debtor may extend the applicable Sale Objection Deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Bankruptcy Court at the Sale Hearing.

To the extent a Sale Hearing is necessary and Sale Objections have been filed, each Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of its Successful Bid and the Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under the Proposed Assumed Contracts to be assumed and assigned as part of the applicable Sale Transaction.

Unless permitted by Order of the Court, any party who fails to file a Sale Objection with the Bankruptcy Court and serve it on the Objection Notice Parties (as defined herein) by the applicable Sale Objection Deadline will be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of a Transaction, including the transfer of Assets to such Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.

## Consent to Jurisdiction and
Authority as Condition to Bidding

All Potential Bidders (including any Stalking Horse Bidder and any credit bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court with respect to these Bid Procedures, the bid process, the Auction, any Transaction, the Sale Hearing, and the construction and enforcement of any agreement or any other document relating to a Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing; and (iii) consented to the entry of a final order or judgment in any way related to any of the foregoing if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## Noticing

Information that must be provided to the "**Objection Notice Parties**" under these Bid Procedures must be provided to each of the following parties:

(i)      Robert E. Eggmann, Counsel for Debtor, Carmody MacDonald, P.C., 120 S. Central Ave., Suite 1800, St. Louis, MO  63105;

(ii) Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO  63102; and

(iii) Paige K. Fronabarger**,** Counsel for the Stalking Horse Bidder, Wilkinson Barker Knauer LLP, 1800 M Street NW, Suite 800N, Washington, DC  20036.

## Reservation of Rights

The Debtor, in its reasonable business judgment, in a manner consistent with its fiduciary duties and applicable law reserves the right to: (i) modify these Bid Procedures; (ii) waive the terms and conditions set forth herein with respect to all Potential Bidders; (iii) extend the deadlines set forth herein; and (iv) announce at the Auction any modified or additional procedures for conducting the Auction. Nothing in these Bid Procedures shall obligate the Debtor to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

## Fiduciary Duties

Nothing in these Bid Procedures shall require the Debtor to take any action, or refrain from taking any action to the extent the Debtor determines that refraining from taking such action or taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.