# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| DOUBLE HELIX CORPORATION, | ) | Case No.: 25-40745 |
| d/b/a KDHX COMMUNITY MEDIA, | ) | |
| | ) | (re: Doc 49) |
| Debtor. | ) | |
| | ) | |

## AMENDED[1]  OBJECTION TO DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE NON-REAL ESTATE ASSETS OF THE DEBTOR AND FOR OTHER RELIEF

Stacy Bernard, et al. Jon Valley, and LOVE of KDHX, Inc. [2]  ("Objectors") object to

Debtor's Motion for An Order Authorizing the Sale of All or Substantially All of the Non-Real

Estate Assets of The Debtor And For Other Relief ("Motion"). Debtors' hurried Motion should

be denied (or delayed) for several straightforward reasons:

- Debtor's votes to authorize the proposed sale violate Missouri law and are void;

- There is no need to rush this sale pursuant to 11 U.S.C. § 363;

- It is impossible for any offer to purchase Debtor's license and tower to be the best offer, even if it is the highest, because any such sale will violate Debtor's essential purpose as a non-profit community radio station; and

- There is a feasible, well-funded alternative which will preserve the station and return it to its former charitable activities.

The attempted sale is tainted by significant misconduct, including unlawful votes and violations

of court orders. Under Debtor's By-Laws and intended structure, the organization's Associate

---

1 For the convenience of the Court and the parties, these Amended Objections incorporate and update Objectors' original objections filed on April 15, 2025, and include new material.

2  Stacy Bernard, James Bruce, Antonio Cabanellas, Ryan Cain, Courtney Dowdall, Keith Dudding, William Gelb, Frederick Gumaer, Lee Howland, Charles Jove, Rob Levy, Christopher Schwarz, Darren Snow, and Steve St. Cyr are Plaintiffs in *Bernard, et al. v. Double Helix Corp., et al.*, 2522-CC00192 (City of St. Louis Circuit Court). Jon Valley is a creditor. LOVE of KDHX, Inc. is a 501(c)(3) corporation devoted to the return of KDHX to its former activities.

Members have certain voting rights—certainly with respect to the sale of the KDHX license, which is an existential crisis. Numerous rules and procedures must be followed for such drastic action.

Debtor's siloed leadership minority wants to sell the license and keep the proceeds, but cannot "win" if it plays by the rules. There is overwhelming opposition to this attempted coup—both within the KDHX community and throughout the St. Louis region. And because leadership didn't have the votes, it broke the rules. As discussed fully below, Debtor has trampled on the rights of its members, who are permitted to vote and participate in governance. Debtor has ignored the mission and essential purpose of KDHX. It violated its own By-Laws (and admitted it). When the Associate Members filed suit in the Circuit Court and attempted—*successfully*—to enforce their voting rights and stop this madness, Debtor simply violated the court's orders, ignored the rules, and "voted" to sell the license anyway. Then it declared bankruptcy and seeks to avoid answering for its misconduct.

Fortunately, it does not have to be this way. Objectors urge the Court to allow time for consideration of a Plan of Reorganization which preserves the station because there is no valid business justification for a hurried Section 363 sale. When Debtor's Executive Director was deposed, she could not identify one. Overall, there is no need to hurry the sale of a rare, arguably priceless asset for almost $9 million, to satisfy under $2 million in creditor claims—especially considering Debtors' misconduct, violations of the law, and apparent willingness to end KDHX at all costs, and keep the massive proceeds.

KDHX is too important to throw away like this. It was built by almost four decades of volunteer commitment and community spirit. The community supported KDHX for decades—until opposing the current management for obvious reasons—and will do so again. Indeed, the opposition to this process is overwhelmingly one-sided. With that in mind, Objectors will be

2

presenting a plan that allows (1) creditor claims to be satisfied, while (2) preserving this cherished community asset, and proposing a carefully-crafted, feasible model for funding, stabilizing, and governing the organization going forward, and returning KDHX to its intended, essential purpose in the St. Louis community.

In further support of their Objections,3 Objectors state as follows:

## I. Debtor's Votes Authorizing the Proposed Sale Violate Missouri Law, Debtor's By-Laws, and the State Court Temporary Restraining Order

Debtor's attempted sale is tainted by significant misconduct, including unlawful votes and violations of court orders. The Bankruptcy Code requires Debtor to comply with "nonbankruptcy law applicable to the transfer of property by a debtor…." *See* 11 U.S.C. § 363(d)(1). Thus, Debtor is subject to the Missouri Nonprofit Corporation Act ("the Act") as well as its By-Laws. These authorities require Debtor to obtain approval of a proposed asset sale from both its Board and its membership class. Debtor failed to do so. Instead, Debtor simply eliminated its membership class unlawfully and scrambled to amend its By-Laws, to rig the vote. As explained below, Debtor repeatedly violated the Act, its own By-Laws, and unambiguous Temporary Restraining Orders issued by the Circuit Court. This misconduct continues a disturbing pattern of behavior by Debtor and its Board, as detailed in *Bernard, et al. v. Double Helix Corp., et al.*, Cause No. 2522-CC00192 (City of St. Louis Circuit Court) ("State Court case"). Inside and outside the courts, it has been well-documented.

For a nonprofit to sell assets outside the normal course of business, the Act requires approval from the "board" and the "members." RSMo § 355.656.2 ("the proposed transaction to be authorized must be approved…" by the Board and the Members). Accordingly, Article IX of

---

3 For the convenience of the Court and the parties, these Amended Objections incorporate and update Objectors' original objections filed on April 15, 2025, and include new material.

Debtor's By-Laws required votes from the Associate Member class and the Board to sell or lease assets ("Article IX Votes"). Exhibit 7 (By-Laws, Art. IX, § 1.B.). Debtor failed to properly obtain either of the required votes.

Regarding the Board vote, the By-Laws require two-thirds approval "of the Directors in office at the time of said vote." *Id.* With respect to the Associate Members, the By-Laws require two-thirds approval "by the members present at the meeting of the associate members." *Id.* Each vote requires a meeting. *Id.* Each vote requires notice of the meeting to all Directors and Members. *Id.* Without such notice or waiver, "no Action Affected by Article IX shall be valid." *Id.* at Art. IX, § 1.A. (titled "Notice of meetings where business includes Actions Affected by Article IX."). None of these provisions were respected and followed.

Debtor did not provide the required notice for either the Associate Members or the Directors. Debtor *did not even hold a meeting* for the Associate Members. It did not obtain waivers, did not allow all Directors to vote, and did not allow all Associate Members to vote. Each failure, independently, negates the attempted votes. Without the requisite votes, the Motion is not appropriately before the Court. The purported votes and sham procedures violated the Act, KDHX's By-Laws, and Temporary Restraining Orders. Debtor's rushed attempt to sell its FCC license and tower should be denied.

All of this is hard to believe, but it happened:

### 1. The Board Vote to Sell Violated the Act and the By-Laws

On March 3, 2025, the Board held an executive session meeting. The Board voted to "[a]uthorize the sale of the radio frequency" licensed by the FCC and voted to authorize the "bankruptcy filing for reorganization." Exhibit 1 (Board Minutes, March 3, 2025). The minutes show Director Courtney Dowdall was not in attendance. Director Dowdall was not given notice of this meeting, was unaware of this meeting, was not allowed to participate, and did not vote.

*Id.*; Exhibit 5 (Dowdall Decl.); (ECF Doc. 60-7).

The failure extends beyond Director Dowdall. In fact, Debtor has failed to produce any notice to any Director. Written notice was required at least seven days before the meeting (i.e., February 24 or earlier). Exhibit 7 (KDHX By-Laws), Art. IX, § 1.A. The notice must state the Board "may take Actions Affected by Article IX." *Id.* The notice "shall be provided … to each Director." *Id.* Notice cannot be waived except "in writing signed by such Director" or by attending the meeting. *Id.*, Art. III, § 5. Debtor failed to follow any of these required procedures.

Debtor informed this Court that Ms. Dowdall was a Director when the bankruptcy was filed on March 10. Doc. 68 at p. 47 of 50. However, Debtor somehow claims Dowdall was not a Director on March 3 when the Article IX vote took place. These positions and statements cannot be reconciled. Regardless, it is undisputed that Dowdall was a Director in February when notice was required. Dowdall ran for re-election to the Board in February 2025. Exhibit 5. Voting ended on February 25. *Id.* at ¶ 6. Dowdall won the election, but Debtor failed to inform her of her victory until March 26. *Id.* at ¶ 7. This conduct violated the Act, which provides a nonprofit director "continues to serve until the director's successor is elected, designated or appointed and qualifies…." RSMo § 355.331.4. Simply put, Director Dowdall's term did not end until her successor was elected. Because she won re-election, there was not a single day during which she was not a Director. *Id.*

Instead of honoring the election results, Debtor kept the results secret from the Associate Members who voted, appointed the losing candidate to a Board seat, did not inform the winning candidate of her victory for a month, and did not provide her notice of any meetings or votes. Exhibit 4 at 76:10-24; 78:8-79:4; 184:17-186:10; Ex. 5.

During its month of silence about the election, Debtor held the most important votes in its four-decade history with an incomplete and improperly constituted Board of Directors. Without

5

informing its members or Director Dowdall—much less allowing them to vote—Debtor held votes to sell assets and to file bankruptcy. These votes were invalid.

Debtor testified that Ms. Dowdall's board seat was simply vacant during the time the Board decided not to inform her of her February 25 re-election. Exhibit 4 at 78:8-79:4. Of course, failing to inform the election winner of the results does not somehow negate the election. Missouri law prevents such obvious gamesmanship. RSMo § 355.331.4.

Debtor schemed in advance to negate the election outcome. Ms. Dowdall defeated Ray Finney for her seat on the Board. However, Mr. Finney already was seated to the Board and participated in the Board votes while Ms. Dowdall was not given notice or an opportunity to participate. This is because on February 19—prior to the Board election—the Board preemptively appointed Mr. Finney to a new seat on the Board in the event he lost the election. *Id.* at 78:15-21; 184:17-186:10. By appointing Mr. Finney to a new seat and allowing him to vote on March 3, Debtor admits that it knew Ms. Dowdall won that election before March 3. However, Debtor prevented Ms. Dowdall from even knowing about the votes, much less participating. Debtor did not inform anyone of the votes until it asked this Court for authorization to sell assets.

## 2. The Associate Member Vote to Sell Violated the Act and the By-Laws

On March 4, 2025, the Associate Member class purportedly voted to sell assets pursuant to Article IX. Debtor admits this vote did not take place during a meeting (which is required, absent a formal, signed waiver). The apparent vote was by online ballot. Debtor did not notice the meeting, because the vote did not occur at a meeting. Debtor has not produced any notice or record of this vote, any waiver of the meeting requirement, or any evidence that the online ballots complied with any of the various applicable By-Laws (e.g., Doc. 60-2 at Art. II, § 2.F., 2.G., 2.J., 2.K., 2.N.1., 2.N.2., 2.N.3., Art. IX, § 1.A., 1.B.).

Article IX of the By-Laws requires votes to occur at meetings. *Id.* at Art. IX.A., IX.B. Debtor testified that it did not hold the required meeting for Associate Members to vote on a sale of assets. Exhibit 4 at 71:17-72:1. "Was [the vote] at a meeting?" "No." "Were you present?" "No. Well, it was not a meeting, so no one was present." *Id.* No notice of the meeting was given, because it was not a meeting. *Id.* at 73:8-11. It was done by electronic ballot on March 4, the day after the Board voted to sell assets and file bankruptcy. *Id.* at 107:11-16.

Debtor admits it did not provide notice of this vote to Ms. Dowdall. Exhibit 4 at 75:8-16. In fact, notice was not given to any of the members whose rights were protected by the TRO. Debtor's position is that only eight Associate Members existed on March 4—seven Directors and Ryan Spearman, the husband of Debtor's Executive Director Kelly Wells. Debtor's position is that Ms. Dowdall was terminated as an Associate Member, because her term as a Director ended. This is unlawful for several reasons. First, as noted above, Missouri law is clear that she was a Director. RSMo § 355.331.4. Therefore, even under Debtor's faulty logic, her status as an Associate Member was uninterrupted. Second, Debtor never terminated Ms. Dowdall pursuant to RSMo § 355.211. Debtor never informed Ms. Dowdall that her status as an Associate Member temporarily ended. Indeed, Debtor's most recent list of Associate Members from February includes Ms. Dowdall. Exhibit 2. The By-Laws are clear that Debtor "shall remove the name of each terminated Associate Member from the list of Associate Members to implement such termination." Doc. 60-2, Art. II, § 2.C.

Without question, Ms. Dowdall is an Associate Member. She is entitled to receive notice and to vote. The notice requirements are necessary to hold a valid vote. Doc. 60-2, Art. IX, § 1.A; RSMo § 355.251.1 ("A corporation shall give notice consistent with its bylaws … in a fair and reasonable manner."). KDHX's failure to follow the notice requirements are dispositive.

7

### 3.   The Associate Member Vote to Sell Violated the State Court's TRO

In the State Court case, Judge Moriarty granted Plaintiffs' motion for a TRO to preserve the status quo regarding plaintiffs' status as Associate Members of KDHX. Doc. 60-3. The TRO was unambiguous. "Defendants are hereby enjoined from terminating the membership of Plaintiffs and/or preventing Plaintiffs from participation in the annual meeting and election of board members on Tuesday, February 18, 2025." *Id.*

On March 4, the TRO was extended. Doc. 60-4. "Plaintiffs under Rule 92.02(a)(5) timely requested an extension of the temporary restraining order on March 4, 2025. It is hereby ordered and decreed that the temporary restraining order against Defendants shall be extended pursuant to Rule 92.02 for an additional fifteen (15) days from the date of this Order." *Id.*

Debtor violated the TRO when it attempted to hold an Associate Member Article IX vote on March 4. The TRO was in place when notice was required for the vote. The TRO was in place when the purported vote was held (without notice and without a meeting).

On May 5, Debtor's Board President, Mr. Pierson, testified before this Court and stated that he understood the TRO prevented Debtor from terminating anyone. Even though the Plaintiffs remained members due to the TRO, Debtor brazenly ignored the TRO by failing to include the Plaintiffs in the Associate Member vote to sell assets. There is no explaining this away or sugar-coating it—they just violated the State Court Orders.

As explained in detail in the Motion for Relief from the Stay (Doc. 60), the TRO pertains to a claim that Debtor and its Board violated RSMo § 355.211 when attempting to terminate nearly all Associate Members. On January 31, 2025, Debtor attempted a mass termination of its last remaining membership class. The mass termination was announced via email, without notice or process. Debtor did not provide any procedure for the termination, much less a procedure conducted in good faith as required by the Act. *See* RSMo § 355.211.

Debtor's motives were transparent then—and are even more so now. Debtor unlawfully eliminated its voting members, so it could obtain the required vote to sell the assets. Debtor admits it was required to obtain affirmative votes from both the Board of Directors and Associate Members in order to sell its FCC license. Exhibit 4 at 63:13-17. However, Debtor's Board knew it did not have the votes. In the Rule 2004 Examination, Debtor was asked, "Do you recall any conversation internally at KDHX where somebody expressed a concern that you couldn't get the associate member vote to approve a sale or lease of the license?" "There were those discussions" she answered. *Id.* at 65:12-20.

Given their inability to obtain the required vote, a handful of Board members decided to keep the Board's desire to sell the license a secret. Rather than explain their reasoning, attempt to change minds, and trying to obtain the required votes lawfully, they chose to simply terminate the voters, and essentially eliminate the Associate Member class. Unable to get the result it wanted lawfully, Debtor's management terminated nearly everyone except themselves (and, of course, the Executive Director's husband). This allowed a handful of Directors to control both arms of Debtor's governance structure and railroad the desired vote.

As a result of this transparent attempt to sidestep the Act and By-Laws, the members sought injunctive relief to preserve the status quo related to their membership. The court granted a TRO. The TRO prevented Debtor "from terminating the membership of plaintiffs." Ex. 60-3. Therefore, the plaintiffs remained members. As members, they have the right to vote on various matters—most importantly, on Article IX actions including the sale of assets. Despite the unambiguous order—which Pierson understood—Debtor disenfranchised its members and persisted with its scheme. Debtor's conduct violated the TRO, but Debtor filed its bankruptcy petition before the State Court ruled on the violations.

#### 4.   The Associate Member Vote Violated Debtor's Quorum Requirement

Debtor attempted to hold the Associate Member Article IX vote with only 8 members. This was unlawful for many reasons detailed above. It also violated the quorum requirement.

The 2021 By-Laws require a quorum of "17 members or 10% of the Associate Members in good standing (whichever is greater) …." Doc. 60-2 (Art. II, § 2.K.). With 8 or 9 members, Debtor's Associate Member class could not conduct any business or take votes. Without a quorum, Debtor could not obtain the required Article IX vote. After terminating almost all the Associate Members suddenly and in bad faith, leaving only 8 or 9 cronies to vote—the only thing Debtor needed was a quorum. To solve that problem, Debtor's Board of Directors simply attempted to amend the By-Laws to reduce the quorum requirement.

On January 30, 2025, the day before the mass termination, Debtor's Board attempted to pass a resolution changing the quorum to be "10% of the Associate Members in good standing…."   Exhibit 3 (January 30, 2025, Resolution). Again, this was all a scheme—given their plan to only have 8 or 9 members, the new 10% quorum requirement allowed one person to take action on behalf of the entire Associate Member class, which had numbered more than 100 dedicated volunteers for many years. Debtor admits that the Board attempted to change the quorum requirement, because terminating everyone except themselves would not allow them to meet the existing quorum requirement. Exhibit 4 at 89:3-25.

Once again, Debtor's scheme to manipulate the law failed. The By-Laws require "[a]n amendment or revision of the by-laws" to be approved at a "regular or special meeting." Doc. 60-2 (Art. IX). That did not occur, so the purported action was unlawful, for several reasons. First, the attempted amendment did not take place at a meeting. Debtor admits this dispositive failure. *Id.* at 85:14-86:14 ("So it was not a meeting? Correct."). Second, such a meeting would require notice. The attempted amendment was not accompanied by a notice to all Directors.

Third, "all Directors in office the time of said vote" are allowed to vote. *Id.* Again, Director Dowdall was in office on January 30, but was not given notice and did not participate in the vote. Until last week, this attempt to amend the By-Laws was kept secret by Debtor (despite the quorum issue being argued in the State Court case). Debtor admits that Director Dowdall did not participate in the resolution. *Id.* at 86:15-87:7.

The many violations of the By-Laws also violated the Act. *See* RSMo § 355.381 (unless the bylaws provide otherwise, actions may be taken without a meeting if taken "by all members of the board," signed by all members, and included in the minutes). First, amendments require a meeting so KDHX's attempt to invoke Section 355.381 would fail. Doc 60-2 (Art. IX). Second, "all members" did not take the action because Director Dowdall was excluded. Third, the members did not sign the resolution. Rather, it simply states "BEING ALL OF THE BOARD OF DIRECTORS" at the bottom without any signatures, and that statement is false. Dowdall was excluded and none of them actually signed it. Exhibit 4 at 86:15-87:7. Fourth, this resolution is not in the minutes of January 30—*because there was no meeting. Id.* at 85:14-86:14.

### 5. Debtor's Recent Misconduct is a Continuation of a Pattern

As detailed in the Motion for Relief from the Stay (Doc. 60), Debtor and its Board have taken many actions in recent years that violate the Act and the By-Laws. Debtor's misconduct includes terminating members in violation of the Act, terminating members in violation of the By-Laws, improperly amending the By-Laws, preventing fair elections, refusing to acknowledge election results, disenfranchising members, suspending a member for simply asking Debtor to provide documents required by the Act, and otherwise retaliating against those who disagreed or spoke out. Doc. 60 at ¶ 11, Ex. 1.

This misconduct is partially explained by Debtor's testimony that it should not necessarily follow its By-Laws or Articles of Incorporation. Debtor acknowledged that it is in Debtor's best

11

interests to follow Missouri law. Exhibit 4 at 24:25-25:2. However, Debtor also testified that it is not necessarily in its best interests to follow its By-Laws or Articles. *Id.* at 25:6-23. When asked if it was in Debtor's best interests to follow those legal documents, Debtor stated "those documents serve the organization, not the other way around. So if those documents are continuing to serve the organization and where it is, yes. If not, then not necessarily." *Id.* at 25:9-15.

While these objections focus on the Associate Member class, Debtor also had an Annual Member class comprised of those in the community who donated to KDHX. Debtor's Board decided to terminate the class devoted to its donors in 2018, and it did so without informing them or allowing them to vote. To terminate a membership class, the Act requires adoption of a resolution, then notice with an opportunity for written opposition, and then approval by a two-thirds vote of each class. RSMo § 355.611. Debtor did not follow any required step when terminating its donorship class. In the Rule 2004 Examination, Debtor admitted its violations. Q: "And do you remember KDHX changing its bylaws in 2018?" A: "Yes." Q: "Am I correct that the annual members and associate members did not vote on these bylaws changes?" A: "Correct." Exhibit 4 at 183:13-184:3.

All this misconduct is highly relevant to this bankruptcy. It culminated in a mass termination of nearly all voting members—the members whose volunteer work built this organization, and who stood in the way of Debtor's plan to end KDHX, as this community has known it for four decades. After the state court enjoined the termination of plaintiffs, Debtor proceeded to ignore the TRO and hold a vote to sell assets without the plaintiffs. The record confirms they will break the rules—or improperly re-write the rules—if needed. They will do anything to force this sale and keep the proceeds. And now, they are hoping the Bankruptcy Court excuses their rampant violations of the law. Debtors' antics are the latest in a pattern of

12

misconduct and bad faith, and the Motion should be denied on those grounds alone.

## II.    There is no need to rush this sale through pursuant to 11 U.S.C. § 363

### (a)    There is no valid business justification for the proposed sale

Debtor seeks an expedited sale under Section 363, but nothing justifies the rush. This is especially true considering the overwhelming public interest in preserving KDHX, and the overwhelming support for an alternative restructuring plan. Considering an alternative plan makes good sense. Again, there is no need to hurry the sale of a rare, arguably priceless asset (the KDHX license) for almost $9 million, to satisfy under $2 million in creditor claims—especially under these circumstances and considering Debtor's misconduct.

In *In re Gulf Coast Oil Corporation*, the court considered whether there was a "need for speed," *i.e.,* whether a proposed sale should occur through a Plan of Reorganization rather than a hurried Section 363 sale. Noting that a desire for speedy resolution can breed abuse, the Court explained such transactions—involving "crown jewel" assets—are subject to "special scrutiny." This is necessary because such a sale effectively replaces a Plan of Reorganization with a *sub rosa* Plan of Liquidation, without the protections afforded by the plan confirmation process. *See also In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990). The sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization *Id.* (citing *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.,* 77 B.R. 15, 17 (Bankr.E.D.Pa.1987).

With this in mind, the *Gulf Coast* court identified several key considerations, including the importance of the movant's fiduciary obligations and business justification for the transactions. *Id.* at 423. The court considered whether the case was sufficiently mature to assure due process, whether "crown jewel" assets were at stake, and whether the fiduciaries were truly disinterested, and who would benefit from the sale, whether the integrity of the bankruptcy

13

process was respected, and other factors. *Id.* at 423-428. Ultimately, the *Gulf Coast* court denied the request for a hurried Section 363 sale because there was no pressing, identifiable, significant need to sell prior to a plan confirmation hearing. *Id.* at 428.

Considering similar factors, the Court should do the same here. The Debtor has a fiduciary duty to its interest holders and to the stated purpose of the corporation and there is no valid business justification for a speedy sale. If there ever was any justification, it is now gone—after all, the Motion sought an expedited sale to K-LOVE, because K-LOVE demanded it in the proposed Asset Purchase Agreement (Article 2.1, requiring Debtor to file its sale motion within three days). In that agreement, K-LOVE linked the purchase price to how quickly the sale closed. Doc. 49-1 at § 1.4(a). However, now, K-LOVE is not the winning bidder for the assets, so Debtor is no longer controlled by K-LOVE's demands and or it's arbitrary, hurried deadlines.

The truth is, there is no valid business justification for this. At her deposition, Wells testified there were no reasons for the sale other than those set forth in paragraph 16 of her declaration. Exhibit 4 at 115:12-19. There, she stated she believed the assets (*i.e.* the license and tower) are at risk of deteriorating. Doc. 49 at p. 16, ¶ 16. Wells has no foundation for those statements. She has no expertise in asset valuation. Indeed, Wells testified that no documentation or written analysis supports the purported risk of deterioration. *Id.* at 32:15-33:7. When asked further about *why* Debtor is attempting to rush the sale, Wells offered nothing. She stated "it would be speculative on my part to try to answer your question." *Id.* at 110:11-17. She had no answer, because there is no good answer—and Debtor's testimony (or lack thereof) confirms there is no actual, valid business justification for the proposed sale.

Wells testified she did not know the number of specific days or months meant by Debtor's request to consummate the sale "quickly." *Id.* at 113:6-11. She was unsure what "best and highest offer" even means in her declaration. *Id.* at 111:8-12. Remarkably, she admitted

14

there is no risk to the license if this sale occurs next week or in eight months. *Id.* at 101:15-102:5. Overall, Debtor has produced no evidence supporting valid business judgment for this proposed sale—much less satisfying the "special scrutiny" required for an expedited Section 363 sale of all major assets. And when pressed, Wells admitted there is no valid business justification. She fabricated the "deterioration" claim in her Declaration—again, willing to do or say anything to railroad this transaction.

Of course, the assets are not at risk. An FCC license is an intangible asset with an indefinite life. There is a limited number of—and limited access to—such licenses. Here, the value is only increasing, as proven by the competing bids, which resulted in a prevailing bid of more than double the amount previously offered. The marketplace has spoken.

> **(b)     Debtor's misconduct, and the proposed sale, violates the nonprofit's mission, founding principles, and essential purpose**

When considering a sale of assets (especially of all assets) of a nonprofit debtor, the Court is required to take "applicable non-bankruptcy law" into account. 11 U.S.C. § 363(d)(1). The Court and other interested parties deserve an opportunity to examine whether Debtor violated Missouri law or breached its fiduciary duties. This is especially important here, considering the mountain of evidence showing Debtor's bad faith and disregard for the law, summarized above.

Section 363 does "not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan." *In re Gulf Coast*, 404 B.R. at 417 (internal citations omitted). Section 363 sales of substantially all assets are scrutinized "to assure that the interests of all parties in interest are protected and that the sale is not for an illegitimate purpose." *Id.* at 418 (citing *Collier on Bankruptcy*). Here, Debtor fails this test dramatically. As explained above, the interests of the

15

Associate Members and Director Dowdall have not been protected. They were shut out of this process, in violation of Missouri law and the Debtor's own By-Laws. This misconduct resulted in a Temporary Restraining Order entered against the Debtor—which the Debtor simply violated to present this proposed sale to the Court. Under these circumstances, the sale should be scrutinized carefully—not rushed.

Beyond that, Debtor's plan seeks to fundamentally alter—and essentially eradicate—KDHX, which was founded as an independent, community-driven terrestrial radio station. It is basic that a nonprofit must act in furtherance of the corporation's stated purpose. A nonprofit's officers and directors are charged with the fiduciary obligation to act in furtherance of the organization's charitable mission. *In re United Healthcare System, Inc.*, 1997 WL 176574, at *5 (D. N.J. Mar. 26, 1997); *see also Summers v. Cherokee Children & Family Servs*., 112 S.W.3d 486, 504 (Tenn. Ct. App. 2002) ("nonprofit directors must be 'principally concerned about the effective performance of the nonprofit's mission'"); *A Framework for L3C Fiduciary Duties & Accountability*, 35 Vt. L. Rev. 117 (2010) ("The clarity and certainty of purpose for exempt organizations focuses not on shareholder value but on faithfulness to the charitable exempt purposes as defined by law and declared by the organization, which helps distinguish these entities from for-profit operations."). !

KDHX was founded for a unique, specific purpose. Indeed, the Articles of Organization make clear Debtor's purpose is to operate a *broadcast* radio station. Exhibit 6 (KDHX Articles of Incorporation). Debtor's representative testified that this is a primary purpose of the Debtor and has been ever since its founding. Exhibit 4 at 13:3-24. She testified that community radio is important to "give voice to people who would not be heard in mainstream media" and to those "in underserved communities and underrepresented communities" and that Debtor's FCC license requires Debtor to provide such a platform. *Id.* at 21:11-23. Further, she testified that "when

16

making any decision, fiduciary or otherwise, we have a responsibility to take into consideration the mission of the organization, the values, and who we're serving when making those decisions." Exhibit 4 at 54:2-6. Until the recent shenanigans under Wells' leadership, KDHX acted consistently with this mission, for decades

In *In re HHH Choices Health Plan, LLC,* the Bankruptcy Court considered competing offers to purchase substantially all of a nonprofit debtor's assets. *See* 554 B.R. 697 (Bankr. S.D.N.Y. 2016). One plan would preserve the company although pay less to creditors; another offered more to creditors but did not preserve the company According to the Court, "fulfilling the corporate mission can be decisive if creditors are all being paid in full." *Id.* at 701. Ultimately, the Court chose to approve the proposal which was consistent with the mission of the company. *Id.* 713. Here, Objectors urge the Court to permit consideration of an alternative plan, that will provide the best of both worlds. As explained below, Objectors intend to submit a Plan of Reorganization, which also will (1) fully satisfy creditors, while also (2) preserving the stated purpose and character of KDHX.

## III.    There is a Superior Alternative to the Proposed Sale

There is widespread community opposition to the sale. It is opposed by civic leadership.[4] The LOVE of KDHX organization has worked tirelessly to assemble a broad, diverse coalition of leaders (the "Coalition") to organize community support, raise funds, and develop a plan for Debtor to retain its assets and preserve its essential purpose. There is a significant commitment to maintain KDHX as an independent, community-driven radio station, under management willing

---

4  For example, Mayor Cara Spencer stated "The value of KDHX to the St. Louis arts and small business community cannot be overstated…. The purpose of a Chapter 11 bankruptcy is to reorganize, not liquidate the primary asset of the organization. Without the radio license and tower, KDHX will be hard-pressed to achieve its stated non-for-profit purpose…." Exhibit 9.

and able to restore KDHX to its former self. People from diverse backgrounds—including several community and nonprofit leaders—have banded together for this Coalition. Fundraising is underway, and efforts have been successful so far.[5]  Funds are being raised from the general public, artists, underwriters and large donors. This makes sense because KDHX serves so many communities within or region. An alternative plan is available which preserves KDHX as it had been for 35 years. KDHX was community-supported for decades, before Debtor's leadership amended the By-Laws unlawfully, fired the DJs, eliminated the volunteers, took the music off the air, and attempted to railroad the sale of the license to a massive corporation. It can be made that way again.

Put another way, Debtor's financial crisis is recent, self-made, and can be resolved by renewing the community support that existed from KDHX's founding until 2023. Debtor's decisions in Fall 2023 to terminate popular volunteer DJs, retaliate against dissenters, and continue disenfranchising its membership class directly caused a steep decline in fundraising and community support. Debtor's financial statements clearly show the financial crisis coincided with the Board's recent misconduct. Debtor disputes the cause of the fundraising decline but does not dispute the correlation in timing. Exhibit 4 at 166:5-21. The community support for KDHX has always existed, and it stands ready to return. Content creators and on-air talent are ready to come back under new management. A Plan of Reorganization is being developed diligently, and with significant effort from a variety of stakeholders and supports.

At the June 9 hearing, Objectors will update the Court as to the Coalition's efforts, and the proposed Plan of Reorganization. Considering the time and effort required to react to the bankruptcy filing—*i.e.*, retaining and educating counsel, organizing the disparate groups, and

---

5  As just one example, LOVE of KDHX recently received a single donation of $200,000 to restore KDHX as the community asset it once was.

developing fundraising strategies, the results have been impressive. As an overview, the Plan will propose:

1. Administrative expenses paid within 30 days after entry of final confirmation order.

   a. Includes DIP loan and fees, Debtor legal fees, etc.

2. Creditors paid upon within 30 days after entry of final confirmation order, with interest from the date of filing.

3. Funds available to Reorganized Debtor to cover expenses while traditional sources of income continue to ramp up.

4. Funds available to Reorganized Debtor to cover repair expenses as needed.

5. Management to be replaced and By-Laws to be amended as needed.

   The Plan will be feasible because:

   a.      The Plan Proponent already will have a significant portion of the foregoing needs raised in cash.

   b.      It already will have significant underwriting commitments.

   c.      Additional funds will be available in the form of unconditional donations or loans.

   d.      Additional funds will be available in traditional pledges.

   **e.**      The station has a strong track record of income prior to the problems arising from firing the DJs and others, which was a unique, one-time event6.

---

6 The fourth quarter of the year is generally a strong fundraising quarter. Note how precipitously donations dropped off after the DJ terminations of September 2023. Donations dropped by more than 50%. Exhibit 8 (Debtor's Q4 Profit and Loss Statements for 2021-2024).
Q4 2021 giving - 294K
Q4 2022 giving - 247K
Q4 2023 giving - 93K
Q4 2024 giving - 125K

On May 5, 2025, Debtor's Board President, Gary Pierson, testified before this Court. On direct examination, Mr. Pierson stated Debtor would consider an exit plan that maintains the FCC license. Mr. Pierson's testimony calls for denying the Motion, and the Court should follow his lead. If a sale of assets ultimately occurs, it should occur after competing plans are presented to the Court. Debtor and the Court should have the opportunity to consider an exit plan that does not require selling Debtor's FCC license and abandoning its founding purpose.

## V.      CONCLUSION

There are many rock stations, talk stations, classical stations, religious stations and the like available in St. Louis. There is only one KDHX. For the many reasons discussed above, the Court should deny the Motion, terminate the Exclusivity Period of 11 U.S.C. § 1121(b) and set this matter for additional hearing in approximately 90 days, so the Coalition identified above can presented a final, fully-funded Alternative Restructuring Plan for consideration.

WHEREFORE, Objectors pray for an order of this Court denying the Motion, terminating the Exclusivity Period so that they may propose a Plan of Reorganization for this Court to consider, and for such additional relief as the Court deems proper.

ASKEW LAW LLC                          DANNA MCKITRICK, P.C.

BY: /s/Benjamin R. Askew              BY:/s/A. Thomas DeWoskin
Benjamin R. Askew, #58933MO            A. Thomas DeWoskin, #25320MO
4117 Olive Street                     7701 Forsyth Blvd., Suite 1200
St. Louis, MO 63108                   St. Louis, MO, 63105
(314) 566-4459                        (314) 726-1000/(314) 725-6592 fax
E-mail: askewlawllc@gmail.com          E-mail:  tdewoskin@dmfirm.com

**ATTORNEYS FOR OBJECTORS**


**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of June 2025, the foregoing was filed via the Court's electronic filing system, which sent electronic notification to all counsel of record.

/s/ A. Thomas DeWoskin

4926-3571-6679, v. 2