Page 1

1          UNITED STATES BANKRUPTCY COURT

           EASTERN DISTRICT OF MISSOURI

2                 EASTERN DIVISION

3     IN RE:

4     DOUBLE HELIX CORPORATION,

      D/B/A KDHX COMMUNITY MEDIA,

5

      Debtor.

6

                             Case No. 25-40745-659

7                            #53

8

9          DEPOSITION OF KELLY WELLS

           Taken on behalf of the Movant

10              April 9, 2025

11         Jo Ann Dickson, CCR 1085

12

13    (Whereupon, the deposition commenced at 10:25 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 4

Page 6

1              IT IS HEREBY STIPULATED AND AGREED, by and

2     between counsel for Movant and counsel for Debtor, that the

3     deposition of KELLY WELLS may be taken in shorthand by Jo

4     Ann Dickson, a certified shorthand reporter, and afterwards

5     transcribed into typewriting; and the signature of the

6     witness is expressly reserved.

7                             *  *  *  *  *

8                        KELLY WELLS,

9     of lawful age, being produced, sworn and examined on

10    behalf of the Movant, deposes and says:

11                        DIRECT EXAMINATION

12    BY MR. ASKEW:

13         Q     Good morning, Ms. Wells.

14         A     Good morning.

15         Q     We met.  My name is Ben Askew.  I represent

16    the movant in this matter.  Have you had your deposition

17    taken before?

18         A     One time, yes.

19         Q     Okay.  Was that -- what was that in relation

20    to?

21         A     It was in relation to a friend's divorce

22    hearing.  So not anything like this I'm assuming.

23         Q     So you've never testified on behalf of an

24    organization?

25         A     I have not.

Exhibit 4

Page 12

1      going to object.  Vague as to time.

2      BY MR. ASKEW:

3          Q   Over the past seven to ten years you said, do

4      you maintain your -- pursuant to that document retention

5      policy, do you --

6          A   Yes, pursuant to the document retention

7      policy, yes.

8          Q   Now, does that -- does the document retention

9      policy apply to your text messages?

10          A   I'm unsure.  I'm not sure if it does.

11          Q   Like, for example, you text with Gary Pierson

12      about KDHX things, right?

13          A   Yes.

14          Q   And have you deleted text messages with Gary

15      Pierson?

16          MR. SCHAEFFER:  Objection, vague as to time.

17      BY MR. ASKEW:

18          Q   In the past these years have you deleted your

19      text messages with Gary Pierson?

20          A   Not that I recall.  Not that I remember.

21          MR. ASKEW:  Okay.  I'll make a request to

22      counsel that I think it would be inappropriate to delete

23      text messages.  So hopefully we can have that understanding

24      with respect to document retention.

25          (Thereupon, Plaintiff Exhibit 2 was marked for

Exhibit 4

Page 13

1    identification.)

2    BY MR. ASKEW:

3         Q    Okay.  I'm marking Exhibit 2.  This is a

4    document beginning with Bates number 72, titled articles of

5    incorporation.  Do you recognize Exhibit 2?

6         A    I do.

7         Q    What is it?

8         A    The original articles of incorporation for

9    Double Helix Corporation.

10        Q    Do you see under Article 2 it lists the

11   purpose of the organization?

12        A    I do.

13        Q    And do you see first purpose is the

14   establishment and operation exclusively for educational

15   purposes of one or more noncommercial educational radio

16   broadcasting stations licensed by the Federal

17   Communications Commission.  Do you see that?

18        A    I do.

19        Q    Do you consider that a primary purpose of

20   KDHX?

21        A    Yes.

22        Q    And it has been ever since the corporation was

23   founded, correct?

24        A    Yes.

25        Q    And would going away from the -- an FCC

Exhibit 4

Page 14

1   licensed radio broadcast be a drastic change to the

2   organization?

3          A    It would be a change.

4          Q    Would it be a significant change?

5          A    Significant?

6          Q    Yes.

7          A    Yes.

8          Q    And if significant changes are being

9   considered to the nonprofit that would be contrary to its

10  nearly 40 year history, who should KDHX make aware of that

11  potential change?

12              MR. SCHAEFFER:  Just going to object to the

13  extent it calls for a legal conclusion and has no

14  foundation as far as legal documents.

15              THE WITNESS:  Obviously there are concentric

16  circles of people.  So staff, board members, volunteers.

17  And then on the outside circle, listeners.

18  BY MR. ASKEW:

19         Q    So if a change was being considered, a

20  significant change was being considered to the articles and

21  the purpose of KDHX, is it your testimony that the staff

22  and the board should know about that potential change?

23              MR. SCHAEFFER:  Same objection and vague.

24              THE WITNESS:  I think it depends on the

25  change.  And I think there -- there -- I think when

Exhibit 4

Page 20

1    don't know if the way I worded it would encompass both

2    class of members.  But I can amend the list.  Either way,

3    I'm just -- I'll make a note of it while we're thinking

4    about it.  Thank you.

5    BY MR. ASKEW:

6        Q    And you also ran the folk school?

7        A    I was the executive director of the folk

8    school.

9        Q    What years?

10       A    I believe it was January 2011 until the folk

11   school merged with KDHX in July 2012.

12       Q    What drew you into KDHX in 2008?

13       A    I knew of KDHX before I moved to Saint Louis.

14   And I grew up with community radio.  So it was natural for

15   me to seek it out when I moved to Saint Louis.

16       Q    And you moved to Saint Louis from the Denver

17   area in what year?

18       A    I moved to Saint Louis from Herman, Missouri.

19       Q    Oh.

20       A    Yeah.  In 2008.

21       Q    In 2008.  And prior to that you were in the

22   Denver area?

23       A    I was in the Boulder area, yeah.

24       Q    I'm just curious where you grew up with

25   community radio.

Exhibit 4

Page 21

1          A    Memphis and then New Orleans.

2          Q    Am I correct to assume that's where your love

3    of music comes from, you growing up in Memphis and New

4    Orleans?

5          A    I'd say it comes from my family more, but the

6    cities helped, yes.  It is a hotbed of music, for sure.

7          Q    So you have a love of music generally?

8          A    Yes.

9          Q    And you have a love of community radio also?

10         A    Yes.

11         Q    Why do you think community radio -- well, do

12   you consider KDHX to be community radio?

13         A    Yes.

14         Q    Why do you think community radio is important?

15         A    I believe platforms that give voice to people

16   who would not be heard in mainstream media are important.

17         Q    And the FCC license that KDHX currently has

18   allows a platform for voices that otherwise wouldn't be

19   heard on mainstream radio, correct?

20         A    It requires it.  Well, to put a finer point,

21   not that aren't heard in mainstream media, but that are

22   served in underserved communities and underrepresented

23   communities.

24         Q    And do you still feel that way?

25         A    What way?

Exhibit 4

Page 22

1          Q    About the importance of community radio.

2          A    I think platforms that do that are important,

3     yes.

4          Q    As executive director, is it your job -- is

5     part of your job to make decisions in the best interests of

6     the corporation?

7          A    Yes.

8          Q    What do you understand that phrase to mean,

9     best interests of the corporation?

10              MR. SCHAEFFER:  Just object to the extent it

11     calls for a legal conclusion.

12              You can answer it.

13              THE WITNESS:  I think when we say best

14     interests of the corporation, we have to look at the

15     corporation as a whole.  So to me that means setting aside

16     individual desires or ideas to serve the whole corporation.

17     BY MR. ASKEW:

18          Q    Nobody owns a nonprofit, correct?

19          A    Correct.

20          Q    It's run by, in this situation it's run by a

21     board of directors, an associate member class, and an

22     executive director, correct?

23          A    It's not run by the associate member class.

24     It's run by the staff and the board of directors.  So it

25     depends on your definition of run, but --

Exhibit 4

Page 23

1        Q    Right.  There's an associate member class that

2    has voting rights and statutory rights, correct?

3        A    Some, yes.

4        Q    But none of those people or groups own the

5    nonprofit, right?

6        A    Correct.

7        Q    So to make decisions in the best interests of

8    the corporation, your testimony is to set aside individual

9    desires, look to the corporation as a whole, and make

10   decisions that are in the best interests of the corporation

11   as a whole.  Do I understand that correctly?

12       A    Yes.

13       Q    Would it be in the best interests of KDHX to

14   not be in bankruptcy, have its financial problems solved

15   and maintain its valuable assets?

16            MR. SCHAEFFER:  Vague, compound, calls for

17   legal conclusion.

18            You can answer.

19            THE WITNESS:  I think that's an existential

20   question that can't be answered in a yes or no is what I

21   think.

22   BY MR. ASKEW:

23       Q    Why can't be that answered in a yes or no?

24       A    Because I think there are a lot of factors to,

25   when we say best interests, in what we're trying to

Exhibit 4

```
                                                    Page 24
 1    accomplish and who we're serving while doing it.
 2          Q    Nonprofit exists to serve the community,
 3    right?
 4          A    The nonprofit exists to build community
 5    through media.
 6          Q    So your last answer you said you have to look
 7    to who you're serving.  Who are you serving?  Who is KDHX
 8    serving?
 9          A    The people in the Saint Louis region and
10    beyond.
11          Q    Why do you say and beyond?
12          A    Because through our online streaming, we're
13    serving people all over the world.
14          Q    Is it in the best interests of KDHX to
15    maintain its FCC license if it could be financially stable
16    without selling it?
17               MR. SCHAEFFER:  Form, foundation.
18               You can answer.
19               THE WITNESS:  Not necessarily.
20    BY MR. ASKEW:
21          Q    Why not?
22          A    Because there are other ways to serve, and we
23    are already serving people all over the world through our
24    online stream.
25          Q    Is it in the best interests of the corporation
```

Exhibit 4

Page 25

1    to follow Missouri law?

2           A    Yes.

3                MR. SCHAEFFER:  Same objection.

4                THE WITNESS:  Yes.

5    BY MR. ASKEW:

6           Q    Is it in the best interests of the corporation

7    to follow its own bylaws?

8           A    Yes feels like a reductive answer, but, yes.

9           Q    Is it in the best interests of the

10   organization to follow its articles of incorporation?

11          A    In all of these scenarios I would say that

12   those documents serve the organization, not the other way

13   around.  So if those documents are continuing to serve the

14   organization and where it is, yes.  If not, then not

15   necessarily.

16          Q    That's your answer with respect to the

17   articles?

18          A    You asked about articles and bylaw kind of in

19   that same scenario.

20          Q    I asked about three things, statutory law,

21   bylaws and articles.

22          A    So my answer was in respect to bylaws and

23   articles.

24          Q    As executive director, do you have fiduciary

25   duties?

Exhibit 4

```
                                                    Page 26

1              A    Yes.

2              Q    And do the members of the board of directors

3      have fiduciary duties?

4              A    Yes.

5              Q    Does KDHX consider following statutory law to

6      be one of those fiduciary duties?

7                   MR. SCHAEFFER:  Object to the extent it's

8      vague, calls for a legal conclusion.

9                   You can answer.

10                  THE WITNESS:  Yes.

11     BY MR. ASKEW:

12             Q    Does KDHX consider following the bylaws to be

13     one of those fiduciary duties?

14             A    Bylaws don't always connect with fiduciary

15     duties.  So perhaps in some cases.

16             Q    Would that also be your answer for the

17     articles?

18             A    Yes.

19             Q    Would it be in the best interests of KDHX to

20     not have creditors?

21             A    Well, that depends.  Sometimes creditors are

22     appropriate.

23             Q    Would it be in the best interests of KDHX to

24     not be in bankruptcy?

25                  MR. SCHAEFFER:  Objection, foundation.
```

Exhibit 4

Page 27

1          You can answer.

2          THE WITNESS:  It depends on the scenario.

3     BY MR. ASKEW:

4          Q    Would it be in the best interests of KDHX to

5     not have financial problems?

6          MR. SCHAEFFER:  Objection, foundation, vague.

7          THE WITNESS:  Best interests is vague, and

8     that can mean different things.  So I think most

9     organizations would like to be financially healthy.

10    BY MR. ASKEW:

11         Q    Would KDHX prefer to be financially healthy?

12         MR. SCHAEFFER:  Vague.  Go ahead.

13         THE WITNESS:  Sure.

14    BY MR. ASKEW:

15         Q    Would it be in the best interests of KDHX to

16    be financially healthy and maintain its valuable assets?

17         MR. SCHAEFFER:  Compound, vague, foundation.

18         THE WITNESS:  It depends on the scenario, so

19    the answer can't be a yes or no on -- on its face.

20    BY MR. ASKEW:

21         Q    Under what circumstance would it not be in

22    KDHX's best interests to be financially healthy and be able

23    to maintain its valuable assets?

24         MR. SCHAEFFER:  I'm just going to say again

25    vague.  I can help.  Your context of best interests, you're

Exhibit 4

Page 31

1       Q     When?

2       A     I believe it was in July.

3       Q     Of 2024?

4       A     Of 2024.  And it was a -- it was a what

5    opportunities do we have conversation in different areas,

6    in fundraising, in programming, in the future.

7       Q     Was that conversation had because of financial

8    difficulty?

9       A     Yes.

10      Q     Do you remember any other board meeting prior

11   to July 2024 where the idea of selling the FCC license was

12   discussed?

13      A     No.  Again, going back to my previous answer

14   of it's always been out there as an option.

15      Q     You said you had no clear, concrete idea prior

16   to late 2024 as to the value of the FCC license.  Is that

17   right?

18      A     That's correct.

19      Q     Were you surprised to learn in late 2024 or

20   early 2025 that it could be worth over four

21   million-dollars?

22      A     No.

23      Q     Has KDHX done any analysis of the future value

24   of the FCC license?

25      A     We have not conducted an analysis on our own.

Exhibit 4

Page 32

1    We have been educated to market trends in the value of FCC

2    licenses.

3         Q     Who educated you about market trends?

4         A     Well, our FCC attorney, eventually in late

5    2024 our broker.  And then I'm in media, so there's a lot

6    of analysis being done out there about trends in radio.

7         Q     Do you know if the value of the FCC license

8    has increased or decreased since you became executive

9    director?

10        A     Well, since I didn't have a concrete idea of

11   of what it was before, I can't say with certainty.  What

12   the trends are showing is that every FCC license has

13   devalued in the time since I became executive director to

14   here.

15        Q     What did your broker tell you about the future

16   market trends on the value of the FCC license?

17        A     That it was trending down.

18        Q     Do you know why?

19        A     I think there a lot of factors.

20        Q     Who is your broker?

21        A     Greg Guy.

22        Q     Did Greg or his company give you a written

23   analysis of market trends?

24        A     He did not.

25        Q     Are you aware of any written analysis KDHX has

Exhibit 4

Page 33

1    regarding the FCC license value?

2            A    I am not.

3            Q    So is it correct that KDHX's understanding of

4    the value of the license is based on what Greg Guy told

5    you, what you've found on the internet, and what the FCC

6    attorney told you?

7            A    Yes.

8            Q    Why did KDHX in late 2024 pursue the option of

9    selling its FCC license?

10           A    It might be a strong word to say pursue at

11   that point.  We were exploring information so that we would

12   have the knowledge of the value of the license.  And that

13   was done both for financial reasons and the continuing

14   discussion around how KDHX as an organization shifts with

15   where people are getting and finding media.

16           Q    Do you know, do more people listen to

17   terrestrial radio or internet radio?

18           A    There are many studies out there.  You can

19   find different trends.  The general accepted idea right now

20   is that while more Americans may listen to radio than

21   digital radio, their time spent listening has greatly

22   decreased, especially younger demographics, but even up to

23   about age 65 are getting more and more of the majority of

24   their music from digital streaming services and listening

25   longer.

Exhibit 4

Page 34

1      Q    KDHX currently provides digital streaming

2    services, correct?

3      A    Correct.

4      Q    How long has KDHX done so?

5      A    I am unsure of the year.  I believe it was in

6    the early oughts.  Perhaps 2002, thereabouts.

7      Q    Does KDHX know how many listeners it gets

8    through streaming and how many listeners it gets through

9    FM?

10      A    Yes.  It's not a -- it's not a perfect system

11    the way ratings are done, but we can see who's clicking on

12    the life player on KDHX and how long they listen.  We can

13    see that from our online streams.

14      Q    Are there records showing this?

15      A    I'm unsure.

16      Q    Are there any -- is there any documentation

17    showing how many listeners you get on FM?

18      A    There are -- not currently.  We have

19    subscribed to Nielson ratings at various points over time.

20    They give an indicator of who's listening and how long.

21      Q    Have you ever compared the Nielson ratings to

22    your ability to click on something to see how many people

23    are online?

24      A    At points in time, yes.

25      Q    When is the last time you did that?

Exhibit 4

Page 53

1          Q     Sorry.  Here we go.  So I've turned Exhibit 6

2     to the page where the first full paragraph starts with

3     Wells said.

4          A     Huh-huh.

5          Q     Okay.  Will you read that paragraph to

6     yourself, please.  Do you remember saying that?

7          A     Not verbatim, no, but --

8          Q     Do you think it's generally accurate?

9          A     I don't know.  One would assume.

10          Q     Well --

11          A     I rarely think things that RFT says are

12     generally accurate quotes, but do I believe that, yes.

13          Q     So just for the record here, so you believe

14     that you and the board have a fiduciary duty, right?

15          A     Correct.

16          Q     And that you and the board have a higher duty,

17     which is the responsibility we have to live into the values

18     of this organization and to live into our mission and use

19     those values and mission, and the fact that we are here to

20     serve our entire listening audience as the foundation of

21     make decision.  So do you agree with that today?

22          A     Yes.

23          Q     And is that, aside from fiduciary duties, is

24     that higher duty what KDHX has in mind with this bankruptcy

25     process?

Exhibit 4

Page 54

1              MR. SCHAEFFER:  Form, vague, foundation.

2              THE WITNESS:  I think that when making any

3      decision, fiduciary, or otherwise, we have a responsibility

4      to take into consideration the mission of the organization,

5      the values, and who we're serving when making these

6      decisions.

7      BY MR. ASKEW:

8              Q    And do you feel like that -- what is the

9      mission?

10             A    It's already been stated.  The mission of KDHX

11     is to build community through media.

12             Q    And then you said values.  Do you think those

13     values are written down somewhere?

14             A    I know they're written down somewhere, yes.

15             Q    Where?

16             A    They're in our strategic plan.  They're on our

17     website.  They're in the corporate policy documents.

18             Q    I'm not asking for attorney/client privileged

19     information, but as the KDHX representative, what is

20     KDHX -- what is KDHX's overall goal with the bankruptcy

21     filing?

22             A    I would say it's two part.  The first goal is

23     the -- is the responsibility we have to creditors and to

24     pay them.  And then I think beyond that, it's the idea of

25     an ongoing, more sustainable and resilient organization

Exhibit 4

Page 55

1    that can continue to support the mission.

2         Q    Do you believe that second goal -- does KDHX

3    believe that second goal can be achieved without selling

4    the FM license?

5         A    Is it possible, yes.

6         Q    How so?

7         A    In the sense that if there is -- if KDHX is in

8    a position to be funded, self-funded, not as reliant on

9    government funding, foundation funding, grant funding, the

10   economy perhaps, then, yes, that goal could be

11   accomplished.

12        Q    I want to make sure I understood you

13   correctly.  I'm not trying to quote verbatim.  The record

14   will do that.  Is it your -- is it KDHX's testimony that

15   the goal of an ongoing sustainable resilient organization

16   can be achieved without selling the FCC license if KDHX can

17   have enough revenue to be financially healthy without

18   relying on grants, is that fair?

19        A    Well, grants was only one of the things I

20   mentioned.  I think that -- we think -- that the

21   organization thinks that a sustainable future looks like

22   not being dependent on ever changing financial and industry

23   scenarios.  So being self-funded does that.

24        Q    What do you -- as a nonprofit, what do you

25   mean by self-funded?

Exhibit 4

Page 60

1    could become self-funded.  I wasn't speaking about KDHX

2    looking to do that.  That was just examples in general.

3         Q    Well, your answer to my question about how can

4    KDHX achieve that goal without --

5         A    I see.

6         Q    -- without selling its FCC license --

7         A    Those are options that some nonprofits would

8    use, yes.

9         Q    What about  KDHX?  If KDHX can accomplish that

10   goal that you have without selling the FCC license, how can

11   KDHX go about accomplishing the goal to be self-funded?

12   What are its options?

13        A    I don't know of other options at this time.

14        Q    Others besides what?

15        A    Selling the license.

16        Q    Okay.  Well now I think we have two different

17   answers.  My prior question was, I asked you about the

18   goals of the bankruptcy.  Your answer was, number one,

19   responsibility to creditors.  And, number two, an ongoing

20   sustainable resilient organization.

21        A    Huh-hum.

22        Q    Yes?

23        A    Yes.

24        Q    And I asked can you achieve goal two without

25   selling the FCC license.  And you said yes.  And now I'm

Exhibit 4

Page 61

1    hearing you say no.  What is your answer?

2              MR. SCHAEFFER:  Hold on.  I just want to put

3    an objection on.  It's vague.  I think there's a confusion

4    as to the goal one doesn't exist, then you're only thinking

5    of goal two.  That's what I interpret all your last

6    questions relate to.  But goal one does exist.  So

7    objection.

8    BY MR. ASKEW:

9         Q    Right.  So okay.  I mean --

10        A    I know of no opportunities for KDHX in the

11   recent or current future that would allow us to accomplish

12   both of those goals outside of the bankruptcy filing.

13        Q    Outside of selling the FCC license?

14        A    Correct.  Sorry, yes.  That's a better way to

15   put it, I guess.  Both perhaps.  Actually -- well, let

16   me -- both.  The one allows us to do the other.

17        Q    The bankruptcy allows you to sell the FCC

18   license, is that what you're saying?

19        A    Not legally, but it allows us to pay creditors

20   while we're doing that, to go ahead and meet those

21   obligations to all of those folks.

22        Q    So is KDHX's testimony that the goal of the

23   bankruptcy is to pay off the creditors and sell the

24   license?

25              MR. SCHAEFFER:  Objection, asked and answered.

Exhibit 4

Page 62

1    You can answer it again.

2              THE WITNESS:  Yes.

3    BY MR. ASKEW:

4         Q    And has KDHX considered the possibility of

5    emerging from bankruptcy without selling the license?

6              MR. SCHAEFFER:  Again, excluding conversations

7    you've had with counsel.

8              THE WITNESS:  I don't have memory of a

9    conversation where that was specifically stated.

10   BY MR. ASKEW:

11        Q    If a proposal was made to KDHX that allowed

12   KDHX to pay off its creditors 100 percent and build an

13   ongoing sustainable, resilient organization, would KDHX

14   want to consider that offer if it did not include selling

15   the license?

16             MR. SCHAEFFER:  Form, speculation.

17             THE WITNESS:  That would certainly not be for

18   me to decide.

19   BY MR. ASKEW:

20        Q    I'm asking as KDHX.

21        A    I don't know.

22        Q    So as the KDHX representative today, am I

23   correct that you don't know whether KDHX would consider an

24   exit from bankruptcy that did not involve selling the

25   license?

Exhibit 4

```
                                                    Page 63
 1               MR. SCHAEFFER:  Form, incomplete hypothetical,
 2      speculation.
 3               THE WITNESS:  I do think that's a hypothetical
 4      that has not materialized, so it's difficult to know the
 5      answer to it.
 6      BY MR. ASKEW:
 7          Q    KDHX could have sold the license without
 8      filing bankruptcy, correct?
 9          A    Technically, yes.  Yeah.
10          Q    And, in fact, that was -- that idea was
11      attempted in late 2024, early 2025, correct?
12          A    Correct.
13          Q    And when that process was being explored and
14      then pursued, KDHX understood that in order to do that
15      private sale, it would require an affirmative vote from the
16      board of directors and from the associate members, correct?
17          A    Absolutely.
18          Q    When was the first time you recall a
19      discussion about those Article 9 votes?  Do you understand
20      what I mean by Article 9?
21          A    I do.
22          Q    That's Article 9, the bylaws that matches
23      Missouri statutory law requiring the votes we just
24      discussed, correct, so we're on the same page?
25               MR. SCHAEFFER:  Objection, legal conclusion,
```

Exhibit 4

Page 64

1    foundation.

2    BY MR. ASKEW:

3        Q    Well --

4        A    I don't know about matches Missouri law.

5        Q    Okay.  You don't know about Missouri law.  So

6    Article 9, is that the provision in the bylaws that

7    requires an affirmative vote from the board and from the

8    associate members in order to sell or lease assets?

9        A    That is correct.

10       Q    Okay.  So when is the first time that you

11   recall a discussion at KDHX about holding or obtaining

12   those Article 9 votes?

13       A    Well, do you mean recently?

14       Q    Well, yes, in the process of --

15       A    In the scope of --

16       Q    Yeah, let's be clear for the record.  In this

17   process of late 2024, early 2025 --

18       A    Right.

19       Q    -- we've talked about exploring and then

20   pursuing selling, selling the license, correct?

21       A    Right.

22       Q    In that time period, or even before then, in

23   2024, what's the first conversation you recall with,

24   internally at KDHX about those Article 9 votes?

25       A    I don't recall when conversations took place.

Exhibit 4

Page 70

1          Q    -- vote conversations.  Any changes to your

2     answer since the break and you've had time to think about

3     it?  Do you remember any more specifics about that issue?

4          A    I believe you asked me if I recall specific

5     conversations, so my answer remains the same.

6          Q    Do you remember anything about any

7     conversation?  I mean, I don't went to get technical about

8     it if you're reading into my question specific conversation

9     as a way to not answer it.  That's not what I'm trying to

10    do here.  I'm trying to ask you what you remember at all

11    about any of those conversations.

12         A    I don't believe my answer has changed.  We

13    were planning -- we knew associates needed to be a part of

14    Article 9.  So that was, that process was discussed along

15    the way with everything else.

16         Q    Did you ever participate in a predictive vote

17    count?

18         A    We did not.  I did not.

19         Q    Did you ever hear anyone say that based on

20    whatever the current associate membership class was at that

21    time, given the makeup of the class, that KDHX would have a

22    hard time getting the votes it wanted?

23         A    I did not ever hear that.

24         Q    So who -- you don't remember specifics of the

25    conversations, but who do you remember speaking with about

Exhibit 4

```
                                                    Page 71
 1     it, or overhearing speaking about it?

 2          A    I thought that was asked about it.  So we

 3     talked about board members --

 4          Q    Right.  Any specific board members that might

 5     know more than you?

 6          A    Not to my knowledge.

 7          Q    Are you aware of any conversations about this

 8     subject -- well, in order for me to see who was involved in

 9     those conversations that you recall, because you say they

10     happened at board meetings, am I correct that I could look

11     at these minutes, I could look at the minutes and to your

12     extent these would be the people that you know about?

13          A    Yes.

14          Q    And you don't remember any phone calls you had

15     about this topic?

16          A    Not specifically, no, I don't.

17          Q    Okay.  Was an associate member Article 9 vote

18     to sell assets ever held?

19          A    Yes.

20          Q    Okay.  On March 3rd?

21          A    It was a Tuesday.

22          Q    Okay.  Was it at a meeting?

23          A    No.

24          Q    Were you present?

25          A    No.  Well, it was not a meeting, so no one was
```

Exhibit 4

Page 72

1    present.

2         Q    Tell me what you know about the associate

3    member vote.

4         A    The process was guided by counsel.

5         Q    Which counsel?  Bankruptcy counsel?

6         A    Tueth Keeney counsel.  I'm trying to think

7    what I know about this vote.  I was not an associate

8    member.  I'm not an associate member.  So I was not

9    included in that vote.

10             So we forwarded the process that was outlined

11   for us by counsel because we were attempting at every turn

12   to follow the processes in the right way according to the

13   bylaws and any other thing that informed it.

14             If there were Missouri state statutes I'm not

15   sure because I wasn't involved in that.  But counsel then

16   guided us in the process.

17             MR. SCHAEFFER:  Draw a line right there.

18             THE WITNESS:  Okay.

19   BY MR. ASKEW:

20        Q    But an actual vote occurred?

21        A    Yes.

22        Q    And was it done by electronic ballot?

23        A    Yes.

24        Q    And was notice of that vote provided to the

25   associate members?

Exhibit 4

Page 73

1          A    Yes.

2          Q    How was notice provided?

3          A    Electronically.

4          Q    Prior to the vote?

5          A    Yes.

6          Q    Do you know how many days?

7          A    I do not.

8          Q    That email was not produced.  Will you please

9     produce that email notice of the associate meeting for

10    Article 9?

11         A    It was not a meeting.

12         Q    Email notice of the article 9 vote.

13              Do you know the result of the vote in terms of

14    how many votes and how they voted?

15         A    Yes.  The vote was unanimous.  I don't -- I

16    don't remember the exact number of votes.  It would have --

17    yeah, I don't.

18         Q    Well, we'll look at -- well, let's just look

19    at it now.  I'm marking Exhibit 7.  This is titled

20    February 1, 2025 associate members.

21              (Thereupon, Plaintiff Exhibit 7 was marked for

22    identification.)

23    BY MR. ASKEW:

24         Q    Are you familiar with Exhibit 7?

25         A    Yes.

Exhibit 4

```
                                                    Page 74
 1          Q    And is that a list of the -- is that a list of
 2     what KDHX thought was its associate members as of
 3     February 1?
 4          A    Yes.
 5          Q    And there's only nine people on it, right?
 6          A    Yes.
 7          Q    Okay.  So there's -- is this the universe of
 8     potential voters for the Article 9 associate member vote?
 9          A    It would have been on February 1st.
10          Q    Well, okay, yeah.  So, well, I don't see
11     another list after February 1st.  Is there a new list of
12     associate members?
13          A    Well, I believe -- I believe that there is,
14     after March 1st.
15          Q    I don't think that was produced.
16          A    Yeah, there's a chance that --
17          Q    Okay.  Who is on the -- what's the difference
18     between the March 1st list and the February 1st list of
19     associate members?
20          A    Courtney Dowdall's term had expired as a board
21     member as of February 31st -- February 28th.
22          Q    Okay.  So the March 1st associate member list
23     has eight people on it?
24          A    It would have been the list that would have
25     been run for the notice of the meeting.  I don't know if it
```

Exhibit 4

Page 75

1    is.  I don't know that it was run on March 1st, but if her

2    term ended on February 28th, we could then extrapolate that

3    was the list.

4         Q    So the list of people that voted on the

5    Article 9 associate member list would have been this list

6    minus Courtney Dowdall?

7         A    Correct.

8         Q    Is that because Courtney Dowdall was not given

9    notice of the Article 9 vote, correct?

10        A    Correct.

11        Q    And Courtney Dowdall was not given notice of

12   the board of directors vote to vote on the assets either,

13   correct?

14        A    I would assume so.

15        Q    You would assume she was not given notice?

16        A    Right.

17        Q    And Courtney Dowdall was not given notice of a

18   meeting about filing for bankruptcy either, was she?

19        A    I assume not.  She was -- I didn't notice

20   that.  So that's the reason why I'm hesitating because I

21   wouldn't have been the one.  So the current active board

22   members were given that one is my understanding because it

23   was a board meeting.

24        Q    On what is KDHX's basis for Courtney's

25   termination as a board member expiring on February 28th?

Exhibit 4

Page 76

1    A    Those terms are for one year and they happen

2    in February, so the end of the year is the end of February,

3    so.

4    Q    There was an election for that seat, correct?

5    A    Correct.

6    Q    And Courtney ran for reelection, correct?

7    A    Correct.

8    Q    That election ended on February 25th, correct?

9    A    That sounds right.

10    Q    And so on February 25th, KDHX knew how many

11    votes each candidate for that board meeting received?

12    A    The board evaluated those results at some

13    point in the future.  I guess in theory we would have known

14    on February 26th, but, yeah it wasn't evaluated on that

15    day.

16    Q    When was it evaluated?  When were the election

17    results first evaluated for the February board of director

18    election?

19    A    In March.  And I don't know the date.

20    Q    At a meeting?

21    A    At the board meeting.  At one of the closed

22    session board meetings.

23    Q    So that would be in the minutes, right?

24    A    Yes.

25    Q    Do you -- you attended every board meeting in

Exhibit 4

```
                                            Page 77
 1    2025, correct?

 2         A    I believe so, yes.  Every board meeting, yes,

 3    yes.

 4         Q    Do you remember conversations where a decision

 5    or an action to determine that Courtney's term expired and

 6    therefore she was no longer a director?

 7         A    There was a discussion.  There was a

 8    discussion about seating her and the results of the

 9    election, and I believe that included a discussion of

10    whether her term had expired or not.

11         Q    Even though that conversation happened in

12    March, the conversation in March was about whether her term

13    expired in February?

14         A    I don't know.  I don't know when that

15    conversation took place, honestly.

16         Q    We'll just -- we'll ask Mr. Pierson or go

17    through the minutes.  But speaking for KDHX, do you know

18    the basis on which KDHX made the decision that her term

19    expired on -- or that she no longer was a director as of

20    February 28th?

21         A    The board makes these decisions, so I'm not

22    trying to not speak on behalf of the organization, but

23    that's not something that I would be a decision maker on

24    and may not have been involved in all of those discussions.

25    I don't know.
```

Exhibit 4

Page 78

1           My understanding as the board terms ends, if

2      you were elected in March, your board terms ends in

3      February.  If you were appointed in April, your board term

4      ends at the end of March.  That's typically how it's been

5      done over the years in my experience.

6           Q    And have you ever seen a situation where --

7      well, strike that.

8           If Courtney's term expired on February 28th

9      and KDHX thinks she's no longer a director as of February

10     28th, was anybody in the board seat after February 28th or

11     in that director position after February 28?

12          A    No.

13          Q    So it was just empty?

14          A    Right.

15          Q    Ray Finney remained on the board, correct?

16          A    Correct.

17          Q    But was his term was also up on February 28?

18          A    Yes.

19          Q    But he was allowed -- he remained on the board

20     through a new -- in a new spot?

21          A    He was appointed to the board.

22          Q    Okay.  So on March 3rd when the vote to enter

23     bankruptcy occurred, KDHX, KDHX's understanding is that no

24     director was then in the seat previously occupied by

25     Courtney Dowdall?

Exhibit 4

```
                                               Page 79
```

1          A     Correct.

2          Q     And that's why it's KDHX didn't give Courtney

3     Dowdall notice?

4          A     Correct.

5          Q     Okay.  And then I think that you testified

6     earlier that KDHX thought her term ended as a director and

7     that she was automatically then terminated as an associate

8     member?

9          A     That would be my understanding, yes.

10          Q     Well, did she ever get notice that she was

11     terminated as an associate member?

12          A     I don't know.

13          Q     Well, you wouldn't be involved in sending out

14     that notice?

15          A     Not always.  I guess it depends.  Board seats

16     are a little bit different.

17          Q     Well, we're talking about an associate member.

18          A     Well, the only way to be an associate member

19     is to be a volunteer.  So if you're not an active

20     volunteer, you are not an associate member.  Those are one

21     in the same.

22          Q     So on March 3rd when the associate member

23     Article 9 vote was taken, your recollection is that the

24     associate member list all eight people at that time?

25          A     Correct.

Exhibit 4

```
                                              Page 80
 1              Q    Do you know if all eight people vote voted?
 2              A    They did.
 3              Q    Now, while we have Exhibit 7 in front of us,
 4    everyone on Exhibit 7 is a member is on the board of
 5    directors except Ryan Spearman, correct?
 6              A    Correct.
 7              Q    Okay.  So Ryan Spearmen is your husband,
 8    right?
 9              A    Yes.
10              Q    Whose decision was it that Ryan Spearmen was
11    able to remain as an associate member when the other 100
12    plus people were terminated?
13              A    His role was different than everyone else's.
14    So the volunteers that we parted ways with on January 31st
15    were all content producers, and Ryan was not a content
16    producer.
17              Q    So Ryan Spearman was the only content producer
18    beside members of the board of directors?
19              A    He was.
20              Q    When was a distinction made between content
21    producers and non-content producers?
22              A    That's always been a distinction.  Your
23    volunteer role at KDHX falls into categories, like content
24    producer, web developer, or software developer in Ryan's
25    case.  Sometimes we have had volunteers that were in the
```

Exhibit 4

                                                            Page 84

1      are purely conversational, exploratory research based.

2           Q    Just while I'm thinking about it, so for board

3      meetings you produced a lot of board minutes, and in those

4      minutes there will be reports, director reports, finance

5      reports?

6           A    Huh-hum.

7           Q    And other documents mentioned in the minutes.

8      Are those documents kept?

9           A    It would depend on what the documents were.

10     Not necessarily.

11          Q    So like if, for example, if like March 2020

12     meeting had a treasurer's report and a director's report,

13     would you be able to go back and find those?

14          A    Those are kept for a time if there was an

15     actual written report.  Sometimes those reports are verbal

16     and they're not written.

17          Q    So if I want to get all the materials from a

18     particular meeting, is there a place I would go to find

19     those?

20          A    For recent years.  But going back further,

21     those documents are not necessarily retained.

22          Q    So like for recent years could you go to your

23     computer and go to a particular month's meeting and click

24     on a folder and see?

25          A    Generally, yes.

Exhibit 4

```
                                                    Page 85
1           Q    Okay.  Have you used -- no, I'll strike that.

2                (Thereupon, Plaintiff Exhibit 8 was marked for

3      identification.)

4      BY MR. ASKEW:

5           Q    I'm handing you Exhibit 8.  Do you recognize

6      Exhibit 8?

7           A    Yes.

8           Q    What is it?

9           A    It is the current version of the Double Helix

10     Corporation bylaws.

11               (Thereupon, Plaintiff Exhibit 9 was marked for

12     identification.)

13     BY MR. ASKEW:

14          Q    I'll also hand you Exhibit 9.  Do you

15     recognize Exhibit 9?

16          A    I do.

17          Q    What is it?

18          A    It is a resolution of the Double Helix

19     Corporation.

20          Q    And that resolution was a resolution to change

21     the bylaws that are written as reflected within Exhibit 8,

22     correct?

23          A    Well, to change not the 2025 bylaws, yes, but

24     to update to Exhibit 8, yes.

25          Q    Yeah, the result of this resolution, Exhibit
```

Exhibit 4

```
                                                Page 86
 1     9, was Exhibit 8?

 2            A     Yes, correct.

 3            Q     And Exhibit 9 is dated January 30th, right?

 4            A     Correct.

 5            Q     And Exhibit 8 is dated January 30th, right?

 6            A     Correct.

 7            Q     Is January 30th, your understanding, the

 8     correct date of when this resolution was adopted?

 9            A     Yes.

10            Q     Did this happen at a board meeting?

11            A     I believe that this was a resolution by

12     electronic vote, email.

13            Q     So it was not a meeting?

14            A     Correct.

15            Q     At the bottom of Exhibit 9 it says being all

16     of the board of directors of the company.  What do you

17     understand that to mean?

18            A     What it says, being all of the board of

19     directors of the company.

20            Q     So was this resolution actually ever signed?

21            A     It was adopted over E-mail, so this is the

22     setting, yes.

23            Q     Okay.  So that all caps statement is

24     equivalent to the directors signing this resolution?

25            A     Correct.
```

Exhibit 4

1          Q    So when it says all, that means 100 percent of

2     the board of directors agreed to this resolution?

3          A    Yes.

4          Q    But as of this date, Courtney Dowdall was

5     still a director, right?

6          A    Courtney Dowdall was a suspended director, so

7     she was not an active board member.

8          Q    So because Courtney was suspended, she wasn't

9     given notice of any meetings and wasn't invited to any

10    meetings, correct?

11         A    That's correct.

12         Q    Why did KDHX change its bylaws to reduce the

13    quorum requirement from 17 people to 10 percent?

14              MR. SCHAEFFER:  Just quickly, again, to the

15    extent this is going to call for conversations with

16    counsel, I'll instruct you not to answer that.  But other

17    conversations you've had or as to the general idea, you can

18    answer that.

19              THE WITNESS:  My understanding of the general

20    idea is that the 17 members was an arbitrary number that

21    didn't align with Missouri state statutes.  So this quorum

22    is more in line with state statutes.

23    BY MR. ASKEW:

24         Q    Well, the very next day KDHX attempted to

25    terminate every associate member except the nine people we

Exhibit 4

Page 88

1     see on Exhibit 7, correct?

2          A    Yes.

3          Q    Okay.  So this resolution to reduce the quorum

4     requirement in KDHX, the very next day, all the people

5     would be let go except for these nine people, correct?

6          A    We knew we were going to have to let

7     volunteers go.

8          Q    If I was to compare the Exhibit 8 bylaws to

9     the 2021 bylaws, are there any other changes besides what

10    we see here on the resolution, or do you not know?

11         A    I believe there are not any other changes.  I

12    believe this was the only change.

13         Q    Now, if you'll turn to the last page of

14    Exhibit 8, there's signatures of Gary Pierson and Joan Bray

15    that were done electronically, correct?

16         A    Yes.

17         Q    And it says that the date on that says 20th of

18    January, 2025.  Do you see that?

19         A    That is a typo.

20         Q    That is a typo?

21         A    Yes.  Yes.

22         Q    So it's the 30th and you're sure it's a typo?

23         A    Yes.

24         Q    And when this resolution was adopted, KDHX

25    knew that it was reducing its membership class to under 17

Exhibit 4

Page 89

1    people, right?

2         A    Correct.

3         Q    So then that decision to terminate almost

4    everyone would be in contravention of the 2021 bylaws that

5    reduced the quorum requirement, right?

6              MR. SCHAEFFER:  Objection, foundation, form.

7              THE WITNESS:  I'm not sure what you're asking.

8    BY MR. ASKEW:

9         Q    Well, KDHX knew that the day after that

10   resolution they were going to terminate almost everybody,

11   right?

12        A    Yes.

13        Q    Okay.  And it also knew that the quorum of the

14   associate membership class was a minium of 17, and that

15   they were about to terminate so many people that the

16   membership class would be -- have only nine people, right?

17        A    Correct.

18        Q    So having only 9 people wasn't allowed by the

19   2021 bylaws, right?

20             MR. SCHAEFFER:  Same objections, vague.

21   BY MR. ASKEW:

22        Q    You couldn't meet quorum with only nine

23   people?

24        A    That is correct, we couldn't meet that part of

25   the quorum.

Exhibit 4

```
                                                     Page 90
 1          Q    So because the termination, the mass

 2     termination of everybody on January 31st was about to

 3     happen, and that was going to drop the associate membership

 4     class below 17 people, that is the reason why KDHX amended

 5     its bylaws on January 30th, right?

 6          A    We needed to have bylaws that served the

 7     organization where it was going to be, and if we weren't

 8     going to have 17 members, there wasn't anything -- it

 9     wasn't serving where the organization was.

10               (Thereupon, Plaintiff Exhibit 10 was marked

11     for identification.)

12     BY MR. ASKEW:

13          Q    I'm handing you Exhibit 10 which is the

14     associate member list from January 30th, 2025, correct?

15          A    Yes.

16          Q    Okay.  And this is the day before the

17     termination occurred, right?

18          A    Correct.

19          Q    Okay.

20               (Thereupon, Plaintiff Exhibit 11 was marked

21     for identification.)

22     BY MR. NIEHAUS:

23          Q    I'm handing you Exhibit 11.  Do you recognize

24     Exhibit 11?

25          A    I do.
```

Exhibit 4

Page 100

1    more months or six more months, it does not jeopardize your

2    license, correct?

3              A    That is my understanding.

4              MR. SCHAEFFER:  Hold on, form, foundation.  Go

5    ahead, you can answer now.

6              THE WITNESS:  That is my understanding.

7    BY MR. ASKEW:

8              Q    So maintaining the license and keeping it --

9    well, maintaining is the word used.  The speed at which the

10   bankruptcy process goes or the time in which it takes to

11   sell the license, does the amount of time that takes impact

12   whether KDHX can maintain its license?

13             MR. SCHAEFFER:  Form, speculation, foundation.

14   Go ahead.

15             THE WITNESS:  Can you reask your question?

16   BY MR. ASKEW:

17             Q    So next week KDHX is asking the court to

18   authorize the sale of the license, right?

19             A    Huh-hum.  Yes.  I apologize.  Yes.

20             Q    If that sale -- let's say that sale goes

21   through six months from now, and KDHX continues during that

22   six month period to air previously recorded content,

23   continuing to air previously recorded content does not

24   jeopardize maintaining the license, is that right?

25             MR. SCHAEFFER:  Same objection.

Exhibit 4

Page 101

1        Go ahead.

2        THE WITNESS:  That is my understanding.

3   BY MR. ASKEW:

4        Q    So maintaining the license is -- maintaining

5   the license is not relevant to asking the court to

6   authorize this sail next week, right?

7        MR. SCHAEFFER:  Same objection, form,

8   foundation, legal conclusion, speculation.  You can answer.

9        THE WITNESS:  I'm not sure I understand your

10  question.

11  BY MR. ASKEW:

12       Q    Yeah, I'm sorry.  You put in here -- this is a

13  motion to sell the license.

14       A    Correct.

15       Q    Do you have any idea what relevance

16  Paragraph 8 of your declaration has to asking the court to

17  sell the license next week?

18       MR. SCHAEFFER:  Same objections and vague.

19       THE WITNESS:  My understanding is that until a

20  sale is complete, KDHX is responsible for compliance with

21  the FCC, and to do that we need to have continual

22  programming.

23  BY MR. ASKEW:

24       Q    And whether the court approves the sale next

25  week or eight months from now, as far as you understand,

Exhibit 4

Page 102

1    KDHX during that time period can continue to air previously

2    recorded content without jeopardizing its license?

3             MR. SCHAEFFER:  Same objections.

4             THE WITNESS:  According to my understanding,

5    yes.

6    BY MR. ASKEW:

7        Q    Okay.  Paragraph 9, it starts with since the

8    onset of its financial difficulties.  When is that?

9        A    I interpret this as recent financial

10   difficulties.  But there's a chance this could be applied

11   for the history of KDHX.

12       Q    Well, these are your words, so --

13       A    I believe we're speaking about the recent

14   financial difficulties.

15       Q    Okay.  And what do you mean by recent

16   financial difficulties?  I mean, can you put a time period

17   on that or a particular event that occurred or a particular

18   profit and loss statement?

19            MR. SCHAEFFER:  You're talking about in the

20   context of 9?

21            MR. ASKEW:  Yes, that's what I'm trying to

22   understand.

23            THE WITNESS:  Towards the end of 2024, the

24   time period we spoke of earlier, yes.  So the latter half

25   of 2024.

Exhibit 4

Page 103

1    BY MR. ASKEW:

2        Q    Okay.  And then it says at the end, prior to

3    the petition date, debtor began actively marketing the

4    assets for a potential private sale.  Do you see that?

5        A    I do.

6        Q    When did KDHX begin actively marketing the

7    assets?

8            MR. SCHAEFFER:  Asked and answered.

9            THE WITNESS:  We talked about that earlier.

10   BY MR. ASKEW:

11       Q    Is that when we talked about hiring a broker

12   in late 2024?

13       A    Correct.

14       Q    And did you also answer already how KDHX

15   actively marketed?  Is there anything more you can say to

16   that?

17       A    I have nothing to add from what I said

18   previously.

19       Q    And do you have anything to add beyond what

20   you said previously about to whom KDHX marketed its assets

21   to?

22       A    I do not.

23       Q    Then Paragraph 10, do you know when KDHX

24   received an acquisition offer from K-LOVE?

25       A    It was in the latter part of 2024.

Exhibit 4

Page 99

1    working at KDHX.

2         Q    How did it -- why did it go away, because it

3    was sold or just because it expired, it wasn't sold?

4         A    My understanding is it was FCC repackaging of

5    how those licenses were offered, and it had to do with

6    cable companies.  That's my understanding.

7         Q    For purposes of your declaration, we're only

8    talking about one license, right?

9         A    Yes.

10        Q    In Paragraph 8, to maintain that license with

11   the FCC, KDHX must provide continuous on air programming

12   right?

13        A    Huh-hum.

14        Q    You're doing that currently through previously

15   recorded programming, right?

16        A    Correct.

17        Q    And that is permitted by FCC regulation as far

18   as you know?

19        A    It is.

20        Q    So during the pendency of this bankruptcy,

21   KDHX is airing previously recorded programming.  That's not

22   jeopardizing the license, is it?

23        A    Correct, it is not.

24        Q    So if the bankruptcy has -- if you continue to

25   air previously recorded content for two more months or four

Exhibit 4

Page 100

1    more months or six more months, it does not jeopardize your

2    license, correct?

3           A     That is my understanding.

4                 MR. SCHAEFFER:  Hold on, form, foundation.  Go

5    ahead, you can answer now.

6                 THE WITNESS:  That is my understanding.

7    BY MR. ASKEW:

8           Q     So maintaining the license and keeping it --

9    well, maintaining is the word used.  The speed at which the

10   bankruptcy process goes or the time in which it takes to

11   sell the license, does the amount of time that takes impact

12   whether KDHX can maintain its license?

13                MR. SCHAEFFER:  Form, speculation, foundation.

14   Go ahead.

15                THE WITNESS:  Can you reask your question?

16   BY MR. ASKEW:

17          Q     So next week KDHX is asking the court to

18   authorize the sale of the license, right?

19          A     Huh-hum.  Yes.  I apologize.  Yes.

20          Q     If that sale -- let's say that sale goes

21   through six months from now, and KDHX continues during that

22   six month period to air previously recorded content,

23   continuing to air previously recorded content does not

24   jeopardize maintaining the license, is that right?

25                MR. SCHAEFFER:  Same objection.

Exhibit 4

Page 101

1          Go ahead.

2          THE WITNESS:  That is my understanding.

3     BY MR. ASKEW:

4          Q    So maintaining the license is -- maintaining

5     the license is not relevant to asking the court to

6     authorize this sail next week, right?

7          MR. SCHAEFFER:  Same objection, form,

8     foundation, legal conclusion, speculation.  You can answer.

9          THE WITNESS:  I'm not sure I understand your

10    question.

11    BY MR. ASKEW:

12         Q    Yeah, I'm sorry.  You put in here -- this is a

13    motion to sell the license.

14         A    Correct.

15         Q    Do you have any idea what relevance

16    Paragraph 8 of your declaration has to asking the court to

17    sell the license next week?

18         MR. SCHAEFFER:  Same objections and vague.

19         THE WITNESS:  My understanding is that until a

20    sale is complete, KDHX is responsible for compliance with

21    the FCC, and to do that we need to have continual

22    programming.

23    BY MR. ASKEW:

24         Q    And whether the court approves the sale next

25    week or eight months from now, as far as you understand,

Exhibit 4

Page 102

1    KDHX during that time period can continue to air previously

2    recorded content without jeopardizing its license?

3                MR. SCHAEFFER:  Same objections.

4                THE WITNESS:  According to my understanding,

5    yes.

6    BY MR. ASKEW:

7        Q    Okay.  Paragraph 9, it starts with since the

8    onset of its financial difficulties.  When is that?

9        A    I interpret this as recent financial

10   difficulties.  But there's a chance this could be applied

11   for the history of KDHX.

12       Q    Well, these are your words, so --

13       A    I believe we're speaking about the recent

14   financial difficulties.

15       Q    Okay.  And what do you mean by recent

16   financial difficulties?  I mean, can you put a time period

17   on that or a particular event that occurred or a particular

18   profit and loss statement?

19                MR. SCHAEFFER:  You're talking about in the

20   context of 9?

21                MR. ASKEW:  Yes, that's what I'm trying to

22   understand.

23                THE WITNESS:  Towards the end of 2024, the

24   time period we spoke of earlier, yes.  So the latter half

25   of 2024.

Exhibit 4

Page 103

1    BY MR. ASKEW:

2         Q    Okay.  And then it says at the end, prior to

3    the petition date, debtor began actively marketing the

4    assets for a potential private sale.  Do you see that?

5         A    I do.

6         Q    When did KDHX begin actively marketing the

7    assets?

8              MR. SCHAEFFER:  Asked and answered.

9              THE WITNESS:  We talked about that earlier.

10   BY MR. ASKEW:

11        Q    Is that when we talked about hiring a broker

12   in late 2024?

13        A    Correct.

14        Q    And did you also answer already how KDHX

15   actively marketed?  Is there anything more you can say to

16   that?

17        A    I have nothing to add from what I said

18   previously.

19        Q    And do you have anything to add beyond what

20   you said previously about to whom KDHX marketed its assets

21   to?

22        A    I do not.

23        Q    Then Paragraph 10, do you know when KDHX

24   received an acquisition offer from K-LOVE?

25        A    It was in the latter part of 2024.

Exhibit 4

```
                                              Page 104

 1           Q    Can you be more specific?

 2           A    It was either November or December.

 3           Q    Do you know if KDHX received K-LOVE's offer

 4      before or after it received Joy's offer?

 5           A    I believe they were received at about the same

 6      time.  I don't know which came first.

 7           Q    Do you recall them both being negotiated at

 8      the same time?

 9           A    Yes.

10           Q    Am I correct that -- so Joy and -- Joy and

11      KDHX entered into a letter of intent, right?

12           A    Correct.

13           Q    And then that letter of intent was terminated?

14           A    Correct.

15           Q    Well, Paragraph 12 says that KDHX entered into

16      a letter of intent with K-LOVE, right?

17           A    Huh-huh.

18           Q    Do you know when?

19           A    Well, after the -- after the -- after the

20      previous letter of intent with Joy FM was --

21           Q    So Joy's letter of intent was terminated.

22           A    Right.  And then -- so the date of the LOI, I

23      do not remember that.  I'm sure it was -- I don't know the

24      date.

25           Q    But my question was just who came first.
```

Exhibit 4

Page 105

1        A    Oh.

2        Q    So Joy was first.  The signed LOI with Joy was

3    first.

4             Paragraph 11, Debtor's Board of Directors and

5    the Associate members voted to approve the proposed sale in

6    accordance with a vote that took place on March 3, 2025.

7        A    Yes.

8        Q    Okay.  And the associate member vote took

9    place by electronic ballot, right?

10       A    Correct.

11       Q    Did the board vote take place by electronic

12   ballot or at a meeting?

13       A    That's ridiculous that I can't specifically

14   remember.  I think it was electronic ballot, but I could be

15   wrong.

16       Q    I ask because Paragraph 11 just says that a

17   vote took place, so --

18       A    Yeah.

19       Q    Was it more than one vote?

20       A    There were two votes, one for the board of

21   directors and one for the associate members, yes.

22       Q    Even though they're identical with the

23   exception of Ryan Spearman, right?

24       A    You mean the list?

25       Q    The list.

Exhibit 4

Page 106

1          A    Yes.

2          Q    So, again, I don't see a notice of either

3     meeting or either vote on March 3rd.  Do you know if that

4     vote by either the board or the associate members was ever

5     planned to occur before March 3rd?

6          A    I'm not sure what you're asking.

7          Q    So on March 3rd those Article 9 votes took

8     place, right?

9          A    Right.  Right.

10         Q    Do you know if those votes were ever planned

11    to take place before March 3rd?

12         A    I don't know of a specific date.  And I

13    didn't -- if you mean a date, no.  We were always going to

14    have to take a vote of those two groups of people, but

15    there was no earlier date set that we didn't do or anything

16    like that.

17              MR. SCHAEFFER:  Ben, would you be in a

18    position to take a short break soon?

19              MR. ASKEW:  Yes.  Yeah, let's just take a

20    break now.

21              MR. SCHAEFFER:  Off the record.

22              (Thereupon, a recess was taken, after which

23    the following proceedings were had:)

24              MR. SCHAEFFER:  Ms. Wells wanted to clarify

25    something from her prior testimony that she learned over

Exhibit 4

Page 107

1    the break.

2                  THE WITNESS:  So you were asking about Number

3    11 here.

4    BY MR. ASKEW:

5          Q    Hold on.  You're talking about Exhibit 12,

6    your declaration?

7          A    Yes.

8          Q    Paragraph 11?

9          A    Yes.

10         Q    Okay.

11         A    Gary looked at his emails just now, which I

12   was not a part of, but the board of directors took a vote

13   in person at the meeting on March 3rd, and then the

14   associate member vote was the next day by electronic

15   ballot, the next day on the 4th.

16         Q    Thanks for that clarification.

17              Are you aware that in this bankruptcy process

18   KDHX has the opportunity to file a motion like this and try

19   to sell the assets early in the process or KDHX could wait

20   until the end of the bankruptcy process and perhaps assets

21   get sold at the end?  Are you aware of those options

22   generally?

23              MR. SCHAEFFER:  Yeah, vague, advice of

24   counsel.  But if you have a general understanding, you

25   can --

Exhibit 4

Page 108

1          THE WITNESS:  I'm generally aware that is

2     true.

3     BY MR. ASKEW:

4          Q    Okay.  Can you answer why KDHX took these

5     votes on March 3rd and 4th and is proceeding to try to sell

6     early in the process?  Can you answer that question without

7     divulging attorney/client privileged information?

8          MR. SCHAEFFER:  Thank you.

9          THE WITNESS:  You're asking if I know why

10    we're -- we're opting to sell early in the process?

11    BY MR. ASKEW:

12         Q    Yes.

13         MR. SCHAEFFER:  Can I just clarify something

14    for the record.  Bankruptcy hadn't been filed as of a

15    March 3rd, right?

16         THE WITNESS:  Correct.  So I feel like it was

17    a two part request here.  You're saying why the votes were

18    taken on this date or why -- I might have gotten confused.

19    BY MR. ASKEW:

20         Q    Well, okay, two questions.  First one, do you

21    know why these votes took place on March 3 and March 4 as

22    opposed to February or later in March?

23         A    I believe it had to do with when the filing of

24    the bankruptcy would take place and we wanted to have the

25    permissions in place to move forward with that around the

Exhibit 4

Page 109

1    sale if it was the best option to wrap the sale into that.

2         Q    Okay.  It's easy to see the benefit from

3    K-LOVE's point of view to buy the assets as early as

4    possible.  Why is it in KDHX's best interests to try to

5    sell the assets early?

6              MR. SCHAEFFER:  And, again, just for all these

7    line of questions, to the extent it involved your legal

8    strategies and discussions with counsel, I'll instruct you

9    not to answer.  If there's something independent of that,

10   go ahead.

11   BY MR. ASKEW:

12        Q    Is there a business reason related to the

13   timing of this motion?

14        A    My understanding is that -- well, we've

15   already talked about KDHX being at the end of our financial

16   runway.  So my understanding is that moving forward as

17   quickly as possible with the opportunity to have revenue

18   was important.

19        Q    Well, assume KDHX has financing referred to as

20   DIP financing or DIP loan, so KDHX can get its financing

21   through a DIP loan to continue operating, right?

22        A    Yes.

23        Q    So financing continued operations during the

24   bankruptcy doesn't seem like a reason to try to sell early.

25   Do you know -- you can disagree with me if you want.  Is

Exhibit 4

Page 110

1    it?

2                MR. SCHAEFFER:  I'm just going to object to

3    foundation and speculation to the extent -- and if you know

4    all this, feel free to say it, because I don't know what

5    you know on this issue, frankly.  The connection of the DIP

6    financing and the sale, your knowledge on that.  I'm just

7    objecting as potentially speculative, foundation, form.

8                THE WITNESS:  It most definitely would be

9    speculative on my part, those two being together.

10   BY MR. ASKEW:

11        Q    Is it speculation on your part testifying on

12   behalf of KDHX as to why KDHX is moving to sell early?

13               MR. SCHAEFFER:  Vague.  Asked and answered.

14               THE WITNESS:  I wasn't involved in the

15   discussion about when all these documents would be filed,

16   so it would be speculative on my part to try to answer your

17   question.

18   BY MR. ASKEW:

19        Q    Okay.  If you'll turn to the last page of your

20   declaration, Paragraph 14, the purchase price for the

21   proposed sale received by Debtor offers terms consistent

22   with what Debtor might expect to receive as fair and

23   equitable consideration for such assets, what is the basis

24   for that statement?

25        A    The basis for that statement is based on the

Exhibit 4

Page 111

1     offers we did receive.

2          Q     Based on the two offers?

3          A     Yes.

4          Q     Paragraph 16 you say it is your belief that

5     the current offer by K-LOVE represents the best and -- best

6     and highest offer for the purchase of assets, right?

7          A     Yes.

8          Q     Is there a difference from KDHX's perspective

9     between best and highest?

10         A     I'm unsure.  I guess to me it feels like they

11    go together here.  And it was the highest, so perhaps that

12    made it the best.

13         Q     Okay.  And you say there's substantial risk of

14    deterioration of the value of the acquired assets and the

15    FCC license if the sale is not consummated quickly.  What

16    is the risk of deterioration to the FCC license?

17         A     I believe this is referring to risk of

18    deterioration of the value.  Well, the deterioration of the

19    FCC license I believe is what we spoke about earlier, that

20    FCC licenses are losing value regularly, so.

21         Q     But what reason do you have reason to believe

22    that the FCC license will be worthless in six months than

23    it is today?

24         A     Yes.

25         Q     Based on what?

Exhibit 4

Page 112

1          A    Based on the answer I gave you earlier about

2     our broker's explanation to us of how FCC licenses are

3     valued and how those trends are going.

4          Q    And that was an oral conversation, correct?

5          A    Correct.

6          Q    Do you remember how much he estimated that the

7     license would go down in value in any period of time in the

8     future, three months, six months, two years?

9          A    We didn't speak about three or six months.  I

10    believe we did talk about two years.

11         Q    What did he say?

12         A    That it could potentially be worth half of

13    what it is worth now.

14         Q    Potentially?

15         A    Right.

16         Q    Did he give you a likelihood of that, a

17    percentage, chance?

18         A    He did not give a percentage chance.  I

19    believe he indicated it was highly likely.

20         Q    And that's the only time period you remember

21    him talking to you about that, is that correct?

22         A    Yes.  Well, there was a conversation that

23    said, you know, in 10 years this could potentially be what,

24    you know, how the whole industry goes, but it wasn't

25    specific to KDHX's license.

Exhibit 4

Page 113

1        Q    Okay.  So when he was talking about in two

2    years it could potentially be worth half, your broker was

3    specifically referring to KDHX's license?

4        A    My understanding of what he was referring to

5    is what he is seeing in the industry and our local market.

6        Q    But here in your declaration you're telling

7    the court that you believe that if the sale is not

8    consummated quickly, there's a risk of deterioration to the

9    license.  Do you know what you mean by quickly?

10       A    I don't know specific days or months that

11   constitutes quickly.  I mean, as quickly as possible.

12       Q    Do you know what -- well, is the FCC license

13   KDHX's most valuable asset?

14       A    Yes.

15       Q    Do you know what document would show or maybe,

16   you know, what percent of KDHX's assets is comprised by the

17   license?

18       A    I would have to estimate off the top of my

19   head.

20            MR. SCHAEFFER:  Speculation then.

21            Go ahead.

22            THE WITNESS:  60 to 75 percent.  And I guess

23   you're talking about the FCC license and not the other

24   assets along with it?

25

Exhibit 4

Page 114

1    BY MR. ASKEW:

2        Q    Right.  So we have an asset license.  You have

3    a purchase agreement to sell it for, you know, over four

4    million.  There's an offer from Joy to sell it for over

5    five million-dollars.  Let's say it's worth five

6    million-dollars.  What percentage of KDHX's assets does

7    that take up?

8            MR. SCHAEFFER:  Speculation.  Go ahead.

9            THE WITNESS:  The rest of our physical assets

10   I think total around maybe, I'm not sure, 2.5 million in

11   addition to that or --

12   BY MR. ASKEW:

13       Q    Well, what would we look to?

14       A    Probably the filings I would assume that list

15   what our assets are.

16       Q    Other than what's filed in the bankruptcy

17   court, are you aware of any corporate record that shows the

18   value of KDHX assets aside from the license?

19       A    They're assets listed in your annual audits.

20       Q    So look to those, look to the 990, look to the

21   P & L's or look to all the financial documents you

22   provided?

23       A    Huh-huh.

24       Q    Okay.  Paragraph 17 -- well, back to 16.  Is

25   there any other reason you have to give the court as to why

Exhibit 4

Page 115

1    you believe it is important for this sale to be consummated

2    quickly other than what's in your declaration?

3              MR. SCHAEFFER:  Can I clarify something,

4    before we were talking exclusively about the FCC license

5    and not the other assets.  Is this question pertaining to

6    both?

7              MR. ASKEW:  Yes.

8              MR. SCHAEFFER:  Okay.

9              THE WITNESS:  Will you restate your question,

10   please?

11   BY MR. ASKEW:

12        Q    So Paragraph 16 in your declaration gives your

13   belief regarding K-LOVE's offer and the reason why KDHX

14   wants the sale to be consummated quickly, correct?

15        A    Correct.

16        Q    Do you have any reason to give the court

17   beside what's in Paragraph 16 as to why KDHX believes this

18   sale should be consummated quickly?

19        A    No.

20        Q    Those are usual business reasons in Paragraph

21   16?

22        A    Correct.

23        Q    Paragraph 17, you say that the sale of all or

24   substantially all of KDHX's non-real estate assets as a

25   going concern to K-LOVE is in the best interests of KDHX,

Exhibit 4

Page 116

1    its creditors and other parties in interest.  Do you feel

2    like you've answered previously today, let me know -- why

3    do you believe it's in the best interests of KDHX?

4          A    It's in the best interests of KDHX to move

5    forward quickly, is that what you're asking?

6          Q    Well, I'm just -- just on your paragraph, why

7    is the sale of assets to K-LOVE in the best interests of

8    KDHX?

9          A    Because it both solves the financial issues

10   that we've outlined and can potentially allow the

11   organization to be sustainable in the future so that we can

12   continue our mission.

13         Q    And why is it in the best interests of

14   creditors to sell to K-LOVE?

15         A    So that they can be made whole and paid.

16         Q    Is there any benefit -- is there any benefit

17   to the creditors if they get paid through a sale to K-LOVE

18   or through a sale to Joy or to somebody else?

19         A    So we've stated here that K-LOVE's offer we

20   believe to be the best and highest.  If that is true, then

21   subsequently selling to them is in the best interests of

22   KDHX, its creditors and other parties of interest.

23         Q    But specifically with respect to the

24   creditors, is it in their best interests to sell to K-LOVE

25   so that they get paid in full?

Exhibit 4

```
                                                  Page 117
 1          A     Considering that we have agreements with

 2     K-LOVE, I would say yes.

 3          Q     I'm just wondering, these are your words and

 4     you're saying that you believe that selling to K-LOVE is in

 5     the best interests of creditors, and I understand that one

 6     reason is that they would get paid in full?

 7          A     Right.

 8          Q     Is there any -- I'm wondering why else you

 9     said this, if any reason.  Is there any reason for it to be

10     in the creditor's interest to sell to K-LOVE as opposed to

11     anyone else if they get paid in full?

12               MR. SCHAEFFER:  Asked and answered.

13               THE WITNESS:  If we have agreements with

14     K-LOVE that we feel are the best and highest offers, and we

15     are already entering in these agreements, it's in the best

16     interests of the creditors because they can get paid back

17     and paid back quickly, perhaps more quickly.

18     BY MR. ASKEW:

19          Q     What other parties in interest is this in the

20     best interests of?

21          A     I don't know that that's been defined by the

22     corporation.  So if I were to answer, I would say to the

23     people that KDHX has the opportunity to serve, that our

24     mission could be some of those parties in interest.

25          Q     Anyone else?
```

Page 118

1          A     I have nothing to add.

2               MR. ASKEW:  Did you mark when we were -- I'm

3     not keeping track of time.  Did you mark when we went back

4     on the record?

5               MR. SCHAEFFER:  I did.

6               MR. ASKEW:  Okay.  Thank you.

7               (Thereupon, Plaintiff Exhibit 13 was marked

8     for identification.)

9     BY MR. ASKEW:

10          Q     I'm handing you Exhibit 13.  This is the asset

11    purchase agreement with K-LOVE that KDHX filed.  Do you

12    recognize Exhibit 13?

13          A     I do.

14          Q     And have you read this in full?

15          A     I have.

16          Q     We spoke earlier about Joy.  You had a letter

17    of intent with them.  Was there of a draft asset purchase

18    treatment with Joy?

19          A     I believe so.

20          Q     Okay.

21               MR. SCHAEFFER:  Just to help you with

22    nomenclature, for someone who may not know what an asset

23    purchase agreement is as opposed to an LOI, you have all of

24    the drafts.

25               MR. ASKEW:  Okay.  Thanks.

Exhibit 4

```
                                                        Page 182
 1    when the items on here are paid, for instance, a bill I've
 2    noted that it's been paid, but so often the vendor payment
 3    sheet, that's what I would be working from.  I think you
 4    mentioned it earlier.
 5                (Thereupon, Plaintiff Exhibits 45 & r6 were
 6    marked for identification.)
 7    BY MR. ASKEW:
 8          Q    Right.  Now, I'll go ahead and mark both of
 9    them.  So we have 45 and 46.  I know that 46 is hard to
10    read, but did you help prepare these?
11          A    I believe this is the same, is it not, the
12    same thing?  Oh, it's -- oh, it's an extension of this.
13    Actually when this -- so this was my larger worksheet, and
14    then I was asked specifically about vendor payments by
15    Mr. DeWoskin.  So this is why this is segregated out, but
16    this is also included here.
17          Q    Okay.  Do you all still pay a PR firm?
18          A    We do.
19          Q    Why do you have a PR firm?
20          A    For public relations.
21          Q    Do you think that's a good use of -- well,
22    given your financial situation, do you think that's a good
23    use of your money?
24          A    Yes.
25          Q    I think I've seen -- I've seen an email to
```

Page 183

1    volunteers with an attachment press release that I think

2    was created by them.  Do you know what I'm talking

3    about?

4          A    They have helped us create various press

5    releases over the last two years.  Other attorneys have as

6    well.

7               (Thereupon, Plaintiff Exhibit 47 was marked

8    for identification.)

9    BY MR. ASKEW:

10          Q    Exhibit 47 are the minutes from 2/18 where

11   KDHX amended its bylaws.  Are you familiar with Exhibit 47?

12          A    Yes.

13          Q    And do you remember KDHX changing its bylaws

14   in 2018?

15          A    Yes.

16          Q    And the board voted on it.  Is that shown

17   here?

18          A    According to -- yes.

19          Q    The associate members do not vote on it,

20   correct?

21          A    No.

22          Q    And the annual members did not vote on it,

23   correct?

24          A    No.

25          Q    I just want to make sure we're on the same

Exhibit 4

Page 184

1   page.  Am I correct that the annual members and associate

2   members did not vote on these bylaw changes?

3          A    Correct.

4          Q    And in 2021 the bylaws were changed again,

5   correct?

6          A    Yes.

7          Q    And did the associate members vote on those

8   changes?

9          A    No.

10              (Thereupon, Plaintiff Exhibit 48 was marked

11   for identification.)

12   BY MR. ASKEW:

13          Q    Exhibit 48, these are, this is the executive

14   session minutes from February 19, 2025.  Are you familiar

15   with Exhibit 48?

16          A    Yes.

17          Q    So February 19th, that's the day after the

18   annual associate meeting occurred, correct?

19          A    Correct.

20          Q    And at that meeting one of the things that was

21   discussed was the board of directors election that the

22   court had ordered that the plaintiffs get to participate

23   in, correct?

24          A    Correct.

25          Q    And at this February 19th board meeting there

Exhibit 4

Page 185

1    was an action taken, the first action, motion to nominate

2    Ray Finney to be on the board election ballot or for

3    appointment to the board pending election outcome, do you

4    see that?

5              A    I do.

6              Q    Who wrote that?

7              A    It was the motion made verbally in the board

8    meeting that was then noted on the minutes.

9              Q    Who takes the minutes?

10             A    The secretary.

11             Q    Who is it?

12             A    Joan Bray.

13             Q    What does KDHX understand this action to be

14   saying?

15             A    That the board nominated Ray Finney to be on

16   the election ballot.

17             Q    Okay.  That's the first part.

18             A    And then to appoint him to the board.

19             Q    Pending election outcome?

20             A    Huh-hum.

21             Q    Yes?

22             A    Yes.

23             Q    What does that mean?  Does that mean that he's

24   going to be appointed to the board if he loses the

25   election?

Exhibit 4

Page 186

1          A     That could be interpreted that way, yes, I

2     assume.

3          Q     I want KDHX's interpretation.  What does it

4     mean that they took an action for appointment to the board

5     pending election outcome?

6          A     That Ray would move to a board appointed spot

7     instead of an associate election spot.

8          Q     So preliminarily it was decided if he lost the

9     election, he's appointed to the board anyway?

10         A     Yes.

11         Q     Have you ever done anything like that before?

12               MR. SCHAEFFER:  Objection, vague.

13    BY MR. ASKEW:

14         Q     Has KDHX ever appointed someone to be a board

15    member in case they lose an election?

16         A     I don't know.

17         Q     KDHX campaigned for Ray Finney in that

18    election, correct?

19         A     I don't know what you mean by KDHX or

20    campaigned.

21         Q     KDHX campaigned for Ray Finney in this

22    election, correct?

23               MR. SCHAEFFER:  Asked and answered.

24               THE WITNESS:  Define campaign and KDHX in

25    this.

Exhibit 4

Page 187

1     BY MR. ASKEW:

2          Q    For example, KDHX employees called volunteers

3     and texted them, emailed them, asking them to vote for Ray

4     Finney, correct?

5          A    Yes.

6          Q    That's campaigning, right?

7          A    I asked your definition, examples.

8          Q    Okay.  KDHX went around to all its associate

9     members that it could call and told them they should vote

10    for Ray, right?

11         A    I don't know that we -- that they said you

12    should vote for Ray.  I saw a couple of email messages

13    that said I would like you to consider Ray Finney, let me

14    tell you why I think why he's done a good job on the

15    board.

16         Q    Can you think of any other instances why KDHX

17    employees campaigned for a --

18         A    KDHX has very rarely had an nominee other than

19    someone that the board has nominated, so this is a unique

20    situation.

21         Q    Yeah, like in 2024 when there was only Caryn

22    Haddix was the only nominee on the ballot, right?

23         A    Right.

24         Q    That's because KDHX kicked everyone off the

25    ballot, correct?  The question is in 2024 for the election

Exhibit 4